UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. | ) ) ) ) ) ) |
| Defendants. | ) |

No. 1:11-cv-08808

Judge Steven C. Seeger

**ORAL ARGUMENT REQUESTED**

**DEFENDANT CAL-MAINE FOODS, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS AMENDED MOTION FOR**
**JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(a)**

## Introduction

Cal-Maine Foods, Inc. ("Cal-Maine") respectfully submits its amended motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure Rule 50(a). Cal-Maine incorporates by reference in their entirety the concurrently filed, revised Rule 50 motions and memoranda submitted by Defendants Rose Acre Farms ("Rose Acre"), United Egg Producers ("UEP") and United States Egg Marketers ("USEM"). For myriad reasons, the evidence that Plaintiffs provided to the jury was not legally sufficient to find in their favor in the liability or damages phase of this trial. The verdict on liability should be vacated, a directed verdict should be entered for Cal-Maine on damages, and judgment should be entered in Cal-Maine's favor.

## Legal Standard

"If a party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on a claim or defense that . . . under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2).

## Argument

**A.   There is No "Antitrust Injury" as a Matter of Law for Cal-Maine's Conduct *At Least* until August 2005.**

As a matter of law, Plaintiffs cannot prove injury attributable to any purported conduct by Cal-Maine—to competition generally or to themselves specifically—until

1

*at least* August 2005. Oct. 31, 2023 Trial Tr. 2712:20–2713:12, 2724:7–25 (Dr. Baye testifying there was no "statistically significant effect" between the time Certified Guidelines went into effect and July 2005). To get to the jury, Plaintiffs must satisfy a threshold burden to demonstrate antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993). Moreover, to satisfy their burden, Plaintiffs cannot solely rely on alleged increased prices[.]" *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (quotation omitted). "[P]rices can be increased in the course of promoting procompetitive effects." *Id.* at 895–96.

Plaintiffs' proffered economics expert, Dr. Baye, found "no statistically significant" effect (or no effect at all) from *any* measure prior to August 2005. Oct. 31, 2023 Trial Tr. 2712:20–2713:12, 2724:7–25 (testifying that he found no "statistically significant effect" between the time the Certified Guidelines went into effect and July 2005); *see also infra*, Sec. B. Plaintiffs' failure to establish injury before August 2005 precludes any claim against Cal-Maine between October 2004-August 2005.

**B.    No Short-Term Recommendation or USEM Export Adversely Affected Competition or Resulted in Antitrust Injury as a Matter of Law.**

This Court determined that short-term recommendations (*i.e.*, early molts and slaughters) and exports through USEM are properly assessed under a Rule of Reason. *See* Dkt. #561; *see generally* Nov. 21 Trial Tr. 6596–657. Plaintiffs' claim of injury based on these two "legs of the stool" fails as a matter of law because Plaintiffs failed

to adduce any evidence of significant anticompetitive effect or sustained antitrust injury directly linked to these measures. *Greater Rockford Energy*, 998 F.2d at 395; *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Assoc.*, 672 F.2d 1280, 1288–89 (7th Cir. 1982); *see also Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998). Plaintiffs argue that the failure of proof is one of damages (*see, e.g.*, Nov. 28, 2023 Trial Tr. 6721:16–6722:2), but that is incorrect. Without evidence of significant anticompetitive effect or sustained antitrust injury, Plaintiffs failed to meet their burden to get to the jury on *liability*. *See Greater Rockford Energy*, 998 F.2d at 395.

***Short-Term Recommendations***. Plaintiffs' proffered economic expert Dr. Baye admits that early molts and slaughters were sporadic, and their economic impact (*i.e.*, antitrust injury) was not, in fact, sustained. Oct. 30, 2023 Trial Tr. 2567:6–16 (testifying that "killing birds" is not a "sustainable way to raises prices"); Oct. 31, 2023 Trial Tr. 2690:11–2691:12, 2819:2–12 (testifying that he could not quantify or measure the impact of molts and slaughters on price); 2805:19–2806:5; 2806:17–23; 2808:3–18; 2811:12–18, 2815:9–16 (testifying that he could not tell if a molt or slaughter had any economic impact "with a degree of scientific certainty"). Plaintiffs cannot demonstrate these activities caused significant anticompetitive effect as would be necessary to avoid a directed verdict on this issue. *Phil Tolkan Datsun, Inc.*, 672 F.2d at 1288–89. Dr. Baye's testimony was consistent with the fact witness testimony of Jeffrey Armstrong, Dolph Baker, and Greg Hurd.

***USEM Exports.*** Dr. Baye also testified to the lack of sustained anticompetitive

3

effect of the USEM exports. Oct. 30, 2023 Trial Tr. 2590:15–20; Oct. 31, 2023 Trial Tr. 2696:6–21 (testifying that he could not determine with a degree of scientific certainty if any of the exports caused Plaintiffs to pay higher prices). This is also not surprising as exports functioned as an outlet for surplus eggs during periods of low demand or when product was at risk of spoilage. *See, e.g.,* Oct. 24, 2023 Trial Tr. 1646:3–11 (Mr. Baker explaining that surplus eggs were exported because of their limited shelf life); 1885:12–19; PX599 (Nov. 23, 2004 United Voices discussing how breakers were no longer buying surplus eggs). Because Plaintiffs failed to show any sustained impact resulting from USEM exports, there is no anticompetitive effect as would be necessary to impose Section 1 liability as a matter of law. *Phil Tolkan Datsun, Inc.*, 672 F.2d at 1288.

  **C. UEP Lacked Enforcement Mechanisms to Enforce Short Term Recommendations and Therefore It Could Not "Restrain Trade."**

Plaintiffs alleged a "hub and spoke" conspiracy where the "hub" was UEP and the "spokes" included Rose Acre, Cal-Maine, Wabash Valley, Moark, and Michael Foods, Inc. ("MFI"). The jury found the vertical relationship between UEP and each of Cal-Maine, Rose Acre, Wabash Valley and Moark resulted in a conspiracy that resulted in an unreasonable restraint on trade. This finding is erroneous as a matter of law, however, because there can be no restraint of trade when UEP had no means by which to enforce its committees' recommendations against anyone, and, based on the complete trial record, took no enforcement action. The Seventh Circuit has been explicit that, in the context of alleged conspiracies between associations and members, "enforcement mechanisms *are* the 'restraints' of trade" and "[w]ithout

4

them there is only uncoordinated individual action, the essence of competition." *Schachar v. Am. Acad. Of Opthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (emphasis added); *see also Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 133 (3d Cir. 2005) ("[A] trade association that . . . issues opinions, without constraining others to follow its recommendations, does not violate the Sherman act by unfavorably evaluating a manufacturer's product.") (internal quotation and citation omitted) (quoting and relying on *Consol. Metal Prods. Inc. v. Am. Petroleum Institute*, 846 F.2d 284, 292 (5th Cir. 1988)).

Here, Plaintiffs did not prove that UEP could force its members to adopt its recommendations. Plaintiffs only available argument based on the evidence is that UEP could shame or praise egg producers in its newsletter, but neither constitutes a "restraint" as a matter of law. *Id.* at 293–296; *compare* DX1086 at 2 (Gene Gregory asking in United Voices if "anyone follow[ed] the recommendation to dispose of flocks six weeks early" and asking if he was "wasting" his time urging producers to be more responsive), *with* PX599 at 2 (United Voices publishing names of companies that had made "their intentions known" regarding UEP recommendations)*; see also* DX1041 (Gene Gregory asking in United Voices about flock size growing despite his recommendations); DX1086. At most, Plaintiffs have only established that UEP *hoped* that members would follow their recommendations but could do nothing about it if members declined to do so. *See* Oct. 23, 2023 Trial Tr. 1145:13–22. Sheer hope of participation is insufficient to establish a restraint of trade. *See Schachar*, 870 F.2d at 399; *Santana Prod., Inc.,* 401 F.3d at 133; *Consol. Metal Prods. Inc.*, 846 F.2d at

5

292. Accordingly, UEP committee recommendations do not constitute "restraints" on trade as a matter of law. *Schachar*, 870 F.2d at 399.

> D. **As a Matter of Law, the "Conspiracy" Cannot (1) Include Michael Foods, Inc. and/or (2) Be *All* Members of the Certified Program.**

As evidenced by the jury's verdict: (1) Plaintiffs failed to prove that MFI was part of any conspiracy; and (2) Plaintiffs also did not prove that *all* members of the Certified Program were co-conspirators.

> 1. **Plaintiffs Failed to Prove as a Matter of Law that MFI or Wabash Valley Joined an Alleged Conspiracy**.

Plaintiffs failed to prove either MFI or Wabash Valley were knowing members of an alleged conspiracy to restrict supply. *See* Verdict, Dkt. #582; *see also* Oct. 16, 2023, Prelim. Jury Instr. at 10; Oct. 19, 2023 Trial Tr. 646:3–9. To show either was part of a conspiracy, Plaintiffs would have had to adduce evidence of their *knowledge* and *intent* to further the purposes of the alleged conspiracy. Plaintiffs made no such showing. The law is clear that "attend[ing] industry meetings . . . is [in]sufficient evidence of agreement without evidence of communication." *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2023 WL 7220170, at *23 (N.D. Ill. Nov. 2, 2023).[1]

> 2. **Plaintiffs Also Failed to Prove All Egg Producers Who Joined the Certified Program were "Co-Conspirators."**

---

[1] MFI applied to join the Certified Program for the first time in mid-2006. PX600 (MFI's June 2006 UEP Certification application). The only evidence regarding the "why" of MFI's decision relates to customer demand. The jury heard from Gary Pickett that Walmart wouldn't purchase egg products from MFI unless it was certified. *See* Nov. 7, 2023 Trial Tr. 4226:19–4227:3; *see also* DX832. That same year—2006—Plaintiff Nestlé began to include UEP Certification as a requirement for the sugared yolks that Dreyer's purchased from MFI. *See* DX175. The only evidence put into the record concerning Wabash Valley pertained to an affiliate's exports and attendance at certain meetings. Oct. 23, 2023 Trial Tr. 1138, 1175, 1218; PX0137.

6

Plaintiffs also failed to prove that all members of the Certified Program were members of a conspiracy to restrict supply. Verdict, Dkt. #582. The membership of USEM, UEP, and the Certified Program was not coextensive or even consistent throughout the entire conspiracy period found by the jury (*i.e.*, Oct. 2004–Dec. 2008); *compare* PX160 (2003 UEP Certified Companies List) *with* DX483 (2006 UEP Certified Companies List); *compare* PX603 (Cal-Maine initial UEP Certification application in 2002) *with* PX600 (MFI's initial UEP Certification application in 2006) *and* PX601 (Rose Acre initial UEP Certification Application in 2002); *compare* PX636 (Oct. 2002 list of USEM members participating in export) *with* PX379 (Jan. 2007 list of USEM members participating in export) *and* PX378 (June 2008 list of USEM members participating in export).

The jury expressly declined to find that *all* members of the UEP Certified Program had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *See* Verdict, Dkt. #582; *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Plaintiffs failed to prove that the mere joining of the Certified Program constituted an agreement between "co-conspirators" to restrict supply. *Id.* at 761; *see also In Re Processed Egg Prods Antitrust Litig.*, 206 F. Supp. 3d 1033, 1045 (E.D. Pa. 2016) (holding the UEP Certified Program "does not involve an express agreement among competitors to restrain supply").

Judge Pratter expressly found that just because an egg producer joined the Certified Program does not mean that egg producer thereby joined a "conspiracy." *Id.* Membership alone in the Certified Program or in a trade association is not enough,

7

and there was a dearth of evidence as to the reasons why almost 200 egg producers, including dozens of non-UEP members, joined the Certified Program. *See* Order on Plaintiffs' *Santiago* Proffer, Dkt. #294 at 29, 32 ("Something more is required, above and beyond trade association membership. There must be 'some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member'"); *see also infra*, Sec. F.

The Certified Program is a science-based certification program setting minimum welfare standards for laying hens adopted by UEP and recommended to the members of two other trade associations, Food Marketing Institute ("FMI") and National Council of Chain Restaurants ("NCCR"), which was open to both UEP egg producers and non-UEP egg producers alike. Customers who "did not want to take the [reputational] risk" of garnering more activist attention, Nov. 7, 2023 Trial Tr. 4214:23–4215:2, wanted (and in many cases were willing to pay more for) these new eggs. *See, e.g.*, DX207 (Walmart agreeing to share $0.02 per dozen of costs related to producers implementing Certified Program); DX210 at 6 (contract between Kroger and Cal-Maine stating that "Kroger will not accept any eggs . . . that have not been 100% produced [under the Certified Program]."); DX211 at 2 (letter from Winn-Dixie asking Cal-Maine for permission to place Certified Program logo on eggs and notifying Cal-Maine that they will require a copy of annual audits to ensure compliance with Certified Program); DX261 (Winn-Dixie asking for Cal-Maine's animal welfare policy for the purpose of being "better informed when [they] receive inquiries from [their] customers and shareholders.").

8

At trial, Plaintiffs only showed, at most, that many egg producers joined the Certified Program when it began in 2002 and thereafter. Some of these were not, and never became, members of UEP, and thus even under Plaintiffs' theory could not be "spokes." Oct. 31, 2023 Trial Tr. at 2753:15–24 (Dr. Baye confirming that approximately 30 of 177 Certified producers in 2004 were not UEP members). In fact, some once-certified producers (and purported conspirators under Plaintiffs' theory), like Sparboe Farms, were UEP Certified until, seeking a competitive advantage, left the program to start a different animal welfare certification program to compete with the Certified Program. *See* PX160 (2003 UEP Certified Companies list showing Sparboe as Certified in 2003); Nov. 2, 2023 Trial Tr. 3218:2–6 (describing Sparboe as "leading the charge" for the alternative Process Verified Program, or PVP); Nov. 7, 2023 Trial Tr. 4220:24–4221:7 (Mr. Pickett describing being pitched by Sparboe in 2005 regarding PVP). This is evidence not of a "conscious commitment to a common unlawful scheme", *Monsanto*, 465 U.S. at 764, but of competitors acting in their own self-interest as they battle each other for market share. And as noted the jury expressly found that an alleged "conspiracy" of "all" UEP Certified Members from October 2004–December 2008 was not proven. *See* Verdict, Dkt. #582.

### E.    Plaintiffs Failed to Prove the Certified Program Caused a Sustained Reduction of Egg Supply in a Relevant Market.

In the Seventh Circuit, proof of substantial market power is a prerequisite to proving anticompetitive effects and injury. *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012). During the liability phase of the trial, Plaintiffs failed to show either that the five alleged co-conspirator egg producers—let alone the four egg producers found

9

by the jury to be conspirators—had sufficient market power to cause substantial anticompetitive effects or injury, foreclosing a liability finding as a matter of law. The four egg producers found to be co-conspirators had only 15.5% market share (which would only have been 20.4% had MFI been included). These are the only members of the UEP Certified Program found to be conspirators; the jury deemed the conduct of the other egg producers (including MFI) to be lawful. Plaintiffs thus failed to prove that the remaining "two legs of the stool" comprising the proffered (or proven) "conspiracy" adversely affected competition in a significant way. *Phil Tolkan Datsun*, 672 F.2d at 1288; *Always Towing & Recovery, Inc. v. Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021).

The Certified Program itself had no supply limitations. No producer had to join, and every Certified producer could produce as many eggs as they wanted to and expand capacity as much as they desired. Nov. 8, 2023 Trial Tr. 4502:20–4503:3 (Mr. Rust confirming that Rose Acre could produce "as many eggs" as it wanted to); Oct. 31, 2023 Trial Tr. 2752:1–2753:24 (Dr. Baye confirming there were at least 30 egg producers that were part of Certified Program but were not members of UEP). Dr. Baye focused on the so-called "effects" of the Certified Program (based on national flock sizes that included a host of independent egg producers as well as specialty eggs like organic and free range) and, therefore, his analysis swept in the actions of hundreds of independent egg producers and different markets. In addition, testimonial evidence established that Plaintiffs had no difficulty procuring non-certified egg products during the alleged conspiracy period. *See, e.g.*, Nov. 3, 2023

10

Trial Tr. 3585:6–9 (Tobey confirming that Kellogg was always able to obtain the UEP Certified and non-certified egg products that it wanted). All these eggs and egg products were lumped in together by Dr. Baye, even though Dr. Baye admitted that having the choice between a new and old product (like the choice that Plaintiffs had between UEP Certified eggs and commodity eggs), is an indicator of competition, and that "choices are procompetitive, absolutely." Nov. 1, 2023 Trial Tr. 2952:5–25.

But in any event, because the total of the market share of the egg producer conspirators was 15.5%, the participation of these four in the UEP Certified Program could not have caused the program itself to constitute an unreasonable restraint on trade. *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987), and the jury did not so find.

### F. The Alleged "Conspiracy" Cannot Be "All" UEP Members by Virtue of Membership in UEP.

Plaintiffs finagled a liability theory that would essentially make UEP a walking conspiracy based on facts that were neither proven nor found by the jury. *See* Nov. 28, 2023 Trial Tr. at 6821:22–2823:6 (Plaintiffs' counsel confirming that Plaintiffs' theory "depends on a supply restrictions by other [non-defendant, non-co-conspirator] egg producers" that was "implemented through UEP."). That theory finds no support in the law. Courts have declined to read the Sherman Act in a manner that would turn associations into "walking conspirac[ies]." *Consol. Metal Prods.*, 846 F.2d at 293–94; *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010). Under Section 1, "every action by a trade association is not concerted action by the association's members." *Id.*; *see also In re Broiler Chicken*

11

*Antitrust Litig.*, 2023 WL 7220170, at \*23 (Neither "acting in parallel with other defendants to reduce supply" nor "attend[ing] industry meetings . . . is sufficient evidence of agreement without evidence of communication."); *Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 410–11 (5th Cir. 2007) (casino trade association's response on behalf of its members collectively to a group proposal to lease a web address did not constitute concerted action); *Jack Russell Terrier Network v. American Kennel Club*, 407 F.3d 1027, 1034–36 (9th Cir. 2005) (club and its regional affiliates were incapable of conspiring to exclude breeders from membership when national club and affiliates were pursuing common goal of maintaining value of dog breed and defendants were not alleged to be actual or potential competitors). This Court acknowledged these governing principles in its order on Plaintiffs' *Santiago* Proffer. Dkt. #294 at 29, 32.

Rather, courts have insisted upon showings of "some evidence of actual knowledge of, *and participation in*, the illegal scheme." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (per curiam) (rejecting "membership-ratification theory" basis for antitrust liability); *see also Moore v. Boating Industry Associations*, 819 F.2d 693, 712 (7th Cir. 1987) ("[M]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws . . . There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member.") (citing T. Vakerics,

12

*Antitrust Basics* § 6.13, at 6-37 to -38 (1985)). Indeed, "there is no such thing as an 'unwitting conspirator.'" *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 33889, at *15 (N.D. Ill. Jan. 19, 1999), *aff'd in relevant part*, 186 F.3d 781 (7th Cir. 1999) (citing *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir.1963)). "When a Section 1 plaintiff relies upon circumstantial evidence to prove the existence of an illegal conspiracy, he 'must show that the inference of conspiracy is reasonable in light of the competing inference [ ] of independent action.'" *Id*.

If Plaintiffs now are claiming that, because the jury found a conspiracy consisting of four egg producers with 15.5% market share plus UEP/USEM, those four egg producers could somehow be responsible for indisputably *lawful conduct* of all other UEP members from September 2004–December 2008, that claim must be rejected. Plaintiffs have not put forward any evidence showing that every member of UEP had "actual knowledge" of, and intent to participate in, an alleged conspiracy. *See In re Brand Name Prescription Drugs*, 1999 WL 33889, at *15; *Moore*, 819 F.2d at 712; *AD/SAT, Div. of Skylight, Inc.,* 181 F.3d at 234. This evidentiary gap would need to have been bridged, but Plaintiffs proffered no evidence to bridge it, and the jury expressly rejected that theory given their verdict. There is no basis in fact or law for Cal-Maine to be held liable for lawful behavior of other non-co-conspirator egg producers by virtue of their status as UEP members. *Id*.

### G. If Alleged Spokes of the "Conspiracy" Are the Five Identified Egg Producers or Fewer, Then Plaintiffs' Section 1 Claim Fails.

Plaintiffs are thus left with the five egg producers (four without MFI) plus UEP and USEM. But "[t]he first requirement in every suit based on the Rule of Reason is

13

market power, without which the practice cannot cause those injuries . . . that matter under the federal antitrust laws." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004); *Agnew*, 683 F.3d at 335. A showing of market power would be essential in order to go to the jury on liability, but Cal-Maine, Rose Acre, Moark, MFI, and Wabash Valley together represented only 20.4% of the market (and without MFI, the number drops to 15.5%). Oct. 31, 2023 Trial Tr. 2844:9–14. "The Seventh Circuit has held in cases alleging a violation of Section 1 of the Sherman Act, 'a 20%-25% market share or less does not constitute market power.'" *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 773 (N.D. Ill. 2015) (quoting *Valley Liquors, Inc.*, 822 F.2d 656, 666 (7th Cir. 1987)). Plaintiffs' inability to show that these entities had sufficient market power to inflict antitrust injury is fatal to Plaintiffs' Section 1 claim. *Id.*; *see also Schachar,* 870 F.2d at 398. Plaintiffs' Section 1 claim necessarily fails as a matter of law.

### H. Plaintiffs Do Not—and Cannot—Meet Their Burden of Proof on Damages Based on the Limited Conspiracy Found by the Jury.

As discussed above, Plaintiffs failed to meet their burden of proof of establishing antitrust injury. For all the reasons set forth in (1) Defendants' Motion and Memorandum in Support of their Motion to Exclude or Limit Testimony of Plaintiffs' Witness Dr. Michael Baye on Damages (Dkt. #565 and #566), and (2) Defendants' Submission in Response to Minute Entry ECF No. 584 (Dkt. #599) all of which are expressly incorporated herein by reference, Plaintiffs damages' theory is unreliable, irrelevant and prejudicial, including because it does not match the limited conspiracy the jury found. *See, e.g., MCI Comms. Corp. v. AT & T,* 708 F.2d 1081,

1161 (7th Cir. 1983) ("It is essential … that damages reflect only the losses directly attributable to unlawful competition"); *see also Comcast v. Behrend*, 569 U.S. 27, 35 (2013) ("any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation'"); *In re Pharm. Benefit Managers Antitrust Litig.*, No. 06-1782, 2017 U.S. Dist. LEXIS 6987, at *62-64 (E.D. Pa. Jan. 18, 2017) (rejecting expert damages model in antitrust MDL that did not attribute differences in reimbursement rates "solely to illegal conduct" and that "fail[ed] to account for legal behavior that could result" in those differences). Cal-Maine is entitled to a directed verdict on damages.

## Conclusion

For the foregoing reasons, Defendant Cal-Maine respectfully asks that the Court vacate the jury's verdict on liability, direct a verdict for Cal-Maine on damages and enter judgment in favor of Cal-Maine.

Dated: November 29, 2023　　　　　Respectfully submitted,

*/s/ Patrick M. Collins*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034

15

Tel: (972) 707-2809

*Counsel for Defendant Cal-Maine Foods, Inc.*

16