7196

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KRAFT FOODS GLOBAL, INC.; THE )
KELLOGG COMPANY; GENERAL )
MILLS, INC.; and NESTLÉ USA, )
INC., )
)
)
Plaintiffs, )
) Case No. 11 CV 8808
-vs- )
) Chicago, Illinois
UNITED EGG PRODUCERS, INC.; ) November 30, 2023
UNITED STATES EGG MARKETERS, ) 8:45 a.m.
INC.; CAL-MAINE FOODS, INC.; )
and ROSE ACRE FARMS, INC., )
)
Defendants. )

VOLUME 27-A
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE STEVEN C. SEEGER, and a Jury


APPEARANCES:

For the Plaintiffs:    JENNER & BLOCK, LLP
                       BY:  MR. BRANDON FOX
                            MS. SATI HARUTYUNYAN
                            MS. AMY GALLEGOS
                       515 South Flower Street
                       Suite 3300
                       Los Angeles, CA  90071-2246

                       JENNER & BLOCK, LLPS
                       BY:  MR. MATTHEW SUMMERS
                       455 Market Street
                       Suite 2100
                       San Francisco, CA  94105-2453

Court Reporter:        AMY M. KLEYNHANS, CSR, RPR, CRR
                       Federal Official Court Reporter
                       United States District Court
                       219 South Dearborn Street, Room 2318A
                       Chicago, IL  60604
                       Telephone:  (312) 818-6531
                       amyofficialtranscripts@gmail.com

7197

APPEARANCES (CONT'D):

For the Plaintiffs:    JENNER & BLOCK, LLP
                       BY:  MS. ANDRIANNA D. KASTANEK
                            MS. ANGELA ALLEN
                            MR. MICHAEL BRODY
                            MR. CHRISTOPHER SHEEHAN
                            MS. MARGARET M. HLOUSEK
                            MR. CHRISTIAN PLUMMER
                            MR. JAMES T. MALYSIAK
                            MR. JOEL T. PELZ
                            MR. JOHN D. VanDEVENTER
                            MS. REANNE ZHENG
                            MS. SAVANNAH McNEILY
                            MR. STEVEN TINETTI
                       353 North Clark Street
                       Chicago, IL  60654

For Defendants United  TROUTMAN PEPPER HAMILTON SANDERS, LLP
Egg Producers, Inc.,   BY:  MS. ROBIN SUMNER
and United States           MS. KAITLIN L. MEOLA
Egg Marketers, Inc.:   3000 Two Logan Square
                       18th and Arch Streets
                       Philadelphia, PA  19103

                       TROUTMAN PEPPER HAMILTON SANDERS, LLP
                       BY:  MS. WHITNEY REDDING
                       501 Grant Street
                       Suite 300
                       Union Trust Building
                       Pittsburgh, PA  15219

                       TROUTMAN PEPPER HAMILTON SANDERS, LLP
                       BY:  MS. MOLLY S. DiRAGO
                            MS. JESSICA RING
                       227 West Monroe Street
                       Suite 3900
                       Chicago, IL  60606

For Defendant          KING & SPALDING
Cal-Maine Foods,       BY:  MR. PATRICK M. COLLINS
Inc.:                       MR. PATRICK OTLEWSKI
                            MS. LIVIA KISER
                            MS. TATUM ELLIS
                            MS. ABIGAIL HOVERMAN TERRY
                            MR. JORDAN BLOCK
                            MS. LEILA M. MORGAN
                       110 North Wacker Drive
                       Suite 3800
                       Chicago, IL  60606

7198

APPEARANCES (CONT'D):

For Defendant          KING & SPALDING
Cal-Maine Foods,       BY:  MS. REBECCA L. PARADIS
Inc.:                       MR. HERSHEL WANJCER
                       1700 Pennsylvania Avenue, NW
                       Suite 900
                       Washington, D.C.  20006

                       BROWN FOX PLLC
                       BY:  MR. ERIC WOOD
                            MR. BRIAN E. ROBISON
                       8111 Preston Road
                       Suite 300
                       Dallas, Texas  75225

For Defendant Rose     PORTER, WRIGHT, MORRIS & ARTHUR, LLP
Acre Farms, Inc.:      BY:  MR. JAMES A. KING
                            MR. ALLEN T. CARTER
                            MR. ERIC B. GALLON
                            MS. GRACE E. KARABINUS
                       41 South High Street
                       Suite 2900
                       Columbus, OH  43215

                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                       BY:  MR. JAY L. LEVINE
                            MR. DONALD M. BARNES
                       2020 K Street, NW
                       Suite 600
                       Washington, D.C.  20006

                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                       BY:  MR. JOSHUA M. DILLE
                       321 North Clark Street
                       Suite 400
                       Chicago, IL  60654

                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                       BY:  MS. ANA P. CRAWFORD
                       250 East Fifth Street
                       Suite 2200
                       Cincinnati, OH  4520

7199

I  N  D  E  X

                                                    PAGE

  Closing Argument By Ms. Kastanek              7302


                    INDEX TO EXHIBITS

PLAINTIFFS' EXHIBIT                          RECEIVED

                        None.

DEFENDANTS' EXHIBIT                          RECEIVED

                        None.

JOINT EXHIBIT                               RECEIVED

                        None.

7200

(Proceedings heard in open court.  Jury out.)

THE CLERK:  11 CV 8808, Kraft Foods Global, Incorporated, *et al.*, versus United Egg Producers, Incorporated, *et al.*

THE COURT:  Good morning, folks.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the plaintiffs.

MR. BRODY:  Good morning, Your Honor.

Michael Brody for the plaintiffs.

MR. FOX:  Good morning, Your Honor.

Brandon Fox for the plaintiffs.

THE COURT:  Good morning.

And defense team.

MR. COLLINS:  Good morning, Your Honor.

Patrick Collins, Cal-Maine.

MS. KISER:  Liv Kiser, Cal-Maine.

MS. SUMNER:  Good morning, Your Honor.

Robin Sumner for UEP and USEM.

THE COURT:  Good morning.

MR. KING:  Good morning, Your Honor.

Jim King on behalf of Rose Acre Farms.

THE COURT:  Good morning.

MR. LEVINE:  Good morning, Your Honor.

Jay Levine on behalf of Rose Acre Farms.

7201

THE COURT:  Good morning.

MR. GALLON:  Good morning.

Eric Gallon for Rose Acre.

THE COURT:  Good morning.

MR. CARTER:  Good morning, Your Honor.

Allen Carter for Rose Acre Farms.

THE COURT:  All right.  Good morning.

Thank you, everybody, for being here.

Sorry to make you late.  It's 8:45.  I had you come at 8:30.  Rest assured that I am only working on your case. So I came out here as soon as I was ready to come out.  So thank you for that.  Thank you for your patience.

I have two things I wanted to cover before I get into the matter at hand.

First of all, we do not yet have the exhibits that were admitted into evidence as part of the damages phase.  And we need that because the jury needs it.

So, Mr. Carter, I don't know if you're the point person on that, but Ms. Ramos tells me we don't have them yet.

MR. CARTER:  I understand, Your Honor.  I thought that the agreement among the parties were that the plaintiffs were going to send it, so I'll go ahead and send those over.

THE COURT:  That's fine with me.  It doesn't matter to me who does it.  It does matter to me that we have it in a format -- oh, it looks like she's got it.  Okay.  She's got

7202

it.  I beg your pardon, folks.

We stand corrected.  I'll take judicial notice of the fact that we stand corrected.

Does that include the exhibit with the stipulation?

MR. CARTER:  I think it does.  I think we -- yeah, I believe it does.

THE COURT:  So it should be the contracts plus the stipulation.

I'm seeing nodding heads.

MR. CARTER:  Yes.

THE COURT:  Okay.  Very good.  So bear with me, folks.  Thank you for that.

Let me also, before I forget, raise a question that I had as I was en route to the courthouse.

Are nominal damages trebled?  I assume.

MR. BRODY:  I'm not certain, Judge, but I would assume the answer is yes.

THE COURT:  Because nominal damages technically is a form of compensatory damages.  I think.  I don't know what else it would be.

Go ahead.

MR. BRODY:  We agree, Your Honor, in the nature of compensatory.

THE COURT:  It's compensatory damages, so I do think it's trebled.

7203

Does anybody disagree with that?

I know we're not talking about the largest amount of dollars, but does anybody disagree with the proposition that nominal damages, if any, would be trebled?

MR. LEVINE: To be honest, I just -- I have no idea. I would assume, but -- I mean, we could do some research, but, you know, pending that --

THE COURT: Fair enough. And I know that the expense of researching this would be disproportionate with the amount at stake.

I want to make sure that everybody is on page with what the judgment would be if there is an award of nominal damages.

Let's imagine a world in which the jury awards nominal damages for exports and awards nominal damages for short-term measures and awards zero dollars for the UEP Certified Program, just for easy math. The judgment I think would be $4 for exports, $4 for short-term measures, for a grand total of $8.

In other words, an award of nominal damages, if plaintiffs were on the table, is a grand total of $8 before trebling; is that right?

MR. BRODY: That's correct.

MR. LEVINE: Yes, Your Honor.

THE COURT: Okay. Very good.

7204

In other words, it's not $1 per plaintiff per defendant; it's $1 per plaintiff total.

Everybody agree with that?

MR. BRODY: Yes.

THE COURT: Okay. Fair enough.

All right. So without further ado, let's talk about the jury instructions and the jury verdict form.

Thank you, everyone, for your submissions. Let me just rewind the tape.

Last night my clerk circulated an updated draft of the jury instructions and an updated draft of the jury verdict form.

Everybody got that? Yes?

MS. KISER: Yes.

MR. COLLINS: Last night or this morning?

THE COURT: Last -- well, I was going to say last night and then this morning.

Everybody got the versions from last night, obviously? Yes?

And, then, I got your submissions. I received the plaintiffs' revisions to the jury instructions. I did not receive any proposed changes to the jury verdict form from the plaintiffs. I inferred from that that the plaintiffs had no changes to the jury verdict form; is that correct?

MR. BRODY: That is correct.

7205

THE COURT: Okay. So I got plaintiffs' proposed changes, Docket No. 613.

That's all we've got from the plaintiff, right?

MR. BRODY: Yes.

THE COURT: And then for the defense team, I received your changes. Docket No. 617 is your changes to the jury instructions, and then your changes to the jury verdict form at Docket No. 618; that's on behalf of all defendants.

Is that right, everybody?

MR. LEVINE: Yes, Your Honor.

MR. COLLINS: Yes, Your Honor.

THE COURT: Okay. And then a little bit ago, I did a turn of the jury verdict form and did a turn of the jury instructions and sent those around. I sent the revisions to the jury instructions at about 8:15, give or take, and I had my clerk send the revised jury verdict form right around 8:30, so shortly before taking the bench.

Did everybody get those two?

MR. BRODY: We have those, Judge.

MR. COLLINS: Yes, Your Honor.

THE COURT: Everybody got it? Okay. Good.

All right. So let's just march through it. I'd like to talk about the jury instructions first. I made both of the changes suggested by the plaintiffs in Docket No. 613. I took the parentheses out from the word "only." I also changed the

7206

phrase "defendants as a group" to "defendants."

Are you satisfied with that, Mr. Brody?

MR. BRODY: Yes. Thank you, Judge. We saw that in the draft you sent this morning.

THE COURT: All right. Very good.

And then I'd like to go through the changes that defendants proposed, but before I do that, I want to make sure everybody was okay with the changes that I had made last night, and then I want to cover the changes that I had made this morning as well at the very end.

But last night, I added the instruction about equality under the law that Mr. Brody had proposed.

Everybody good with that?

MR. COLLINS: Judge, again -- and I wasn't here and I understand -- and I'm looking at the instruction.

The first sentence, there's no problem.

The second sentence, I guess I just wanted to make a 10-second record that the reference to public company or private company, again, I assume was added because of what I said in opening statement. And I reread what I said, and I just -- I don't think it's necessary and it suggested something was said that was untoward and I don't think it was.

But, again, I just wanted to mention that for the record.

THE COURT: Okay. Fair enough.

7207

So I'm going to go ahead and keep it as is. I think it's accurate, and I don't think you should feel admonished in any way, shape, or form. I don't think the intent is to make anybody look bad and I don't think the jury is going to take it that way.

The other change that I made last night that I flagged in the e-mail that my clerk sent around was the removal of the phrase "likely consequence."

Is everybody on board with that?

MS. KISER: Yes.

MR. COLLINS: Yes.

MR. LEVINE: Yes, Your Honor.

THE COURT: Everybody on board?

Okay. That seems correct to me. I assumed they were synonyms. To the extent they weren't synonyms, I thought it could inject confusion. So I have taken out that phrase by agreement.

All right. So let's go through defendants' proposed changes. I'm looking at Docket No. 617. We've covered the change to instruction number -- old Instruction No. 2 on Page 3 of Docket No. 617. I'm going to keep the reference to public companies and private companies.

On Page 6, defendants proposed removing the parentheses around the word "only," which I've done.

In Instruction No. 8, meaning old Instruction No. 8

7208

on Page 9, Docket No. 617, plaintiffs proposed adding some language to make clear that plaintiffs are seeking nominal damages for some things and a bigger amount of compensatory damages for something else.

Your proposed language said, "Plaintiffs have determined that they cannot establish damages for, No. 1, the part of the conspiracy that included short-term measures . . . And for, No. 2, the part of the conspiracy that included exports as part of the USEM export program. You must not award plaintiffs any damages for these parts of the conspiracy. At most, you may award nominal damages to each plaintiff, not to exceed $1. You may also award zero damages."

I thought that language as framed was a bit argumentative and then some. It says, "Plaintiff has determined that they cannot establish damages." It could maybe cast the plaintiffs in a negative light. At least I worried about that.

But the fact of the matter is it is directionally correct, so that's why I put language in the revision that I sent around this morning basically previewing for the jury what they're going to see when they look at the jury verdict form. And that's the revision that I have in new jury verdict -- excuse me -- Jury Instruction No. --

MR. LEVINE: 7.

7209

THE COURT: -- 7.

Thank you.

So this is in the version that I e-mailed around this morning through my clerk. It's on Page 8, Instruction 7.

It says, "Plaintiffs are seeking nominal damages of $1 for the part of the conspiracy involving short-term measures (*i.e.*, early slaughter, early molting, and flock reduction).

"Plaintiffs are seeking nominal damages of $1 for the part of the conspiracy involving the exports as part of the USEM export program.

"Plaintiffs are seeking compensatory damages for the part of the conspiracy involving the cage space or henhouse density restrictions as parts of the UEP Certified Program, and the restriction on backfilling of egg-producing hens as part of the UEP Certified Program.

"Defendants deny that plaintiffs are entitled to damages."

Does anybody have any objections, changes, corrections, or additions to that language?

MR. BRODY: We have no objections to Instruction 7. We think it's better than the language the defendants proposed. We note, as Your Honor stated earlier, that nominal damages are compensatory damages, but we don't have to go into that for the jury.

7210

THE COURT: Okay. Fair enough. I thought if I teased that out here, it would get confusing for the jury.

The key point for them is going to be, it's a dollar for exports, it's a dollar for short-term measures, yes or no; and then the big action is going to be the UEP Certified Program. And I think this conveys the concept, I think.

MR. BRODY: We agree with that, and we think we're going to make it absolutely clear in our closing that that's what we're asking for.

THE COURT: Okay. Fair enough.

Did the defendants have any objections, changes, corrections, or additions to that language?

MR. COLLINS: Judge, on behalf of Cal-Maine -- and maybe this is more on the verdict form -- and, again, in terms of juror confusion, I don't understand why they -- the plaintiffs don't have to show that they were damaged to seek nominal damages. And I think we're missing a step.

THE COURT: Do you mean injured or damaged?

MR. COLLINS: Damaged.

You know -- and, again, this is -- we can reserve this for the verdict form. I mean, as stated, I just think it's confusing, and I don't know that I understand why the plaintiffs -- they presented zero evidence of damage in short-term measures or exports, zero, not $1, but zero. And they're asking for a dollar. And I think it's very confusing

7211

why the jury should give them a dollar when they've had zero evidence of it.

And I think -- this usually comes -- the defendants usually make this argument. I've never seen a case, and we have been discussing this internally, where the plaintiffs are seeking a dollar. I think it's confusing, and I also don't know the justification for it.

And so maybe, ultimately, Judge, it's a verdict form issue. And we did propose, and I understand Your Honor is rejecting, the request to have the jury check the box whether they've established damage at all.

I just don't know why they can ask for $1 when they've established zero evidence of any damage.

THE COURT: All right. So thank you for that.

So let me separate for purposes of our discussion injury and damages.

This instruction is about damages, how much -- the amount of money. That's what this instruction is intended -- entitled to get at. And the idea is simply to preview for the jury what plaintiffs are asking for. Plaintiffs are asking for a dollar for exports, they're asking for a dollar for short-term measures, and they're asking for a bunch of damages that you'll hear about for the UEP Certified Program. It doesn't get into injury here, it gets into the amount of money. It's just a preview. That's the goal of this

7212

instruction.

And I'm happy to talk about the jury verdict form when we get there. And I appreciate the preview. I'm happy to talk about that.

As crafted, with that understanding, is there anything wrong or confusing or unhelpful or anything like that about the revised Instruction No. 7 that I just read? Anybody?

MR. COLLINS: No. And, again, this is not an injury point, it's a damages point. They've offered no evidence of damage for either of these two, and yet they're seeking nominal damages of a dollar. And I think that's confusing to the jury.

MS. KISER: Especially because we just got done saying it's trebled because it's compensatory.

THE COURT: Okay. Okay. So let's bear this in mind as we go to the jury verdict form in a moment.

I want to see if there are any other changes that plaintiffs -- excuse me -- defendants proposed. I don't think that there are any other changes that you had proposed to the jury instructions.

Is that right, defense team?

MR. COLLINS: Yeah.

MS. KISER: That's correct.

MR. COLLINS: That's correct based on our submission

7213

last night, Your Honor.

THE COURT: Okay. I added two additional instructions this morning. I flagged those in my e-mail. I want to talk through them.

If everybody could pull up the most recent copy.

I added new Jury Instruction No. 2. So old Jury Instruction No. 2 is now Jury Instruction No. 3.

The new Jury Instruction No. 2 basically says, I gave you jury instructions before. I'm now giving you additional instructions. I'm using some of the same terminology. The same terms mean the same thing. Those earlier instructions seem to apply.

I think we all know that and took that for a given, but the jury should know that. And I also think it's helpful to give them a copy.

Any issue, anybody, with anything I said in Jury Instruction No. 2? Any objections or changes or corrections?

MR. BRODY: No, Your Honor, no objections.

Do you anticipate -- so they'll have one set of the prior instructions. And will they have 12 sets of this one?

THE COURT: Yes, that's the thought. Just to save paper. I'm not going to give them 12 more sets of the old instructions.

MR. BRODY: We agree. It makes perfect sense.

MR. COLLINS: No objection for Cal-Maine.

7214

MS. SUMNER:  No objection.

MR. LEVINE:  No objection.

THE COURT:  All right.  Very good.

So let's go to Jury Instruction No. 7.  We talked about it a minute ago, new Jury Instruction No. 7.

Does anyone have any other changes, corrections, additions, or objections to proposed new Jury Instruction No. 7, meaning the one that talks about nominal damages of a dollar for export and short-term measures and compensatory damages for the UEP Certified Program?  Anyone?

MR. COLLINS:  Not in addition to what we've said.

THE COURT:  Okay.  Can I flag one other thought that I had?  And this picks up a little on some of the issues that Mr. Collins was talking about a minute ago.

I reread these instructions last night, and I paused on one part and I just thought we should take a minute to talk it through.

If everybody looks at the most recent version, Instruction No. 13, Page 14.  It starts, "Each plaintiff is entitled to recover damages."

Does everybody see that?

I'd like to talk about the paragraphs that follow. Let's go to the second paragraph and the third paragraph.

It reads:  "Each Plaintiff has the burden to prove that its injuries were caused by the conspiracy that you

7215

previously found as opposed to any other factors.

"If you find that a Plaintiff suffered an injury that was caused in part by the conspiracy and was caused in part by other factors, then you may award damages only for the portion of the injuries that were caused by the conspiracy.

"Plaintiffs claim that they suffered injury because they paid higher prices for egg products than they otherwise would have paid without the conspiracy."

So I read Paragraphs 2, 3, and 4.

No one proposed any changes to that. I paused on that when I read it last night, especially the phrase "If you find that a plaintiff suffered an injury that was caused in part by the conspiracy."

I paused on that because the jury already found an injury. The existence of an injury is a liability question, not a damages question. But then as I thought about it more, I thought back about what the jury previously did. The jury found an injury caused by the conspiracy.

We did not ask the jury to decide with specificity what caused the jury. We didn't ask the jury to decide whether the injury was caused by the UEP Certified Program or by exports or by short-term measures. It was just a yay or a nay, yes or no, up or down, was there an injury or was there not an injury.

So all the jury has found at this point is there was

7216

an injury.

I've never asked them to delineate what exactly caused the injury. In other words, was there an injury from short-term measures? Was there an injury by exports? Was there an injury by the UEP Certified Program?

I do not have to get to that level of granularity in a jury verdict form. You don't have to delineate all the elements. You don't have to break it down. The ABA model instructions includes a note that says that you don't have to ask the jury to allocate different parts of damages awarded to different parts of the conspiracy, for example.

So I thought for a moment about changing the third paragraph to read: "If you find that a plaintiff suffered an injury and incurred damages" or "and sustained damages that were caused in part by the conspiracy," I think that's technically correct. I paused on it, but I think we ought to say, I think, something like this: "If you find that a plaintiff suffered an injury and incurred damages that were caused in part by the conspiracy."

MS. KISER: Yep.

THE COURT: "And were caused in part by other factors, then you may award damages only for the portion of the injury" -- "injuries that were caused by the conspiracy."

Is everybody on board with that?

MR. LEVINE: Yes.

7217

MS. KISER:  Yes, Your Honor.

MR. BRODY:  We have no objection, Your Honor.

THE COURT:  And we would make the same change to the fourth paragraph:  "Plaintiffs claim that they suffered injury and incurred damages because . . ."

MR. FOX:  Your Honor, I'm just wondering why we need to -- why can't we just go with damages rather than injury because we are talking about the one big conspiracy still. And the verdict form is the reason why we're not -- why things have to be broken down.  And as you know, we proposed one verdict form that said what were the damages for the conspiracy.  Defendants proposed a verdict form that broke down the different measures, which we've now relied on, but this is still -- the jury found one big conspiracy, injuries related to one big conspiracy.  What we have to prove damages for is for the one big conspiracy.

So a lot of these complications we're talking about are because the defendants wanted things broken down and now they're saying now that things are broken down, that we've got some problems here.

So with this, the jury did find injury for the conspiracy.  That's all they needed to find.  That issue has been put to bed.

THE COURT:  Well, it has been put to bed that the plaintiffs suffered an injury.  We didn't ask the jury to

7218

delineate what part of the conspiracy caused an injury.

MS. KISER: And, Your Honor, again, I just want to make the point that we take serious issue with the idea that this is, quote, one big conspiracy when it includes four egg producers, at most 15.5 percent of the market. It's the conduct that these four egg producers did with respect to the UEP Certified Program that is an issue.

MR. FOX: But, Your Honor, I'm talking about what the jury found. Ms. Kiser is talking about things that are not related to this instruction or the issues.

My point is, we need to prove injury and damages related to the one conspiracy, overarching conspiracy that the jury found.

And by breaking things down, it's causing these complications, which is what I just mentioned. The jury found injury for the conspiracy. What we need to do is prove damages for the conspiracy.

THE COURT: Can I back up one second?

I mean, it currently reads: "If you find that a plaintiff suffered an injury that was caused in part by the conspiracy." Well, they've already found that.

MR. FOX: Yes.

THE COURT: So that precipitated some thinking by me yesterday. I thought that language was potentially confusing. They did find an injury of some sort. They didn't delineate

what exactly they found because we didn't ask them to.

So -- I also think this, by the way: If we use the current version of the jury form and if the jury awards damages for exports and if the jury awards damages for short-term measures, they will have necessarily implicitly decided that plaintiffs suffered an injury as a result of exports and short-term measures. It is implicit in that finding necessarily. I think.

MS. SUMNER: I think this instruction as you have modified it is really important because it is important for the jury to understand that any damages they award have to be connected to an injury that they found.

THE COURT: I think that's correct.

MS. SUMNER: And I think to eliminate the language the way that Mr. Fox is suggesting wipes that concept out of the instruction and would be very confusing to the jury and would leave us all in a position I don't think anybody wants to be in.

MR. BRODY: Your Honor, can I make a suggestion?

THE COURT: Yeah.

MR. BRODY: Paragraph 3, the "if you find" paragraph --

THE COURT: Yeah.

MR. BRODY: -- could it say, "If you find plaintiffs paid higher prices for egg products caused in part by the

7220

conspiracy" --

MS. KISER: No. No.

MR. BRODY: -- and so on? They've already found the injury. The question now is damage. That's the nature of the damage we're asserting.

And then the next paragraph could read the same way, "Plaintiffs claim that they paid higher prices for egg products." That's our -- that's the overcharge.

MR. LEVINE: I'm not sure that remedies the issue we were just talking about. That just substitutes certain words for injury.

MR. BRODY: Right, but it's --

MR. LEVINE: It still doesn't connect the damages to the injury they found for the particular component.

THE COURT: Can I back up one second? Can we go to the second paragraph.

It reads: "Each plaintiff has the burden to prove that its injuries were caused by the conspiracy that you previously found as opposed to any other factors."

That seems correct.

Do we need to add a sentence that says, "Each plaintiff also has the burden to prove damages"?

MR. FOX: I think with that second paragraph that you're talking about, we've already proven that. So I think we should -- you have determined that the plaintiffs have

7221

proven that their injuries were caused by the conspiracy, and then if you want to add something about damages, I think that's fine. Otherwise, we're asking them to revisit something they've already done.

THE COURT: That's why I'm bringing this up. So . . .

MS. SUMNER: Your Honor --

THE COURT: Yes.

MS. SUMNER: -- I think this -- those two -- the second and third paragraph here are intended not to ask the jury to revisit its finding of an injury but to point out to the jury that if they are in the event -- and I think the commas in the third paragraph are what's causing the confusion here. And if I had drafted it, I'm not sure if I would have included that first comma.

I think what this is pointing out for the jury is if you find that there is an injury that's caused by the conspiracy that you already found but there's also something else there, you have to separate the two and you can only award damages for the injury that you found was caused by the conspiracy.

I think it's very simple. And that's what this is intended to do. And I really -- I do think the comma is kind of misplaced and causing the confusion.

THE COURT: Well, I'm supporting -- supportive of

7222

taking out that first comma. I think that's fine. I'll do that.

MR. FOX: Your Honor, I think that there might be even a simpler solution to this, and it's very close to what Ms. Sumner is saying, and I think it's where you want to be in terms of not having the jury revisit anything.

It would say in the second paragraph, "You have found that the plaintiffs have proven that they were injured by the conspiracy."

Then you can use the second part of the third paragraph to say just -- the next sentence would be, "You may award damages only for the portion of the injuries that were caused by the conspiracy."

THE COURT: Hang on one second. Maybe we should just refer -- sorry -- delete reference to "injury" in the third paragraph entirely. I'm not sure this is a good idea. Let me just think out loud.

Another option would be just to say, "If you find that plaintiffs suffered damages caused in part by the conspiracy and caused in part by other factors, then you may award damages only for the portion of the injury caused by the conspiracy."

So let me say that again.

"If you find that plaintiffs suffered damages caused in part by the conspiracy and caused in part by other factors,

7223

then you may award damages only for the portion of the damages that were caused by the conspiracy."

MR. FOX:  That's fine with us.

MR. LEVINE:  Then the second paragraph would have the same modification, "Each plaintiff has the burden to prove that it sustained damages caused by the conspiracy."

THE COURT:  Yeah.

MR. LEVINE:  That they previously found as opposed to any other factor.

THE COURT:  "Each plaintiff has a burden to prove that it incurred damages caused by . . ."

Wouldn't that be better?

MS. KISER:  Mm-hmm.

THE COURT:  "Each plaintiff has the burden to prove that it suffered damages or incurred damages."

MR. BRODY:  And then the third paragraph, Your Honor, could read:  "If you find that a plaintiff incurred damages" and so on "caused in part by the conspiracy."

No, I'm sorry, the fourth paragraph.

"If you" -- "plaintiffs claim that they incurred damages because they paid higher prices."

THE COURT:  Keep that thought, Mr. Brody.  I'm thinking about one other thing.

Do we -- candidly should we say something like this to the jury:  "You previously found that plaintiffs suffered

7224

an antitrust injury caused by the -- by the conspiracy. It is up to you to decide whether the injury involved X, Y, or Z"?

I mean, do they -- I'm thinking out loud here.

MR. BRODY: Your Honor, I think we would push back on that. That sounds like we're asking them to reconsider antitrust injury. And they found what they needed to find of --

THE COURT: Yeah. Well, is it the plaintiffs' view that the jury has already made a finding about injury with respect to the specific parts of the conspiracy?

They found an injury. They didn't make an express finding about the parts of the injury. I'm not saying that they need to expressly.

Go ahead.

I mean, here's the bottom line, folks: If they award damages, they find an injury by definition. That's the bottom line. It makes it real simple, I think.

Go ahead.

MR. BRODY: Correct. Well, I agree with that. And I think we're in the -- our view is antitrust injury is binary, either you have it or you don't, and we have it. And we've shown -- the jury has found that there was antitrust injury caused by the overarching conspiracy we alleged and the jury concluded we proved.

THE COURT: Okay.

7225

MR. BRODY: And that issue is done. Put a bow on it. We're not going back to it.

THE COURT: Okay. Can I go back to where my head was a minute ago, and then you folks can give me your reaction?

I'm inclined to change the second paragraph as follows: "Each plaintiff has the burden to prove that it incurred damages that were caused by the conspiracy that you previously found as opposed to any other factors."

Let me say that again.

"Each plaintiff has the burden to prove that it incurred damages that were caused by the conspiracy that you previously found as opposed to any other factors."

MR. BRODY: That's fine with us, Judge.

MS. SUMNER: Is that the only thing you're --

THE COURT: No, I'm just going one paragraph at a time.

Is that okay, everybody?

MR. COLLINS: That works.

THE COURT: Okay.

MR. LEVINE: Yes, Your Honor.

THE COURT: Okay. And then the next paragraph would be as follows: "If you find that a plaintiff suffered damages caused in part by the conspiracy and caused in part by other factors, then you may award damages only for the portion of the damages that were caused by the conspiracy."

Is that good, everybody?

MR. COLLINS: It works for Cal-Maine.

MR. BRODY: Yes, Your Honor.

THE COURT: And then the final paragraph there, meaning the fourth paragraph, would say, "Plaintiffs claim that they incurred damages because they paid higher prices," *et cetera*.

Is that conceptually okay to everybody?

MR. LEVINE: Yes.

MR. COLLINS: Yes.

THE COURT: Okay. Folks, let me propose this. I think this is important. Why don't I go make this change right now and print it out for you so you can see it. Because if it's not right, I want to talk it through. Is that okay? Can we take a break for five minutes? I'll be quick.

MR. BRODY: That would be great.

MR. COLLINS: Yes.

THE CLERK: All rise.

(Recess taken from 9:20 a.m. until 9:28 a.m.)

THE COURT: All right, everyone. I made the corrections that we just talked about to Instruction No. 13. I'll ask my clerk to hand out copies to everybody.

I will e-mail it to you in a moment, but I wanted to send it to you now in the interest of time.

Thank you, Ms. Garten, for doing that.

I left my glasses in chambers, so all of you are going to be momentarily blurry.

Does everybody have a copy?

MS. SUMNER: Yes.

THE COURT: So let's look at Paragraphs 2, 3, and 4.

Let me explain the overarching comment -- or concept. The concept is I framed it in terms of damages instead of injury. The only other change I made conceptually is in the first paragraph -- I'm sorry, the second paragraph. I changed "as opposed to by any other factors" I changed to "as opposed to damages caused by any other factors," just to make it a little more clear.

Let me read Paragraphs 2, 3, and 4 and get your reaction to it.

"Each plaintiff has the burden to prove that it incurred damages that were caused by the conspiracy that you previously found as opposed to damages caused by any other factors.

"If you find that a plaintiff suffered damages that were caused in part by the conspiracy and were caused in part by other factors, then you may award damages only for the portion of the damages that were caused by the conspiracy.

"Plaintiffs claimed that they suffered damages because they paid higher prices for egg products than they otherwise would have paid without the conspiracy."

7228

That's Paragraphs 2, 3, and 4 of the revised version.

Any reaction?  Any objections, changes, corrections, additions, or otherwise?

MR. BRODY:  No objection, Your Honor.  We think that's consistent with what we just discussed.

MR. COLLINS:  No objection for Cal-Maine.

MR. LEVINE:  No objection.

MS. SUMNER:  No objection.

THE COURT:  Okay.  I think it's better than what it was before, hopefully.  Hopefully clearer.

Let me throw out one other thought before we leave the jury instructions.  We added the instruction about nominal damages of a dollar and about compensatory damages.

Do we need to tell the jury something along these lines:  You may award nominal damages for an antitrust injury?

I guess they don't have to -- I mean -- well, let me -- let me ask you this question:  Is it the case that a plaintiff is entitled as a matter of law to nominal damages for an antitrust injury?

MR. LEVINE:  No.

MS. KISER:  No.

THE COURT:  So -- and, plaintiffs, you agree with that?

There could be an antitrust injury with no nominal damages, right?

7229

MR. BRODY:  I suppose that's correct, Your Honor.

THE COURT:  So shouldn't we say something like this: "You may award nominal damages of $1 for an" -- "if you find an antitrust injury, but you do not have to award nominal damages of $1 if you find an antitrust injury"?

MR. BRODY:  Your Honor, I think that's in Instruction 8 at the end.  "If you find the plaintiff has failed to carry a burden of providing a reasonable basis for determining damages, then you may not award damages, or you may award nominal damages not to exceed $1."

So we're telling them that if we've shown we're damaged but we haven't provided a basis for determining the amount, then they may, but need not, award nominal damages.  I think we're covered.

THE COURT:  Okay.  Maybe that's right from the use of the word "may."

Any -- any reaction from that from the defendants?

MR. COLLINS:  My reaction is the same as Mr. Brody, Your Honor, that that's covered, and I don't think they should be told that -- I think they can and they don't have to and they can also award zero equally.

MS. KISER:  Yeah, just so long as they understand they can award zero.

THE COURT:  They can award zero.

MS. KISER:  Yeah.

7230

THE COURT: Are the defendants sufficiently comfortable that the jury will understand that they can award zero dollars? I mean, that's consistent with the jury verdict form.

MR. LEVINE: I think the verdict form --

THE COURT: Makes that clear, right?

MR. LEVINE: Makes that clear.

THE COURT: Okay. All right. Would anyone like me to e-mail you the updated set of the jury instructions right now so people can start looking at it one last time?

Let me take a break for 30 seconds, e-mail it to you, and come back and we'll talk about the jury verdict form.

Does that sound good, everybody?

MR. FOX: Yes, Your Honor, but I think that part of our discussion on the verdict form could also relate -- we may have to go back, then. And I want to -- I want to warn you that we may have to go back because, again, as we look at this and, as the jury found, it's one overall conspiracy, and that's the way that I think the jury needs to decide this on the verdict form, which means that Instruction No. 7 might have to be altered as a result of that.

But I think that you should decide that issue as we talk about the verdict form, and then we can go back if need be.

THE COURT: Okay. I'll tell you what, let's go back

and talk about the verdict form.

Plaintiffs are on board with the jury verdict form as is?

MR. FOX: Your Honor, our original verdict form we think is the right way of doing this because of the overarching conspiracy. And so I just don't want -- I think that that's the best way of looking at it because the jury has found injury, the jury has found one overarching conspiracy. What we've proven is damages related to that overarching conspiracy.

Having said that, if you have decided to break it down by measure, then we think that this is fine, Your Honor. But I just -- I think, again, the better way of doing it is just to have a very simple form that talks about the overarching conspiracy and ask for damages related to it because then, as I said, we're going to be getting into these issues that they're doing which is trying to take apart each part of the conspiracy and say they didn't prove this, they didn't prove this. We proved the overall conspiracy and we've proved already injury related to it.

THE COURT: Well -- all right. So thank you for that. I agree with you that the standard is simplicity in part. It needs to be complete and accurate, but simplicity is one of the goals.

I think my form does that. It's four questions. It

7232

says, are there damages for exports, are there damages for short-term measures, did they prove damages for the UEP Certified Program, and if so, how much. So I do think it is pretty simple as is.

Let me talk about the change that I made this morning. I added the phrase "the part of" before "conspiracy." So instead of saying "the conspiracy," it now says "the part of the conspiracy."

I think the defense team may have suggested that. That was a good suggestion.

Any problems with that, anybody?

MR. COLLINS: No, Your Honor.

THE COURT: I will tell you, I'm pretty comfortable with the jury verdict form as is. I will listen to you folks if you want to go to bat for changing anything.

You know, I think the defense team conceptually proposed that I break out a finding of injury from an award of nominal damages. I don't have to break it out into elements. And I would construe the form this way: If they award nominal damages, they will necessarily have found an injury.

Isn't that the case?

MR. COLLINS: Yes, Judge. And, again, maybe I'll speak very briefly to that, but I mean, if I'm looking at the right form, and my apologies, but I think the one you sent around this morning, Question No. 3 relating to the certified

7233

program -- and this is not an injury question -- it says, Did plaintiffs prove they sustained damages? And then if so -- then there's -- 4 is to quantification question.

And I think what the defendants --

THE COURT: Okay.

MR. COLLINS: -- were proposing last night --

MS. KISER: Was the same.

MR. COLLINS: -- was the same for 1 and 2. And Mr. Fox can say we gummed up the works. They're the ones who added the nominal damages after the Court's hearing the other day when you expressed some issues about the plaintiffs' theory. And so then they ran in and added this nominal damages stuff.

So I -- I respectfully disagree that we've gummed up the works here, but --

THE COURT: Well, can I do this? Maybe we should change Question 3 to "Did plaintiffs prove that they incurred" -- "or they suffered an injury and sustained damages?"

MR. FOX: Well, isn't the finding that we sustained damages going to do the same thing that you're talking about, because they found antitrust injury overall. And so I think that just -- I agree with you on 1 and 2 that if we find nominal damages, then they found injury. The same principle should apply to 3.

7234

THE COURT: Well, that's true.

MR. COLLINS: But I would submit, on that same logic, Your Honor, we're skipping a step for 1 and 2 and we're jumping to what they're seeking. We're jumping to the quantification for 1 and 2, and I'm not sure why we're doing that.

MR. FOX: I think, Your Honor, again, going back to my original point on the verdict form, if we wanted to have a Question 1 that is sort of like Question 3 and it covers all the measures, then I think that would be fine. "Did plaintiffs prove that they sustained damages as a result of the conspiracy?" "Yes" or "no" for all of them, all the plaintiffs. And then we can have the individual questions that just seek quantification, which I think is more principled and more in line with what the jury found.

MR. COLLINS: Judge, we do on the -- we do want breakouts for each of the legs of the stool to track the verdict form for liability. And I think because of plaintiffs' position on exports and short-term measures and because of the disproportionate amount of time spent at the trial, it's only fair that the jury -- that there be symmetry between the verdict form for liability and the verdict form for damages.

MR. FOX: And, Your Honor, this would be symmetry because there was the question about antitrust injury overall

7235

for the conspiracy. Now this is asking damages overall for the conspiracy and then breaking it down by damages for the different components, which is what the defense wanted. And we're okay with that.

THE COURT: Why do the defendants want to break out the question of whether there is an injury for exports and short-term measures? Why can't it be implicit?

MR. COLLINS: Well, Judge, I think, again, it's -- part of the step is have they established damage, and then quantifying it. And that's the symmetry for 3 and -- for the certified program.

I guess I would ask the question, why are they seeking a dollar? I still don't understand the logic of that.

But the question the jury should be proposed to is was there damage, not injury, was there damage and what's the quantification. That's how 3 and 4 is set up, and I'm not sure why exports and short-term measures shouldn't be set up the same way as opposed to what plaintiffs are seeking.

You have that in the instruction, but I'm not sure that should be the verdict form. Defendants are seeking that plaintiffs get zero.

MS. KISER: Maybe we could solve this by saying for 1, "Plaintiffs claim they are damaged and seek nominal damages of a dollar."

I mean, what we're trying to do is be symmetrical and

make it make sense because if you read 1 without that qualification -- we're trying to make the point that you do have to reach that threshold question somehow.

THE COURT:  The threshold question of what?  An injury?

MS. KISER:  Whether they suffered damage at all.

THE COURT:  Well, when you -- meaning injury, the fact of harm?

MS. KISER:  The fact of harm.

THE COURT:  Yeah.

(Counsel conferring.)

THE COURT:  Let me just go back to first principles here.  A plaintiff has to suffer an injury to recover.  A plaintiff has to prove the amount of its damages.  The jury here found an antitrust injury of some variety from the conspiracy.  The jury did not decide whether any particular part of the conspiracy caused an injury.  The jury was not asked to decide that and the jury didn't decide that.  But the jury did decide that plaintiffs prevailed and the defendants were liable because they found an antitrust injury.

If the jury awards damages, then they will have necessarily found an antitrust injury for that component of the conspiracy.  That's what it means based on the instructions as a whole.

In other words, if a jury awards damages for exports,

then the jury will have necessarily found that there was an injury from exports. If the jury awards damages for short-term measures, then the jury will have necessarily found an injury for the short-term measures. If the jury awards damages for conspiracy, then they will have -- I'm sorry -- a conspiracy involving the UEP Certified Program, then the jury will have necessarily found an injury from the UEP Certified Program.

Does anyone disagree with anything I've just said?

MR. BRODY: No, Your Honor.

MS. KISER: I think -- respectfully, I don't think they're going to understand that. I don't understand it, and I'm not that dumb. I think --

THE COURT: That goes without saying.

MR. COLLINS: Judge, I'm sorry, you know, Instruction No. 8 that Mr. Brody referenced, Judge, it says at the bottom, "If you find that a plaintiff has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages or you may award nominal damages not to exceed $1."

I think what's happened is plaintiffs have essentially conceded, for whatever reason, that they cannot carry their burden of providing a reasonable basis for determining damages for exports or short-term measures. And, you know, I think that's the concept that should be broken out

7238

before -- that's the symmetry, I think, we're seeking.

And plaintiffs have -- and they can speak for themselves, but I think they've failed to carry their burden of providing a reasonable basis for determining damages.

What the argument apparently is going to be in closing is whether it should be zero or it should be $1. But I think that's the construct that -- we're not talking about injury. We're talking about plaintiff failing to carry its burden of providing a reasonable basis for determining damages.

MR. BRODY: Your Honor, what -- I think Mr. Collins is combining a couple of concepts. Instruction 8 in Paragraph 3 says the amount of damages must have a reasonable basis.

So the reasonable basis here is relating -- in this instruction, is relating to the amount. And maybe the last paragraph ought to say, "If you find plaintiff has failed to carry its burden of proving a reasonable basis for determining the amount of damages . . ." That -- that would probably be fair.

THE COURT: That's fine with me.

Mr. Collins, do you like that?

MR. COLLINS: "Amount"? It says "determining damages." And I think that's -- that's really the issue. And I know Your Honor has indicated that we should be happy that

they're only asking for a dollar, but, you know, their expert said there's -- they don't have a -- he doesn't have a basis for determining damages, and they've had -- now they've had to concede they can't do it.  And so it's not the amount.  It's --

MS. KISER:  It's damages.

MR. FOX:  And, Your Honor, we've been silent on this whole issue of damages.  It is the amount of damages that -- for the short-term measures and for the export program, that the experts and everybody has said that they cannot do.

Everybody has agreed, including executives at every -- at Cal-Maine, at UEP, USEM that the exports were done to raise the prices.  And there's plenty of evidence that prices were raised.

THE COURT:  Yeah, I --

MR. FOX:  It's an amount of damages issue.  It's not a damages issue.

THE COURT:  So I'm going to -- I think this is a small point, but I think it's directionally correct.  I'm going to add the phrase "the amount of" in Instruction No. 8.

MR. COLLINS:  We would object.  It's outside the pattern.  But I understand.

THE COURT:  Well, how is this wrong?  "If you find that a plaintiff has failed to carry its burden of providing a reasonable basis for determining the amount of damages."

7240

That's got to be correct, it seems to me.

MR. COLLINS: Again, it's outside the pattern, and I think in this particular case, they have not tied an increase in price of exports to overcharges on the back end. And that's -- that's a damage threshold issue, not an amount issue.

THE COURT: Well, let me take a step back.

The jury cannot award damages, either compensatory damages above a dollar or nominal damages of a dollar, unless the jury finds an injury.

Everybody agree with that?

MS. KISER: Yes.

MR. BRODY: Yes.

THE COURT: And if the jury awards damages, they will have necessarily found the existence of an injury.

Everybody agree with that?

MS. SUMNER: Not exactly because of the point Ms. Kiser raised. That assumes that they understand that that is what they have to do, and I think our point is the verdict form needs to make that more clear because we are concerned there will not be an understanding there.

MR. LEVINE: If we go straight to the amount that -- my fear is that it implies that we're sort of instructing them that damages have already been proven as opposed to sort of "Do you find that they have been damaged and, if so, by how

7241

much?"

That first -- that first component is what the instructions are telling them, but yet the verdict form goes to the second part and sort of im- -- almost implies to them that that first part has already been decided.

THE COURT: I mean, the question is whether I need to tease out for the jury that an award of damages will necessarily include an embedded finding of an injury, whether you believe that implicit or make that explicit.

Isn't that the issue, folks?

MR. BRODY: Yes.

MR. LEVINE: We keep saying injury. We agree injury is -- the problem is here, have they shown that A has damaged them? And if so, how much of that damage?

Now, if you go straight to the damage, yes, implicitly that means they found that there was a damage to them. My fear is if you go straight to that, you're sort of telling them that, you know -- that there was a damage already rather than telling them its their job to decide whether a damage has occurred.

THE COURT: Yeah. Let me put it this way to the plaintiffs: Has the jury yet decided whether plaintiffs suffered an injury from the short-term measures?

MR. FOX: No, but it goes back to the principle that this is an overarching conspiracy, which they have found

injury for.

So that's why I keep going back to, they should be finding damages overall for the conspiracy. That should be question one.

And, again, our verdict form that we submitted only had the question about the overall conspiracy because we think that's the right concept. We think that that's the right way of doing it.

So we don't think that we need to break it down like this has been broken down. In fact, we think it's wrong to break it down like it's been broken down.

Now, some of these issues might be good for information for all of the parties for later, but that's separate than what the jury should find and needs to find.

THE COURT: Mr. Fox, tell me again what your verdict form proposed. I don't have it in my stack here.

MR. FOX: Your Honor, my recollection is that it was very similar to what Question 4 is.

But to -- I think it would be question -- well, I'm sorry.

It wasn't focused on the UEP Certified Program. It would have been something like, what is -- what is the total amount of damages that you award? There, of course, would have been a predicate statement that said that we needed to show damages. But what is the total damages that you award to

7243

each plaintiff, period.

And, again, there would have to be a predicate that says that we have a burden of proving --

THE COURT: For the injury? I'm sorry, for the conspiracy?

MR. FOX: Yes.

THE COURT: So -- and then we would never know whether the jury awarded damages for exports or short-term measures.

MR. FOX: I think we would implicitly know that, Your Honor, because we've only presented one version of what the damages are.

THE COURT: Well, let's go with your verdict form. The jury returns a verdict for $20 million. Did they award damages for exports?

MR. FOX: If they did, then it would have been --

THE COURT: Well -- no. Did they or didn't they? We don't know. That's the issue.

MR. FOX: They would have awarded for the overall conspiracy. That's what they would have awarded it for.

THE COURT: And we won't know what exactly that entailed?

MR. FOX: Other than it's very clear from the evidence and our arguments what we're presenting to the jury. So I think that based on the consistency of our arguments, our

7244

presentation, our witnesses, that we would know.

THE COURT: Defense team, I hear you.

MR. COLLINS: Yeah, we disagree, Judge. Given what's been put into this case, given the legal issues that are going to succeed the verdicts here, given the symmetry of the liability findings, given the plaintiffs' about-face on exports, we're entitled, we believe, to a breakout and --

THE COURT: You know, I broke it out in the last verdict form and I did it for a reason. So I'm going to break it out again. Okay. So that's the ruling. I broke it out for a reason.

I didn't do a clump-and-dump last time. I broke it out. I thought that was the right thing to do. Because the evidence was different. I thought the damages would be different. I didn't think the damages would be this different, but I thought the damages would be different. The liability questions were different. I thought there might be different legal arguments for different hunks of the case, so I wanted to separate it. I didn't know. It seemed like it would make sense.

So I'm going to separate it. The question is simply whether I need to -- whether I should ask the jury to expressly find one way or the other whether there was an injury.

Let me say again what I've said before that I believe

7245

to be correct.

If the jury awards damages for part of the conspiracy, they will have necessarily found an injury. That's what it means. That's what the instructions say. That's what it means. An award of a dollar equals a finding of an injury.

The question is whether I need to tease that out expressly.

MR. COLLINS: Well, Judge, and that --

THE COURT: And I'll hear from you folks again on that as I think this through.

MR. COLLINS: And, Judge, very briefly, the problem with their dollar -- and, again, they injected the dollar thing into the mix.

The problem with the dollar is it also -- according to the instruction Mr. Brody cited, it's the same in the juror's mind as zero. And, you know, we've thrown them a -- you know, the jury is, you know, these guys are good guys and, jeez, there were a lot of export damages, let's not do zero, let's give them a buck.

So I think -- so by your equation, that would -- necessarily they found dam- -- injury and damage and they gave them a buck; whereas, they may have actually found no, they presented us no information, we're going to do zero.

THE COURT: The defendants basically want six

7246

questions. You want for each leg of the stool, is there an injury and what's the amount.

MR. COLLINS: Injury and -- yes, I think we want --

THE COURT: For example -- I didn't mean to shut you off. But in terms of short-term measures, you want a question that says, did plaintiffs suffer an injury? And Question 2 would be, do you award nominal damages?

Question 3 would be, did they -- did you find an injury, and then do you award damages, right?

And the same with --

MR. COLLINS: Yeah, I think what we presented last night -- and, again, we're trying to speak as a group here. You know, I think we wanted symmetry and eight questions, one for each leg -- two for each leg of the stool. And I think that's -- Ms. Sumner can correct me, but I think that's what we presented last night.

THE COURT: I'm going to take five minutes. I'm going think it over.

MS. KISER: Thank you.

THE COURT: I'm not going to shut anybody off, though. As you folks know by now, I like talking to you. It helps me.

MR. COLLINS: Judge, we don't want to do anything. But our position I think is fairly in what we submitted last night.

7247

THE COURT: Okay. Plaintiffs' team?

MR. BRODY: Your Honor, we think that's unnecessary. We think it --

THE COURT: It's not wrong. It might be unnecessary. I've got to think about that.

It -- it is not wrong to ask the jury expressly if they found -- I'm sorry. It is not wrong to ask the jury if they find an injury for a specific component of the conspiracy. It could be a problem if they say no, no, no, which I don't expect them to do, but that would be inconsistent with what they did before. Right? They have to find an injury for one of the three legs of the stool because they found an injury before.

Mr. Fox, go ahead.

MR. FOX: Yes, the same concept that I've been talking about, which is the overarching conspiracy. And I think that we could be confusing the jury here by saying that you need to find injury for each of these individual components.

Now, if you're going to do it the way that you're talking about, I think we need to instruct them that you have found injury -- you have found injury.

THE COURT: Well, I think that is correct. If I do break this out, I would have to tell the jury, I think, you have previously found an injury.

7248

The question is whether there was an injury for each of the specific parts.

MR. FOX:  Yes.

THE COURT:  Isn't that correct?

MR. FOX:  Yes.

MR. LEVINE:  Again, we keep using the same word, and I just want to be precise.  They found injury; they haven't found damages.

THE COURT:  Correct.

MR. LEVINE:  They could find injury and zero damages for each leg of the stool.

THE COURT:  Correct.

MR. LEVINE:  So --

THE COURT:  But that's not what --

MR. LEVINE:  I just want to make sure --

THE COURT:  You all are basically, as I understand things -- I mean the defense team -- are proposing a separate question of a finding of an injury, the fact of damage -- I'm using those interchangeably, and if that's wrong, tell me -- but as I understand things, defendants want two questions for each leg of the stool:  Did plaintiffs suffer an injury?  And if so, what is the amount of damages that you award, if any?

MR. LEVINE:  I wouldn't even say did they suffer injury.  I think the first is did they -- were they damaged.

MR. COLLINS:  Yeah, Judge, our question in what we

7249

submitted last night is did they sustain damage.

THE COURT: Yeah, but that means injury, doesn't it?

MR. LEVINE: No, this -- by the same token that they could find that -- an injury but zero damages.

The law is clear that even if you find injury, they can award zero damages because they would find that plaintiffs failed their burden of proof as to damages and the only way they could come up with damages is through guesswork or speculation. So they are entitled to award zero or, in some cases, nominal.

But that doesn't mean that -- that's a different concept than the injury in the liability.

THE COURT: So I -- I'm not fully tracking, then, what you want.

It seems to me that the jury has decided that there was an injury. The jury did not specifically find what part of the alleged conspiracy caused an injury. They didn't get specific. They just said there was an injury caused by the conspiracy.

I thought plaintiffs wanted the jury verdict form to ask the jury to make specific findings about injury, which I view as the fact of damage, fact of harm, for each leg of the stool, and then say, what's the dollar?

MR. FOX: You just said "plaintiffs." Do you mean defendants?

THE COURT: Yeah, correct.

MR. FOX: Thank you, Your Honor.

THE COURT: Standing order that I may get those phrases wrong.

Let me say that again.

I understood defendants to be saying that they want separate questions. They want a question about whether the plaintiffs suffered an injury, meaning suffered a harm, meaning whether there is a fact of damage, and then a separate question for the amount of damages.

I understood you to want those to be two separate questions.

Is that different than what you're saying?

MR. LEVINE: Other than the fact that we propose, like in Question 1, did plaintiffs prove that they sustained damages as a result and, if so, are you going to give them zero or $1.

THE COURT: Does "sustained damages" mean suffered an injury?

MR. LEVINE: It incorporates that, yes. You can't sustain --

THE COURT: Let me just put it real simply: Does injury mean fact of damage?

MR. LEVINE: That's injury in fact.

THE COURT: Okay. Mr. Brody?

7251

MR. BRODY: Your Honor, I think the fact that we are having trouble agreeing among ourselves as to how -- as to what these concepts mean reveals that this is just introducing confusion.

THE COURT: Well, I'm --

MR. BRODY: The instructions --

THE COURT: I'm concerned about that.

MR. BRODY: The instructions advise the jurors what they need to find. I'm confident defendants will argue that we haven't proven what we need to prove. So we think breaking these questions out in the way they suggest just creates a risk of error, unintentional error.

And then the -- we've made all other points about this.

The other thing I would say about the defendants' proposed form is they've asked the jury to separately delineate the amount of money the plaintiffs lost as a result of backfilling and then separately as a result of the henhouse density --

THE COURT: That, I'm not doing.

MR. BRODY: Thank you.

THE COURT: That, I'm not doing.

Let me make my record on that.

I am not going to ask the jury to separately allocate damages, on the one hand, to cage space or henhouse density

restrictions and, on the other hand, to restrictions on backfilling. I think it's confusing. I think it's unnecessary.

Dr. Baye gave his damages analysis yesterday. He had the part above the line, the part below the line in his demonstrative that talked about different ways to calculate it. One was a $25 million figure. The other was a $14 million figure.

Imagine a world in which the jury wants to award $20 million in damages and then imagine asking them to allocate that between henhouse density and backfilling. It may be difficult for them to do. The evidence didn't get that granular. The evidence didn't have to get that granular. The jury didn't have to get that granular.

The jury has to award damages caused by the injury suffered as a result of the conspiracy. And this form does that and then some.

So I'm not going to ask the jury to delineate that.

MR. BRODY: Thank you, Judge.

THE COURT: The question simply is, do I need to ask the jury to make an expressed finding, yes or no, up or down, yay or nay, about whether plaintiffs suffered an injury for each specific part of the conspiracy?

And I'm going to give everybody one last chance to address the Court on this before I take five minutes and then

7253

just come out and tell you what I'm doing because we need to get rolling.

Go ahead.

MR. BRODY: Our position is they do not need to find that. They've already found the existence of an injury. And the instructions are clear as to what needs to be shown to award damages.

THE COURT: Do you agree with the proposition that if they award damages for exports, then they will have necessarily found an injury for exports?

MR. BRODY: Yes.

THE COURT: And the same for short-term measures?

MR. BRODY: All of them.

THE COURT: And the same for the UEP Certified Program?

MR. BRODY: Yes, Your Honor.

THE COURT: That's what that means, right? An award of damages equals a finding of injury, right?

MR. BRODY: We think that's clear.

THE COURT: Okay. Defense team?

MR. COLLINS: Judge, again, I'll just speak very briefly, and I know I'm repeating myself, but given the legal defects that defendants believe relate to the various legs of this stool, given that -- plaintiffs' changing position, and given the symmetry of the liability findings, we believe a

7254

breakout as we've proposed is appropriate.

THE COURT: Okay.

MR. COLLINS: And necessary.

THE COURT: Okay.

MS. KISER: The one thing I would add is if you look at the *Broiler* verdict, Judge Durkin did ask them to identify the damages they sustained as a result of the conspiracy. And I think that that's our point.

THE COURT: Don't we do that in Question 3, though, at least?

It says, Did plaintiffs prove that they sustained damages as a result of the part of the conspiracy?

MS. KISER: Yes, we do, but we don't do it for --

THE COURT: 1 and 2.

MS. KISER: 1 and 2. That's the issue.

MR. FOX: Your Honor, it does it in the second sentence of 1 and 2 -- I'm sorry, of 1. Yes, of 1 and -- 1, it says, Do you award nominal damages? And that's after they've already received the instructions about what it means for them to award nominal damages.

So we think that it's implicit based on what's in the jury instructions.

THE COURT: Let me say one other thing on Question 3. Can it say or should it say, "Did plaintiffs prove that they suffered an injury and sustained damages?" Is that better or

7255

worse?

MR. FOX: Again, it has the concept of injury in there. And I think you're on board with this. If we're going to put injury in here at all, which I don't think is necessary, we need to then instruct them in the verdict form that they found injury.

THE COURT: Yeah. What else from the defense team?

MR. LEVINE: If we could just make the record that we would object to not breaking out the backfilling and the cage space. We understand Your Honor's ruling. I just want to make a record on that.

THE COURT: On the breakout for the damages?

MR. LEVINE: On the breakout for the damages.

THE COURT: All right. What's your objection?

MR. LEVINE: Well, essentially we think it should track the verdict form. We had this battle during liability --

THE COURT: I'm sorry, what should track the verdict form?

MR. LEVINE: The -- Your Honor right now has in the verdict form the question of damages applying to the certified program, both the cage space restrictions and the backfilling ban.

THE COURT: Mm-hmm. Right.

MR. LEVINE: When we had this battle during

7256

liability, I think Your Honor said, well, you know, they get to describe their conspiracy the way they want, and, therefore, you know, if they want four legs instead of three, so be it. We lost that argument, but we now -- and now the roles are reversed where they want three legs, not four, and we think it should be four to track what happened in the liability.

If Your Honor's, you know, moved past that, that's fine. I just wanted to make sure we made a record of our objection to it and, you know --

THE COURT: Can I say one more thing on this? We've got "and/or" in Question No. 4. What that means is the jury can award damages for cage space or henhouse density restrictions, on the one hand, or the jury can award damages for restriction on backfilling, or the jury can do both. It's one or two or one and two. Those are the three options.

Option number one is cage space only.

Option two is restriction of backfilling only.

Option number three is cage space plus restriction on backfilling, all three.

So that's -- and I'm just throwing it to the jury and saying, "Jury, what's the amount of damages?"

What's wrong with that?

MR. LEVINE: Again, we think given the fact that they litigated this case as four different components, that they

7257

should be held to proving damages for each of the components. But that's --

THE COURT: Okay.

MR. LEVINE: That's our objection.

THE COURT: Okay. Fair enough. Fair enough.

MR. LEVINE: And in terms of the -- in terms of the -- you know, if Your Honor is inclined to go with his original form, I guess we -- you know, that's fine. We do think that, you know, sort of the foundational question as to whether they -- they sustained damages is appropriate first. You know, you could always start the question, "Have they proven that they sustained damage, and if so, how much?"

And for --

THE COURT: I know you're trying to be brief, and I appreciate that. I don't know which question you're talking about.

MR. LEVINE: Oh. For 1 and 2.

THE COURT: For 1 and 2.

What do you think -- stick with me on that, but what did you think about the proposed addition for Question 3 that says, "Did plaintiffs prove that they suffered an injury and sustained damages"?

MR. LEVINE: I'd be fine with that.

MR. COLLINS: Again, I --

THE COURT: Mr. Brody, do you have any objection with

7258

that?

MR. BRODY:  Injury has been found.  It's not an issue --

THE COURT:  Well, injury has been found for the conspiracy.  Injury hasn't been found for the UEP Certified Program expressly.

MR. BRODY:  Right.  And they're instructed that in order to award damages, they have to find that we paid an overcharge.

THE COURT:  Correct. It's implicit.  The question is, is there any -- the question we've been talking about for 45 minutes is, is there harm by making things express?

Do you see any downside to saying, do plaintiffs prove that they suffered an injury and sustained damages?

MR. BRODY:  The downside we would see -- and who knows what goes on in the jury room -- is the jury may say, why are they asking us to talk about injury and we've already done that?

You know, the first instruction says the verdict form is sacrosanct and it says we've found injury, and now we've got to ask about injury.  I think it -- I'm speculating as to what might go on, but I don't think there's any benefit for it and there's that potential detriment.

THE COURT:  Okay.  Mr. Levine, you were saying smart things and I cut you off.  You were starting to talk about

7259

Instructions 1 and 2, and then I asked you to go to No. 3. So I want you to take the microphone back and continue with where you were, please.

MR. LEVINE: I'm not quite sure I had any more pearls of wisdom, but --

THE COURT: No, go ahead.

MR. LEVINE: I mean, again, it certainly -- they found -- right. Our problem is they found injury and we have no idea what they found injury from other than something.

And so I don't think there's any harm or confusion that will be caused. We're not asking them to relitigate or refine anything. This is all about dollars.

And so the way Your Honor posed the question, I don't think it's going to cause any confusion, and it's just focusing them on, okay, if you're going to award dollars, is this what you're awarding dollars for.

THE COURT: Mr. Collins?

MR. COLLINS: Nothing further, Your Honor.

THE COURT: Okay. Ms. Sumner?

MS. SUMNER: Nothing further, Your Honor.

THE COURT: Okay. Anything else anybody else wants to say?

Mr. Brody, I'll give you the last word for the plaintiffs.

MR. BRODY: I'll waive the last word on this one,

7260

Judge.

THE COURT: Thank you, everybody, for talking this through. It's important. Let me just take a few minutes, think it over. I'll come out when I'm ready. All right?

I think we're in good shape on the jury instructions. We had talked about maybe adding the phrase "the amount of" in Instruction No. 8. I don't know how important that is.

MR. FOX: Your Honor, I think it's only important because to the extent the defense uses that portion to say something other than what the instruction means, which I'm concerned about based on the argument, that the amount of -- that that will be clarification to that paragraph that would be helpful.

THE COURT: Let me get defendants to respond to this one point.

You're the ones that want the jury to delineate whether they suffered -- whether plaintiffs suffered an injury for each leg of the stool. That's your ask.

If I were to do that, wouldn't I have to remind them that they've already found an injury from the conspiracy as a whole? Wouldn't that be fair?

MR. LEVINE: I think Your Honor already does when he recounts what they found in phase one.

THE COURT: Yes, but I -- but remember we -- we took most of that out, though. Remember?

7261

MS. KISER:  In Instruction No. 1, you say you found the defendants liable for an antitrust violation.

THE COURT:  Right.  I just don't mention the injury, though.  You know, and we're talking about giving granular, and I'm saying if we climb down the granularity rat hole, do we need to be reminding them one step back that they found an injury before we ask them to get more extra granular about what injury they found -- they find.

Mr. Brody?

MR. BRODY:  We think it's better to stay out of that rat hole, but if we go down there, we think yes, we do have to tell them that.

THE COURT:  Got it.  Okay.

All right.  Anything else anybody wants to say before I have a couple minutes to think this over and make any final changes?

I will e-mail you the final version of both.  The good news for Ms. Kastanek is she's got more time to prepare for her closings, so . . .

Thank you, everybody.  I appreciate everybody's time.

Mr. Levine, did you want to say something?

MR. LEVINE:  Yeah, I just want to -- yeah, I don't know if we're not necessarily doing a formal charging conference, but to the extent that our original causation instruction was not given, we would have an objection to that.

7262

And just as a reminder, it necessarily pegged it to the four -- you know, it was a lot of the issues we were talking about before, that they can't find damages based on the effects of all the other producers in the certified program and the like and that they had to tie it to the just four. That was our original proposed causation instruction that I think was filed, an amended form, as recently as a couple of days ago.

Your Honor has his own causation instruction, which is fine, but we just want to preserve our rights and formally sort of object because of that.

THE COURT: Got it. So the concept is if the price increase is attributable to nonconspirator, nondefendants who joined the UEP Certified Program and restricted supply but didn't do so as part of the conspiracy, that that shouldn't count? That's the idea.

MR. LEVINE: That's correct.

THE COURT: And they're free to make those arguments in closings, aren't they, Mr. Brody? Doesn't that go to causation? That's your argument, I think.

MR. BRODY: I expect we'll hear that.

THE COURT: Yeah, okay.

All right. Thank you for that.

Let me say one other thing about closing before I -- before I go back.

I want to remind everyone of the ground rules. Do not call into question what the jury already did. Do not instruct the jury on the law. Do not tell the jury what the jury instructions mean. Do not construe the jury verdict form. Do not appeal to sympathy.

There have been a few statements in closings and openings that I haven't always loved, and I have been loathed to interject myself.

Here's my thinking on this: Juries react to judges, so I am sometimes loathed to interject myself because I don't want them to overreact.

But let me give you an example. There should not be any statements about sympathy. People should not be saying, "Please feel sympathy for these defendants. A jury verdict would have bad consequences for us. We may have layoffs. We may go bankrupt. It may hurt our family," something like that. That's not appropriate.

On the flip side, I don't think people should say, "Don't feel sympathy for them."

There was some of that before, and I don't expect to hear that again. Before we heard expressly, "Don't feel sorry for the Rust family." That came out before I think in response to something that was said by the defense.

This should not be a war of sympathies. It should not be do you feel sorry for these people or don't you? Or

7264

damages based on sympathy or not.

I'm still figuring out how much to inject myself. I wondered when we were done last time if I should have *sua sponte* injected myself more. I'm not inclined to do that. But I'm really relying on you folks to stay within the barriers that I've laid down. And I don't want people to talk about the consequences.

The jury just needs to make the best decision they can on the facts and the law about what damages are appropriate, not whether this award is going to be hurtful or harmful to the Rust family. They shouldn't think about whether Kraft needs this money or not. Right? Those sorts of issues.

So I wanted to throw this out there because I have been thinking about it.

So, Ms. Kastanek, you've looked for at least four minutes like you've wanted to say something because you've bent the mic and, even with my blurry vision without glasses, I can see that you're chomping at the bit to add your two cents this morning.

So go ahead, please.

MS. KASTANEK: So, of course, we agree that the defense should not make those types of comments.

The problem is that the genie is out of the bottle with respect to what happened in opening, which there were a

7265

ton of comments in opening along those lines. I can detail them to you, but there were a lot of them.

And, of course, Your Honor is instructing the jury that financial condition doesn't matter, but we have a slide from Cal-Maine showing the respective sizes of the company. We have them saying "every dollar matters to us." We have them talking about the impact on their -- you know, the fact that they're a public company who has to report to shareholders. We have all kinds of statements like that.

And I think that we, as the plaintiffs, are entitled to say to the jury, look, all of that happened in opening, and it's irrelevant. And here's the judge's instruction on that, and you shouldn't be considering this and this is, you know, not what the law is.

THE COURT: So you can point to the instruction. I don't want anybody reminding the jury what was said in openings on those points. No one objected during openings, so that ship has sailed. I don't want to hear it again, is what I'm saying.

Okay. I don't want people saying plaintiffs are big companies, they don't need the money. I don't want to hear people saying, we're little egg farmers, don't tag us with money. I don't want people to say, I feel sorry for the Rust family. I don't want to people to say, I don't feel sorry for the Rust family, they deserve it. Anything like that.

7266

You know, I think if you go back to it, you're going to remind the jury of things that they heard that I didn't want them to hear and I don't want them to think about. It will generate more harm than it will cure. You will tear open a wound which does not help it heal. I would rather just turn the page and leave the Band-Aid on.

Go ahead.

MS. KASTANEK: I'm struggling with it because, of course, it happened. And so I think that --

THE COURT: Yeah, but you guys didn't object. So, you know, in the heat of the moment, you said nothing. So I'm not sure how harmful it was, right? I mean, that's the reality. It was said. Plaintiffs' counsel didn't bat an eye. I thought you were going to object. You didn't object. I thought about injecting myself. I didn't.

So, you know . . .

MR. FOX: Your Honor, you -- and we hear you.

THE COURT: I was the one that -- you didn't even bring it up. Not to argue it, but, like, I was the one that brought it up after closings -- after openings. Nobody on the plaintiffs' team brought it up. So I did it *sua sponte* because I want this to go smooth for everybody and be fair for everybody. That's why I *sua sponte* brought it up. So . . .

MR. FOX: We hear Your Honor, and we will move on. I just want to say, you've been very clear in the past that you

don't expect objections during openings. You've been clear in the past that the way we should deal with it is through arguments when somebody opens the door or says something inappropriate.

As you recall before closings last time, I raised the issue about we don't think the defense should raise sympathy about the Rust family, and then we heard sympathy about the Rust family. So did I object at that point? No, because we had raised it already and I was going to address it.

So now this puts us in the position where we didn't object because --

THE COURT: And that's why I didn't stop you last time. When you said, "Don't feel sorry for the Rust family," I thought, frankly, given what was said -- you know, I gave you a little latitude on that.

And just to be clear, I have not said you can't object. What I have said is do not object for improper reasons. I have also said that it is very difficult for a district court judge on the fly to respond to an objection that somebody is saying something that is not encompassed by the record because we've got thousands and thousands of pages of record and oodles of documents, and that is a particularly difficult thing for me to police. It's better for you to just duke it out.

If somebody says something inappropriate along these

7268

lines and you object, I will rule.

MR. FOX:  We hear you, Your Honor.  And, again, we were -- sometimes you see our pauses in our discussions amongst each other, sometimes you don't about these issues, so you should not take our lack of objection or our lack of saying something right afterwards to mean that we didn't have a -- we didn't think that it shouldn't be addressed.  We just were going to address it in a different way than what you're saying now.

But, again, we hear you and we will move on.

THE COURT:  And I will say this:  I don't think that the defense team pitched a very big tent on this yesterday.  There were a couple statements that came out.  I don't want to give this undue attention.  Okay.  And I think we're probably at risk of doing that already.  It was just a couple sentences.

Remember my metaphor about one bad egg in a tanker truck of liquid eggs, you know, it doesn't have much of an impact.  And I think that's directionally correct here.

And just to put everything into perspective, I don't know what the word count is for you all for openings and closings.  Your batting percentage is remarkably high.  The number of sentences that I haven't loved is remarkably low.  So I've had very little problem, if any, with the vast, vast majority of the sentences you've said.

7269

So I don't want this to take on an outsized importance. You know, I don't think anything was said during openings yesterday that will affect the verdict in any negative way in any way, shape, or form. It was just a passing comment in a sea of comments in a vast ocean of commentary. So I don't think it's going to impact the verdict negatively.

MR. LEVINE: Your Honor, towards that end, we also believe it would be inappropriate to interpret for the jury their verdict form. We heard a lot of questioning yesterday that implied the entire certified program was a conspiracy.

The jury verdict form found two specific components. And I don't think anything should be made more than those two specific components --

THE COURT: I think people should be very careful not to interpret the jury verdict form other than just to repeat what they said.

MR. FOX: And, Your Honor, on both sides?

THE COURT: On both --

MR. FOX: (Indiscernible) --

THE COURT: -- sides.

MR. FOX: -- received outside influence over some of the arguments --

THE COURT: Well, the jury said that not every member of the UEP Certified Program was in on the conspiracy. They

7270

did not say that other people were not involved.

MR. FOX: We know of one.

THE COURT: They said not all.

It could be that there was nobody else, and it could be that everyone else was involved except one person, meaning Moark -- no, meaning Michael Foods. I beg your pardon. Right?

Okay, folks. Anything else?

Here's the spirit in which I'm saying this. I want this to go smoothly for all of you. I genuinely want this to go smoothly. And I don't want anybody to feel like the other side said something that was below the belt or you got hit in the knees by the other side or they made a comment that really shouldn't have been said.

You know, I want this case to be decided within the field of play. I don't want anybody to feel like the other side did something that was out of bounds, right. And I think everybody wants that. Nobody wants to deliver a punch below the belt, nobody wants to get hit out of bounds, either. Right?

So I'm just encouraging everybody to do this because you don't like if it happens to you, don't do it to the other side. That's all. Okay. And I think this will --

MS. SUMNER: Your Honor --

THE COURT: -- go smoothly.

7271

Ms. Sumner, go ahead.

MS. SUMNER: Yeah. Excuse me, sorry. There's just one additional thing, and I think this goes without saying, but I do feel compelled to say it just based on some of the discussions we've had about the instructions and the verdict form, and that is, we do not believe that they can argue or say to the jury that the jury has found that the certified program is an antitrust violation. Again, any statements on that would need to be limited to the components of the program that have been challenged and had been found to be in the conspiracy by the jury.

THE COURT: Well, I will say this: I -- it is true that the jury did not find that the entirety of the UEP Certified Program is conspiratorial and anticompetitive. But it is also true that the jury found that several prominent parts of the UEP Certified Program were anticompetitive and conspiratorial; specifically, the cage space or henhouse density restrictions and, specifically, the restriction on backfilling. And I also instructed the jury that includes the 100% Rule, if you go back. That was part of the finding. Look at the transcript.

All right. So I think this will go smoothly.

Is there anything else anyone wants to say on any topic?

We need a break anyway. We need our midmorning

7272

break. The good news is the jury has their breakfast back there and they won't be surprised that we're talking.

Anything else, anybody?

All right. So I'll take a break and we'll come back. And I will e-mail you the version and I'll let you know when we're ready to go. Okay?

Thank you, folks.

THE CLERK: All rise.

(Recess taken from 10:28 a.m. until 10:49 a.m.)

THE COURT: All right. Have a seat, everyone.

I wanted to throw something out there. I've got a sentence to distribute.

Good morning, Mr. Baker. Nice to see you again, sir.

MR. BAKER: Good morning, Your Honor.

THE COURT: I thought that was you in the back, but I forgot my glasses last time and you were a bit blurry and I didn't want to take a flyer and say hello to you if I wasn't sure that was you. I thought that was you.

So good morning. Nice to see you.

My clerk has handed out hard copies of a sentence.

Does everybody have it in front of them?

MR. FOX: Yes, Your Honor.

THE COURT: Let's take a step back and talk about where we are.

We've been talking a lot about injury. We've been

talking a lot about damages. I think it's been helpful.

The jury found that there was a conspiracy. The jury found that there was an injury. We did not ask the jury to delineate what part of the conspiracy caused an injury. It was just yay or nay, up or down, yes or no, was there an injury.

I had said before, and I continue to believe, that if the jury awards damages for any part of the conspiracy, the jury will necessarily have decided that the plaintiffs suffered an injury for that part of the conspiracy.

I am proposing adding one sentence to the jury instructions that makes that point expressly clear, it teases it out a little bit more.

So the sentence to read as part of the jury instructions, the addition would be as follows: "You may award damages for a part of the conspiracy only if you find the plaintiffs proved that they suffered an injury for that part of the conspiracy."

Let me read that one more time.

"You may award damages for a part of the conspiracy only if you find the plaintiffs proved that they suffered an injury for that part of the conspiracy."

I believe that to be an accurate statement of the law.

Does anybody disagree with the fact that that is an

7274

accurate statement of the law?

Let me put it differently.

Does everybody agree that that is an accurate statement of the law?

MR. BRODY: I agree with your statement, Your Honor, that the jury will necessarily have reached that conclusion. If they award damages, they will have found that the plaintiffs, in fact, were injured by the conduct that is at issue.

We can debate, and lawyers undoubtedly do debate, about the difference between injury and damage, but I think in terms of asking the jury, this explains that they -- to award damages -- if -- they may only award damages if they feel that what they're awarding damages for hurt the plaintiffs. I think it's fair.

THE COURT: So let me put it this way. Do the plaintiffs agree that the following sentence is correct as a matter of law: "You may award damages for a part of the conspiracy only if you find that plaintiffs prove that they suffered an injury for that part of the conspiracy"?

MR. BRODY: You want a yes or no?

THE COURT: Yes. Is it an accurate statement of the law?

MR. BRODY: We're willing -- I think it's accurate for purposes of an instruction. I suspect if I were standing

in the Seventh Circuit, I'd be asked about the difference between fact --

THE COURT: Well, the same law applies here as the Seventh Circuit.

MR. BRODY: I understand.

THE COURT: So there's not a different set of rules.

So I just want to know is this an accurate statement of the law?

MR. BRODY: Yes.

THE COURT: Okay.

MR. LEVINE: Yes.

MS. SUMNER: Yes.

THE COURT: This teases out a little bit more the existence of the embedded finding, correct?

MR. COLLINS: Yeah, I mean, the embedded finding meaning the first of the two questions? Are we talking about the verdict form?

THE COURT: Yeah. So it lets the jury know that if you award damages, you're finding the existence of an injury, right?

MR. COLLINS: Yes.

THE COURT: Should we add a sentence that says, "You may not award damages without an injury"?

MR. FOX: I don't think that's necessary, Your Honor, and as I mentioned before --

7276

THE COURT: Well, that's true, you may not award damages without an injury.

MR. FOX: There are a lot of things that are true, but the more you put in an instruction -- as you know, if they have already been properly instructed, the more attention you focus on it, the more importance the jury thinks that it needs to have.

You have a correct statement of the law here, I think it's very clear, and I don't think that we need to add any more sentences to it otherwise it might have outside influence on the jury.

THE COURT: Okay.

Does anyone want to say anything else about this proposed addition to the jury instructions? Does anybody have any objections, changes, corrections, or otherwise to my proposal to add this instruction to the jury instructions?

MR. COLLINS: It would be a stand-alone, Your Honor?

THE COURT: It would be a stand-alone, yeah.

It would go after the instruction about nominal damages and before the instruction about how to calculate damages.

MR. FOX: Your Honor, my only question, and I think you're probably handling this separately, is are you going to inform the jury of what they found with respect to injury and the verdict form separately? With their prior findings that

7277

they found injury?

Because I think with this instruction, it would be nice to have -- you say, you found that the plaintiffs suffered injury as a result of conspiracy, period.

THE COURT: So it could say this: "In your last jury verdict form, you decided that plaintiffs suffered an injury. The jury verdict form for damages will ask you whether you are awarding damages for different parts of the conspiracy. You may award damages for part only if you find X, Y, and Z."

MR. LEVINE: And I think Your Honor had suggested also doing the reverse, and I think that was Your Honor's sort of MO in -- for liability. When you do pro, you do con, and I think that would be appropriate --

THE COURT: Okay.

MR. LEVINE: -- here as well.

THE COURT: So this is what I'm inclined to do: Give this instruction with three more sentences. And this is not going to be wordsmith, but here it goes. "During the liability phase in your jury verdict form, you decided that plaintiffs suffered an injury as a result of the conspiracy. In the jury verdict form for the damages phase, you will decide whether to award damages for different parts of the conspiracy. You may award damages for a part of the conspiracy only if you find that plaintiffs proved that they suffered an injury for that part of the conspiracy. You may

7278

not award damages without an injury."

MR. LEVINE:  Agreed.

MR. FOX:  One moment, Your Honor.

(Counsel conferring.)

MR. FOX:  Your Honor, we are okay with your suggestions.  I just don't want anything to be -- anything to indicate that we don't still think that this should be one finding with an overarching conspiracy.  So I don't want -- this is not for Your Honor because you know that point.  I just don't want it to be claimed that we waived or forfeited any argument as a result of saying that this is legally fine.

THE COURT:  No, I hear you.  I hear you.

I know we're all anxious to get going.  I certainly am.  I'm going to type this up.  I'm going to come back out here in two minutes.  This is important.

I'll come back in two minutes.

(Recess taken from 10:58 a.m. until 11:05 a.m.)

THE COURT:  All right, folks.  I'm going to ask my clerks to hand out the hard copies.  The hard copies have the four sentences that we just talked about.

I know everyone is anxious to get going.  I'm sure the jury is anxious to get going.  I think there is value in making sure everyone is comfortable with the language before we get going.  So it is a good use of time, even though it is 11:05.

7279

I'm going to read into the record what I've just handed out to everybody.

Everybody got a copy?

It looks like everybody has got a copy.

I propose adding the following four sentences to the jury instructions. This would go I think after current Instruction 7, which is -- actually, it will probably go before Instruction 7. We'll talk about that in a minute. It will probably go before Instruction 7.

Here's the proposed addition: "In the jury verdict form for the liability phase, you decided that plaintiffs suffered an injury caused by the conspiracy. In the jury verdict form for the damages phase, you will decide whether to award damages for different parts of the conspiracy. You may award damages for a part of the conspiracy only if you find that plaintiffs proved that they suffered an injury for that part of the conspiracy. You may not award damages without an injury."

Any objection to that proposed jury instruction from the plaintiffs?

MR. FOX: No. Subject to the, again, issue with the overarching conspiracy, no objection to that.

THE COURT: Okay. But any objection to this language?

MR. FOX: No, Your Honor.

7280

THE COURT: Okay. Defense team, does anyone object to the addition of this proposed jury instruction?

MR. COLLINS: Not for Cal-Maine.

MS. SUMNER: No, Your Honor.

MR. LEVINE: No, Your Honor.

THE COURT: Does everyone agree that the jury instructions are better with this language?

MR. LEVINE: Yes.

MR. COLLINS: Yes, Your Honor.

MR. BRODY: Yes.

THE COURT: Everybody? Okay. I think it makes things express that were implicit.

I'm loathed to do this. Let me go back to Question No. 3 from the jury verdict form that currently says, "Did plaintiffs prove that they sustained damages?" I'm inclined to probably just leave that. It could say, alternatively, "Did plaintiffs prove that they suffered an injury and sustained damages?"

I think I'm entitled to leave it.

Everybody agree?

I'm seeing only heads nodding.

Okay. Here's what I'm going to do. I'm going to add this jury instruction. I'm going to e-mail it to you. I'm going to e-mail you the final jury verdict form.

I think this ought to go before Instruction No. 7.

7281

Instruction No. 7 breaks out what they're seeking for the different parts of the conspiracy, the nominal damages for short-term measures and exports. I think it ought to go before that because the instruction that I've just added introduces the concept that they can award different parts -- different amounts of damages for different parts of the conspiracy.

Everybody agree with the placement?

MR. FOX: It's fine, Your Honor.

MR. COLLINS: Yes, Your Honor.

MR. LEVINE: Yes.

THE COURT: I'm going to include this language. I'm going to e-mail it to you. I'm going to print some hard copies for the jury.

The good news is it's only 17 pages. It won't take forever.

I don't know if you all need time to put this language into your slides, if any. You're welcome to show this to the jury.

Go ahead.

MS. KASTANEK: I do not need time for that, but for the verdict form, has Your Honor made changes to it in the last, let's say, hour? Like, do you plan to make changes right now when you go back?

I have the version from, you know, this morning in

7282

the PowerPoint, which is why I ask.

THE COURT: Okay. I will e-mail you the version that I have. I don't think I've made any changes to the jury verdict form today.

Have we?

MR. FOX: I think it would be helpful just to get the copy that we all agree on.

THE COURT: You'll get it. Yeah, go ahead.

MR. FOX: As you say, if you could e-mail it to us, that would be great, because I just want to make sure we're all on the same page on what it is.

THE COURT: Correct. And I'll put the word "final" at the end so you know you've got the final.

MR. FOX: Thank you, Your Honor.

THE COURT: Is that good, everybody?

MR. COLLINS: We certainly discussed changes, and, again, I don't know where Your Honor landed, but just in the spirit of trying to move this along, we are requesting -- and Your Honor, as I understand, ruled that you're not going to break out backfilling, but we had requested basically six questions. And I don't believe that's what the version you sent around this morning is. But I don't know where Your Honor is on this.

But accepting Your Honor's ruling on backfilling, we have requested six questions to mirror the Question 3 and 4

7283

that is in the -- what I understood to be the current version, but add prefatory questions for 1 and 2.

THE COURT: Yeah.

MR. COLLINS: That, at least, was our request.

THE COURT: I hear you.

I think the instruction that I'm just giving -- sorry, that I have just discussed adding to the jury instructions is going to address that point. It makes it expressly clear to the jury that if you award damages, you're necessarily finding that they suffered an injury.

So I don't need to ask them a question on that because it's going to be embedded in the yes-or-no question about whether to award damages.

Put another way, I don't need to ask the jury expressly whether they find an injury for short-term measures or for exports because if they award damages, they will have necessarily found an injury, and I'm telling them that expressly in the instruction that I've just added.

Okay. Anything else, anybody?

MR. FOX: No, Your Honor.

THE COURT: All right. So I will go back there. I will add this language. I will e-mail you the final jury verdict form. I will add the -- I'm sorry, I will e-mail you the jury instructions.

We will make copies. You will have time to embed it

7284

in your PowerPoint as you see fit.  And we will get going.
Okay?

Let's talk about the order.

Ms. Kastanek is going.  And then who is going for the
defense and in what order?

MR. KING:  Your Honor, I'm going next.

THE COURT:  Okay.

MS. SUMNER:  Yeah, and then, Your Honor, I will have
not even a minute worth of remarks.

THE COURT:  Totally fine.  Totally fine.

And then Mr. Collins or Mr. Otlewski or Kiser?

MR. COLLINS:  Otlewski will be going.

THE COURT:  Okay.  Sounds good, everybody.

Are you still an hour?

MS. KASTANEK:  Yes, maybe a little bit less.

THE COURT:  I think it would be good to get the
opening in before lunch, so I'm going to try to do this
quickly.  All right?  Sound good?

Thank you, folks.

Hopefully we'll start in 15 minutes or so.

(Recess taken from 11:11 a.m. until 11:34 a.m.)

THE COURT:  All right.  Welcome back, everyone.

During the break, we did a couple of things.  We
e-mailed you the final version of the jury verdict form and
the final version of the jury instructions.

7285

Did everybody get that?

MR. BRODY:  Yes, Your Honor.

MR. COLLINS:  Yes.

THE COURT:  Any final objections, changes, corrections, additions, on otherwise, other than what you've already articulated?

MR. FOX:  No, Your Honor.

MR. LEVINE:  No, Your Honor.

MR. COLLINS:  No, Your Honor, not other than what was previously articulated.

THE COURT:  Okay.  Thank you, everybody, for your time this morning.  I will do my best to smooth things over with the jury.  They've been sitting back there an hour and a half thinking we're going at 10:00 o'clock and it's now 11:35.  I'll tell them not to blame you.  I'll take the heat for it.  I want them in good spirits today.

So here's what we're going to do:  I'm going to instruct the jury on the first 15 instructions.  We will have plaintiffs' counsel deliver closings.  We will then break for lunch.  Defendants will go.  And then the jury will be off to the races.

Does that sound good, everybody?

MR. KING:  Yes, Your Honor.

MR. COLLINS:  Just one logistical thing.  Because we're behind schedule, and no one's fault, but Mr. Baker is

not able to stay through lunch. So -- and I don't want him leaving in front of the jury with Ms. Kastanek speaking. So if it's all right with the Court, he was going to excuse himself at this time.

THE COURT: Okay. That's certainly fine.

Mr. Baker, I'm sorry that you did not get to hear closings today. The good news is you got more than your fair share of a jury instructions conference. You now see behind the scenes what it looks like when a judge works with the lawyers to try to craft jury instructions. I don't know if that process seemed painful to you. But the spirit of it is to try to get the law right in terms that are clear and fair to everybody. So that was the goal of that.

I wanted to say, Mr. Baker, it was pleasure having you in the courtroom. You were a friendly, positive presence in the courtroom every day, and it was a pleasure to have you here. And I don't know what the future holds, if I'll see you again in the courtroom, maybe yes, maybe no, but I wish you all the best, sir, and good luck to you down the road.

MR. BAKER: Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Baker.

MR. FOX: Your Honor, you mentioned the defendants go and then the jury is off to the races. You are providing us an opportunity for rebuttal argument, aren't you?

THE COURT: Oh, yeah. I meant closings -- I was

trying to be a little brief. Yeah, you'll get the last word. Don't worry.

MR. FOX: Thank you.

THE COURT: And then I'll give them the final three instructions.

All right. Everybody ready to get the jury? Everybody ready for closings?

MR. KING: Your Honor, on rebuttal, the same general guidelines, 50 percent of the --

THE COURT: Yeah, same -- I'm not repeating all the rules, but the same rules apply. Nothing new. No new export damages theories will be uncorked for the first time in rebuttal, okay, or anything else.

All right. Everybody ready?

We'll get the jury.

(Jury in at 11:38 a.m.)

THE CLERK: All rise.

THE COURT: Thank you, Ms. Ramos.

Have a seat, everyone.

Good morning. We're perilously close to be saying "good afternoon."

Let me start with the obvious. You folks were here bright and early on time every day, as you're always here every day on time, every single day, all of you, for a 10:00 o'clock start, and it has undoubtedly not escaped your

7288

attention that it is closer to noon than it is to 10:00 o'clock. It is 11:40.

Let me start by saying I'm sorry you had to wait.

Let me say that again.

I'm sorry you had to wait. I'm sorry you had to wait. Thank you for your patience.

Can I just say this? You've gotten to know me a little bit over the last couple of months. I don't like making people wait. I don't. I don't like making juries wait. I don't like making juries wait. I really don't. I respect your time. I sat on a jury. I know how hard it is to sit back there and wait. I really do get it.

Here's the reality, folks: Sometimes, unfortunately, you have to wait because we have some things to talk about. That's just the reality.

And here's what I'll say, too: Don't blame the lawyers. Don't blame the lawyers that we've got a late start time. If you need to blame anybody, you can blame me, that's fine. But we had some final things that we had to talk about. Okay? We had some things to talk about. Just trust me that we're going as fast as we can and we do respect your time. I'll just leave it at that. Okay.

But I'll just start by saying, thank you for being here. Thank you for waiting. I hope breakfast was good and I hope there was plenty of it.

7289

You are getting lunch today, so if that's any consultation, I'll just start by saying all that.

Thank you, folks, for being here again.

Let me talk to you about the plan for the day. We have completed all the evidence. You are not going to hear any more evidence. The record is closed.

In a moment, I'm going to give you jury instructions about damages. It's much shorter than last time. I think it's about 18 pages or so, give or take. I don't expect it to take particularly long to go through.

You're then going to hear closing arguments just like last time. You're going to hear from the plaintiffs first. You're then going to hear from the defendants, and then you're going to hear rebuttal from the plaintiffs.

The closing arguments will be the arguments by the lawyers about why you ought to award damages and what they think the jury -- what they think the damages ought to be.

We are going to take a lunch break after the plaintiffs deliver their closings. So the concept is going to be I'm going to read you most but not quite all of the jury instructions. The plaintiffs will deliver their closings. When we get back from lunch, the defense team is going to give their closing arguments. We're going to have a rebuttal. I'll give you the last couple of instructions about the foreperson, *et cetera*, and then you'll get the jury verdict

7290

form and you'll be off to the races.

Does that make sense, everyone?

Okay. The next step is for me to ask Ms. Ramos if she'd be kind enough to distribute to all members of the jury a hard copy of the jury instructions.

Thank you, Ms. Ramos.

Members of the jury, we're going to do it just like we did last time. You're pros at this by now. We're going to go one page at a time. Everybody is a team. Everybody stick with everyone else. We're all going to be on the same page together.

We're also going to project the jury instructions onto the screen, if you'd like to see that. If you want to follow along in hard copy, you can. If you want to look at the screen, you can. If you only want to listen, that's fine, too.

This is your copy of the jury instructions. If you want to make notes, you can. If you don't want to make notes, that's fine, too. Whatever works for everybody.

It looks like everybody has got a hard copy?

Can everybody see the screen with the jury instructions?

The copy you have should say "Jury Instructions-Damages."

Does everybody see that?

7291

I'll now deliver the jury instructions.

Everybody turn to Page 2.

It should say Instruction No. 1 at the top. Everybody see that?

Here it goes.

Members of the jury:  On November 21st, 2023, you rendered a verdict on the liability phase of the trial.  You found the defendants liable for an antitrust violation.

Your verdict was unanimous.

You made your findings of fact in the jury verdict form.  That jury verdict form is the definitive statement of your findings from the liability phase.

The jury verdict form speaks for itself.

For your reference, I will provide you with a copy of your signed jury verdict form from the liability phase when you deliberate about the damages phase.

You may not change or reconsider any of your previous findings about liability.  Your previous answers are final.

You have answered the questions about liability.  The next step is to answer the questions about damages.

At the end of the liability phase of the trial, I instructed you on the law.  I gave you more than 50 jury instructions.

I will now instruct you on the law that applies to the damages phase of the trial.

Some of the instructions that I will give you about damages use terms that I explained during my instructions about liability. For example, some of the instructions about damages use terms such as "conspiracy" and "injury."

The meaning of the terms does not change. Those terms mean the same thing during the damages phase that they meant during the liability phase.

The instructions from the liability phase continue to apply.

I will give you one hard copy of the jury instructions from the liability phase when you deliberate about damages. You may refer to those jury instructions during your deliberations about damages.

So let me pause there, folks.

When you go back to deliberate, you're going to have three things. You're going to get a copy of the jury verdict form about damages, which I'll explain to you in a minute, and you'll also have the materials that you had last time. You'll have the completed jury verdict form about liability, which I'm holding up for you now, and you're going to have a copy of the jury instructions that you got last time about the liability phase of the trial.

Okay. So you're going to have all three things.

If you'd like to follow along, please turn the page to Page 4, with Instruction No. 3 at the top.

7293

Here it goes.

As I previously instructed you, all parties are equal in the eyes of the law.

A party's financial condition, size, or status as a public company or a private company should not influence your verdict.

When you consider the issue of damages, you may consider any evidence presented at any stage of the trial.

You may consider testimony, exhibits, stipulations, and any other evidence presented during the liability phase of the trial, or during the damages phase of the trial.

You are not limited to the evidence presented during the damages phase of the trial.

Plaintiffs have the burden of proof on the question of damages.

Plaintiffs must prove the fact of damages by a preponderance of the evidence.

When I say a particular party must prove something by a preponderance of the evidence, or when I use the expression "if you find," or "if you decide," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

You have found that defendants violated the antitrust laws, and that the violation caused an injury to each of the plaintiffs. You must now determine the amount of damages, if

any, each plaintiff is entitled to recover.

Each plaintiff is entitled to recover for all damages to its business or property that were a direct result of the conduct that you previously found to be unlawful.

Antitrust damages are compensatory only, not punitive. The purpose of antitrust damages is to put an injured plaintiff as near as possible in the position where it would have been without the conspiracy.

The law does not permit you to award damages to punish a wrongdoer or what we sometimes refer to as punitive damages, or to deter particular conduct in the future.

You must not award the plaintiffs any amount for attorneys' fees or the costs of maintaining this lawsuit.

In the jury verdict form for the liability phase, you decided that plaintiffs suffered an injury caused by the conspiracy.

In the jury verdict form for the damages phase, you will decide whether to award damages for different parts of the conspiracy.

You may award damages for a part of the conspiracy only if you find that the plaintiffs proved that they suffered an injury for that part of the conspiracy.

You may not award damages without an injury.

Plaintiffs are seeking nominal damages of $1 for the part of the conspiracy involving short-term measures (*i.e.,*

7295

early slaughter, early molting, and flock reduction.)

Plaintiffs are seeking nominal damages of $1 for the part of the conspiracy involving the exports as part of the USEM export program.

Plaintiffs are seeking compensatory damages for the part of the conspiracy involving the cage space or henhouse density restrictions as part of the UEP Certified Program, and the restriction on backfilling of egg-producing hens as part of the UEP Certified Program.

Defendants deny that plaintiffs are entitled to damages.

You are permitted to make just and reasonable estimates in calculating each plaintiff's damages.

You are not required to calculate damages with mathematical certainty or precision.

However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, nonspeculative assumptions and estimates. Damages may not be based on guesswork or speculation.

Plaintiffs must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that a plaintiff has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

7296

If you find that a plaintiff has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages, or you may award nominal damages, not to exceed $1.

The proper way to calculate the amount of damages is to determine the difference between the prices that each plaintiff actually paid for egg products and the prices that each plaintiff would have paid without an agreement to restrict supply.

In other words, the proper way to calculate damages is to determine the difference between the prices actually paid by each plaintiff and the prices that each plaintiff would have paid but for the conspiracy.

The difference is referred to as the overcharge.

Overcharge damages may be calculated in a variety of ways.

If you award damages, you must decide what sum of money would fairly and reasonably compensate each plaintiff.

You must consider an award of damages for each plaintiff separately.

If you find that one plaintiff is entitled to recover damages, exercise caution to be sure that each plaintiff is awarded damages only for its own injuries.

Each participant in a conspiracy that violates the antitrust laws is jointly and severally liable for all of the

damages resulting from the conspiracy.

Joint and several liability means that each conspirator is fully liable for all of the damages caused by the conspiracy and not solely for damages caused by an individual conspirator.

One who knowingly joins an ongoing conspiracy is liable for the previous acts of the other conspirators in furtherance of the conspiracy.

If you find that one or more plaintiffs is entitled to recover damages, then defendants would be liable for all damages caused by the conspiracy, including any overcharges from purchases of the product in question.

A defendant is liable for overcharges on all purchases of egg products by plaintiffs from all members of the conspiracy, including defendants and two nondefendant co-conspirators (*i.e.*, Moark and Wabash Valley).

A defendant is not only liable for overcharges from purchases from that particular defendant. In other words, a defendant may be liable for overcharges for purchases that a plaintiff made from another defendant. Put another way, Defendant No. 1 is responsible for overcharges from purchases that a plaintiff made from Defendant No. 2.

Similarly, a defendant is not only liable for overcharges from purchases from the defendants. In other words, you may consider any purchases that a -- let me say

7298

that again.

In other words, you may consider any purchases that plaintiffs made from a nondefendant co-conspirator (*e.g.*, Wabash Valley) when considering damages.

As a reminder, you previously found that the conspiracy included all four defendants (*i.e.*, Cal-Maine, Rose Acre, United Egg Producers, and United States Egg Marketers) plus two nondefendants (*i.e.*, Moark and Wabash Valley).

When calculating damages, you may not consider any purchases that plaintiffs made from any other egg producers. That is, you may not consider any purchases that plaintiffs made from any egg producer other than the members of the conspiracy.

You may award damages for any purchases that any plaintiff made from any member of the conspiracy (including defendants and the two nondefendant co-conspirators) from October 2004 to December 2008.

You may not award damages for any purchases before October 2004.

You may not award damages for any purchases after 2008.

Each plaintiff is entitled to recover damages for an injury that was the direct result of the conspiracy to reduce the supply of eggs during the relevant time period (*i.e.*, October 2004 to December 2008) by, No. 1, Cal-Maine Foods;

7299

No. 2, Rose Acre Farms; No. 3, United Egg Producers (UEP); No. 4, United States Egg Marketers (USEM); No. 5, Wabash Valley Farms; and No. 6, Moark.

Each plaintiff has the burden to prove that it incurred damages that were caused by the conspiracy you previously found, as opposed to damages caused by other factors.

If you find that a plaintiff suffered damages that were caused in part by the conspiracy and were caused in part by other factors, then you may award damages only for the portion of the damages that were caused by the conspiracy.

Plaintiffs claim that they suffered damages because they paid higher prices for egg products than they otherwise would have paid without the conspiracy.

Defendants contend that a price increase, if any, was not caused by the conspiracy. Defendants contend that any price increase was caused by other factors.

Plaintiffs are not required -- I beg your pardon. I misspoke. Strike that. Let me repeat that sentence.

Plaintiffs are not entitled to recover for changes in price that resulted solely from other causes arising from the normal course of lawful business activity.

The presence of another cause for a price increase does not mean that plaintiffs did not suffer an antitrust injury. But plaintiffs are not entitled to recover for

7300

damages caused by any factor other than the conspiracy. Plaintiffs only may recover damages for an injury caused by the antitrust violation you found.

You may not award damages for an injury caused by other factors, meaning factors other than the conspiracy.

Plaintiffs bear the burden of proving damages by -- let me say that again.

Plaintiffs bear the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that one or more plaintiffs suffered an injury that was caused in part by lawful factors and was caused in part by the conspiracy, and if you find a reasonable basis to apportion the damages between the lawful factors and the conspiracy, then you may award damages for the part of the injury caused by the conspiracy.

We'll give one last instruction before we do closing arguments.

Instruction No. 15: You have heard any evidence in this case -- let me restate that. I'm sorry. Strike that. Here we go.

Say it again.

You have not heard any evidence in this case about whether plaintiffs passed along higher prices to their customers. When determining the amount of damages that will

7301

compensate plaintiffs, you should not consider whether any plaintiff passed along higher prices to their customers.

Counsel, with the corrections I made, did I otherwise read the jury instructions accurately?

MS. KASTANEK: Yes, Your Honor.

MR. COLLINS: Yes, Your Honor.

MR. KING: Yes, Your Honor.

MS. SUMNER: Yes, Your Honor.

THE COURT: All right. Very good.

So, members of the jury, I read Instruction No. 1 through Instruction No. 15. We're on Page 16 of the jury instructions. We will read the last few instructions after you've heard all the closing arguments. Okay?

Members of the jury, it is now time for you to hear from the lawyers. They're going to give closing arguments.

I'll give you the reminder that you've heard before. Closing arguments are not evidence. The evidence is what you hear from the testimony, from the exhibits, *et cetera*. These are arguments by the lawyers.

They're going to make arguments to help you make your decision. They're going to tell you why the evidence in the record supports their version of the case.

And without further ado, I'll turn the floor over to plaintiffs' counsel.

MS. KASTANEK: Thank you, Your Honor.

And may we publish our PowerPoint slides for the jury, please?

THE COURT: You may.

CLOSING ARGUMENT

MS. KASTANEK: What is fair? That's what the attorney for Rose Acre started his opening statement with. What is fair?

What is fair compensation for the conspiracy you found and the antitrust injury you concluded was the result of that conspiracy?

Here's what's fair: It is fair to compensate the plaintiffs for the overcharges that they paid as a result of the defendants' colluding.

Instead of egg producers within the industry making independent decisions about supply, they came together and they conspired to restrict nationwide supply. It is fair to compensate the plaintiffs for the impacts of those decisions.

It is fair to compensate the plaintiffs for the overcharges they paid as a direct result of UEP facilitating those supply agreements between the conspirators.

It is fair to follow the judge's instructions that tell you to award damages for the injury that was the direct result of the conspiracy to restrict the supply of eggs during the relevant time period.

That's what's fair.

So is the defense's position on damages fair? They refuse to acknowledge that they did anything wrong. They referred to the conspiracy in quotation marks in their own opening slides, the conspiracy.

They refused to accept responsibility for their conduct. An example is they want you to award no money instead of $1 in nominal damages for the short-term measures and the export program that you found was part of the conspiracy.

Another example, you found that this was a conspiracy to restrict egg supply and yet the defense continues to say that this certified program at large was about customer demand.

The defendants rigged the system. They broke the law. They should not get a free pass. So what is fair is to hold the defendants accountable for that.

Let's start with the road map so you know where I'm going over the next 45 to -- 45 minutes to an hour or so. So first, I'm going to review the evidence related to damages. We'll talk about that evidence, the testimony that you've heard, and throughout that discussion, I'll review with you the judge's instructions on damages and causation. So, of course, everything the judge said governs. I'm just going to highlight a few of those instructions to help frame our discussion.

Closing Argument by Ms. Kastanek

7304

And then next, second, we'll talk about the verdict form, the questions it's going to ask you to fill out and the numbers the plaintiffs will ask you to put onto that verdict form.

Let's start where I started my other closing argument two weeks ago or so, and that's with the conspiracy.

So you found that the defendants' conspiracy had four parts to it:  the short-term measures -- so these are the blatant restrictions of trade, for example, the agreement across competitors to slaughter 5 percent of their flock -- the exports, which were the measures that were explicitly intended to increase domestic egg prices; the cage space or henhouse density restrictions as part of the UEP Certified Program; and then the restriction on backfilling.

So you found that each of these was part of a conspiracy by each of those four defendants, plus Moark and Wabash Valley.

And we're only seeking nominal damages for the short-term measures and the exports.  Those are the first two means.

What are nominal damages?

Nominal damages means that we are asking you to award a dollar, not because that's the harm that the plaintiffs actually suffered, but because there was injury, and the damages, the exact damages are not quantifiable, as you heard

from Dr. Baye.

So we've looked at abundant documents together, including in my last closing argument showing that the defendants themselves recognized that these measures had impact on Urner Barry prices.

So, for example, the short-term measures, there was a crisis management program in 2004, 2005, about 35 percent of the national flock producers participated in it, and it was intended to, and it did, impact the Urner Barry market. And that market is the same prices that were being paid by the plaintiffs during these periods of time.

Now, the defense counsel has claimed, and I'm sure that they will get up in closing and they will claim again that there was no evidence of injury. But there is evidence, and that evidence came from UEP's own president. The defendants themselves recognized that their exports in November 2006 resulted in the Urner Barry going up by 40 cents.

The defendants themselves recognized that every reduction in nationwide flock size, such as by short-term measures, would increase price by a substantial amount. Again, the same prices that the plaintiffs' purchase prices were based on.

But Dr. Baye has explained to you that this impact precisely cannot be quantified, it can't be quantified to a

99 percent degree of certainty. And that makes sense. Those impacts were not long term. They might have changed prices for a short period of time and then dissipated. So he can't use his econometric model which measures long-term impact to provide certainty. But they're still important. And so time spent there at trial certainly was not wasted.

And they're important for two reasons:

First, they show that the cage space requirements, the backfilling ban, the 100% Rule that we're going to talk about next, those were all designed by the same people, the same entities in the organizations over the same period of time for the same purpose in furtherance of the same goal, which was to restrict supply.

And then, second, the simple fact that the plaintiffs proved the conspiracy as to these means is important, as I said, symbolically. The $1 represents that there was a violation of the law, that there was antitrust injury as to that violation of that law, that there was harm caused by that violation of the law, and that the harm can't be quantified, but it occurred, and that $1 reflects that it occurred.

So Dr. Baye did, however, quantify the overcharges that resulted to the plaintiffs from, one, the UEP certification program's cage space requirements and other rules related to the cage space requirements; and, two, the backfilling ban as a component of that program.

So let's pause here, and we're going to talk about the legal standards that govern your consideration of Dr. Baye's calculations. So here are some of the ground rules pursuant to the judge's instructions to you.

"Each plaintiff is entitled to recover for all damages to its business or property that were a direct result of the conduct you previously found to be unlawful."

This is important. We're going to come back to this, so "direct result" is that key language to have in mind.

The purpose of the damages is to put the plaintiff, the injured plaintiff, back in near -- as close as possible to the position that they would have been without the conspiracy.

The jury, you guys, are entitled to make a just and reasonable estimate. It must be -- have a reasonable basis in the evidence, it must be based on reasonable assumptions, but certainty or precision are not required.

Okay. Certainty and precision are not required.

One more instruction on the law.

You are prohibited from considering the defendants' financial status. Every party is equal before the law. You're prohibited from considering the plaintiffs' financial status.

So here's the instruction that the judge gave you on this: "A party's financial condition, size, or status as a public company or a private company should not influence your

Closing Argument by Ms. Kastanek

7308

verdict."

You should not take into account the impact of the verdict on Cal-Maine, Rose Acre, UEP, USEM.

What you should focus on is the law that the judge instructed you on. And this -- these are those principles of law that we just looked at.

What you should focus on is whether the overcharges that you've heard about from Dr. Baye were a direct result of the conduct you found to be unlawful. You should focus on whether the damages at the plaintiffs' request would put the plaintiffs back into a position they would have been without the conspiracy.

And just like in the liability phase, the standard is one of preponderance of the evidence. It doesn't require a hundred percent certainty, it doesn't require beyond a reasonable doubt, the standard applied in a criminal case. It requires that it be more likely than not, and it must be more likely than not that the defendants' conspiracy for which you found the defendants liable caused the overcharges that Dr. Baye testified about.

So let's discuss for a moment what an overcharge is. The judge instructed you to calculate damages by determining the difference between the price the plaintiffs paid and the price that they would have paid. So that's that delta, that difference is the overcharge.

Closing Argument by Ms. Kastanek

7309

To calculate that overcharge, as you've now repeatedly heard, Dr. Baye used this regression model. He ran regressions that allowed him to quantify what would have happened based on historical trends if the UEP Certified Program didn't exist, or at least the components of that program that are at issue in this case.

So this is one of Dr. Baye's models. It isolates the damages period you've been instructed to focus on. The blue line is the actual price of egg products purchased. I've blown up and circled in red there the line that shows that had there been no conspiracy, egg prices would have been at this lower level.

And notice that this is not just a flat line, okay. This is a reflection of market conditions. Dr. Baye took those market conditions into account. And the market is moving with those economic conditions, those same conditions that Dr. Walker said Dr. Baye didn't take into account.

But the fact of the matter is, that red line, despite moving up and down a little bit, is lower than the blue line of the prices that actually were paid.

And the difference between those two lines is the overcharge.

Now, you will not have this slide back in the jury room. You won't have these numbers back in the jury room. So I'm going to go through this slowly and read the numbers to

Closing Argument by Ms. Kastanek

7310

you.

This is the result of the overcharge analysis conducted by Dr. Baye.

He found that during this period, the damages period of your analysis, October 2004 through December 2009, Kraft had overcharges of $18,329,288.

Kellogg had overcharges of $4,605,380.

General Mills had overcharges of 1,305,612.

Nestlé had overcharges of 1,156,262.

And that resulted in a grand total overcharge for all the plaintiffs of just under $25.4 million.

Now, this is the product of the cage space requirements, the backfilling ban, the 100% Rule.

One note here about the time frame. This calculates the overcharges through December 2008. And you heard through the testimony yesterday that *The Wall Street Journal* article that exposed the conspiracy was from September of 2008.

So the defense's theory seems to be, you know, at the very least, you've got to take out that period of time. That is simply wrong. And here's why: So the planning of the defendants' conduct -- so the planning for chick hatch, pullets, the space that they were going to take up in a particular henhouse was done way before September 2008, right. The conduct didn't just stop. They didn't just suddenly -- September of 2008 now suddenly jam all those hens into the

henhouse.  They were restricted.  Their flock size was restricted based on planning that was done in June of 2008, July of 2008, August of 2008.

And that extra three-month period from September to December of 2008 is a reasonable effect of the conspiracy to restrict egg supply.

Let's take a pause here and look at this slide from Rose Acre's opening statement.

This is the defendants, the four defendants that are producers, in red.  Okay.  It shows that Rose Acre, Cal-Maine, Wabash Valley, Moark are four of many producers.  Probably about 160 or so.

This is actually not accurate, of course, because all the producers are not the same size.  They don't have the same barns.  Cal-Maine and Rose Acre were huge.  They were the No. 1 and No. 2 producers in the country.  So their barns should look a little bit more like this, reflecting their appropriate size.

Now, the defendants don't offer you a damages number. They are going to get up here and say that even though you found a conspiracy, the plaintiffs shouldn't get anything because, according to the defendants, the plaintiffs didn't suffer any damages from the conspiracy at all even though the entire purpose of the scheme was to increase egg prices and the prices the plaintiffs paid.  That was the entire purpose

of this conspiracy.

But the defendants say, nope, they're not injured. It didn't result in damages. And they reach that conclusion in part because Dr. Baye measured the impact of the totality of the UEP Certified Program on prices rather than looking at just these red barns.

So according to the defense, it's a gap in causation. So they want really specific evidence about those gray barns.

They -- without it, the defendants claim, Dr. Baye shouldn't have relied upon the marketwide impact of the UEP Certified Program. That's the argument.

Let's start where we agree. We agree Dr. Baye did not just look at the supply restrictions of these four red barns. Of course not. He did not limit his analysis like that. And for really good reason. The reason is that you found UEP, which is depicted here as the hub, was liable for a conspiracy that included as one of its means the cage space requirements and the backfilling requirements of the UEP Certified Program.

So let me repeat that.

You found that the UEP was liable, along with these other defendants, for a conspiracy that included as one of its means the components of its certified program that were the cage space restrictions and the backfilling restrictions.

You found that UEP conspired with producers. You

found that the cage space restrictions and the backfilling ban were part of that conspiracy.

So here is how Dr. Baye described UEP's role in that testimony: "I didn't back out any of the participants' individual contributions. I'm looking at the entire certification program."

The point is, because the program exists, prices are going to be higher.

Like, so we found -- we saw, for example, in my last closing argument when Michael Foods joined that certified program, other participants were saying, yeah, prices are going to go higher.

"If that program wasn't hatched, no one could have joined it."

This is really important language, so focus on it.

It was the hatching of the certified program that provided a vehicle for people to join. And that's exactly right. That's exactly right. We're going to come back to that.

Let's frame our discussion, though, with the judge's instructions regarding causation. So here is what the plaintiffs must prove.

The causation standards are as follows:

The plaintiffs must prove that the injuries for which they are seeking damages were caused by the conspiracy you

previously found. Okay. It has to be caused by the conspiracy.

They must be a direct result of the conduct you found to be unlawful.

And you can't award damages if there's an injury that's caused by other factors.

So let's go back to this hub slide.

As we just looked at, the conspiracy had UEP in the middle at its core. It had additional participants in the conspiracy as spokes. Those are the producers. And from its inception, from its very inception, the cage space and backfilling components of the UEP Certified Program was a supply restriction program. It was corrupt. They were not a good-faith attempt to meet consumer demand. They were designed to reduce supply and increase prices. They were the subject of the defendants' agreement to restrict egg supply.

This is supported by the evidence in the record. This is evidence that you've already heard in the liability phase. It showed that UEP as a trade association was uniquely focused on making the industry money through supply restrictions.

This is supported by UEP's reputation as an association that worked to persuade its members to come together and manage supply.

So remember the defendants' whole cheerleader theory?

Oh, you can't listen to Gene Gregory because he was just a cheerleader. Yeah, they work to recruit participants in this program.

This is supported by how UEP talked to its members about the cage space requirements. So this is the report from Gene Gregory about how the UEP was working on this newfangled awesome idea to reduce cage space -- I'm sorry, reduce henhouse density by taking one bird out of a cage until 5 percent reduction was reached.

This was the impetus for the UEP Certified Program and the components that are the subject of that conspiracy.

This is how UEP sold this program to its members.

Here's another example from the liability phase. Al Pope: "Put money in your pocket." Put money in your pocket by coming together to reduce supply.

And here's one more example: UEP had a goal of getting producers totaling 225 million hens onto this program. Okay. That's not just those four producers on Rose Acre's slide. That's not just those four producers. 225 million hens on the program would then continue to reflect the impact of the welfare guidelines. And by "impact," he certainly means economic impact.

So this is the same evidence that I discussed in my closing argument. And you may wonder, why are we revisiting this? We've already decided liability.

We're revisiting it because it defeats the defendants' arguments about causation. The UEP, the sponsor of this program that it believed would make its producers a lot of money, was the hub of this conspiracy to restrict supply. It was the center of that wheel around all of -- around which all of these producers revolved. It designed that supply management program. It set the rules that the producers had to comply with if they wanted to be UEP certified.

So one of those rules was backfilling.

As you no doubt remember, backfilling is the replacement of dead or injured hens in a house. It keeps the total number of hens the same, but it affects whether you're allowed to replace them with a healthy hen.

It was banned by UEP. It was banned by UEP after this article was published in *United Voices*. So here's Al Pope, who then was the head of UEP. He says, "Backfilling is strangling our profits." Strangling our profits. Purely economically motivating. It was thwarting -- it was thwarting the price-fixing that the defendants intended.

So UEP adopted a rule banning it.

And that ban meant that every single company that was UEP certified was no longer allowed to backfill, and that applied to its affiliates and its contract farms, and that included Rose Acre even though Marcus Rust probably voted

Closing Argument by Ms. Kastanek

7317

against it because he thought it was a supply restriction.

And it resulted in this observation that backfilling will add several million hens to the nation's flock inventory and was the major reason we destroyed good prices, and so the UEP Certified Program developed a policy to prohibit backfilling cages, and the market now reflects the benefits of that policy.

Okay. This is really important to the defendants' causation arguments. So let's start with how Dr. Baye isolates the impact of backfilling.

So he isolated the impact of it, and he found that even if you assume the cage space restrictions didn't have economic effect, the backfilling ban alone resulted in $14 million of overcharges. And it's broken down in this way.

This is subsumed within that $25 million total, right. So 14 of that $25 million total is attributable to this backfilling ban. Okay.

And this is significant not because we're just asking for $14 million, we're asking for that larger $25 million number, but it's really important, as I said, in evaluating the defendants' argument about causation for this reason.

There may have been a lot of innocent producers. On that slide we looked at, of the 160, some of them may not have conspired. Right? They did not necessarily knowingly conspire, like the defendants did, to restrict supply. Okay.

Closing Argument by Ms. Kastanek

7318

Those gray barns could have acted lawfully.

The defense's argument, however, with regards to causation can't be true with respect to backfilling because of the timing.

So the backfilling ban came years after the defendants developed market power.

This chart shows the number of flocks signed up for the certified program over time. October 2002, the UEP adopts the 100% Rule as part of the certified program.

So you see here that by that time, October of 2002, you know, between 70 and 80 percent of total nationwide flock size is part of the certified program. Right?

And that rule meant, that mandatory rule meant that everybody who wanted to be UEP certified had to do it for every single hen they produced, every single hen their contract firms produced, every single hen -- I'm sorry, egg that their affiliates produced.

By 2004, if you follow the line along here, 80 percent, more than 80 percent of the industry of the total nationwide flock size are part of the UEP Certified Program.

Okay. That's the point at which the UEP implemented the backfilling ban. All certified members, once that backfilling ban went into effect, had to comply with this restriction in every henhouse of themselves, their affiliates, and their contract farms.

Okay. UEP, with its members of the certified program making up more than 80 percent of the market, set these rules. They're the ones that set these rules, and they're the ones that enforce them. And, in fact, backfilling became an automatic fail. Right. That's the way in which that rule was enforced against its members, including that entirety of those gray barns.

So it was only after the UEP implemented that mandatory backfilling restriction that Dr. Baye's model and analysis and calculation of overcharges begin.

Okay. The industry's compliance with the UEP's rules, which was a prerequisite for the certified program, it's a prerequisite for anybody who wanted to be certified, resulted in those higher prices for plaintiffs. Right. It increased the prices and resulted in those overcharges.

So the question for you is, should UEP be responsible for the rules it sets? Should it be responsible for the impacts of its conduct, including setting those rules, enforcing them, making it mandatory as part of the UEP Certified Program?

You remember this instruction from the liability phase: "An association cannot lawfully act to facilitate the raising, stabilizing, or maintaining of prices in the market in which one of its members compete with another."

But what the defense wants to do is give the UEP a

free pass for acting to facilitate the raising, the stabilizing, or the maintaining of prices in this market, including that stemmed from the backfilling ban.

A defendant is responsible for its actions, period. That is a fundamental principle of conspiracy law. It is responsible for the damages that are the direct result of its conduct. So if UEP conspired to set these rules like the backfilling ban and the 100% Rule, they are on the hook for the consequences.

And because there is joint and several liability for co-conspirators -- and, of course, you found that Rose Acre and Cal-Maine are co-conspirators -- they, too, are responsible for the consequences of the rules that are set by the UEP as part of the UEP Certified Program.

Marcus Rust -- sorry, I've got to find this.

Apologies, I may come back to that.

Marcus Rust from Rose Acre wanted that 100% Rule that UEP adopted and enforced. And it didn't just want that rule for itself. Right? I'm going to show you -- maybe I'll do it in rebuttal -- that there are communications in which Marcus Rust is talking about enforcing that 100% Rule against others in that program, okay, others in that program that need to comply with the 100% Rule and, therefore, suffer the consequences of noncompliance.

And Cal-Maine, too. Right? You recall these slides

Closing Argument by Ms. Kastanek

7321

from Dolph Baker's testimony. Cal-Maine couldn't adopt cage space restrictions on its own. They wouldn't be competitive. This is what Dolph Baker told you during his testimony in the liability phase. They can't be competitive on their own. They became competitive as a result of their competitors participating.

So, yes, it is perfectly appropriate for Dr. Baye to have evaluated the impact of these producers as a whole.

It is perfectly appropriate for Dr. Baye to consider what happened when Dolph Baker's competitors joined the program just as he wanted them to do.

Dr. Baye measured the impact of the producers complying with the rules set by UEP, and he measured the impact on the producers of producers complying with rules that were part of the conspiracy, as you, the jury, found.

One more note about backfilling. You do not need to look at all of these gray barns. Right? The defendants' corrupt motive in forming the conspiracy, in carrying it out as planned through a majority of industry is enough.

But even if you looked at these other gray barns, it would be unreasonable to conclude that most producers acted innocently in staying in the program despite the backfilling ban.

Perhaps a few did. Perhaps a few did. But the vast majority of these producers, it is fair to infer that this was

a blatant supply restriction. It was like the short-term measures in this regard. And just like the short-term measures, UEP did not hide the purpose of these; they explicitly trumpeted the purpose as a supply restriction.

And, remember, if a producer believed that it was better for their hens to not backfill -- it causes diseases, it can hurt the hens -- don't backfill. They do not need to come together on an industrywide basis to prohibit this. The only purpose of doing so is, in fact, to limit supply. And that's exactly what Al Pope is communicating, at least to the members who are receiving these communications as of 2004.

So let's switch gears. And we're going to talk about how Dr. Baye's model is fair and reasonable. He explains that his model is really conservative. So it errs on the side of caution. And he had a big, long slide with all the reasons for that. I'm just going to highlight a few of them in the interest of time.

It's conservative because, as we've already discussed, it doesn't assign a dollar number to those export and short-term measures, even though the UEP and USEM itself recognized that those had an impact on the Urner Barry market.

It's conservative because Dr. Baye used a confidence level of 99 percent.

And you heard Dr. Walker yesterday talk about how his testimony was excluded in a different case because he didn't

use a competence level of 95 percent.  Right?

This is a 99 percent confidence level.  And certainly it's more than a preponderance standard.  Had he used a lower confidence level, even a 90 percent one, it certainly would have resulted in larger damages.

It's also conservative because Dr. Baye evaluated the price impacts using a product with the most elastic demand, meaning it's the least impacted by supply restrictions.  He used that instead of the actual products that the plaintiffs purchased in order to give the defendants the benefit of the doubt here.

And it's conservative because Dr. Baye didn't just follow the documentary record.  And what I mean by that is things like Cal-Maine's observations in its own 10-K filings that a 1 percent decrease in supply would result in a 7 percent corresponding change in shell egg prices.

Had Dr. Baye instead relied upon Cal-Maine's experience in the industry which informed these statements to its investors, it certainly would be a higher damages estimate.

So this $25 million figure is conservative, it's on the low end, and it's reasonable.

Let's take a look at the verdict form now so you know how to fill it out.

While we have these slides up with the numbers, we're

going to transfer them onto the verdict form so you can see what it looks like before you go into the jury deliberation room.

Question No. 1 states that the plaintiffs are seeking nominal damages of a dollar for the short-term measures.

And as I explained, this is because the damage is not easily quantifiable, so we ask for a dollar for each plaintiff, so basically a symbolic recognition that there's injury and that there is damage and that that conduct injured competition.

Question No. 2 is the same thing but for exports. So, again, we ask for a dollar for each of the plaintiffs as a symbolic recognition that there was liability, that there was antitrust injury, that there was damage, and, again, as a symbolic recognition of those factors being met.

Let's turn to Question 3, which asks whether you find that the plaintiffs suffered damages as a result of the cage space restrictions and the backfilling ban that were part of the UEP Certified Program. And that's, of course, what we've been talking about for the last half an hour here. I won't repeat it. The answer is yes for all of these plaintiffs. Those are the overcharges that Dr. Baye calculated as part of his model.

And then Question 4 asks you to specify the amount of overcharges caused by these aspects of the UEP Certified

Program.

So let's look back at Baye's calculations. Here they are. This includes all the different aspects of the UEP Certified Program. We've discussed the backfilling ban, the 100% Rule, the house average, all the different components that we challenge as plaintiffs.

When you fill out these numbers -- here they are. I'll read them to you one more time because, again, you won't have these documents or these PowerPoint slides back in the jury deliberation room.

These are the overcharges that Dr. Baye's regression found for the period of October 2004 through December of 2008.

For Kraft Foods Global, 18,329,288.

For The Kellogg Company, 4,605,380.

For General Mills, 1,305,612.

And for Nestlé, 1,156,262.

These are the numbers. These are the overcharges to which the plaintiffs are entitled.

So let's return to where we started, which is what is fair and reasonable under the facts of this case, what compensates the plaintiffs for the harm caused by UEP, the ring leader of the conspiracy, as part of its agreement with producers, such as Cal-Maine and Rose Acre, to restrict supply nationwide, industrywide.

It is fair and reasonable to reimburse plaintiffs for

this conservative estimate of overcharges that they paid as a direct result of that conspiracy. And we ask you to make those findings.

Thank you.

THE COURT: Thank you, Ms. Kastanek.

Members of the jury, one very brief point before we break for lunch. I wanted to perhaps correct a sentence that I read in the jury instructions. My clerks listen very carefully to what I read when I go over the jury instructions. I may have forgotten to say the phrase "more than" in Jury Instruction No. 11. I don't know if I did or not. But I just want to repeat the sentence.

If I said anything different before, I'm going to correct it now just in case. Okay? So if anybody wants to follow along, you can. You're not required to.

Instruction No. 11 is on Page 12 of your packet. It's going to be put up on the screen.

Let me reread the last sentence. I may have forgotten to read "more than" in my original version. So if it's anything different, this will supersede what I said before.

Here's the instruction: If you award damages, you must decide what sum of money would fairly and reasonably compensate each plaintiff.

You must consider an award of damages for each

plaintiff separately.

If you find that more than one plaintiff is entitled to recover damages, exercise caution to be sure that each plaintiff is awarded damages only for its own injuries.

That's Jury Instruction No. 11.

All right. Members of the jury, it is now time for lunch. It is 12:37. Lunch is here. Lunch is ready and waiting for you.

Does it give you folks enough time if we come back at 1:15? Does that give everyone enough time? I don't want to make you wait back there again. But hopefully -- I don't know if people have phone calls to make, but hopefully that -- does that give everybody enough time? 1:15?

We'll come back at 1:15, everyone.

When we come back, defense counsel will give their closings. You will hear rebuttal from the plaintiffs. I will give you final instructions, and then it will be time to deliberate.

Have a good lunch. We'll see you in a little bit.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 12:38 p.m.)

THE COURT: All right. Have a seat, everyone.

I had one housekeeping matter to address about the pending motions for directed verdict. If we can just talk about that for two minutes and I'll let you folks get ready

7328

for your closings.

I know that motions for directed verdict were filed at the close of the evidence at the liability stage. I saw that yesterday. And perhaps this morning the defendants filed amended versions of their motions for directed verdict. You did so because the record was reopened because there was a damages phase. I think it was a perfectly appropriate thing to do, and I have no issue with that whatsoever.

I've now got it basically from each set of defendants two motions on the same basic point, which is fine. I understand that the new version is going to supersede the old version. So for docket housekeeping matters only, in other words, for administrative purposes only, I'm going to deny the original version of those motions. I am not denying the original version of those motions on the merits. I just can't have two motions on the same exact point.

The original versions were filed in a timely manner on the issue of liability. So I want to be a hundred percent clear that when you see on the docket that those motions have been denied today, that's only going to be for administrative reasons because they've been superseded by new motions.

Does that make sense, everyone?

So don't anybody take from that that there's been a ruling on the merits. It's not a ruling on the merits. It's just that we've got a superseded amended version of a motion

7329

because the docket -- excuse me -- the record was reopened in light of the damages.

Is everybody clear on that? Mr. Levine?

MR. LEVINE: Yes, and it still applies at the liability stage.

THE COURT: I'm sorry?

MR. LEVINE: Our amended and restated, or however we titled it --

THE COURT: Yeah.

MR. LEVINE: -- directed verdict still applies to the liability stage, what we wanted to protect.

THE COURT: You're not dropping anything. You're not waiving anything. It's simply to -- I mean, I could rule on it later, I suppose, but I just thought it would be a cleaner docket.

Okay. I don't want to spend a lot of time on this, but we do need to talk about a schedule.

Have you folks thought about how much time you need from the plaintiffs' end?

MR. FOX: We haven't, Your Honor. We can tell you by the end of the day, if that's okay.

THE COURT: That's fine. Why don't you do that.

Here's what I will say: I want to be humane to you folks. You've been working really hard. The thing that I care about is for you to have the opportunity to put your best

7330

foot forward for your clients. I don't want to unnecessarily elongate things. I know how hard you folks have been working for how long.

My sense is it would be helpful for plaintiffs to put something in before the holidays for sure. I usually give a week or two for rebuttal. I would give more time here given the nature of the motions and given that, you know, if we have holidays, I'm not going to wipe anybody out on the defense side on that.

So just think about that. I'll give you folks time.

I think on my end, I would like everything to be fully briefed at some point before the end of January, maybe mid-January, if we could. But talk it over. You have a better sense of how much time you need than I do.

Mr. Collins, go ahead.

MR. COLLINS: Judge, there were two issues in Ms. Kastanek's opening that I think were violative of the instructions, and I wanted to raise those with the Court.

THE COURT: Okay.

MR. COLLINS: The first is the repeated use of the word "symbolic damages," that she encouraged on multiple occasions, Ms. Kastanek encouraged this jury to award symbolic damages. There's nominal and there's compensatory. There is not symbolic, which to me is sending a message which is punitive. And Ms. Kastanek did it repeatedly.

7331

And I think the jury should be instructed that they are not entitled toward damages based on symbolic.

So that's point number one, Your Honor.

Point number two, and this goes to Question No. 8 and the Court's admonitions, with her gray barn scenario, which, again, Judge, there was a significant amount of time spent on this issue, and it's obviously an issue of concern for the plaintiffs as it should be on the legal front, but she said, and I quote, "If you looked at these other gray barns, it would be unreasonable to conclude that most producers acted innocently in staying in the program despite the backfilling ban. Perhaps a few did. But the vast majority of these producers, it is fair to infer that this was a blatant supply restriction."

Your Honor, that is a blatant violation of Question No. 8, interpreting Question No. 8. It's obviously a very significant issue in the case. It goes to the heart of the damages, it goes to the heart of the legal issue. And we believe the jury should be -- should be given a curative instruction on that issue.

THE COURT: Okay. Do any of the other defendants want to say anything on either of those points, not any other points, but either of those points before I talk to plaintiffs' counsel?

MS. SUMNER: Just that we agree, Your Honor.

7332

THE COURT: Okay. Ms. Kastanek, anything you want to say?

MS. KASTANEK: Sure. The Supreme Court two terms ago had a case that involved nominal damages. It's called you *Uzuegbunam*. It's at 141 S. Ct. Reporter 792. It talks about how nominal damages are symbolic, not purely symbolic, but they are symbolic.

I can find more case law for Your Honor. I think the case law is pretty replete with talking about nominal damages as appropriately symbolic.

THE COURT: I mean, I didn't understand you to be saying that symbolic damages were some new and different category. I just understood you to be saying that nominal damages are symbolic; in other words, they stand for something, they stand for the proposition that there was an antitrust violation. You know, you're entitled to something, so you get something, you get a dollar.

That's what I understood you to say. Is that fair?

MS. KASTANEK: Yes. Correct.

THE COURT: I mean, what's wrong with that, Mr. Collins? That seems right to me.

MR. COLLINS: Judge --

THE COURT: I took it to mean like it sends a message, there was a violation, so you get something.

MS. KASTANEK: And just to be clear, every time I

talked about nominal damages, I made clear, repeatedly, every single time, that they had to find an antitrust injury and they had to find harm and harm could not be quantified.

THE COURT: I noticed that. I noticed that, yeah.

So I think that was fine. I didn't have an issue with what she said on that.

And do you want to address the second point, Ms. Kastanek?

MS. KASTANEK: Sure.

MR. FOX: Your Honor, we talked about it this morning, that question -- first of all, she didn't refer to Question 8 at all, and we already discussed this this morning with Your Honor, and Your Honor agreed, that Question 8 only means that at least one producer did not conspire, and it might have been Michael Foods. We only know that Michael Foods was what they decided.

There was nothing wrong with what she said. She didn't ask them to revisit anything. She didn't interpret their verdict. All she did was have a position that is consistent with what the position is we've had the entire time.

THE COURT: Yeah, I did not hear Ms. Kastanek construe Question No. 8. I mean, I heard her say that it's reasonable to infer that other egg producers who were not in the courtroom participated in the re- -- in the program for

7334

unlawful reasons.

Is that fair?

I mean --

MS. KASTANEK:  Yes, it is.  And of course, you know, we're going to have a big problem if we're not allowed to respond to their characterizations of the conspiracy limited in the way that they interpret Question 8.

The jury simply was not asked to identify who the co-conspirators are or the scope of the UEP and the defendants' responsibilities for what happened as part of the UEP Certified Program.

So this is a matter of interpretation.  We are arguing that UEP as the hub is responsible for it, and that's not inconsistent with Question No. 8.

THE COURT:  Question 8 asked if everybody was in on it.

MS. KASTANEK:  Correct.  And just to be clear -- because part of that requirement for a conspiracy is that everybody acted knowingly.  You had to have a meeting of the minds.  So -- yeah.

MR. COLLINS:  Judge --

THE COURT:  Question No. 8 did not ask if no one else was involved.  In other words, the fact that not everyone was involved does not necessarily mean that no one else was involved.  Those are two different propositions.

7335

Go ahead.

MR. COLLINS:  I don't necessarily disagree with that, Judge.

And, again, this is not a UEP issue.  She made -- Ms. Kastanek made her point loud and clear about UEP, but she got into the heads of the producers for which there was zero, zero evidence at the trial.  And she made the comment, "It would be unreasonable to conclude that most producers acted innocently in staying in the program" -- I'm sorry.

MS. KISER:  Yeah, that's right.  You're right.

MR. COLLINS:  -- "staying in the program despite the backfilling."

THE COURT:  Can't she say that in closings, though? I mean, they presented lots of evidence about *United Voices* and other people being at the committee meetings and getting newsletters.  And if you want to say, look, there's -- you know, there was no finding that other people were in on the conspiracy, you know, you want to make a causation argument, I think you can.

I mean, you know, what's wrong with that?

MR. COLLINS:  Well, Judge, there should have been some evidence in the record.  And, again, part of this I guess is they spent a lot of time on these two prongs of the stool that they are asking for no damages on.  And the one --

THE COURT:  That's a different issue.

7336

MR. COLLINS:  Yeah, it is.  It is.  Thank you, Your Honor.

But I think -- Ms. Kastanek told this jury what is unreasonable based on zero evidence in the record --

MS. KASTANEK:  That's --

MR. COLLINS:  -- as to the gray barns.  And, again, this was not a passing comment.  This was the -- this was the core of her closing argument.

THE COURT:  Well, here's what I'd say:  If Ms. Kastanek, in your view, said something where there's utterly no evidence in the record, she gave you a gift. That's why we all earn the big bucks.

MR. COLLINS:  Fair enough.

THE COURT:  Maybe I should say, that's why you earn the big bucks.  I don't think I should have used the phrase "we."  You know, I -- that's why I earn the cents on the dollar.

Go ahead, Mr. Fox.

MR. FOX:  No, I was going to say, we obviously -- everyone has a lot to do, and if you've got nothing further, we'll grab our lunch and prepare for our rebuttal.

THE COURT:  Yeah, think about a briefing schedule.

I wanted to say at this point.  It's important that you be in a position to put your best foot forward for your clients.  I would like the briefs sooner rather than later in

7337

a way that's consistent, and I don't want to wipe out anybody's holidays again. Okay. So I want to be -- you know, I don't want plaintiffs to take more than they need and defendants, but I'm not going to make the defendants put their stuff in on January 2nd, is what I'm trying to say.

MR. FOX: And, Your Honor, just preliminarily, get your temperature on this, if we filed on the 22nd, which would be before the holidays -- maybe I should not take your temperature before I take my team's temperature.

THE COURT: Yeah, take the team temperature. You know, you -- I'm hoping you can get it in, you know, let's say, three weeks, and then I'll probably give the defendants a month, frankly, to respond. Give you a little extra time because of the holidays.

You know, plaintiffs do have more briefs to respond to, but they're making a lot of the same arguments, too, you know. So do what's reasonable. Okay. Do what's reasonable and we'll come back.

Come back in about 25 minutes. I'm going to try to be laser-like in my precision with 1:15 for the jury because I think I owe it to these people. I'm going to come out here in about 17 minutes and we're going to get going right at 1:15.

MR. COLLINS: Judge, just to close the book, we are going to be given latitude to respond to the gray barns in the same context.

7338

THE COURT: Yeah, I mean, you can make whatever arguments you think are consistent with the evidence. You can back it up. We shouldn't be construing No. 8. I think it is fair to tell the jury what they found. The jury did not find that no one else was involved. I think that's fair.

Why don't you talk it over as a team and we can seek clarification if you need when you come back. All right.

Thanks, folks.

THE CLERK: All rise.

(Luncheon recess taken from 12:51 p.m. until 1:18 p.m.)

* * * * * *

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ *Amy Kleynhans*          *12/01/2023*

_____          _____
Amy Kleynhans, CSR, RPR, CRR     Date
Official Court Reporter