7339

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KRAFT FOODS GLOBAL, INC.; THE )
KELLOGG COMPANY; GENERAL )
MILLS, INC.; and NESTLÉ USA, )
INC., )
                                    )
                Plaintiffs, )
                                    ) Case No. 11 CV 8808
-vs- )
                                    ) Chicago, Illinois
UNITED EGG PRODUCERS, INC.; ) November 30, 2023
UNITED STATES EGG MARKETERS, ) 1:18 p.m.
INC.; CAL-MAINE FOODS, INC.; )
and ROSE ACRE FARMS, INC., )
                                    )
                Defendants. )

VOLUME 27-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE STEVEN C. SEEGER, and a Jury

APPEARANCES:

For the Plaintiffs:      JENNER & BLOCK, LLP
                             BY:  MR. BRANDON FOX
                                  MS. SATI HARUTYUNYAN
                                  MS. AMY GALLEGOS
                           515 South Flower Street
                           Suite 3300
                           Los Angeles, CA  90071-2246

                           JENNER & BLOCK, LLPS
                           BY:  MR. MATTHEW SUMMERS
                           455 Market Street
                           Suite 2100
                           San Francisco, CA  94105-2453

Court Reporter:       AMY M. KLEYNHANS, CSR, RPR, CRR
                           Federal Official Court Reporter
                           United States District Court
                           219 South Dearborn Street, Room 2318A
                           Chicago, IL  60604
                           Telephone:  (312) 818-6531
                           amyofficialtranscripts@gmail.com

7340

APPEARANCES (CONT'D):

For the Plaintiffs:    JENNER & BLOCK, LLP
                       BY:  MS. ANDRIANNA D. KASTANEK
                            MS. ANGELA ALLEN
                            MR. MICHAEL BRODY
                            MR. CHRISTOPHER SHEEHAN
                            MS. MARGARET M. HLOUSEK
                            MR. CHRISTIAN PLUMMER
                            MR. JAMES T. MALYSIAK
                            MR. JOEL T. PELZ
                            MR. JOHN D. VanDEVENTER
                            MS. REANNE ZHENG
                            MS. SAVANNAH McNEILY
                            MR. STEVEN TINETTI
                       353 North Clark Street
                       Chicago, IL  60654

For Defendants United  TROUTMAN PEPPER HAMILTON SANDERS, LLP
Egg Producers, Inc.,   BY:  MS. ROBIN SUMNER
and United States           MS. KAITLIN L. MEOLA
Egg Marketers, Inc.:   3000 Two Logan Square
                       18th and Arch Streets
                       Philadelphia, PA  19103

                       TROUTMAN PEPPER HAMILTON SANDERS, LLP
                       BY:  MS. WHITNEY REDDING
                       501 Grant Street
                       Suite 300
                       Union Trust Building
                       Pittsburgh, PA  15219

                       TROUTMAN PEPPER HAMILTON SANDERS, LLP
                       BY:  MS. MOLLY S. DiRAGO
                            MS. JESSICA RING
                       227 West Monroe Street
                       Suite 3900
                       Chicago, IL  60606

For Defendant          KING & SPALDING
Cal-Maine Foods,       BY:  MR. PATRICK M. COLLINS
Inc.:                       MR. PATRICK OTLEWSKI
                            MS. LIVIA KISER
                            MS. TATUM ELLIS
                            MS. ABIGAIL HOVERMAN TERRY
                            MR. JORDAN BLOCK
                            MS. LEILA M. MORGAN
                       110 North Wacker Drive
                       Suite 3800
                       Chicago, IL  60606

7341

APPEARANCES (CONT'D):

For Defendant          KING & SPALDING
Cal-Maine Foods,       BY:  MS. REBECCA L. PARADIS
Inc.:                       MR. HERSHEL WANJCER
                       1700 Pennsylvania Avenue, NW
                       Suite 900
                       Washington, D.C.  20006

                       BROWN FOX PLLC
                       BY:  MR. ERIC WOOD
                            MR. BRIAN E. ROBISON
                       8111 Preston Road
                       Suite 300
                       Dallas, Texas  75225

For Defendant Rose     PORTER, WRIGHT, MORRIS & ARTHUR, LLP
Acre Farms, Inc.:      BY:  MR. JAMES A. KING
                            MR. ALLEN T. CARTER
                            MR. ERIC B. GALLON
                            MS. GRACE E. KARABINUS
                       41 South High Street
                       Suite 2900
                       Columbus, OH  43215

                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                       BY:  MR. JAY L. LEVINE
                            MR. DONALD M. BARNES
                       2020 K Street, NW
                       Suite 600
                       Washington, D.C.  20006

                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                       BY:  MR. JOSHUA M. DILLE
                       321 North Clark Street
                       Suite 400
                       Chicago, IL  60654

                       PORTER, WRIGHT, MORRIS & ARTHUR, LLP
                       BY:  MS. ANA P. CRAWFORD
                       250 East Fifth Street
                       Suite 2200
                       Cincinnati, OH  4520

7342

I  N  D  E  X

                                              PAGE

Closing Argument By Mr. King              7345
Closing Argument By Ms. Sumner            7367
Closing Argument By Mr. Otlewski          7369
Rebuttal Argument By Ms. Kastanek         7392

INDEX TO EXHIBITS

PLAINTIFFS' EXHIBIT                        RECEIVED

                    None.

DEFENDANTS' EXHIBIT                       RECEIVED

                    None.

JOINT EXHIBIT                             RECEIVED

                    None.

(Proceedings heard in open court.  Jury out.)

THE COURT:  Everybody ready for the jury?

MR. FOX:  Yes, Your Honor.

THE COURT:  And let's review the bidding on the defense team.

Who is going first?  Mr. Otlewski or Mr. King? Mr. King?

MR. KING:  I am, Your Honor.

THE COURT:  I'm sorry.  I forgot.  You told me this morning.  I didn't remember.

I assume all defendants will be able to go in a row before we take a break here.  Is that --

MR. KING:  Yeah, I think so.  I -- I haven't practiced it, so I'm not sure how long it's going to be.

THE COURT:  That's fine.

MR. KING:  Hopefully it's going to be as short as --

THE COURT:  I'm not putting any limits on you.  You can say whatever you think is best.  All right.

Do you have slides?

MR. KING:  I do.

THE COURT:  And are they ready to go?  Everything queued up already?  We're good?

MR. KING:  Yes.

THE COURT:  You can put the first slide up if you want so we're ready -- or just be ready to go.

7344

And then, Mr. Otlewski, are you going second or Ms. Sumner?

MS. SUMNER:  I'm actually going to go second, Your Honor.

THE COURT:  There's no need for a break between each of you?

MS. SUMNER:  No.

THE COURT:  All right.  So -- and, Mr. Otlewski, do you have slides?

MR. OTLEWSKI:  I have slides, and I don't expect it will be --

THE COURT:  Okay.

MR. OTLEWSKI:  -- difficult to make the transition.

THE COURT:  All right.  So what we'll do, folks, is we'll do all three of your closings.  Then we'll take a short break.  One of the reasons I'm having a short break is out of fairness to the plaintiffs, defense team got a chance to chat about your opening -- I'm sorry, your opening closing.

Defense team got a chance to talk about your closings, so I want to give you a chance during a break to talk about their closings before you give your rebuttal. Okay.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Okay.  Let's get the jury.

(Jury in at 1:21 p.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: Have a seat, everyone.

Welcome back, everyone.

I'll now invite defense counsel to please deliver your closing argument.

MR. KING: Okay. Thank you, Your Honor.

CLOSING ARGUMENT

MR. KING: May it please the Court, counsel, members of the jury.

I want to begin by thanking you again for your service. It's been a long time, seven weeks, long days. We're almost done. Almost -- and I think these closings won't go very much longer, either.

It isn't often when I agree with plaintiffs' counsel, but I do -- but one thing I will agree is that I'll start where she started, which is where I started yesterday, and the question is what's fair. What is fair and reasonable, what amount of money is fair and reasonable to compensate the plaintiffs for the injuries that they're claiming in this case?

And, again, as I said yesterday, you're simply to award the plaintiffs damages that put them in a position that they would have been were it not for the antitrust violations that you found, and it can't be any more, it can't be any less.

But plaintiffs, they have the burden of proof. They have the burden of proof like they did on liability, they have the burden of proof on the damages phase, and they have the burden to prove -- burden of proof on the question of damages and on the fact of damages by a preponderance of the evidence.

That decision is yours. And you also have to find that -- if you don't find that the plaintiffs have met their burden of providing a reasonable basis for damages, you can award nothing or you can award a nominal $1 amount. That's all your decision.

And you are -- have a lot of -- a lot of discretion in making that decision and evaluating the evidence. You can make just and reasonable estimates. You don't have to decide it with mathematical certainty, but they have -- there has to be a reasonable basis in the evidence in order for you to determine the damages you're going to award. It can't be based on speculation or guesswork.

And they have to prove -- the plaintiffs have to prove the reasonableness of each of their assumptions on which the damages calculation is based.

We heard from counsel for plaintiffs that we don't accept your verdict or words of that effect. We do accept your verdict. We understand the liability finding that you've made.

What we question is whether the damages calculation

that the plaintiffs are presenting to you, that they want you to accept and award damages on, is that accepting your verdict, is their damages calculation consistent with the findings that you made on liability?  And it's our view that the answer to that question is no.

Yesterday I asked a lot of questions.  Today at least I'm going to try to answer them.

We don't know, none of us here on the other side of where you're sitting know exactly how you decided the case. We know you made certain findings.  We don't know how you made those findings.  There's been a lot of discussion about Question 8, Question 8, that you found that not every member of the UEP Certified Program through 2008, not every producer participated in the conspiracy.  We think we know what that means, but only you know what that means.

You found that each of the components of the conspiracy, the four, were part of it.  But then you answered a question on injury, and we're not sure -- we don't know exactly what you found on injury.  We're guessing, we're thinking maybe you found it this way, but that's all yours. That was your decision.

So some of the things I'm going to talk about today, I'll admit, I'm guessing.  I'm saying if you decided it this way, think about this or decide it this way.

Again, only you can decide that.

But we accept your verdict and we are presenting our case in a way that we believe is consistent with our understanding of your verdict on liability.

I showed this yesterday. The plaintiffs' conspiracy claim with the four items of conduct that you found comprised this conspiracy to restrict supply.

So where are the damages that they're seeking? And we talked about this yesterday, and we'll talk about it some more today. The export program and the short-term measures, they're only asking for nominal damages, which is their right.

And we heard that they're symbolic, they're symbolic. The term "symbolic" doesn't appear anywhere in the jury instructions that you saw that the judge read to you and that you have a copy of.

It's a nominal amount. It's a nominal amount because the plaintiffs were unable to demonstrate and prove that they sustained damages. We spent a lot of time talking about these two legs of the stool, the exports and the short-term measures. A lot of time. We talked about -- we saw these Gene Gregory e-mails -- excuse me -- newsletters and e-mails that talked about the exports and the short-term measures and how much credit he gave to the market for those steps.

And what -- at least what we said during liability is, Gene Gregory likes to toot his own horn, that he's not always right. In fact, he said one time in a newsletter that

-- "How wrong could I have been?"

Well, it turns out he was wrong. Because the plaintiffs had retained, we heard yesterday, a Ph.D. in economics, a full professor at Indiana University who came here and said, I can't figure out any damages with respect to either of those two legs of the stool. I can't do it.

But the plaintiffs want you to -- even today, they want you to believe that Gene Gregory was right, that Gene Gregory knew that this was affecting the market and affecting prices.

And it turns out, he didn't know what he was talking about. And it turns out that their expert also can't figure out, can't determine any damages associated with those two prongs of the steel -- I mean, two prongs of the conspiracy.

And it's not surprising that the export program, they can't calculate any damages off of it. Because you heard yesterday, they were very small. You heard from Dr. Walker they were a drop of rain in a bucket of water.

Counsel talked about the closing in the summation, and during the closing there was a mistake, an exaggeration of how large these exports were through the USEM program. I think they talked about billions of eggs. It wasn't really billions of eggs. It was millions of eggs. But it was only 5 percent -- point -- excuse me -- half of 1 percent, 0.5 percent of the entire market, egg market of egg production

was part -- part of these exports during this entire time. 0.5 percent, a half of 1 percent.

If you think about a hen, an egg-laying hen, they produce about 300 eggs a year, and they have a productive life of about two years, 600 eggs.

The number of eggs would be about 600 for those two years. The number of eggs that went to exports were three. It's no wonder Dr. Baye couldn't calculate any damages based on any of this.

The same thing for short-term measures. Short-term measures, he couldn't -- he said they were unsuccessful, and he -- and he told you that he also couldn't calculate any damages based on those short-term measures.

So the plaintiffs have the right to seek, after all this time, after all this evidence, after scores of documents, lots of deposition testimony -- Linda Reickard, Phyllis Blizzard -- that focused on the export program, testimony that focused on the short-term measures, and all we have is something symbolic.

And my question there -- another question I'll ask, if that information, all those documents from Gene Gregory that they relied upon for the export program and the short-term measures, if that wasn't true, if that wasn't to be believed, then how can you believe -- anything that Gene Gregory and the documents you saw today related to the UEP

Certified Program, how can you believe that?  Do you really believe that Gene Gregory and those statements in the *United Voices* that talked about, that touted the benefits in his view of the certified program -- can you believe those, too? Because he was dead wrong when it came to the export program and the short-term measures.

And even though they're asking for a total of $8 for those two legs of the stool, they still have to prove that they were damaged in some way.

And Dr. Baye did no analysis of any of the egg product prices related to -- the effect of the egg product prices related to those two measures.

So if you don't find that they've proven that -- any damage, you can award them zero.  That would be symbolic, too.

So what are we left with?  We're left with these two elements of the certified program.  They haven't alleged the entire certified program is illegal or unlawful or violative of the antitrust laws.  They've only alleged discrete elements of it, the backfilling ban and the henhouse density requirements, the cage density requirements.

Well, of those, ladies and gentlemen, we would submit the answer in terms of what damages they should get for those elements of the conspiracy, it's zero.  And why is it zero? It's zero because the spokesperson for their damages calculation, Dr. Baye, analyzed a conspiracy that you didn't

find. He analyzed a different conspiracy. And his step one -- this is a slide that was used yesterday with his direct examination.

His step one in describing his analysis was his first and fatal misstep because he looked at how much did the UEP program restrict output relative to what it would have been but for the illegal coordination.

Now, if you remember, he said, I'm not offering any opinions on -- I'm not offering any opinions on whether this violated the antitrust laws, but his first step talks about illegal coordination.

And remember, it's their burden. It's Dr. Baye's burden to convince you that he calculated damages in a way that's consistent with your jury verdict.

It wasn't our burden. You heard yesterday Dr. Walker testifying. And I think Mr. Fox asked him, where is your model? Where is your model?

It's not up to Dr. Walker or the defendants to come up with a model. It's up to the plaintiffs to come up with a model that convinces you because they have the burden. Dr. Walker, yes, he critiqued it, he said it didn't make any sense. But it wasn't our burden. It wasn't Dr. Walker's responsibility to come up with a model. It was up to Dr. Baye and the plaintiffs to come up with a model that convinced you.

And the conspiracy that Dr. Baye analyzed and what he

looked at as the foundation for his entire testimony and his opinions was the entire egg market, the entire egg production market. Every egg for human consumption. Every one.

And this is what he said. This is his testimony from yesterday:

"It includes the conduct of everyone that was part of the certification program, that's correct."

Everyone. Even those that were not UEP members but joined the certified program, others that were UEP members that joined the certified program, the 177 members that you said in Question No. 8 not every producer was a member of this conspiracy, not every producer who had joined the certified program was part of this conspiracy, yet he concludes that they should be part of his analysis.

He is mixing lawful and unlawful conduct. We understand that the plaintiffs have proven that the conspiracy involved here with Moark, Wabash Valley, Cal-Maine, Rose Acre along with the trade groups, UEP and USEM -- we understand that's the conspiracy you found. That's the conspiracy that they alleged. That's the conspiracy they proved.

But they didn't prove that anyone else was a member of that conspiracy. In fact, they failed to prove that Michael Foods was part of that conspiracy. You found that they weren't. They were a member of the certified program. They're a part of the -- the foundation, the analysis of

the -- of egg production that Dr. Baye looked at.

That's still in there. They may have taken off and deducted any sales from Michael Foods, but it's still in there. It's still -- their activity is still embedded in his model, activity and a producer that you found was specifically not part of this conspiracy.

Again, Dr. Baye said, "My econometric analysis doesn't depend on whether the UEP program was created through legal means, illegal means, who participated or not. It's just the economic effect of the program."

He's combining the activities of those you found who were engaged in the conspiracy with a lot more who weren't. Mixing lawful and unlawful conduct. And we'll get to why that's a problem for them in a second.

Because -- well, I'll get to it right now. Jury Instruction No. 14, it says, "Plaintiffs bear the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes."

They cannot stick the defendants with damages associated with lawful causes.

And Jury Instruction No. 14 also says that "Each plaintiff has the burden to prove that it incurred damages that were caused by the conspiracy that you previously found . . ."

It has to be consistent with the conspiracy you

previously found as opposed to damages caused by any other factors.

"The plaintiffs are entitled to recover for changes" -- excuse me -- "are not entitled to recover for changes in price that resulted solely from other causes arising from the normal course of lawful business activity." Lawful business activity.

And then "You may not award damages for an injury caused by other factors, meaning factors other than the conspiracy."

This is the conspiracy that has taken up the last seven weeks of your lives. This is a slide that the plaintiffs presented way back on October 19th during opening statement. It's a -- what they call a hub-and-spoke conspiracy. And here are the alleged co-conspirators the plaintiffs presented and proved to you at least in part as part of this conspiracy.

It's those producers: Cal-Maine, Moark, Wabash Valley, Rose Acre Farms. And they also claim Michael Foods, which you found was not a co-conspirator.

But this is the conspiracy that the plaintiffs attempted to prove, and they were successful in proving, that you found in your liability decision.

And what I heard from counsel for plaintiffs, Ms. Kastanek, this morning -- or this afternoon, I should say,

or around noon, I'm hearing something that's brand-new. This is a brand-new theory. It's not surprising that most of her closing was spent on revisiting liability rather than talking about the damages. Because they want to revisit their theory.

Their theory was this: Their theory was these five producers, not six, not 177, not ten, not 15, these five were part of the conspiracy. And of those five, you found four were.

Now what we're hearing is, well, everybody else who was part of the certified program, all those gray barns, all these gray barns that she showed you, well, they were part of it, too -- or not really part of it, but their activities, their actions the defendants here are responsible for.

But their actions were lawful. No -- and no producer, no other producer came into this courtroom and explained that, oh, we did this because Gene Gregory blew the clarion call to say, come join the UEP Certified Program because we need to get more producers.

All they have are these statements from Gene Gregory saying, hey, we'd like to get more producers on board. But did you hear from any other producer, one, who said, hey, that's why we joined, that's why we became part of the certified program, along with the other 176 producers?

They didn't present that evidence. There was no evidence. Because that's not the conspiracy they litigated.

They litigated this conspiracy with these five producers who allegedly were part of it.

So we will submit that plaintiffs are trying to convince you of a conspiracy that you didn't find exist by virtue of finding that not every member of producer who joined the certified program was part of this conspiracy.

And I'll mention again Michael Foods. That's important. It's important that you found that Michael Foods was not part of this conspiracy. As you heard yesterday, Michael Foods had 4.9 percent of the total egg market. They were a big one, too. If you looked at those big red houses, they'd have a big red house, too. And you found that they weren't part of this conspiracy.

And that's important in part because Dr. Baye's main specification calculation, which is the basis for their 25.4 million, approximately, damages claim -- Dr. Baye said, as I mentioned yesterday -- but Dr. Baye said that the certified program and these cage space restrictions really started to have an impact after Michael Foods joined in 2006.

This is what he said in this trial:

He said, "And that's why, in my opinion, it's not surprising at all that restrictions one and two" -- one and two, there's restrictions one and two -- "had a limited effect until you got more firms on board, including, ultimately, Michael Foods."

Michael Foods, their participation in the UEP Certified Program was instrumental, according to Dr. Baye, in his analysis. Michael Foods, the company that you found was not part of this conspiracy.

And what about this -- the other -- the second alternative calculation? We heard a little bit about backfilling. There wasn't a shred of evidence in this case that addressed how -- how common backfilling was and what the actual result was on egg production by virtue of this ban on backfilling.

You heard that Michael -- excuse me -- you heard that Cal-Maine didn't even backfill. The largest egg producer in the country did not backfill, well before the backfilling ban went into effect.

And Rose Acre explained they only did it on a limited basis.

So who is doing all this backfilling that when you banned it, egg production went up? You didn't hear anything about that. It's all speculation and guesswork.

Again, these are the red barns. Dr. Baye looks at every one in the UEP Certified Program, including those who weren't even members of UEP. And these are the conspirators that you found, these four and not Michael Foods.

And how big were those barns that you saw where they took the illustration -- the previous illustration to show the

Closing Argument by Mr. King

7359

177 and they said, Cal-Maine and Rose Acre, they're pretty big, and so they blew up the big red barns? Well, if you add up Cal-Maine, Rose Acre, Moark, and Wabash Valley, yeah, they're big, but they only make up 15.5 percent of the entire egg market. 15.5 percent. They didn't control it. They had less than 20 percent. That's how big they were. They were big, but combined, they didn't -- they weren't able to control the egg market. Not in the least.

Ms. Kastanek said we're not going to offer a number. We think the number should be zero for the certified program, we think the number should be zero despite their claim for nominal damages for the USEM exports and the short-term measures.

But if you are inclined to award damages, we would like you to consider three alternatives because the number they've presented is overstated.

First of all, this is the calculation that they've made for their main specification, the total -- excuse me -- 25 million -- 25.4 million.

And their backfilling ban calculation is about 14 million.

Now, they rely on the bigger one, not the other one, even though Dr. Baye said it's equally reliable.

But if you take that 15.5 percent market share and you multiply it by those numbers, you come up with a different

number, a much smaller number.

Why is it that these four, four producers, should be responsible for a hundred percent of the damages that Dr. Baye calculates when most of the egg market weren't part -- or most of the certified producers weren't part of this conspiracy?

To be fair -- and I'll use the term "fair" again and "reasonable" -- why is it that they should have a hundred percent rather than 15.5 percent, the amount that they contribute to the overall damages that Dr. Baye calculates based on the entire egg market?

If you take those numbers and multiply them by 15.5 percent, that's the result.

Backfilling ban. That's the result for the backfilling ban.

In the plaintiffs' opening statement, they said the evidence was going to show that the conspiracy that we're going to prove is from 1998 to September 2008, after *The Wall Street Journal* article in September 2008 and they became aware of this alleged conspiracy and that's where the conspiracy period end.

So the question was asked yesterday, then, why -- why are they asking for damages through all the way -- all the way through 2008? Why not take the last three months off, deduct that amount, both under the main specification and under the backfilling ban?

And then a third way you could look at this is what I described yesterday is, what do we do about the fact that Kraft, Nestlé, and Kellogg demanded UEP-certified egg products? They specifically demanded it. Kraft in 2007, Nestlé in 2006, and Kellogg at some period of time between 2005 and 2008.

Is it appropriate to have them collect overcharges for something that they demanded, something that they wanted?

And if you look at -- oops, the same thing with Nestlé. Nestlé asked for it in 2006. Kellogg demanded certified eggs starting in 2005, 2008.

It's our view that a fair damage calculation for Kraft, Nestlé, and Kellogg should deduct those sales after they began demanding certified egg products. Nestlé in 2006. And I guess to be conservative, we don't know and no one from Kellogg told you when they started demanding certified eggs in that period between 2005-2008. We would suggest, split the difference. Start in 2007. It could have been as early as 2005. We don't know. But we know from their admissions, they did demand certified eggs.

This is from Dr. Baye's report. You saw this yesterday. This is his Appendix 6.1 that contains the calculations that he developed, came up with in order to get his damages calculations under his main specification. These are his main specification.

And if you look at the sales for Kraft who, again, began demanding certified egg products in June of 2007, that's the amount of damages, 18,329,288, that Dr. Baye calculates of sales that they believe are overcharges for the period, the damages period.

Well, reduce -- if they started demanding, Kellogg -- excuse me -- Kraft started demanding certified eggs in the middle of 2007, cut it in half because after 2007, they were demanding the thing that they're complaining about repeatedly. They asked for certified eggs, they continued to ask for certified eggs, and they continued to demand certified eggs all the way through 2012, even though they claim they knew about this conspiracy after *The Wall Street Journal* article came out in 2008. They continued to demand it. They made a business decision to demand certified eggs. They needed it after developing their own animal welfare policy over a two-year period.

And then what about 2008? All that year they're asking for certified eggs. We would submit that they should get nothing for 2008 because they got exactly what they asked for, certified egg product.

That reduces that $18 million number to 6.5 million.

What about Nestlé? They began demanding certified eggs in 2006, as we discussed, because they needed to compete with Ben & Jerry's. Ben & Jerry's had already started buying

animal welfare-friendly egg products for its ice cream.  So in order to compete with Ben & Jerry's, they began demanding certified egg product in 2006.  And you heard that they did it because they were getting animal welfare pressure.  They made a business decision.

So why award them any damages in 2006 for product that they demanded?  Why award damages in 2007 for egg product that they demanded?  And why award them anything in 2008 for selling them certified egg product that they demanded?

That $1.1 million gets reduced to $811 if you do that.

And then Kellogg, you cut it off at 2007 based on their demand of certified egg product.  2007, gone; 2008, gone.  Their damages number is 594,192.

General Mills didn't ask for certified egg product. That number stays.

The same thing with the backfilling ban calculation. Kraft, the same thing, 2007, they're asking for certified egg product.  Half of that reduced.  2008, they're asking for certified egg product.  Why, then, should they recover for overcharges for buying certified egg product when they demanded it?

The $10 million number under the backfilling ban calculation goes to 5 million -- $5.3 million, approximately.

Nestlé, you take out 2006 for their demand, 2007 for

their demand, 2008 for their demand; that $521,000 number gets down to 1623.

And then Kellogg, looking at 2007, 2008 under the backfilling ban, calculation, reduce those numbers, deduct those numbers, deduct that number, and you get from 2 point -- roughly $2.5 million to 705,778.

The same, General Mills, they didn't ask for it. They're 832,994. We don't have a suggestion for deducting any off of that amount.

So if you subtract the demand from their main specification calculation, Kraft, rather than recovering 18 million, would be roughly 6.5.

Nestlé, rather than 1.1, would be $811.

Kellogg, 594 from their original calculation of 4.6 million.

And then General Mills stays with 1.3.

And then why wouldn't that number also be calculated? Because that's a hundred percent number, that's a hundred percent damages based on a hundred percent of the entire egg production that Dr. Baye analyzed, why shouldn't it be our market share? And if you multiply the market share by that calculation, it gets reduced even further.

1 million for Kraft; $126 for Nestlé; $92,000 for Kellogg; and $202,000 for General Mills.

You can do the same calculation, the same basic

Closing Argument by Mr. King

7365

calculation for the backfilling ban calculation to the extent you think that's a more appropriate methodology to calculate their damages.

So in summary, their main specification, that's their numbers. We don't believe that these numbers are reliable at all based on Dr. Baye's analysis because he analyzed a conspiracy that you didn't find.

But if you use the market share deduction, multiply everything by point -- by 15.5 percent, you get a number of 2.8 for Kraft, $179,000 for Nestlé, $713,834 for Kellogg, and 202,370 for General Mills. And if you take the certified program demand deductions during the time periods they demanded it and then if you also multiply it by their market share, those are the damages.

The backfilling ban, the same thing. It's not a reliable calculation. Market share deduction results in these numbers: 1.6 for Kraft, 80,000 for Nestlé, 387,000 for Kellogg, 129,000 for General Mills.

And then, again, the certified demand deduction, deduct the times when they demanded it: 831 for Kraft, 252 for Nestlé, $109,000 for Kellogg, and 129 for General Mills.

To close, this case is important, and we really appreciate your giving this case the attention that it deserves.

We would ask that after you review the evidence,

7366

discuss it and deliberate, that you would award them no damages because they haven't met their burden of proof. Dr. Baye's analysis doesn't fit with the conspiracy that you found and they haven't proven their damages.

In fact, they've already admitted with respect to two elements of the conspiracy that we've been here for for the past seven weeks or so -- they've already admitted with respect to those two elements they can't prove their damages. That's why they're only asking for a dollar.

What's fair?  What's reasonable?

I'm not going to sit here, stand here and walk through the verdict form.  You've already filled one out.  You know how to fill out a verdict form.  But ask yourself what is consistent with the verdict that you found.  And with respect to many of those elements, only you know.

But we would submit what plaintiffs are asking for is neither fair nor reasonable.

We think the verdict should be zero because we think plaintiffs haven't met their burden.  But if you're inclined to award damages, we would ask that you take into account these deductions that we've suggested to you and award them an amount that's far less than the $25.4 million that they seek to recover from these defendants.

Thank you very much.

THE COURT:  Thank you, counsel.

Defense Counsel, you may proceed.

MS. SUMNER:  Thank you, Your Honor.

CLOSING ARGUMENT

MS. SUMNER:  Good afternoon, ladies and gentlemen of the jury.

I want to start where Mr. King left off by thanking you again for your service.  This phase is an important phase, and although it was not nearly as long as the first phase, it is just as important.

You haven't heard much from UEP or USEM in this phase.  And that is not because this phase is not important to them.  It is.  And your time is valuable, so I'm going to be very brief here.

You found that the cage space and the backfilling restrictions as part of the UEP Certified Program were part of a conspiracy among four egg producers and UEP and USEM.

And like Mr. King said, we accept that.

We also know that you found that not all of the producers who are members of the UEP Certified Program participated in that conspiracy that you found.  And we don't know much more about why you found what you found.

But we're here now to determine the damages that these plaintiffs sustained as a direct result of the conspiracy that you did find, one that includes four producers, UEP, and USEM.

And with respect to the UEP Certified Program, that is not what plaintiffs have asked you to do. Instead, plaintiffs are asking you to assess damages against these four defendants based on the conduct of more than 170 producers who have not been found to be participants in the conspiracy, many who are not and never were members of UEP.

That, we submit, is not reasonable, it is not just, and it is not fair, for one simple reason: There is no evidence in this trial as to why any one of those more than 170 producers joined or stayed in the UEP Certified Program. That evidence was not part of the trial and not part of the evidence that was offered to you by plaintiffs or defendants.

What we do know and have seen in this trial is that there are lots of reasons why producers might choose to join the UEP Certified Program and to continue to participate in that program that have nothing to do with restricting supply.

We also know that there was evidence that the prohibition on backfilling did not in fact restrict supply.

So as you deliberate on the important questions that are now before you, I ask that you carefully consider as part of those deliberations all of the evidence that you've heard during this trial. And, in particular, consider everything that you have heard about the UEP Certified Program as you consider whether plaintiffs have met their burden to prove that the damages that they are asking for, again, damages

relating to the conduct of more than 170 companies who have not been found to be participants in this conspiracy, whether those damages resulted directly from the conduct that you found to be unlawful.

If you determine that they did not, then you cannot award damages for that conduct.

Thank you.

THE COURT: Thank you, counsel.

Counsel for Cal-Maine.

CLOSING ARGUMENT

MR. OTLEWSKI: Good afternoon, everyone.

In trying to think about how to explain overcharges to all 12 of you, it brought me back to about 30 years ago when I was in junior high. My little brother and I used to walk around the neighborhood mowing lawns, and then when the fall turned, we'd go around and rake leaves. And we'd rake our neighbors' leaves and they'd pay us $10 a lawn. And it was great.

But my biggest concern, because I couldn't control my little brother as much as I tried, was that he wouldn't do a good job or that one of our neighbors, particularly the one that my little brother would ride his bike over the lawn every day, would complain and say, well, look, after you raked our lawn, all these leaves, you didn't do a good job, there's all these leaves on it. And these leaves are because your little

brother didn't do a good enough job raking them up.

And so we'd have to go back and forth and try to figure it out. And that was my number one fear doing that work.

And it reminded me a lot of the task that's in front of you. Because your job is, with respect to these four plaintiffs and the amount that they're claiming as overcharges, think about them as leaves. Think about them as leaves that are on their lawns after someone has apparently come through and raked them up.

Your job is to figure out were those leaves that are left on that lawn the result of some misconduct from, in my case, my little brother and I, or, in this case, from Cal-Maine, Rose Acre, Moark, and Wabash Valley? Or are there other reasons?

Perhaps that neighbor right next door whose lawn touches that neighbor's lawn who never raked his leaves and whenever there's a gust of wind or a car driving by fast, it blows them on. Or perhaps it's that giant oak tree that, when the frost hits, all of their leaves fall.

That is your job. That is the unfortunate, and I hate to say that, unfortunate task in front of you, is to try to parse out those leaves. Which of those leaves, overcharges, are the result of the conspiracy and which are the result of other factors?

And as you've heard the judge instruct you, those other factors include lawful conduct, like those trees that happen to fall, or that other negligent neighbor who didn't ask anyone to rake them up and has left them on his lawn. And we all know neighbors like that.

And with that, ladies and gentlemen, I want to jump in and start talking about what your job is. It is only about compensatory, giving these plaintiffs back what they had originally asked for. It's not to punish anybody. It's not to send any message. It's not to do anything more.

And let's put this in perspective. So what I did here is try to give you a sense of scale. And what we know from the plaintiffs' presentation of evidence during damages is that they paid approximately $96.4 million for egg products from Wabash Valley and Rose Acre.

And they're claiming overcharges of approximately $25.4 million. That is the ceiling that they've set.

Well, just think about that. Altogether, that's about 26 percent of the price that they -- that they paid between 2004 and December of 2008. So go back to my lawn-raking analogy, we're talking about a quarter of their collective lawns, they're saying, wasn't raked. And now the job for all of us is to figure out how much of that is a result of unlawful conduct, an antitrust violation, how much of that is the result of a different factor.

And this instruction, Instruction No. 9, is incredibly important during your deliberations in making that determination. The amount of damages must have a reasonable basis in the evidence, a reasonable basis in the evidence, and that's the evidence from the liability phase, it's the evidence from this damages phase.

And if the plaintiffs are going to rely on assumptions, you -- you have to hold them to their burden because they have to prove the reasonableness of each of their assumptions that they based their calculation on.

Now, we've heard a little bit from Rose Acre's counsel about three different flaws in their -- the plaintiffs' overcharge model.

Now, counsel for Rose Acre covered the last of these flaws, the fact that the overcharge model doesn't account for Kraft, Kellogg, Nestlé demand for certified eggs, and I'm not going to cover that.

Instead, what I want to talk to you about is Professor Baye's analysis and how his analysis improperly includes lawful conduct. And I'm going to focus my time on that part of the -- of one of the -- which, in our view, is a significant flaw in his model.

Now, again, just like Instruction No. 9, Instruction No. 14 doubles down on this principle of reasonableness. And how do you know when an overcharge is reasonable versus

unreasonable?  Well, here it is laid out in Instruction 14.

"Plaintiffs are not entitled to recover for changes in price that resulted solely from other causes arising from the normal course of lawful business activity."

Plaintiffs are not, are not entitled to recover for damages caused by any other factor other than the conspiracy. Again, it has to be the conspiracy's conduct that causes their injury, that causes their damage.  No more, no less.

And that is a math problem.  That is a math problem. And you heard over the course of about 45 minutes during Professor Baye's direct examination yesterday his efforts to explain that.

Now, I don't know about you -- he's a professor of economics -- but that math, that economic analysis was complicated.  At times, it was confusing.  And I don't know if that was an effort just to suggest that it's simple, you come up with these answers really quickly and you can check the box, check the box, fill in a blank.

But the reality is, this is a very complicated model that he created, and a complicated model that he ultimately didn't adjust after the fact.

And what do I mean by that?

After the fact of your verdict.  After your verdict determined in Question 4 that Michael Foods was not a member of the conspiracy.

And after the fact didn't account for the fact that not every member of the certified program was a part of the conspiracy.

Now, it could be really easy to throw your hands up back in the jury room and say, you know what, we've been here for six and a half weeks, 25 -- 25.4 million amongst these four plaintiffs, let's just get out of here. I would understand that.

But I have to ask you respectfully, the math matters. The math matters. It matters to Cal-Maine. It matters to Rose Acre. It matters because those damages are real money. The damages that these plaintiffs are seeking are real money, millions of dollars.

And the plaintiffs have a burden to prove those damages, prove them, and base that damages calculation in evidence.

And what do we know about Professor Baye's model? Well, we talked -- I talked about this at length with him yesterday. The number one problem with his model begins with the fact that he includes pricing information from all producers, regardless of whether they were a member of the certified program or not.

Now, just think about that going back to the lawn analogy. And, again, all producers, all trees, regardless of whether those trees were on that neighbor's lawn or whether

they were on someone else's that happened to blow down the street, all leaves everywhere are part of his analysis.

And he takes it a step further when trying to pin down what the certified program's effect was. He even says everybody in the certified program was part of the problem. That includes producers who were members of UEP and in the certified program as well as producers not in UEP but in the certified program.

And I want to pause there. This last prong is very important, and I think it's really important in light of what you heard from plaintiffs' counsel earlier today.

His model includes producers not in UEP but members of the certified program.

So let's unpack what we saw Dr. Baye say yesterday.

So what do we know? Well, using the most expansive definition percentage of the UEP Certified Program at its height, the UEP Certified Program totaled approximately 83.6 percent of the market.

Now, you saw that that number graduated and went up and down over time. Right here, just for purposes of discussion, I'm using the highest number. Okay. I want to be conservative. 83.6 percent.

Well, what do we know?

We know that there were 29 non-UEP members who were part of the program. 29. All of whom had together

approximately 14 million egg-laying birds, roughly the same amount of flock size as Michael Foods, who, under Question 4, you, as the jury, found was not a part of the conspiracy.

Now, why does this matter?

Plaintiffs' counsel during their closing argument said, well, Gene Gregory set out to make the UEP Certified Program a supply restriction. And they talked about it at meetings. They put it out there in *United Voices*.

Well, these 29 members, where's the evidence that they got a *United Voices* newsletter? If they're not in UEP, when and where are they getting those newsletters?

That's a problem for the plaintiffs.

If these 29 non-UEP members are not a member of UEP, where's the proof that they're attending any of these UEP meetings, where, apparently, Gene -- as you found, Gene Gregory and others were discussing the supply restriction? Where is that proof?

It isn't in the record. That is a failure of proof by the plaintiffs.

And your job as a jury is to hold the plaintiffs to that burden. Because if they don't make that -- establish that and carry out and show you why those producers were a part of this conspiracy, well, guess what? That's lawful conduct.

And your job, going back to the raking leaves

analogy, is to apportion it out and start to weed those out and say that that's lawful conduct, it shouldn't be included in the damages analysis.

Now, as I think about this, I heard plaintiffs' counsel say a couple different things. And I'm going to do my best to quote her.

She said, "There may have been a lot of innocent producers. Some may not have conspired."

If that is true, it was Dr. Baye's responsibility to back it out, to apportion his damages calculation to account for those who weren't.

But then she turned around and said, well, the vast majority, you can infer, considered a blatant supply restriction.

Well, put aside the contradiction there, on the one hand, she's saying perhaps there may have been a lot of innocent producers, and then she turns around and says the vast majority were part of a blatant supply restriction.

Put that aside.

The fact that she is throwing that up there and saying "perhaps," "possible," "maybe," that's guesswork. That is not what a verdict by this jury can be based on. It has to be based on evidence.

And that is why when Professor Baye was on the witness stand, I asked him point-blank about Michael Foods and

whether he sought to back out Michael Foods' conduct, and he said he did not. That is a failure by the plaintiffs.

He also didn't try to back out those 29 producers.

And, again, you'll have that exhibit in evidence if you want to take another look at it. It is Defendants' Exhibit 1242. You'll have it. You can take a look at it. Count up the 29 producers. See that those producers had 14 million birds, just the same as Professor Baye said Michael Foods did.

And there's a point to that, because separating out lawful conduct is necessary. You have to apportion damages only to the conspiracy.

And so, ladies and gentlemen, that's where we come up with this 15.5 percent number. What do we know? Well, we know based on the evidence established at trial, which we accept, contrary to plaintiffs' suggestion that we're not accepting your verdict -- what we know is that Cal-Maine, Rose Acre, Moark, and Wabash Valley together totaled 15.5 percent of the market. That's what the evidence presented at trial, and that you determined, established.

And, again, for purposes of damages, that is what should guide your analysis, in Cal-Maine's view.

Now, I expect plaintiffs' counsel in rebuttal, because, remember, they get the last word, to say something like they did before, oh, well, if we had tried to prove that

every producer was in this conspiracy, we would have been here for eight, nine, ten weeks. It would have extended this trial even longer.

Let's put that in context. Remember how many days of testimony they asked Dolph Baker about molts and slaughters and hatch reductions and exports. Phyllis Blizzard, Linda Reickard, you heard and saw their deposition testimony, the countless exhibits. And all the plaintiffs are asking for for those days, documents, depositions: $4. $4.

So if it really mattered for the plaintiffs, if it really mattered for the plaintiffs to try to get the full extent of that overcharge, did they need to spend all that time and effort on that? No. They should have put their time and energy into proving up that more of that circle was engaged in unlawful conduct.

But they didn't. And that's their choice, and that's fine. But the choices they made during the liability phase follow them now into the damages phase. The choices they made then follow them here.

And so when they come up here and they say, oh, well, it would have been longer. No, it necessarily wouldn't have. All they needed to do was focus on where the money was. Focus on where the money was and what they're trying to recover instead of trying to get something for nothing.

Because your verdict cannot be based on guesswork.

It cannot be based on speculation. And that's why, again, if we go back to Instruction No. 14, if you find a reasonable basis to apportion the damages between the lawful factors and the conspiracy, then you may award damages for the part of the injury caused by the conspiracy.

And apportioning damages is something that I spent time doing yesterday with Professor Baye.

And you heard him and you saw him probably scoff, oh, multiplying it times 15.5 percent, that's not economics; that's math.

That's exactly the point. It's math because we're doing a math problem. We are trying to apportion damages. We -- on behalf of the defense, we're trying to do the exact work that Professor Baye didn't because he didn't make any effort to back out Michael Foods, these non-UEP members, anyone else. Instead, that work was left to us. And that's what we had to try to do.

And so as much as he might want to scoff at it and poo-poo it, well, ladies and gentlemen, this is what we're left with based on the evidence that these plaintiffs offered despite all the time they spent on it and the weeks and the hundreds of documents and the hours that you had to endure.

And so what I've put up here is the simple math calculation that brings their damages calculation down from guesswork and speculation into reality, into the facts

established at trial. Take the numbers, each of the plaintiff's overcharges, and you multiply them by times 0.155, multiply it and you take it by 15.5 percent. That number corresponds with the conspiracy's market share. No more, no less. Consistent with the evidence.

Now, we also showed you this. And you'll remember during my closing argument during the liability phase, I talked about the tail, how the plaintiffs had this tail from 2009 to 2012 and that that tail was trying to wag the injury dog.

Well, now you just have a little teeny-tiny tail, a stub, kind of like on a little Boston Terrier or a Pug. A little tiny stub of a tail that goes from October to November to December of 2008. Well, the same principles that applied before apply -- from liability apply now.

The conspiracy that these plaintiffs alleged and that they sought out to prove by their own words ended on September 24th, 2008. The conspiracy stopped. And, again, remember, we're talking about eggs. We're not talking about a product that has a very long shelf life that can sit out there for a long period of time.

And so when they tell you that we're trying to get damages for a period after the conspiracy, ask yourself how does that marry up with the evidence and their theory of the case? It just doesn't.

Now, during Professor Baye's cross-examination, I expected that he would have been able to say, yes, in order to come up with my damages, I looked at these sales month over month. Unfortunately, apparently, he didn't do that work. He just came up with a lump sum figure.

And so in terms of calculating out this number, what I'm offering to you is a reasonable way to take that number and bring it down to reality.

So what do I have here? We know that there were three months: October of 2008, November of 2008, December of 2008.

And what do we know as a denominator for this division problem? Again, our effort to actually apportion the damages, we know that the injury period spans October of 2004 through December of 2008. 12 months to a year, 2005, 2006, 2007, 2008. That's 48 months. Plus three months from October 2004 to December of 2008.

Again, that's conservative because what we know is, Dr. Baye's analysis on damages doesn't pick up on the main specification until August of 2005. And under the backfilling specification, it doesn't pick up until February of 2005.

So could I have come up with a lower number and given a bigger haircut? Sure. But that's not my point. My point is simply this: The evidence -- the damages that you apportion to these defendant -- plaintiffs has to marry up

with the evidence. And, again, reasonable efforts to apportion the damages to be consistent with the evidence.

And so to do that math, I've tried to make it simple. All you need to do is multiply each of those numbers -- whether before or after applying the 15.5 percent market share apportionment, you can multiply it times 0.941, which is consistent with the 5.9 percent, if you take those three months and divide it by 51.

Again, conservative.

And that brings me back again to Instruction No. 9, which I cannot emphasize enough. The amount of damages must have a reasonable basis in the evidence. It cannot be based on guesswork, it cannot be based on speculation. The "possible," "perhaps," "maybe," that doesn't cut it in this federal courthouse. It does not. And it should not cut it back there in that jury deliberation room, ladies and gentlemen.

And so no matter how hard it may be to sit there and listen to Dr. Baye try to explain the math and think it's difficult to apportion it -- bless you -- what we are trying to do is give you the tools, the tools to make your analysis based in the evidence.

That is the only thing we've ever asked you to do, look at the evidence, give it a hard look.

And, ladies and gentlemen, you did that during the

liability phase. And your verdict came back, and we respect that verdict. We -- on behalf of Cal-Maine, we're humbled by that verdict.

And we're not asking you for sympathy. We're not asking you to base your decision on anything other than cold hard facts and cold hard math. And it's important to say it, and I'm going to say it twice, the math matters. The math matters to Cal-Maine, the math matters to your verdict, because the law requires that the math be based on reasonableness and justice. And basing it off of guesswork, speculation is neither reasonable nor just.

Now, ladies and gentlemen, I'm not going to hold up a verdict form and tell you what numbers to write in. I have too much respect for this group of 12. We trust you. Cal-Maine believes that you will do your job analytically, thoughtfully, and thoroughly, that you will analyze the evidence and you will make good judgments. And whatever number you come back with, we will accept it, and we'll accept it because we know that you will look hard at the evidence and you will think to yourself about what makes sense to apportion the damages to the conspiracy you found in the verdict you rendered.

Thank you.

THE COURT: Thank you, counsel.

Members of the jury, we're going to take our last

afternoon break. We're going to take about 10 or 15 minutes and we're going to let you folks stretch your legs, go to the restroom, get a drink, and then we're going to come back.

When we come back, we only have one more thing to do from the parties and one more thing from me.

Plaintiffs have the burden of proof, they speak first, they speak last. So plaintiffs are entitled to give a rebuttal. That will be the last thing you will hear from the parties. I, then, am just going to give you the last three instructions. And I'm then going to give you the jury verdict form and it will up to you to deliberate as you see fit. So that's what you can expect when you come back.

We will take a break. When you all are ready, we'll get going and we'll see you shortly.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 2:27 p.m.)

THE COURT: All right. Have a seat, everyone.

Anything to cover?

MR. FOX: Your Honor, could we have -- Ms. Kastanek is going to be doing rebuttal -- let me move to this microphone.

Ms. Kastanek is going to be doing the rebuttal. She is going to excuse herself now. But we're hoping for half an hour, Your Honor, because we do need to change things again just to make sure we're not covering something that they

7386

didn't cover and making sure that everything is in line.  If we can have an half an hour, then she'll also be able to print her sheets of paper which caused me some problems last time, I'll be honest, when I did rebuttal.  And then we can -- I think we're doing fine given how long her rebuttal is likely to be.

THE COURT:  Okay.  Here's what I have to say, I've got a jury back there who is going to be anxious to go.

MS. KASTANEK:  Can we just do 20 minutes?

THE COURT:  Usually when I say 10 or 15, it's usually 20 anyway.  Isn't that right?

So I'm not going to sit on you, Ms. Kastanek.  I think our -- everyone's interests are aligned.  You know, we want everybody to do as best they can for their client consistent with the jury getting going here.

So I'll ask Ms. Ramos to come out at 2:45 and just see how the plaintiffs' team is doing.  I'd like to start in that neck of the woods.

MR. FOX:  And while she -- Your Honor, we can talk about schedule, if you'd like, for the post --

THE COURT:  Sure.

MR. FOX:  -- trial -- or the Rule 50.

I take it from Mr. -- I'm just joking here.  I'm taking it from Mr. Otlewski's statement that he'll accept the verdict, that they're going to withdraw the Rule 50, but . . .

7387

I'm just kidding on that.

THE COURT: I'm laughing internally.

MR. FOX: Thank you.

THE COURT: That joke didn't land with anybody else.

MR. FOX: Yes, thank you, Your Honor. We took some work away from you.

So December 22nd is what I think the parties have agreed on if it's okay with Your Honor that we would respond.

And then the defense asked for four weeks, which is fine with us.

THE COURT: Okay. Is that enough time for the defense team? You've got the holidays in there. You know, if we went -- I see Mr. Levine wince, which I never like to see.

Is that enough time or do you want five weeks?

MR. LEVINE: I think it may be enough time, but, you know, to be honest, it's hard to know right now.

THE COURT: Yeah. What -- so January 22nd, what's five weeks from then?

MS. SUMNER: The 26th.

MR. FOX: December 22nd is what we were --

THE COURT: I'm sorry. I beg your pardon. You're exactly right.

I meant December 22nd. Five weeks from that is . . . ?

MS. SUMNER: January 26th.

7388

MR. KING: No -- oh, five weeks, that's right.

MR. LEVINE: Yeah, January 26th.

THE COURT: Okay. And the beginning of that week would be the 22nd?

MS. SUMNER: Yes.

THE COURT: Is that -- is there a holiday that week? MLK --

MR. FOX: I think that's --

THE COURT: The 15th, okay.

Can you do it by the 22nd of January or do you want until the 26th? If you want until the 26th, I'll give it to you.

(Counsel conferring.)

MR. KING: The 26th probably works best.

THE COURT: Let's do the 26th. I'm not going to tell you it matters that much to me. In the spirit of the holidays, given that you folks got crunched over Thanksgiving, I'm giving -- I usually give people a week or two for a reply, I'm giving you folks five weeks because you've worked pretty hard and then some.

All right. So I will enter an order today for the directed verdict. The defendants are going to respond on --

MR. FOX: The plaintiffs will respond.

THE COURT: Yeah, I knew you caught me there.

The plaintiffs will respond on the 22nd of December,

and the defense team will have until the 26th of January.

Does that work for everybody? Everybody happy with that schedule? That's plenty of time to --

MR. LEVINE: Yes, Your Honor.

THE COURT: That way you folks really won't have the pressure over the holidays. You can read it if you want beforehand, but you can really handle it in earnest in January. Okay.

Any other housekeeping matters that you wanted to raise, Mr. Fox?

MR. FOX: No, Your Honor.

THE COURT: Defense team, any housekeeping matters?

MR. KING: Nothing.

MR. COLLINS: Nothing, Your Honor.

THE COURT: Okay. Very good. I'll have Ms. Ramos come out in 15 minutes and see how you're doing.

THE CLERK: All rise.

(Recess taken from 2:32 p.m. until 2:52 p.m.)

THE COURT: All right, everyone. Before we resume, I wanted to float one thought I have a perspective on. But I wanted to get your input.

There's a lot of math involved, a lot of numbers flying around, a lot of discounts, a lot of chopping, a lot of adding. One question is whether the jury will have access to a calculator. I don't know what people think about that.

7390

They will not have their phones, which is a good thing.

Most of us who want to do calculations now do it on our phones.

I don't know what you would think about me preemptively offering a calculator. I am often loathed to do anything that would be suggestive, so I don't know if people think that would be helpful or unhelpful for me to make that suggestion.

If they ask for a calculator, I will give them a calculator. The question only is, do we want to offer that proactively ahead of time? I don't know. People may like that idea, may not. If there's any issue with it, I won't do it, but maybe people like that idea.

What do people think?

There's a lot of math on both sides, I'll say that. Each side is throwing a lot of numbers and a lot of calculations out there.

Plaintiffs' counsel, what do you think?

MR. FOX: We are concerned about the suggestive nature of it if you give it to them. So we would prefer that we wait to see if they have a question, and if they ask for it, then we can give it to them.

THE COURT: I mean, I think on your end, you all have floated a lot of numbers out, you know.

MR. FOX: None of them can be calculated using a

7391

calculator, though.

THE COURT: There's no grand total, I suppose, on your end.

MR. FOX: Correct.

MS. KISER: Your Honor, our thought was to just mention that there is one available. You don't have to say we'll give it to you, but for them to understand there is one available. And you could even just say, as you saw during the testimony, there was a calculator available, it's still available if you need it.

MR. FOX: Your Honor, that's still suggestive, and they know it's available, they saw it. So I don't think it's needed.

THE COURT: All right. I'll think about it. I don't think it matters one way or the other, but I wanted to just let you know.

Are we ready to go with the rebuttal?

MR. FOX: Yes, Your Honor.

THE COURT: All right. Let's get the jury.

(Jury in at 2:55 p.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: Have a seat, everyone.

Members of the jury, we have one last piece to hear from the parties. So we're now going to hear plaintiffs' counsel deliver the rebuttal.

Counsel, you may proceed.

MS. KASTANEK:  Thank you, Your Honor.

REBUTTAL ARGUMENT

MS. KASTANEK:  The defendants are throwing spaghetti against the wall.  They don't have their number from any witness, a number for damages, let alone an expert witness.  They are trying to see what sticks.  They are poking holes in theories, they're throwing out numbers and criticism right and left like you don't even know what number of theirs to write down.

There's so many numbers I could hardly even keep track.  So they will not even accept nominal damages of a dollar on the exports and the short-term measures.  They want you to award zero dollars.  It makes no sense.  They want you to give the plaintiffs no compensation for the conspiracy that you found.  Okay.

Let's start with the nominal damages.

So it is true that Dr. Baye's mathematical model cannot determine with certainty what the damages are from the short-term measures and the exports.  The model's too sophisticated for that, perhaps only a mathematician can understand.

I am no mathematician, but it does not require very much math to recognize that the UEP president himself calculated the impact of some of these exports.

This is a great example that I've shown you before, I showed it to you in my closing today, I showed it to you in the liability phase. And there are many, many, many more examples like that. You know that because this is my third time up here talking to you about it. I feel like it's kind of like déjà vu. They are, yet again, saying that Gene Gregory isn't reliable.

Gene Gregory was the president of the UEP. It is the spokesperson, it is the voice piece through which one of the defendants whom you have found liable was speaking.

And you don't even have to agree with just Gene Gregory because this is corroborated by a ton of evidence in the record that you've seen both during the liability phase and this damages phase. So, for example, Cal-Maine's 10-K that we looked at earlier today, which shows that a 1 percent change in supply equals a 7 percent change in price. Well, Mr. King for Rose Acre got up here and said, well, those exports were only half a percentage point. Yeah, that is a 3 percent change in price for that period of time.

Baye also showed you an exports model. So Mr. King got up here, and he said, but Baye didn't have an exports model. In the liability phase, yes, he does not calculate the ultimate impact, he does not quantify the damages, but he has a model that you saw during the liability phase that calculates that this -- that these exports would have taken

supply away from the domestic market.

Okay. And if exports don't matter, why do they keep doing it? They did it because it affected domestic price.

All we're asking for is a dollar. And once again, I am not focused on this because a dollar is all we're asking for; it's because it has that symbolic value of putting down that dollar to reflect the harm that was caused to the plaintiffs from these programs.

Exactly the same thing is true of other communications that were received by Gene Gregory. So this is a communication from a USEM market. It recognizes that they had enough market power as part of this export program to kick start the market, even though they were hoping for better participation next time.

Here's an example from short-term measures, the impact of those crisis measures that were done in 2004 and 2005.

Okay. I start here because it's some of the best proof that the defense is not grappling with the conspiracy. Okay. They say -- they got up here and they said, you know, we accept responsibility for this conspiracy. That's fine. Okay. They may accept your response -- your verdict with respect to the conspiracy, but they're not grappling with the implications of the conspiracy that they devised and they participated in.

And this is the best reflection of that. So let's go back to the red barns, which are the producers, so Rose Acre, Cal-Maine, Moark, and Wabash Valley.

Oh, wait. It's actually this.

This is the causation argument that I told you that the defendants would get up here and make, that the gray barns are the producers you haven't heard anything about, and you don't know whether they knowingly conspired.

So here's some things that Rose Acre's counsel said to you in closing about this. The plaintiffs' theory -- these are his words: "The plaintiffs' theory was that these five producers, not six, not 177, not ten, not 15, these five were part of the conspiracy and you found that four were."

No, that is just -- it's just plain and simple not correct.

The question for you in the liability phase was not who the co-conspirators were. You were not asked that question. The plaintiffs' evidence proved that the conspiracy included at least, at least these four producer co-conspirators, plus UEP, and that is a super significant omission from the defense's closing arguments.

Question 8 asked you, Question 8 asked you whether every single participant in the UEP Certified Program was a co-conspirator. That was the question. Was every single one? Well, of course not. You found Michael Foods was not. That's

it.  That is the implication of that.  You were not asked to decide who, if any, conspired.

And perhaps most importantly, really, really important, you were not asked to decide whether the four defendants, so the two producer defendants, Cal-Maine and Rose Acre, and UEP and USEM, so the defendants in this courtroom, you were not asked to decide whether they're responsible for the effects of the UEP Certified Program's cage space restrictions and the backfilling ban.

That is the question for you today.  Are they responsible for the effects?  That does not require you to say that every single one of these gray barns is a co-conspirator.  That is not the question.

The question is, did they cause this to happen?  Did they cause the market effects that were observed by Dr. Baye in his regression analysis to happen?  And the answer to that is yes.

So what do all of these -- I'm going to go back to this.  What do all of these have in common?  They are members of the UEP Certified Program.  They complied with the cage space and backfilling requirements of that program, mandatory rules imposed by UEP of which Rose Acre and Cal-Maine were a fundamental part, mandatory rules that they had to comply with, mandatory rules that were imposed after this program already had 70 to 80 percent market share.  Okay.

So they are part of this program that are enforcing supply restrictions upon others.

What's the significance of that?

So as I said, it's not that every single one of these gray barns needs to be a co-conspirator. There's like a serious disconnect between the plaintiffs' theory and everything the defense said to you up here. Right?

This program was a vehicle that was hatched by the defendants. Remember Dr. Baye's testimony? That's exactly right. It was a vehicle that was hatched by them, and it was a vehicle through which their supply restriction conspiracy was carried out.

Could those other program -- those other producers think that this was legit? Maybe. Right. To conspire -- and you know this from the liability phase, the definition of a conspiracy is to enter knowingly, to have a meeting of the minds. Right? And you found that met with respect to the four defendants.

We don't know whether all of these, every single one of these additional producers had that meeting of the minds, but it's also not relevant. Okay.

The way that the defense is talking, you would think that the plaintiffs are seeking to recover from purchases made by these other 170 producers. We are not. So just to be clear, we are not seeking to recover from anybody else that we

allege is a co-conspirator.

The $25.4 million figure that we are seeking damages for, that consists of purchases from two: Rose Acre and Wabash Valley. You have found them to be co-conspirators.

So the only question, the sole task with respect to these other gray barns was, was it reasonable for Dr. Baye to calculate injury using the UEP Certified Program's impact on the market? Was that reasonable for him to measure it using the program as a whole?

Okay. Each of the co-conspirators in this case -- and you've found that they're co-conspirators -- is responsible for the acts of the other co-conspirators. You found them to be co-conspirators, so they are jointly and severally liable for each other's actions. That's standard conspiracy law. And, of course, it's much worse here because we're not talking just about co-conspirators, but Rose Acre and Cal-Maine played a really fundamental role serving as chairman of committees, on the board of directors, *et cetera*, of the UEP.

And so the actions of UEP to make and enforce the rules that we have talked about, like the ban on backfilling, the 100% Rule, and the other anticompetitive rules that were part of this program are also attributable to Cal-Maine and Rose Acre.

Let me give you an analogy. I think it's going to

Rebuttal Argument by Ms. Kastanek

7399

help as we kind of work through these issues and talking about it outside this very narrow context of the egg industry, which has been really our lives for the last six or seven weeks.

So let's take the example of a Ponzi scheme. You may be familiar with a Ponzi scheme. It's where someone entrusts their money with a financial advisor. Okay? Let's call that advisor Bernie Madoff. And I'm saying that not because what UEP did or what Cal-Maine did or what Rose Acre did is a Ponzi scheme. Of course not. That is not my suggestion at all, but bear with me as we work through this analogy.

So instead of Mr. Madoff actually investing the money in question, he pockets it, and then he gets additional investments from other victims and he uses those funds to repay his first investors. Right?

It feels legitimate. Those investors are getting maybe a 5 percent return regularly, but Mr. Madoff is spending that money. Right? That initial investment doesn't exist anymore. This is a typical Ponzi scheme. It is corrupt from the start, it's not legitimate, it's designed for an unlawful purpose.

MR. COLLINS: Judge, I need to object.

THE COURT: Let's do a sidebar.

(Proceedings heard at sidebar on the record.)

THE COURT: Well, having spent the better part of a decade in the SEC, I'll tell you that the Ponzi scheme analogy

never resonated with me. So I don't know where you're going with this, but this is nothing like a Ponzi scheme.

MS. KASTANEK: Yep, I'm about to talk about when innocent helpers, people that are not co-conspirators, come in to assist in the scheme but they do so unwittingly and unwillingly. I think it's actually a great analogy. And I've already told them that I'm not saying that this is a Ponzi scheme. It is an analogy about the responsibility of the co-conspirators for the effects of their conspiracy including things that happened as a result, as a direct result --

THE COURT: Well, there are a whole bunch --

MR. COLLINS: Judge, she's used the worst example of a fraud scheme. This is so inappropriate on so many levels.

THE COURT: Yes, so --

MR. KING: It's a legal analogy.

THE COURT: All right. So I'm going to strike the analogy to a Ponzi scheme. This is nothing like a Ponzi scheme.

You've got to move on. I'm going to strike it. You've got to move on.

(End of sidebar.)

THE COURT: All right. So, the analogy is -- excuse me -- the objection is sustained.

Members of the jury, you just heard an analogy to a Ponzi scheme. That is going to be stricken from the record.

You should not consider any comments comparing what happened to a Ponzi scheme. So that's been stricken.

That being said, plaintiffs' counsel can proceed.

MS. KASTANEK: Let's take this a little bit more generally.

Okay. If you have a criminal -- sorry -- a scheme that is designed for an unlawful purpose, as this conspiracy was, if there are individuals who come into that scheme and they do things to further the scheme but perhaps without full knowledge of its scope, they could do so for an altruistic purpose.

Are the people that devised that conspiracy and put it into motion responsible for the acts that are in furtherance of it even by somebody who is an innocent party? Of course they are. Of course they are. They are responsible for the full scope of what they set out to do. Okay?

And the reason why this is important is because, of course, we've got this kind of invisible defendant over here, UEP. And I call them invisible because where was UEP during the damages phase of this trial?

You heard a two-minute long closing from UEP's counsel. They didn't present witnesses, they didn't cross-examine witnesses during this damages phase. Their strategy has been to hide. And more importantly, where is UEP on this chart? Where is it?

Rebuttal Argument by Ms. Kastanek

7402

So the gray barns are the producers, but this completely ignores UEP as the hub.

It's really convenient that UEP now wants to be invisible, they want you to forget about them. It's like *The Wizard of Oz* defense. Right? So pay no attention to the man behind the curtain. The man behind the curtain in this case conducting this program was UEP. UEP developed the program, UEP was the cheerleader with the bullhorn that recruited producers. UEP told many of those producers -- not every single one, but many of them that the cage space restrictions were key to profits. They included that information in newsletters, in e-mails, in PowerPoint presentations, in board presentations, in board meetings, in company meetings.

I mean, the examples of this are almost endless.

The program wasn't a legitimate animal welfare program. It wasn't driven by consumer demand. It was a supply restriction effort. And this is really important. It was a supply restriction program that depended in full on maximum participation. So the defendants wanted and, more fundamentally, they needed other producers to participate. Right? It didn't matter whether they had a meeting of minds with these other producers; they needed to rally the troops.

So let's start with UEP.

UEP needed and wanted maximum participation. Here is an example. UEP urging producers to adopt cage space

restrictions as of July 2002.

Here's another. UEP urging producers to adopt cage space restrictions as of February 2003.

The industry as a whole needs to adopt these guidelines so that the national flock size stops growing.

Rose Acre wanted and needed exactly the same thing: Maximum participation, including maximum commitment to the 100% Rule.

So this is the e-mail that I promised you during my initial closing. This is about the 100% Rule. This is Marcus Rust telling UEP that if any leeway is given to other producers with the 100% Rule, Rose Acre will drop out. Right? He is not concerned about his own conduct. He is not concerned about Rose Acre's conduct. He is working to enforce UEP's rules on other producers.

Okay. This is important, and Rose Acre -- I'm sorry, UEP then agrees.

So Gene Gregory comes back and tells Marcus Rust, UEP is committed, they're committed to that 100% Rule that you find so important, and without it, the industry will have problems. And, of course, what he's talking about are supply programs.

Cal-Maine needed and wanted the same. Maximum participation. So, again, remember, Dolph Baker is asked why didn't Cal-Maine do this on their own, and he says we can't,

and that's because he acknowledges that if he did it on his own, they couldn't be competitive; if they did it together, it would help raise the prices industrywide.

So this is what they do. They come up with a restriction. They gather the troops. They create a market impact. The defendants needed and they wanted this to be industrywide. They got their wish. And it consisted of this. It consisted of this: A conspiracy between the six participants that you have found that was not lawful, and those participants should be held responsible for the consequences of that UEP Certified Program.

So a separate argument that the defendants make is that the plaintiffs asked for the UEP Certified Program starting in about 2006, 2007.

So let's talk about each of the plaintiffs and what they asked for and when they asked for it.

So, for example, they characterize Nestlé and Kellogg as asking for UEP certified starting in 2005 or 2006.

Nestlé asked for UEP certified eggs for a single product. That is the evidence in the record. For ice cream. That's it. That started in 2006. There is no evidence in the record they asked for UEP certified eggs as to any other products.

As for Kellogg, there is no evidence that Kellogg required UEP certified for any more than a single point in

time.  This is that document that the defense showed you in the liability phase that stands for the proposition that they asked for UEP certified for a single point in time, for a single producer after 2005.  It could have been a single day. And there is no evidence that Kellogg was asking for UEP certified eggs from Rose Acre or Wabash Valley.

This is hardly the wave of support for UEP certified that the defense wants you to believe it is.

And, of course, General Mills never, ever asked for or required UEP certified eggs.

Kraft for its part required UEP certification as of June 2007.  All right.  The defense says this is -- that because Kraft asked for it, you should back out at least the damages for after that period of time.

Kraft asked for this?  Kraft did not ask for a program designed by UEP to put money in the egg producers' pocket, money in the egg producers' pocket that of course was coming from the people that bought eggs from them.  All right. Kraft did not ask for that.  Nobody told anybody at Kraft that this was a supply restriction conspiracy.

Remember Karen Brown from FMI?  This was her reaction when she was asked whether she knew whether UEP told her that they were using the animal welfare guidelines to reduce supply or increase price.  And she said, yeah, that would have impacted our relationship with them, it would have impacted

our conversations.

Of course it would have. And it's totally fair to say that that would have been most customers' reactions.

And, in fact, with Kraft, Rose Acre was really cunning, they were strategic. So this is the document from 2005. In 2005, Rose Acre told Kraft it was -- it was in the course of selling it, the UEP Certified Program, and it said, don't worry, don't worry, the program is not going to impact supply. Right. It's not going to have an impact that shorts the market.

And then here they are, less than two years later, they're back, and this time they are asking for higher prices because of those supply restrictions.

So, no, plaintiffs are not somehow culpable for their own losses for putting UEP certified into their contracts.

Let's turn to the other criticisms of Dr. Baye's calculations. And it kind of takes us back to that spaghetti-on-the-wall analogy.

The defense doesn't have, again, a single witness who tells you, the jury, whose task it is to come up with a reasonable assessment of damages from the conspiracy that you found. They don't have a single witness who tells you what that number should be. It is a lot easier to poke holes in people's theories, to throw numbers around.

And the cross-examination of Dr. Baye and the defense

counsel's closings are the world's most perfect examples. So both consisted of the attorneys, not any expert witness, basically professing to do math equations without a lot of explanations. So you shave off, you know, a half million here, you shave off of a couple of thousand here, you multiply Baye's number by 15 percent because that's their market share?

Let's think about that for a second. Where is UEP in that? Where is UEP?

In a calculation of market share that only includes Cal-Maine, Rose Acre, and the other two producers, they are going to get off scot-free for a program that they devised and developed and implemented and had mandatory rules as part of?

That makes no sense. And no witness, of course, sat up in that witness stand and adopted that as a rule that you should carry forward with you into the jury deliberation room.

There's a lot of creativity going on, and that's not surprising because there's been a lot of creativity throughout this trial coming from the defense. So they came up with an innovative playbook that turned out to be an illegal conspiracy. Right? They came up with novel arguments like, hey, if you, you know, kill the hens, it results in more eggs.

And the most recent installment is they've come up with these different ways to reduce their damages, all these charts that they showed through Dr. Baye's cross-examination and then, again, in their closing. And you might be forgiven

for actually thinking that any of these numbers came from Dr. Baye's or Dr. Walker's charts; they didn't. You might be forgiven for thinking that a witness testified that those approaches were a valid way of actually calculating damages; and they didn't. The closest we have is when they were presented to Dr. Baye, he repeatedly said those models made no economic sense.

And if those calculations were valid, why, of course, wouldn't they use their expert to present them or any expert to present them?

So let's take a look at one example of where the numbers completely fail, and look at the problems with lawyer-generated figures.

This is the chart they used to say, look at all those damages after *The Wall Street Journal* article was published in September of '08.

This is just plain wrong. So you see Nestlé's total. Nestlé's total amount is about $1.1 million. And then the total in that three-month period, October to December '08, is like really the vast majority of that, so 1 -- a little bit over $1 million. Strange, right? It's strange.

This is because when you go into one set of the data, all of the transactions look like they were posted in December. Right? It looks like all the transactions are posted in December. But if you look at the individual

Rebuttal Argument by Ms. Kastanek

7409

transactions in the original data for Nestlé, and this is in evidence as Plaintiffs' Exhibit 743, these are those original transactions. These are the top ten transactions for Nestlé for 2008. And you can see, they're disbursed throughout the year, January, February, April, May, July, August.

So that $1 million figure in that red column, not correct.

The defense does have its own expert, of course, and he doesn't propose his own calculation of damages. He doesn't adopt Cal-Maine's or Rose Acre's calculations. In fact, strangely, you didn't hear much about Dr. Walker at all during their closings.

Dr. Baye is the only expert, the only economist who took into account egg supply, which is the subject of the conspiracy. You found a conspiracy to restrict egg supply.

Dr. Walker, of course, did a regression. It's this. This is complicated, so let me break it down. The most important factor is he took Dr. Baye's analysis and he removed egg production as a variable.

Literally, what is this case about? It is about egg production, egg supply. He removed it as a variable, and then he said, wow, look, you get these really unreliable answers. No kidding, because the case is about egg supply. Okay.

It is a great example of it's really easy to criticize. What's hard to do is create a model to analyze the

7410

evidence and the numbers consistent with this jury's findings. And that is what Dr. Baye did.

And Dr. Baye's model doesn't mean to be perfect, it doesn't mean to be precise. Those are the instructions that we looked at during my earlier closing argument. Okay. It just needs to be reasonable, and it is.

What the defendants did through their conspiracy is wrong. Don't let them get away with it. We ask that you compensate the plaintiffs in the amount of these totals to reflect the overcharges that were a direct result of that conspiracy.

Thank you.

THE COURT: All right. Thank you, counsel.

I need a brief sidebar with counsel for a housekeeping matter real briefly, folks. Just bear with me.

(Proceedings heard at sidebar on the record.)

THE COURT: All right. I want to cover one thing about an exhibit. I looked at your list of admitted exhibits. By my count, the defense team admitted four exhibits into evidence, plus the stipulation, and it looks like the list of admitted exhibits from your end only as three. It has Defendants' Exhibit 90, 110, and 122. That's on your list of admitted exhibits.

What about Exhibit D-76? Was that already admitted or what's the story?

7411

MR. CARTER: It was previously admitted, Your Honor.

THE COURT: Okay. Very good. So I don't need to -- I was going to include that by way of an additional hard copy.

So let me just say the thing about Madoff, I don't plan to go back with that. I don't think it was fair at all to compare the defendants implicitly to Bernie Madoff, and I don't think the situation is anything like a financial fraud involving a Ponzi scheme. It never resonated with me.

If I had any idea this would have come up, I would have shut it down originally. And I wish counsel would have flagged it with me ahead of time. I don't intend to say anything else about it because I think the jury is going to follow what I said.

Anything else anyone -- defense team wants to say on that?

MR. COLLINS: Judge, not on that. But very briefly, her last comments, "Don't let them get away with it," I mean, this is not a criminal case. The defendants aren't getting away with anything. This is a dispute about damages, and I just think it's wholly improper and it follows up on the Bernie Madoff line. This is completely prejudicial and improper.

THE COURT: Okay. Anything else from the defense team?

Anything else from the plaintiffs?

7412

Okay. We'll go back.

(End of sidebar.)

THE COURT: All right. Thank you, members of the jury.

Members of the jury, I will now give you the last few instructions. I would invite you to look at your jury instructions copy if you'd like. If you want to just listen, that's fine, too. We are going to put it up on the screen so you can see it there as well.

We left off at Instruction 15 on Page 16. I'm now going to resume with Instruction No. 16 on Page 17. Again, if you would like to follow along, you can.

Just a couple instructions.

Here it goes.

Upon retiring to the jury room, you must select a presiding juror. You may select the same presiding juror that you selected during the liability phase or you may select a new presiding juror. It's up to you. The presiding juror will preside over your deliberations and will be your representative here in court. You may discuss the case only when all jurors are present.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, a cell phone, a smartphone, or computer

7413

to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, or correspond with anyone, or electronically communicate with anyone about this case.

You can only discuss the case in the jury room with your fellow jurors during deliberations.

A jury verdict form has been prepared for you.

I'm holding up a copy of the jury verdict form in my hands. I'd ask my courtroom deputy to kindly put it up on the screen.

Everybody see that? She'll blow it up nice and big so you can see it.

Notice it's a little bit different. On the first page it says "Verdict Form-Damages." All right.

Let's go to the second page. The second page is identical to what you saw before. I'm not going to take the time to read it. It gives you some instructions for how to complete the jury verdict form.

Let's go to Page 3. As you'll see, there's Questions 1 and 2, and let's just scroll down to give them the big picture here.

If you look on Page 4, there's Questions 3 and 4.

So you've got four big questions and some sub questions to answer, folks. That's the idea.

7414

So let me go through it with you.

It says, "We, the jury, unanimously find as follows on the questions submitted to us, and we return our verdict in this case follows:"

By way of a concept, folks, Question No. 1 is about the short-term measures. Question No. 2 is about the exports. Questions 3 and 4 are about the UEP Certified Program.

So let me read Question No. 1.

It reads: "Plaintiffs seek nominal damages of $1 for the part of the conspiracy involving the short-term measures (*i.e.*, early slaughter, early molting, and flock reduction). Do you award nominal damages to one or more of the plaintiffs for the part of the conspiracy involving the short-term measures?" And it's a choice. You either have to check yes or no, one or the other.

If the answer to that question is yes, you enter a dollar below. If the answer to the question is no, then you enter zero below.

And it says you must respond separately for each plaintiff.

So, in other words, folks, you've got to answer "yes" or "no" to the first question and then either put a dollar or zero dollars for each individual plaintiff.

The same concept applies to Question No. 2. It reads: "Plaintiffs seek nominal damages of $1 for the part of

7415

the conspiracy involving the exports as part of the USEM export program. Do you award nominal damages to one or more plaintiffs for the part of the conspiracy involving the exports?"

It says yes or no. You have to check one box or the other.

And then as before, it says, "If the answer to the question is 'yes,' enter $1. If the answer to the question is 'no,' enter zero dollars."

Okay. So, again, you've got to answer each question separately for each plaintiff. That's the idea.

All right. Let's go to the next page, Page 4.

Question No. 3, it reads: "Did Plaintiffs prove that they sustained damages as a result of the part of the conspiracy involving the UEP Certified Program (*i.e.*, the cage space or henhouse density restrictions, and/or the restriction on backfilling of egg-producing hens)?"

Notice that question includes both aspects of the UEP Certified Program that you previously addressed.

It includes the cage space or henhouse density restrictions, on the one hand, and also the restriction on backfilling of egg-producing hens.

So you've got to answer yes or no separately for each plaintiff. Again, look at the question. It says, "Did Plaintiffs prove that they sustained damages as a result of

7416

the part of the conspiracy involving the UEP Certified Program?" And you either answer yes or you answer no for each individual plaintiff. Did they sustain damages? Yes or no.

And then notice the instruction at the bottom of Question 3. It says, "If you answered 'yes' to any part of Question No. 3, then proceed to Question 4."

"If you answered 'no' to all parts of Question 3, do not answer any further questions, and sign and date the last page of the verdict form."

So, in other words, when you get to Question 3, you've got to answer yes or no. If you answered yes for one or more of the plaintiffs, go to Question 4.

If you answered no for all four defendants, you're done, go to the signature page.

Question No. 4 reads as follows: "What is the total amount of damages that you award to each Plaintiff for the part of the conspiracy involving the UEP Certified Program (*i.e.*, the cage space or henhouse density restrictions, and/or the restriction on backfilling of egg-producing hens)?"

And then it reads: "Include a dollar amount for one or more of the Plaintiffs only if you answered 'yes' for that plaintiff in response to Question No. 3."

All right. So it goes again one by one.

So if the answer for Question 3 for a plaintiff is yes, then you go to Question 4 for that plaintiff and insert a

7417

number.

If the answer for a defendant is no for Question No. 3, then you don't have to fill anything for that particular plaintiff for Question No. 4, or alternatively, you could put a zero, it would be the same thing.

Okay.  Does that make sense, everyone?

Question No. 3 is, did plaintiffs sustain damages, and you answer separately for each plaintiff.  And then Question No. 4, if you find that they did sustain -- if you find the plaintiffs did prove that they sustained damages, one or more of them, then you provide a dollar amount.

So, again, I'm just giving you a plain English explanation of the form.  The form speaks for itself.

Those are the four questions, folks.  You see the instructions on Page 5.  It reads:  "You have now reached the end of the verdict form.  Please review it carefully to ensure that it accurately reflects your unanimous decision.

"Each juror should sign the verdict form in the spaces below, and the presiding juror should date the form below and notify the court security officer that you have reached a unanimous verdict.

"The presiding officer should retain possession of the verdict form and bring it when the jury is brought back into the courtroom."

See there's 12 spaces and a spot for the date.

7418

That's the jury verdict form.

When you are in the jury room to deliberate, as before, you will have access to all of the exhibits that were admitted into evidence. You do not have a copy of the transcript from the trial. You do not have a copy of the testimony, but you do have the exhibits if you'd like to look at them. It's on the JERS system as before. All the exhibits that were on there before are on there again.

We have simply added the exhibits that were submitted into evidence yesterday, meaning Plaintiffs' Exhibit 2012, which was the stipulation about the purchases, as well as Defendants' 90, 110, and 122. So those have been uploaded onto the system as well.

If you have any trouble with the system, let us know and we'll have an IT person or Ms. Ramos get it up and running for you. But hopefully it will go smoothly if you'd like to see it.

I will now ask my courtroom deputy to swear in the court security officer.

(Court security officer sworn.)

THE COURT: All right. I'm now going to hand three documents to Ms. Ramos who will hand to the court security officer to hand to you when you get in the jury room.

The first document is the document we just went over. It's the verdict form for damages.

7419

The second document is the verdict form that you completed last time on the issue of liability. If you'd like to look at it, you can. The only difference from what you see before is it has the heading at the top showing that it was filed. That's all that means. Otherwise, it's exactly the same. You can see on the last page, it shows your signatures. Okay?

So I'm going to hand this to Ms. Ramos to give to the court security officer.

The last thing I'm going to give to Ms. Ramos to give to the court security officer is all of the jury instructions from the liability phase of the trial. Again, the jury instructions that I gave you for damages uses terminology that borrows from what I instructed you before.

So if you'd like to see anything that I instructed you before, here is a hard copy for your convenience if you'd like to look at it.

So I've now handed that document to my courtroom deputy. She'll hand all three documents to the court security officer.

The court security officer has it in hand.

Members of the jury, it is now time for you to deliberate. You can deliberate for as long as you want. Do not feel rushed for any reason. The decision is in your hands and your hands alone. We will see you when we see you.

7420

Thank you for your being here. Thank you for your public service. You may now begin your deliberations.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 3:35 p.m.)

THE COURT: All right. Have a seat, everyone.

All right. It's 3:35. We are in the seventh week of trial. You never know what a jury is going to do. You never know how long a jury will take. There is a universe in which they are motivated to be done today. So I think I would like all of you to stay pretty close. I'm not going to prohibit you from leaving the building, but I'd ask you to not go more than a block or two away. If you want to go across the street and get a cup of coffee, I'm not going to prohibit you from doing that, but you have to be able to be back within 15 minutes.

MR. FOX: Your Honor, I'm going to, if it's okay with you, Judge Hotaling had her investiture at 3 -- clerk ceremony for investiture at 3:00 o'clock. So I'll be here. As long as that's going on, I'll stay in the Dirksen building.

THE COURT: Yeah. If -- just by way of background, Magistrate Hotaling is having her investiture at 3:00 o'clock today. She was at Jenner & Block, so I assume many of the plaintiffs' team knows that.

If you all would like to go upstairs and see the last part of it, you may do so. I won't prohibit you from doing

7421

that.  I sort of celebrate that, actually.  You just have to be available so that when we reach out, you'll come down.

So as long as you --

MR. FOX:  I'll leave my cell phone on, so if Ms. Ramos calls, I'll be there.

THE COURT:  Okay.  Keep an eye on your phone so she doesn't have to call you, call you.  I don't want to have a phone go off in the middle of an investiture.

MR. FOX:  Yes, Your Honor.

THE COURT:  Investitures are my second favorite thing that happens in the building, the first being naturalization ceremonies.

So we don't know how long the jury will take.

When I hear from the jury by getting a note, I will let you know.

Is there anything that anyone wants to say on any topic of any kind?  Anything from the plaintiffs' side?

MR. FOX:  No, Your Honor.

THE COURT:  Defense team, anything you want to say? Anything?

MR. KING:  Nothing, Your Honor.

THE COURT:  Okay.  We'll see you when we see you.

All right.  Thanks, folks.

THE CLERK:  All rise.

(Court adjourned at 3:38 p.m.)

* * * * * *

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ *Amy Kleynhans*                    *12/01/2023*
_____        _____
Amy Kleynhans, CSR, RPR, CRR    Date
Official Court Reporter