**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:11-cv-08808 |
| | ) | |
| v. | ) | Judge Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC. | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTIONS FOR JUDGMENT AS A MATTER OF LAW**

Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com
aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com

Brandon D. Fox
Amy M. Gallegos (*admitted pro hac vice*)
Sati Harutyunyan (*admitted pro hac vice*)
JENNER & BLOCK LLP
515 S. Flower St.,
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com
sharutyunyan@jenner.com

*Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc.,*
*Nestlé USA, Inc. and The Kellogg Company*

## TABLE OF CONTENTS

I.     Defendants Have Not Met The Demanding Standard For Rule 50 Motions. ..................... 2

II.    The Jury's Liability Finding Was Supported By Substantial Evidence. ........................... 3

      A.    Plaintiffs Proved Defendants Agreed To Restrain Trade. ...................................... 4

      B.    Plaintiffs Proved That The Conspiracy Unreasonably Restrained Trade. .............. 8

      C.    Plaintiffs Proved Antitrust Injury. ......................................................................... 14

III.   The Jury's Verdict Is Supported By Evidence That Damages Were The Direct Result Of Defendants' Conspiracy. ................................................................................................... 23

      A.    The Properly Instructed Jury Correctly Found Plaintiffs Suffered Damage. ......... 23

      B.    The Existence Of Other Producers Provides No Basis To Upset The Verdict. ................................................................................................................... 26

            1.    Under Settled Law, Defendants Are Liable For The Entire Damage They Caused, Even If It Involved The Actions Of Third Parties. ............. 28

            2.    The Jury's Verdict Comports With These Longstanding Principles. ........ 34

            3.    The Jury Verdicts Comport With Antitrust Law Regarding Market Power. ..................................................................................................... 37

            4.    Defendants' Cited Cases Do Not Support A Different Result. .................. 39

            5.    The Court Properly Admitted Dr. Baye's Testimony. ............................... 42

Conclusion ..................................................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
  141 F.3d 947 (9th Cir. 1998) ...................................................................22

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ...............................................................................33

*Am. Sales Co., LLC v. Pfizer, Inc.*,
  No. 2:14CV361, 2017 WL 3669604 (E.D. Va. July 28, 2017) .............20

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ...............................................................................31

*Assoc. Press v. United States*,
  326 U.S. 1 (1945) ...................................................................................33

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946) ...............................................................................39

*Blue Cross & Blue Shield v. Marshfield Clinic.*,
  65 F.3d 1406 (7th Cir. 1995) .................................................................13

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ...............................................................................32

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................................................28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ...............................................................................14

*Burruss v. Cook Cnty. Sheriff's Office*,
  08 C 6621, 2013 WL 3754006 (N.D. Ill. July 15, 2013) ........................3

*Cent. States, SE &SW Areas Pension Fund v. Transp. Serv. Co.*,
  2009 WL 424145 (N.D.Ill.,2009) ..........................................................17

*Clipper Express v. Rocky Mtn. Motor Tariff Bureau, Inc.*,
  690 F.2d 1240 (9th Cir. 1982) ...............................................................40

*Collins v. Kibort*,
  143 F.3d 331 (7th Cir. 1998) ...................................................................3

*Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*,
   885 F.2d 683 (10th Cir. 1989) ...........................................................................22

*Consol. Metal Prods. Inc. v. Am. Petroleum Inst.*,
   846 F.2d 284 (5th Cir. 1988) .............................................................................11

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ...........................................................................................27

*In re Crude Oil Commodity Futures Litig.*,
   913 F. Supp. 2d 41 (S.D.N.Y. 2012) .................................................................19

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   No. 18 C 864, 2023 WL 4305901 (N.D. Ill. June 29, 2023) ...............................39

*Denny's Marina, Inc. v. Renfro Prod., Inc.*,
   8 F.3d 1217 (7th Cir. 1993) .................................................................................4

*Ekstrand v. Sch. Dist. of Somerset*,
   683 F.3d 826 (7th Cir. 2012) ...............................................................................3

*ES Dev., Inc. v. RWM Enters., Inc.*,
   939 F.2d 547 (8th Cir. 1991) .........................................................................30, 31

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986) .......................................................................................36, 37

*FTC v. Superior Ct. Trial Laws. Ass'n*,
   493 U.S. 411 (1990) ...........................................................................................34

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
   998 F.2d 391 (7th Cir. 1993) ..............................................................................14

*Hakim v. Safariland, LLC*,
   79 F.4th 861 (7th Cir. 2023) ................................................................................3

*Hannah's Boutique, Inc. v. Surdej*,
   112 F. Supp. 3d 758 (N.D. Ill. 2015) ..................................................................38

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
   864 F.2d 1409 (7th Cir. 1989) ............................................................................20

*JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs of Montrose.*,
   754 F.3d 824 (10th Cir. 2014) ............................................................................22

*Kleen Prod. LLC v. Georgia-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ..............................................................................10

*Kleen Prods. LLC. v. Int'l Paper*,
  306 F.R.D. 585 (N. D. Ill. 2015), *aff'd* 831 F. 3d 919 (7th Cir. 2016) ....................................41

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) .........................................................................................19

*Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*,
  No. 11-CV-8808, 2023 WL 6065308 (N.D. Ill. Sept. 18, 2023) ............................................34

*Marion Diagnostics Ctr. v Becton Dickenson & Co.*,
  29 F. 4th 337 (7th Cir. 2022) ..................................................................................40, 41

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ...........................................................................................4

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
  937 F.3d 1056 (7th Cir. 2019) .........................................................................................14

*MCI Communications Corp. v. AT&T*,
  708 F.2d 1081 (7th Cir. 1983) .....................................................................................39, 42

*Meaux Surface Protection, Inc. v. Fogleman*,
  607 F.3d 161 (5th Cir. 2010) ..........................................................................................17

*Menasha Corp v. News Am. Mktg. In-Store, Inc*.,
  354 F.3d 661 (7th Cir. 2004) ..........................................................................................13

*Mississippi Chemical Corp. v. Dresser-Rand Co.*,
  287 F.3d 359 (5th Cir. 2002) ..........................................................................................17

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  141 S. Ct. 2141 (2021) ..............................................................................................33, 36

*National Collegiate Athletic Association v. Board of Regents of the University of
  Oklahoma*,
  468 U.S. 85 (1984) ......................................................................................................33

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978) ..........................................................................................32, 33, 38

*NHC, LLC v. Centaur Constr. Co.*,
  No. 19 C 6332, 2023 WL 2525493 (N.D. Ill. Mar. 15, 2023) (Kennelly, J.) .........................16

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) ..........................................................................................41

*Passananti v. Cook Cnty.*,
  689 F.3d 655 (7th Cir. 2012) ......................................................................................3, 39

iv

*Peto v. Howell*,
    101 F.2d 353 (7th Cir. 1938) ................................................................................19

*Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n, Inc.*,
    672 F.2d 1280 (7th Cir. 1982) ..............................................................................21

*Pollock v. Citrus Assocs. of N.Y. Cotton Exch.*,
    512 F. Supp. 711 (S.D.N.Y. 1981) ........................................................................20

*Procaps S.A. v. Patheon Inc.*,
    141 F. Supp. 3d 1246 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).....................22

*In re Processed Egg Prods. Antitrust Litig.*,
    881 F.3d 262 (3d Cir. 2018)..................................................................................31

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    587 F. Supp. 2d 27 (D.D.C. 2008) ........................................................................40

*Relevant Sports LLC v. U.S. Soccer Fed. Inc.*,
    61 F.4th 299 (2d Cir. 2023) ..................................................................................30

*Sanner v. Board of Trade*,
    62 F.3d 918 (7th Cir. 1995) ...................................................................31, 32, 36

*Santana Prod., Inc. v. Bobrick Washroom Equip. Inc.*,
    401 F.3d 123 (3d Cir. 2005)..................................................................................10

*Schachar v. Am. Acad. of Ophthalmology*,
    870 F.2d 397 (7th Cir. 1989) ................................................................................10

*Stansell v. Revolutionary Armed Forces of Colom.*,
    45 F. 4th 1340 (11th Cir. 2022)............................................................................28

*Stragapede v. City of Evanston*,
    865 F.3d 861 (7th Cir. 2017) ..................................................................................3

*In re Sulfuric Acid Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ....................................................................41

*Sullivan v. Flora, Inc.*,
    936 F.3d 562 (7th Cir. 2019) ..................................................................................3

*In re Tableware Antitrust Litig.*,
    485 F. Supp. 2d 1121 (N.D. Cal. 2007) .......................................................... *passim*

*Tart v. Ill. Power Co.*,
    366 F.3d 461 (7th Cir. 2004) ................................................................................27

*TAS Distrib. Co. v. Cummins Engine Co.*,
    491 F.3d 625 (7th Cir. 2007) ........................................................................................18

*Thompson's Gas & Electric Service, Inc. v. BP America, Inc.*,
    691 F.Supp.2d 860 (N.D. Ill. 2010) ..............................................................................19

*United States v. Beaver*,
    515 F.3d 730 (7th Cir. 2008) ........................................................................................10

*United States v. Honeywell Int'l Inc.*,
    337 F.R.D. 456 (D.D.C. 2020)......................................................................................17

*United States v. Johnson*,
    165 F.2d 42 (3d Cir. 1947)............................................................................................28

*United States v. Nguyen*,
    504 F.3d 561 (5th Cir. 2007) ........................................................................................41

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ......................................................................................38

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*,
    822 F.2d 656 (7th Cir. 1987) ........................................................................................38

*Vogel v. Am. Soc'y of Appraisers*,
    744 F.2d 598 (7th Cir. 1984) ........................................................................................38

*W. Wholesale Supply v. Holladay*,
    No. 97-0297, 2000 U.S. Dist. LEXIS 22012 (D. Idaho Feb. 29, 2000) .................................22

Defendants seek to undo a verdict rendered by a properly instructed jury that was attentive and dedicated during the seven-week trial. The jury found that Defendants conspired to violate the antitrust laws by restricting the number of eggs in the United States in order to increase the price of eggs and egg products. Their conspiracy injured Plaintiffs in the amount of approximately $17.8 million. There is no justification for upsetting the verdict: The jury made its findings after a bifurcated trial during which it, among other things: (a) heard extensive testimony from, and reviewed documents written by, Defendants' highest-ranking executives containing damning admissions about the conspiracy; (b) listened to multiple rounds of testimony by the parties' economic experts; and (c) considered lengthy arguments by counsel as to liability and damages.[1]

In Section I of this consolidated response, Plaintiffs set forth the difficult standard Defendants must meet to overturn a jury verdict.

In Section II, Plaintiffs summarize the overwhelming evidence that supports the jury's liability verdict. In addition, Plaintiffs refute Defendants' arguments about the liability verdict, showing that Plaintiffs proved Defendants unreasonably restrained trade through short-term measures, coordinated exports, and aspects of the UEP Certified Program that restricted supply and increased price. The trial record contains reliable proof of substantial antitrust injury, which—contrary to Defendants' argument—need not be "sustained" for a certain minimum time period.

In Section III, Plaintiffs respond to Defendants' arguments regarding damages. Defendants argue that, because the jury did not explicitly find all UEP-certified producers to be conspirators, they cannot be held responsible for the market effects of the UEP Certified Program. Defendants

---

[1] This filing exceeds 15 pages, but in it, Plaintiffs respond in consolidated fashion to three motions—UEP and USEM's Rule 50 motion, Cal-Maine Foods' Rule 50 motion, and Rose Acre Farms' Rule 50 motion. *See* Dkts. 607, 608, 610, 611, 621, 622. This filing does not exceed 45 pages (15 pages x 3 motions).

are incorrect. The Court correctly instructed the jury in the damages phase that Defendants were liable for any harms that "directly resulted" from the unlawful conspiracy the jury found during the liability phase. Defendants argued to the jury that Plaintiffs had not proven any such harms, because Plaintiffs' damages theory assumed that all UEP-certified producers were conspirators. The jury disagreed. The jury instead found that Defendants, including UEP as hub of the conspiracy, were responsible for 70% of the overcharges paid by Plaintiffs to Rose Acre and Wabash Valley—the same percentage as the market share of UEP-certified producers when the program was first endorsed by FMI and before any buyers had asked for the program in their specifications.

The jury's damages verdict also was consistent with antitrust law. In cases that present similar factual scenarios, courts have found defendants liable for the harms they caused—even if non-conspirators were necessary participants. Under both general conspiracy and antitrust-specific law, a party is liable for causing harm even when non-conspirators played a dispositive role. This rule is particularly clear in cases in which an association implemented an anticompetitive scheme. Under the law, Plaintiffs had no obligation to prove whether other members of the association were knowing co-conspirators or, by contrast, went along with the scheme for innocent reasons—as long as the harms caused by the scheme were a direct result of the antitrust conspiracy, as the jury here found.

## I.     Defendants Have Not Met The Demanding Standard For Rule 50 Motions.

Defendants do not dispute in their Rule 50 motions that the Court properly instructed the jury on the law. Instead, as to both liability and damages, Defendants' argument is that the jury *misapplied* the instructions to find the elements of a Section 1 conspiracy satisfied by Plaintiffs' evidence and to find that compensatory damages of approximately $17.8 million directly resulted

from that conspiracy. *See Sullivan v. Flora, Inc.*, 936 F.3d 562, 574 (7th Cir. 2019) (noting in affirming denial of defendant's motion for judgment as a matter of law that the jury was properly instructed on relevant law).

The standard imposed by Rule 50 for Defendants' challenge to the sufficiency of the evidence is exceedingly high. The Court should not grant a motion for judgment under Rule 50 unless "a party has been fully heard on an issue and a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); *accord Hakim v. Safariland, LLC*, 79 F.4th 861, 868 (7th Cir. 2023). In evaluating whether Defendants have met this standard, the Court must construe the evidence in favor of Plaintiffs and "examine[] the evidence only to determine whether the jury's verdict could reasonably be based on that evidence," *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012), without "mak[ing] credibility determinations or weigh[ing] the evidence," *Hakim*, 79 F.4th at 868; *see also Ekstrand v. Sch. Dist. of Somerset*, 683 F.3d 826, 828 (7th Cir. 2012) ("[W]e are generally forbidden from reexamining the facts found by the jury at trial.").

In other words, the "court's assessment of the nonmoving party's evidence should be 'highly charitable.'" *Burruss v. Cook Cnty. Sheriff's Office*, 08 C 6621, 2013 WL 3754006, at *3 (N.D. Ill. July 15, 2013) (quoting *May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir.2013)). The Court may overturn the jury's verdicts "only if" it concludes that "no rational jury could have found for the prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation marks omitted); *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998).

## II.     The Jury's Liability Finding Was Supported By Substantial Evidence.

Defendants have not met their heavy burden of establishing that "no rational jury could have found for [Plaintiffs]." *Stragapede*, 865 F.3d at 865.

3

As the Court instructed the jury, Section 1 of the Sherman Act prohibits (1) an agreement to reduce output; (2) that unreasonably restrains trade in the relevant market; and (3) that caused Plaintiffs to suffer antitrust injury. *See* Tr. 6128 (instructing the jury on the elements); *Denny's Marina, Inc. v. Renfro Prod., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993) (setting forth elements). The jury found Plaintiffs met these elements and its findings were amply supported by the evidence, which established that Defendants entered into an unlawful conspiracy to restrain trade, that the conspiracy unreasonably restrained trade, and that the conspiracy caused antitrust injury.

### A. Plaintiffs Proved Defendants Agreed To Restrain Trade.

Overwhelming evidence established that Defendants agreed with each other to restrict the nationwide supply of eggs. A hub and spoke conspiracy in violation of the antitrust laws—which was the nature of Defendants' agreement that operated through the UEP—entails "a central coordinating party (the 'hub')" with "each participant (along the 'rim') recogniz[ing] that it was part of the greater arrangement, and that it coordinated, or otherwise carried out its duties as part of the broader group." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). In a supply-restriction conspiracy, this requires that the spokes "would not have attempted to inflate prices without assurance that each distributor was abiding by the agreement and behaving in the same way." *Id*. That is precisely what Plaintiffs' evidence showed: that Rose Acre and Cal-Maine would not have agreed to restrict supply without their competitors doing the same, and that UEP coordinated the broader effort amongst the competitors, including by publicizing participation and auditing compliance.

Evidence of Defendants' hub-and-spoke agreement included the following, in summary:

The UEP as a trade association was dedicated to encouraging industry-wide control of supply to keep prices high. For example, Rose Acre's Marcus Rust testified at trial that UEP's

4

"claim to fame was how they help[ed] producers figure out how to make more money with their business going forward." (Tr. 4433.) Likewise, UEP economic consultant and member of the Scientific Advisory Committee, Don Bell, testified that the UEP "persuade[d] its members to manage egg supply." (Bell Dep., Dkt. 386-1, at 32:17-21; *see also* Pl. Tr. Ex. 210 at 2-3.)

One way in which UEP facilitated the coordinated control of supply—that is, an agreement between itself and egg producers to restrain trade—was through short-term measures and exports. For example, UEP coordinated efforts across producers to early molt or early slaughter their hens, for the express purpose of reducing nationwide supply during periods in which prices were low. (*See, e.g.*, Tr. 1033-34, 1053-57, 1209, 1388-89 (Cal-Maine's Dolph Baker testifying about UEP motions he sponsored, calling on competing producers to manage, control, or reduce the size of layer flocks for the purpose of restricting supply).) Likewise, UEP—through USEM, which it managed—used coordinated exports to increase domestic price of eggs. (*See, e.g.,* Tr. 1158, 1326-28, 1502-15 (Baker testifying about exports); Reickard Dep., Dkt. 415-1, at 134:23-135:5; 144:10-12, 15-19.)

Another way in which UEP facilitated the coordinated control of supply (and the subject of the jury's $17.8 million damages verdict) was through the UEP Certified Program. In response to UEP's request for a supply plan that would give producers a "reasonable return on investment," Don Bell provided a strategy that called for an industry-wide policy of a minimum floor space allowance. (Pl. Tr. Ex. 328 at 11; Bell Dep., Dkt. 386-1, at 96:25-97:9; 98:1-25.) UEP published Mr. Bell's plan in the *United Voices* newsletter and marketed it as a "supply adjustment program." (Pl. Tr. Ex. 1 at 3.) UEP also announced during a marketing conference call in September 2001 that its "staff had been working on an idea that would encourage members to take one bird out of

5

each cage until a total of 5% of the house capacity had been reached"—in other words, as a measure *explicitly* designed to control supply. (Pl. Tr. Ex. 227 at 2.)

Egg producers joined the UEP Certified Program after seeing UEP's plan to restrict supply and increase prices and knowing their competitors also were participating based on the UEP's reports in newsletters. Mr. Bell explained that, while all producers would benefit from lower nationwide supply, no producer was willing to restrict its own supply "without having some idea what the industry is doing as a whole." (Bell Dep., Dkt. 386-1, at 102:12-17; *see also* Pl. Tr. Ex. 206 at 1.) Recognizing this, UEP passed a resolution that provided that the names of all members agreeing to the program be publicized. (Pl. Tr. Ex. 403 at 1.) And it urged "[i]ndustry-wide adoption of the[ ] guidelines," (Pl. Tr. Ex. 824 at 6), including because the greater the number of producers that participated, the greater the "payback," (Pl. Tr. Ex. 211 at 3 (Gene Gregory soliciting the participation of Cal-Maine, Rose Acre, and others, explaining that if "all the industry were to follow the guidelines through the first step this would result in a flock size reduction of 13 million hens. … So the payback for making this first step ... is tremendous.")).

In fact, Mr. Baker testified that, while it would not have been competitive for Cal-Maine to "go up to 56.14 square inches per hen" on its "own," (Tr. 1236), it chose to do so after "reach[ing] an agreement with UEP and its competitors," (Tr. 1988). Mr. Baker likewise testified that the price one producer charges is dependent on how many eggs its competitors produce. (*E.g.*, Tr. 1129-30, 1144-1145, 1228, 1236.)

Rose Acre also joined the UEP Certified Program knowing and intending that it would restrict competition and increase egg prices. For example, a key component of the UEP Certified Program was the 100% rule—the requirement that certified producers produce only certified eggs. Rose Acre was a strong advocate of the 100% rule because, in its absence, Rose Acre's competitors

6

could sell uncertified eggs to those who demanded uncertified eggs for a cheaper price. (Pl. Tr. Ex. 99 at 1.) Mr. Rust explained that the 100% rule was key to putting all producers "on the same competitive playing field," so that UEP-certified producers could charge higher prices without competition. (Tr. 2365, 4523-24.) Indeed, Rose Acre threatened to "drop out of UEP if … leeway [was] granted" on the 100% rule. (Pl. Tr. Ex. 119 at 1.)

A separate significant component of the UEP Certified Program was the backfilling ban, which, starting in 2004, prohibited certified producers from replacing dead or injured hens while remaining within house averages mandated by the program. (*E.g.*, Pl. Tr. Ex. 788 at 10 (UEP explaining the history of backfilling, including that it "added several million hens to the nation's flock inventory and was a major reason we destroyed good prices"); Pl. Tr. Ex. 371 at 2 (UEP calling on producers to ban backfilling, which it called the "hangman's noose," because it was "'strangling' the opportunity of enjoying, once again, the favorable prices for our product").) Rose Acre "probably" voted against the backfilling ban, "probably" because it was a supply restriction." (Rust 3/6/14 Dep., Dkt. 427-1, at 457:3-19.) Yet, when the ban was passed by UEP, Rose Acre stopped its practice of backfilling, which Mr. Rust testified up until then had "allowed [Rose Acre] to have more eggs." (Tr. 2367.) In other words, as Plaintiffs argued to the jury and as the jury found, Rose Acre and other producers participated in a conspiracy to restrict supply by agreeing to not backfill their henhouses, knowing that the ban was a supply restriction not driven by any procompetitive justifications.

Contrary to Defendants' arguments (Dkt. 622 at 6), the jury properly found Wabash Valley, too, was a co-conspirator. Plaintiffs proved that Wabash Valley agreed with its competitors to restrict output by coordinating collusive exports, voting for and organizing short-term measures, and participating in the UEP Certified Program. (*See, e.g.*, Pl. Tr. Exs. 85 at 3; 115 at 2; 179 at 1.)

7

Wabash Valley's CEO Larry Seger molded and carried out the conspiracy by serving as the USEM Chairman, a member of the USEM Board of Directors, and a member of the USEM Exports and Executive Committees. (Pl. Tr. Exs. 179 at 1; 242 at 2; 244 at 2-3; 635 at 3-4.) Mr. Seger decided, along with Mr. Gregory, whether to take an export to USEM's committee for a vote. (Tr. 2185-87.) In other words, Wabash Valley was at the helm of agreements among competitors to restrict egg supply through exports.

Similarly, Mr. Seger served on the UEP Marketing Committee and the UEP Board of Directors—voting for and passing supply-restriction measures. (Pl. Tr. Exs. 410 at 1, 3; 592 at 1, 2; 641 at 1, 2; 827 at 1, 2.) Finally, Wabash Valley joined the UEP Certified Program in April 2002, prior to when FMI endorsed the program. (Pl. Tr. Ex. 637 at 1.) Indeed, Wabash Valley shaped key components of the Certified Program through committee leadership and decision-making. (*See e.g.,* Pl. Tr. Ex. 85 at 3 (Wabash seconding successful motion for the 100% rule).) Plaintiffs thus proved that Wabash Valley led or was entrenched in every component of the conspiracy found by the jury.[2]

**B.     Plaintiffs Proved That The Conspiracy Unreasonably Restrained Trade.**

Overwhelming evidence also established that Defendants' conspiracy unreasonably restrained trade.[3] As the Court instructed the jury, for the restraint to be unreasonable, it must have

---

[2] Defendant argues that Plaintiffs failed to prove every producer that joined the UEP Certified Program was a co-conspirator. (Dkt. 608 at 11-15; Dkt. 611 at 8-13; Dkt. 622 at 6-9.) Plaintiffs did not attempt to prove this fact, nor was it their obligation to do so. The Defendants are liable for the injuries their conspiracy directly caused. *See infra*, Section III(B).

[3] Plaintiffs preserve their argument that this conspiracy and its various measures should be adjudicated under a per se theory, under which the Court should have instructed the jury that Defendants' agreement unreasonably restrained trade as a matter of law. (*See* Tr. 6072 ("I think plaintiffs have fully reserved the issue of whether the standard here should be per se or rule of reason for the conspiracy for the case as a whole."); Dkt. 289 at App. 13-5; Dkt. 461 (Plaintiffs arguing that the jury should be instructed under a per se theory, rather than under the rule of reason).)

resulted in (1) substantial harm to competition (2) in the relevant product and geographical market. (Tr. 6139.) Plaintiffs' evidence showed that Defendants' conspiracy did so: It substantially harmed competition within the domestic market for eggs and egg products.

1.       **Substantial Harm to Competition**. First, the jury found Defendants' conspiracy caused substantial harm to competition and that the harm substantially outweighed any competitive benefit. (*See* Tr. 6139 (instructing the jury).) The jury's findings were amply supported by evidence regarding the impact of Defendants' conspiracy on prices and output. This evidence included documents and testimony that Defendants intended to and did in fact reduce egg supply and increase egg prices. (*See, e.g*., Pl. Tr. Exs. 159 at 1 (Gregory admitting UEP Certified Program was a major reason why "egg producers are enjoying good times"); 213 at 2 (Rose Acre's Hendrix stating that producers were joining UEP Certified Program because it "will make them rich"); 268 at 1 (Looper urging "hen disappearance" as the "key to profits"); 356 at 2 (USEM reporting 30 cents-per-dozen price increase due to coordinated export); 574 at 1 (J. Rust admitting that UEP Certified Program was designed "to boost prices under the alleged agenda of animal rights"); Tr. 1158 (Baker admitting goal of coordinated exports was "to improve prices"); Tr. 1228 (Baker testifying that Cal-Maine needed the industry to reduce flock size to achieve price increase).) It also included evidence that the 100% rule was anticompetitive and reduced, rather than enhanced, consumer choice. (*E.g.,* Tr. 4409 (Rust) ("The only thing most customers cared about was the price they bought at."); Tr. 4489 (Rust) ("Q. And the 100% Rule meant that the people that didn't want the program weren't getting what they wanted, right, sir? A. There's some buyers that the only thing they cared about was the price.").)Defendants argue, as they did at trial, that the short-term measures and exports were not anticompetitive and could not have reduced output and increased price because they had no "enforcement mechanism." (Dkt. 622 at 4-5.) An enforcement

mechanism is not an element of a Sherman Act conspiracy and the Seventh Circuit does not require a mechanism to enforce compliance for a conspiracy to exist. *See Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 937 (7th Cir. 2018) ("It is true that a cartel may exist with only soft measures of control or ineffective enforcement."); *United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008) ("[W]e cannot say that the producers' occasional cheating prevented the government from sufficiently proving that they conspired to fix the price of concrete."). Reflecting this legal consensus, the ABA Model Instructions do not require proof of an enforcement mechanism. *See* ABA Model Jury Instructions in Civil Antitrust Cases (2016 ed.), Ch. 2, Instruction A-1, p. 13-14.

Defendants rely on *Schachar v. Am. Acad. of Ophthalmology*, 870 F.2d 397, 399 (7th Cir. 1989), but it did not hold otherwise. In *Schacher*, a plaintiff claimed the American Academy of Ophthalmology violated the antitrust laws by describing a new surgical procedure as experimental. Affirming the jury's finding of no liability, the Seventh Circuit explained that an antitrust violation required more, and that a trade association merely "provid[ing] information" or "giv[ing] a seal of approval" without "constrain[ing] others to follow its recommendation" does not violate the antitrust laws. *Id*. at 399-400. But the Court clarified that it was referring to a *demand-side recommendation* by a trade association, *id*. at 400, not supply-side coordinated action. And in describing enforcement mechanisms that amounted to a restraint of trade, the Seventh Circuit gave an *agreement* amongst producers not to manufacture products as an example.[4] Here, the

---

[4] Cal-Maine cites out-of-circuit cases involving inapposite fact patterns. In *Santana Prod., Inc. v. Bobrick Washroom Equip. Inc.*, 401 F.3d 123 (3d Cir. 2005), for example, members of a trade association engaged in a marketing campaign criticizing technology used in the plaintiff's products. 401 F.3d at 133. The court found no restraint of trade because the plaintiff did not allege that defendant "engaged in coercive measures that prevented [plaintiff] from selling its products to any willing buyer or prevented others from dealing with [plaintiff]." *Id.* at 132. The plaintiff, the court explained, was free to market the quality of its product and sell its product in the marketplace. *Id.* at 133. Nothing remotely similar happened here, where the allegations involve and the evidence proved supply restrictions and artificially raised prices, not efforts to disadvantage Plaintiffs' business within the same competitive industry. In *Consol. Metal Prods. Inc. v. Am.*

Defendants' conspiracy took the form of an agreement to sell fewer eggs on the domestic market (either because eggs were being exported, or because fewer hens were laying eggs)—in other words, an agreement amongst producers to manufacture fewer products.

In any event, the evidence demonstrated UEP's various supply programs *did* have enforcement mechanisms, both formal and informal. To be UEP certified, a company needed to comply with all rules set by the UEP Certified Program and were subject to audit. (*See, e.g.*, Tr. 3061-70 (discussing audit fails for non-compliance).) To participate in the USEM's export program, a company was obliged to export eggs at whatever time, amount, and price approved by the USEM Board, even if it meant having to purchase eggs (at a set price) from competitors to fulfill its obligation. (*See, e.g.*, Tr. 4106, 4151-52, 4157.) And adherence to short-term recommendations—as with each of the other measures—was enforced, albeit informally, by publishing a list of companies committed to those recommendations. (*See, e.g.*, Pl. Tr. Ex. 599 at 2.) In fact, Cal-Maine's Ken Looper was an early proponent of publishing participation to ensure adherence to UEP-sponsored supply restrictions. (Pl. Tr. Ex. 268 (Looper stating that, "[b]eginning this month we will keep score ....").

The jury's findings on restraint of trade were also supported by the evidence regarding the lack of any countervailing procompetitive benefit for the supply restrictions, such as customer demand. Defendants presented no evidence that customers knew egg producers coordinated the export of eggs to increase domestic price, much less that customers demanded coordinated exports. Defendants presented no evidence that customers knew that egg producers coordinated their molt

---

*Petroleum Inst.*, 846 F.2d 284, 292 (5th Cir. 1988), likewise, the plaintiff challenged the trade association's delay in certifying the plaintiff's product. *Id.* at 296. This holding has no relevance where, as here, Plaintiffs are attacking a horizontal agreement by producers to restrict supply.

and slaughter of hens to increase domestic price, much less demanded coordinated measures to reduce flock. Defendants presented no evidence that customers knew about UEP's backfilling ban, much less demanded it. And the evidence supported the conclusion that customers did not know about or demand the 100% rule. (*See, e.g.*, Tr. 3642-45 (Tony Airoso from Walmart testifying that he did not understand the need or customer-based justification for the 100% rule); Tr. 4489 (Rust) ("Q. And the 100% Rule meant that the people that didn't want the program weren't getting what they wanted, right, sir? A. There's some buyers that the only thing they cared about was the price.").) Although Defendants introduced evidence that some customers requested UEP-certified eggs, there was no evidence that any purchaser added it to their specifications before July 2002, by which time 70% of the egg industry had joined the UEP Certified Program. (*See* Brown Dep., Dkt. 475-1, at 195:02-11 (testifying that FMI endorsed the UEP Certified Program in June 2002); Pl. Tr. Ex. 824 at 6 (70% market participation as of July 2002).) Further, there was *no evidence* that any buyer knew about the overall conspiracy. In other words, a buyer could only approve of the use of the Certified Program and fully understand its impact after knowing there were other ways the Defendants and co-conspirators were restricting the market. (*See* Brown Dep., Dkt. 475-1, at 252:19-253:03 ("Q. If UEP had told you that they were using the Animal Welfare Guidelines to reduce supply or increase price, would that have impacted FMI's review of the UEP guidelines? A: It certainly would have impacted our relationship and conversations with UEP.")

       **2.**    **Relevant Market.** The jury also found that the relevant product market was eggs, which included egg products, and its factual finding was well supported.[5] Defendants' supply restrictions influenced the prices Cal-Maine, Rose Acre, and other egg producers charged for shell

---

[5] The jury resolved this factual issue despite the instruction on relevant market including—at Defendants' request—a long passage discussing demand-side substitutability. (Tr 6140-41.)

eggs and egg products alike, which evidence showed were linked. Rose Acre argues that Plaintiffs' economic expert Dr. Michael Baye did not show supply restriction in egg products, (Dkt. 611 at 14-15), but the evidence demonstrated that supply of eggs and egg products were interdependent and that restrictions in supply of eggs affected prices for egg products. The law in this Circuit fully supports considering the relevant market from the supply side where the restraint affects the availability of supply. *See Menasha Corp v. News Am. Mktg. In-Store, Inc*., 354 F.3d 661, 663-64 (7th Cir. 2004); *Blue Cross & Blue Shield v. Marshfield Clinic*., 65 F.3d 1406 (7th Cir. 1995). That legal principle is reflected in the Model Instruction on supply-side substitutability, which the Court incorporated into its relevant market instruction. *See* ABA Model Jury Instructions in Civil Antitrust Cases (2016 ed.), Ch. 3, Instruction A-5, p. 112; Tr. 5907-10 (instruction conference). *See generally* ABA Antitrust Law Developments, 602-04 (8th ed., 2017) (appropriate to consider supply-side substitutability in defining relevant market).

Defendants' own statements proved that supply-side restrictions of eggs affected egg products pricing, as did Dr. Baye's economic analysis, which demonstrated and quantified that Plaintiffs were overcharged for the egg products that Plaintiffs purchased. (Tr. 6969-70.). For example:

- In 2004, Gene Gregory relayed to Don Bell that "Michael Foods has openly said that as this trend continues that egg breaking companies will no longer buy surplus eggs from shell egg producers but instead will sell eggs into the shell egg markets when shell egg prices are high." (Pl. Tr. Ex. 401 at 1.) In other words, high shell egg prices affected business decisions of egg products producers.

- In 2007, UEP stated in an edition of *United Voices* that exports had had a positive impact both on shell egg and breaking stock prices. (Pl. Tr. Ex. 279 at 2-3.)

- In 2008, UEP stated in an edition of *United Voices* that, in 2007, "[s]hell egg prices likely were the driving force for all forms of eggs," including liquid whole egg prices. (Pl. Tr. Ex. 37 at 1.) In other words, there was a strong relationship between shell egg and egg products prices, as documented by Dr. Baye in his econometric analysis.

13

- Dolph Baker admitted at trial that egg breaking companies also benefited from exports because "the fewer eggs in the U.S. market, the higher both shell eggs and egg products are on the Urner Barry system." (Tr. 1514.)

### C. Plaintiffs Proved Antitrust Injury.

With respect to antitrust injury, Defendants again do not dispute that the Court properly instructed the jury on antitrust injury. Defendants instead ask this Court to second-guess the jury's findings of fact. The Court should decline to do so.

As the jury found, each component of Defendants' conspiracy to restrict supply caused antitrust injury.[6] To prove antitrust injury, Plaintiffs were required to establish "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 399 (7th Cir. 1993). Paying a higher price as a result of reduced supply is a quintessential example of such injury. *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc*., 937 F.3d 1056, 1065 (7th Cir. 2019) (describing higher prices and lower output as the "principal vices proscribed by the antitrust laws").

1. **UEP Certified Program**. To begin, the evidence supports the jury's finding that the UEP Certified Program increased the price of egg products paid by Plaintiffs. Dr. Baye found that the Certified Program caused the price of both liquid and shell eggs to increase substantially— between approximately 21% to 59% for liquid eggs, depending on type; and between

---

[6] The conspiracy to restrict supply included four means: short-term measures, exports, the UEP Certified Program's henhouse density restrictions, and the backfilling ban. While the jury did not need to find that each of the four means caused antitrust injury to find liability, (Tr. 6131), it *did* need to find this for purposes of awarding damages, including nominal damages for the short-term measures and exports, (Tr. 7294-95 (instructing the jury that, to award nominal damages, it must find antitrust injury)). The jury's damages verdict reflected its conclusion that each measure injured Plaintiffs.

approximately 15% and 30% for shell eggs. (Tr. 2583-87.) Dr. Baye explained to the jury that,

under his models and to a 99% level of confidence, the supply restrictions of the UEP Certified

Program resulted in overcharges to Plaintiffs in the egg producers they purchased from Rose Acre

and Wabash Valley.[7] (Tr. 6969-70.) Focusing on Dr. Baye's testimony, Defendants argue Plaintiffs

did not isolate the effect of the conspiracy on egg products. The jury resolved the issue by

concluding that eggs were the relevant market, (*see* Dkt. 582 at Question 5), and that the conspiracy

injured Plaintiffs through the imposition of overcharges on egg products they purchased, (*see* Dkt.

582 at Question 6).

      **2.**    **Exports**. Substantial evidence also supports the jury's finding that coordinated

exports caused antitrust injury. Dr. Baye testified that, although he could not use an *econometric*

model to assess the price impact of exports, he *did* quantify the effect of exports between 2006 and

2008 by looking at "how much domestic output fell because these eggs were being shipped

overseas instead of being sold in the domestic market." (Tr. 2591-92.) Dr. Baye's export analysis

showed that, even using the "absolute lowest inverse elasticity in all 68 of those shell eggs and egg

products" he had identified, the exports increased domestic price by as much as 9.56% over a

period of a month and a half. (Tr. 2592-93 ("[T]his is just demonstrating that a small decline in ...

U.S. supply, by shipping them overseas leads to a fairly significant increase in price").) Dr. Baye's

findings on exports are consistent with Defendants' own statements.[8] UEP President Gene Gregory

repeatedly and consistently stated the obvious: that the reduction of supply resulting from exports

---

[7] Defendants' arguments with respect to the reliability of Dr. Baye's model, because it is based on market impacts of the Certified Program as a whole instead of on the supply restrictions undertaken by individual producers who participated in the conspiracy, are addressed below in the context of damages. *See infra* Section III(B).

[8] Even Defendants' own expert, Dr. Jonathan Walker, acknowledged that exports could have an impact on domestic prices. (*See* Tr. 7086 (USEM exports "may have" damaged Plaintiffs).)

increased domestic prices. (*See, e.g*., Pl. Tr. Exs. 242 at 2; 367 at 1; 374 at 1-2.) USEM did the same. (*See, e.g.,* Pl. Tr. Exs. 189 at 1; 356 at 2; 555 at 1.) So did Cal-Maine. (*See, e.g.*, Tr. 1158; Pl. Tr. Ex. 437.)

**3.      Short-Term Measures**. Plaintiffs' evidence also established what is intuitively obvious: Short-term measures to reduce supply, including coordinated early slaughter, increased prices. For example, Mr. Baker testified that Cal-Maine's agreement with its competitors to engage in short-term supply restrictions in fact raised domestic prices. (Tr. 1356.) UEP's Al Pope and Gene Gregory both repeatedly wrote about the prospective and retrospective scope and effect of the short-term measures. (*E.g.*, Plf. Tr. Exs. 37 at 1; 102 at 1; 135 at 2.) Rose Acre claims that the evidence is ambiguous as to the cause of the price changes, but this misconstrues how specific the documentary record is—for example, Plaintiffs' Trial Exhibit 788, which says reduction in egg production between Easter and Labor Day "will make a major contribution" to increase the price of eggs and attributes a 37.3 cent increase in price to UEP's recommended flock reduction of 1.65% over the prior year.

**4.      Plaintiffs' Evidence of Antitrust Injury Was Reliable.** Defendants argue in their Rule 50 motions—as they did to the jury—that Plaintiffs' evidence of injury was unreliable and cannot be credited. (Dkt. 622 at 9-11 (Cal-Maine); Dkt. 611 at 5-6 (Rose Acre); Dkt. 608 at 3-10 (UEP).) This argument goes to the weight of the evidence, entrusted to the jury, rather than its sufficiency. *See NHC, LLC v. Centaur Constr. Co.,* No. 19 C 6332, 2023 WL 2525493, at *4 (N.D. Ill. Mar. 15, 2023) (Kennelly, J.) (Courts are "'obligated to review the record to ensure that sufficient evidence exists to support the verdict, but [courts] will not otherwise consider the weight of the evidence'" or "'reevaluate the credibility of witnesses'" (alteration in original) (quoting *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 515 (7th Cir. 1993)). In any event, Defendants are

16

incorrect: The price impacts of the UEP Certified Program and exports were analyzed by Dr. Baye, an expert in business economics, based on conservative estimates of elasticities of demand and known quantities of exports to demonstrate the exports would cause injury. Defendants' own statements corroborate Dr. Baye's analysis. (*E.g.,* Pl. Tr. Ex. 159 at 1; 175 at 7; 362 at 1.)

Defendants also try to distance themselves from UEP executive Gene Gregory, but this argument was a factual one for the jury, not a legal one for this Court. In fact, Defendants repeatedly urged the jury to give little or no weight to assessments performed by Mr. Gregory as a non-economist. (*E.g.,* Tr. 6357 (USEM closing argument: "[T]hey're showing you over and over all of these statements from Mr. Gregory, but Mr. Gregory is not an economist.").) The jury was entitled to credit or reject Defendants' arguments that they should be dismissive of Mr. Gregory's statements. At this stage, the question for the Court is whether a rational jury could have relied upon the record as a whole to find antitrust injury, which it undoubtedly could: Lay witnesses, including defendants and agents with personal knowledge and experience in the industry, can provide factual information relevant to damages. *See United States v. Honeywell Int'l Inc.,* 337 F.R.D. 456 (D.D.C. 2020) (damages calculated using estimate of profit provided by defendant's general manager); *Cent. States, SE &SW Areas Pension Fund v. Transp. Serv. Co.*, 2009 WL 424145, at *5 (N.D.Ill.,2009) (lay testimony in sworn affidavit supported damages claim); *Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (collecting cases finding that lay witness testimony concerning damages is appropriate "if the witness has direct knowledge"); *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 169 (5th Cir. 2010) (holding trial court did not abuse its discretion when it permitted plaintiff's chief financial officer to provide lay witness testimony regarding damages).

Even if Defendants' documentary admissions regarding price impacts were in some way deficient, that deficiency impacts the calculation of the extent of injury from exports and short-term measures (for which the jury only awarded nominal damages) rather than the existence of that injury. *Cf. TAS Distrib. Co. v. Cummins Engine Co*., 491 F.3d 625, 632 (7th Cir. 2007) (nominal damages appropriate where damages are challenging to compute precisely). It can hardly be doubted that reduced supply from coordinated exports and coordinated short-term measures caused spikes in prices in an inelastic market. Indeed, price improvement was the entire point: Defendants called for participants to join short-term measures and export campaigns with the explicit goal of raising prices. (Pl. Tr. Ex. 268 at 1; Tr. 1040 (Baker testifying he "personally advocated" for his competitors to agree to short term measures to reduce supply); Tr. 1158 (Baker admitting the goal of exports was to "raise the Urner Barry Market").) This is fully consistent with Rose Acre's and Cal-Maine's own statements that even a small reduction in supply can have a large impact on domestic prices. (*See, e.g*., Pl. Tr. Ex. 445 at 22 (Cal-Maine's 2008 10-K stating, "Small changes in production or demand levels can have a large effect on shell egg prices").)

**5.      Although Not An Element Of The Claim, The Antitrust Injury Continued Over A Sustained Period**. Defendants also argue that any injuries caused by exports and short-term measures are not "antitrust injuries" because they were short-lived.[9] (Dkt. 622 at 2-3 (Cal-Maine); Dkt. 611 at 5-6 (Rose Acre); Dkt. 608 at 5-10 (UEP).) Defendants' position cannot be reconciled with the case law, which does not require that injury be sustained over for any particular period of time, so long as there is a negative impact on competition in the relevant market. The

---

[9] Defendants' argument only implicates short-term measures and exports because the UEP Certified Program impacted prices for years. Regardless, the jury awarding damages of 70% of the overcharges found by Plaintiffs' expert from October 2004 to December 2008 can be read no other way than it determining that the UEP Certified Program caused Plaintiffs a sustained injury. Accordingly, any error is harmless.

Court instructed the jury properly on the law. The Court's instruction was based on the ABA Model Instruction, which does not contain the "sustained" or "one year" requirement for antitrust injury. (Tr. 5931 (instruction conference rejecting Defendants' argument).)[10] As far back as 1938, the Seventh Circuit has held that an antitrust violation "for one day" is no "less a violation of the law than a monopoly over the same product and the same market for thirty days or for a year." *Peto v. Howell*, 101 F.2d 353, 356 (7th Cir. 1938); *see also Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009) (citing *Peto* in analyzing similar monopoly claim for cornering a futures commodities market).

More recently, courts addressing antitrust claims stemming from conduct in the commodities markets have reaffirmed the rule that a short-term impact on the market is no less an antitrust injury than a long-term one. For example, in *Thompson's Gas & Electric Service, Inc. v. BP America, Inc.*, 691 F.Supp.2d 860 (N.D. Ill. 2010), the court found that the plaintiffs had adequately alleged a Section 2 claim based on monopolization of a month-long commodities market. *Id*. at 867 & n.13, 14. It rejected the argument that monopolization claims require a market impact of longer duration, *see id.* at 866-67 (discussing the Areeda treatise), and concluded that (1) "relevant market should not be so narrowly defined," in light of *Peto*'s observation that a short-term monopoly is no less a monopoly than a long-term one; (2) effects on competition is a factual question for the jury; and (3) even if durability is a required element, a month-long market impact suffices. *Id*. Other courts concur. *See, e.g., In re Crude Oil Commodity Futures Litig.*, 913 F. Supp.

---

[10] In discussing competitive harm the Court properly instructed the jury, consistent with the ABA Model Instructions, that market power is "an ability to profitably raise prices, for a sustained period of time" above a competitive price. (Tr. 6143. *See* ABA Model Instructions in Civil Antitrust Cases (2016 ed.), Ch. 1, Instr. 3B, at pp. 5-6.) That requirement was plainly met by the UEP Certified Program, and there was evidence of price impact from other measures as well. There is no requirement of a sustained injury in the antitrust injury model instruction and the Court's rejection of Defendants' request for a non-pattern instruction was correct.

2d 41, 55 (S.D.N.Y. 2012) (citing *Peto* and noting that "[c]ommodities markets are often organized around short time intervals.… Therefore, a month-long monopolization could be of sufficient duration to cause anti-competitive effects."); *Pollock v. Citrus Assocs. of N.Y. Cotton Exch.,* 512 F. Supp. 711, 718-19 (S.D.N.Y. 1981) (monopoly of futures contracts for specific month).

Any other rule would lead to absurd results. As the Court posited, if the law were as Defendants suggest, a clever turkey cartel could conspire to implement an annual "Thanksgiving Surprise" which would raise the price of turkeys in the days before Thanksgiving every year. (Tr. 5929-30.) Or, as seen here, a group of egg producers and trade associations could go to great lengths to raise egg prices in the leadup to Easter. (*Id.*) Under Defendants' interpretation, they would be immune from scrutiny. Nothing in the text or history of antitrust law suggests that this conduct should be immune; indeed, for that reason, the pattern instructions do not contain the requirement Defendants now assert. If the one-year threshold Defendants asked for was a genuine requirement, then there would be no way to take action against the monopolist in *Peto*, the Thanksgiving Surprise cartel, pharmaceutical companies obtaining market exclusivity for a few months,[11] or a range of other actual and hypothetical violators of the antitrust laws.[12] This cannot

---

[11] There are many examples of pay-for-delay antitrust cases wherein the alleged generic exclusion lasted less than a year. *See, e.g.*, *Am. Sales Co., LLC v. Pfizer, Inc.*, No. 2:14CV361, 2017 WL 3669604, at *2 (E.D. Va. July 28, 2017), *report and recommendation adopted*, No. 2:14CV361, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017) ("The terms of the settlement agreements permitted generic competition from four manufacturers beginning in December 2014, just over six months after the other Celebrex patents had expired").

[12] Defendants attempt to distinguish *Peto* and its progeny by asserting they arise under Section 2 of the Sherman Act, rather than Section 1. Dkt. 505 at 9-10. Defendants do not explain why this distinction makes a difference (or any sense). Both Sections 1 and 2 require proof of competitive harm. To the extent there is a difference, the law requires a *greater* proof of injury in a Section 2 case. The Seventh Circuit has explained that Section 2 "must be used with the greatest caution" in cases in which a rival firm complains a defendant has monopolized an industry. *See Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989). Section 2 cases often require evidence of a lasting structural change in the market, not simply a practice that results in an overcharge to consumers. This is because, as with excluded rival cases (discussed

be the law.

A minimum-duration requirement is particularly inappropriate in this case, where the short-term measures and exports had long-term consequences. The jury heard evidence that the effects of these measures lasted months. (*E.g.*, Pl. Tr. Exs. 151 at 1; 362 at 1; Def. Tr. Ex. 9 at 2.) Additionally, Dr. Baye showed that effects of inflated prices and supply decisions by egg producers had durable effects on egg prices. (Tr. 2532, 2587.) Most significantly, this case involves a unified conspiracy in which the industry engaged in short term measures and exports repeatedly—dozens of times over many years—including while the UEP Certified Program was in place, which would have made the harm from the measures even more impactful given the inelasticity of egg demand. The jury therefore had sufficient evidence to conclude that these measures, taken together, affected the egg market on the order of years.

The cases Defendants cite are inapposite. Almost all of them are excluded-rival cases and are inapplicable to horizontal price-fixing. None holds that for an unreasonable restraint of trade to cause antitrust injury the injury must be sustained for a particular period of time. For example, in *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n, Inc.*, 672 F.2d 1280 (7th Cir. 1982), the Seventh Circuit addressed an exclusion of <u>one</u> car dealer from a single limited-duration promotion and held that this was not the kind of injury that the antitrust laws exist to prevent. The Court explained antitrust law protects "competition, not competitors," and the plaintiff, an excluded rival, "had no clear right to participate in this promotion," meaning its exclusion could not "constitute the requisite competitive harm," regardless of its duration. *Id*. at 1287. The same logic does not extend to a price-fixing conspiracy. The analogy would be if

___

below), courts put additional scrutiny on the validity of harms to competition alleged in Section 2 cases because they relate to unilateral conduct that could reflect the normal competitive process.

Plaintiffs were excluded egg producers who wanted to be UEP certified but were denied; harm flowing from that exclusion is not likely to affect competition in the market as a whole. In the distinct context of direct purchaser consumer harm, however, the harm to the purchaser (Plaintiffs) accrues the moment the consumer purchases a good at an inflated price. And Dr. Baye's analysis observed precisely that impact. Introducing any temporal bright line in the context of price-fixing would distort antitrust law.

None of the other cases Defendants cite denied recovery to direct purchasers who were harmed by an overarching Section 1 conspiracy to raise prices that spanned many years and involved dozens of acts of market manipulation, as here. They are excluded-rival cases, *see JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs of Montrose.*, 754 F.3d 824, 835 (10th Cir. 2014) (exclusion of plaintiff from market); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 951-52 (9th Cir. 1998) (no harm to competition based on a single firm exiting market because other firms immediately replaced lost supply); *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 696-97 (10th Cir. 1989) (business was momentarily disadvantaged but could not show market effects); *W. Wholesale Supply v. Holladay*, No. CIV 97-0297-S-BLW, 2000 WL 33716996, at *14 (D. Idaho Feb. 29, 2000) (same); or cases that base the denial of antitrust recovery on the fact that the competing business should have raised a contract claim instead, *see, e.g.*, *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1272, 1281 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).

By contrast, antitrust laws were created to discipline cases just like these. The jury's conclusion that Plaintiffs were injured is final.

**III.    The Jury's Verdict Is Supported By Evidence That Damages Were The Direct Result Of Defendants' Conspiracy.**

**A.    The Properly Instructed Jury Correctly Found Plaintiffs Suffered Damage.**

The Court instructed the jury in the damages phase of the trial that: (a) Plaintiffs had to prove, with reasonable certainty, the amount of damages caused by Defendants' unlawful acts; (b) Plaintiffs could not recover damages resulting from lawful acts; and (c) it could award nominal damages, including if it concluded Plaintiffs were injured but it could not reasonably calculate the extent of injury. (Tr. 7295-300.) Based on these correct instructions and the evidence, the jury reasonably awarded nominal damages on the short-term measures and exports, and compensatory damages of $17.8 million on the claims relating to the UEP Certified Program—70% of Plaintiffs' requested damages. Ample evidence supports the jury's verdict.

1.    **Short Term Measures**. Defendants noted and shared with their competitors data on how changes in industry-wide hen population impacted egg prices. Defendants' data showed a decrease of 5 million hens could increase the price of eggs by 16 to 23 cents depending on the level of demand. (Pl. Tr. Ex. 591 at 4.) The jury heard significant evidence regarding Defendants' coordinated actions to restrict flock size through measures such as early flock disposal or early slaughter. For example, at a January 25, 2005 meeting, UEP's Board of Directors passed a motion to dispose of flocks four weeks earlier than scheduled or to reduce flock size by 5% through Labor Day. (Pl. Tr. Ex. 410 at 2.) Cal-Maine lauded those measures and reported in its 2007 10-K that "[i]n March 2005, the egg industry took action to better align the size of laying flocks with current demand needs." (Pl. Tr. Ex. 336 at 12.) A March 2008 presentation by Gene Gregory stated that flock reduction of 1.65% between Easter and Labor Day 2007 contributed to a market increase of 37.3 cents compared to the prior year. (Pl. Tr. Ex. 788 at 8.)

Based on this evidence of the direct link between Defendants' actions and the prices Plaintiffs paid, the jury properly found that Plaintiffs sustained injury and awarded nominal damages of $1 to each Plaintiff.

**2.** **Exports**. Substantial evidence also supported the jury's award of nominal damages for exports. As discussed above, throughout trial, the jury heard that the co-conspirators intended for the coordinated exports to increase the price of eggs. Defendants themselves admitted that they coordinated exports to raise the market price. Mr. Baker testified, for example, that "the goal" of the export program was to "raise the Urner Barry market." (Tr. 1158.) Mr. Rust said the same: that exports were efforts to "stabilize and possibly influence the market" and should be discussed only on secured conference calls. (Pl. Tr. Ex. 50 at 1.)

Defendants likewise admitted that the coordinated exports did, in fact, raise the Urner Barry market—the same market index used to price egg products Plaintiffs purchased. For instance, a November 22, 2006 memorandum to USEM members reported a 40 cent per dozen increase in the Urner Barry Midwest Large quote as a result of one export. (Pl. Tr. Ex. 555 at 1.) In an email sent the same day from a USEM member to UEP leader Gene Gregory, the member wrote, "Once again the export proved to be very timely as this 'kick started' the market rise and the entire egg industry benefitted." (Plf. Tr. Ex. 80 at 1.) In the February 14, 2007 issue of *United Voices*, the UEP communicated improved prices of 23.9 cents per dozen attributable to three exports. (Def. Tr. Ex. 9 at 2.) As another example, an April 27, 2007 edition of *United Voices* detailed four exports undertaken by USEM between mid-October 2006 and April 2007. (Pl. Tr. Ex. 362 at 1.) The article stated, "During this period the Urner Barry Midwest Large quote has averaged 24.5 cents per dozen more than during the same period a year earlier" when no exports were coordinated. (*Id.*) Additionally, the article noted a 17-cent increase in the Urner Barry market simply from the

24

announcement of the last export before publication. (*Id.*) And a July 2008 memorandum to USEM members declared the "Urner Barry quote rose by 30 cents per dozen" over a multi-week period spanning late May to late June. (Pl. Tr. Ex. 356 at 2.)

As with the short-term measures, the jury properly found based on this evidence that Plaintiffs sustained injury from exports, and awarded nominal damages of $1 to each Plaintiff.

**3.     UEP Certified Program.** Extensive evidence supported the jury's award of damages for the restrictive effects of the UEP Certified Program. Dr. Baye presented multiple econometric models in which he examined the impact of the Certified Program on the production of eggs and flock size. (Tr. 6975-81.)

As discussed further below, Dr. Baye evaluated the impact of the entire Certified Program, rather than the actions of individual producers. (*See* Tr. 7040 ("The point … is because the program exists, prices are going to be higher."); Tr. 7037 ("[My model] includes the conduct of everyone that was part of that certification program .... If the program wasn't hatched, no one could have joined it. So it was the hatching of the certified program that provided a vehicle for people to join.").) To assess the impact of the supply restrictions on price, Dr. Baye ran a statistical regression analysis, (Tr. 6990-92), and then used his findings to craft an econometric model. Even his most conservative econometric model showed egg production between 2004 and 2008 was 2 to 4% lower than it would have been absent the Certified Program's supply restrictions. (Tr. 6977.) Dr. Baye explained, using four representative products, that this reduction in production increased the prices of egg products Plaintiffs purchased. (Tr. 6984-88.) Ultimately, Dr. Baye found that, for egg product purchases between October 2004 and December 2008, Kraft was overcharged $18,329,288, Kellogg's was overcharged $4,605,380, General Mills was overcharged $1,305,612, and Nestle was overcharged $1,156,262. (Tr. 7003.)

25

The jury awarded each Plaintiff 70% of the overcharges calculated by Dr. Baye—a percentage that matches the market share of UEP-certified producers as of July 2002. (*See* Pl. Tr. Ex. 824 at 6.)

### B.     The Existence Of Other Producers Provides No Basis To Upset The Verdict.

The evidence at trial showed that Defendants and their co-conspirators created and implemented the UEP Certified Program as a supply restriction scheme that required maximum participation by egg producers, induced producers controlling the substantial majority of the market to join, and successfully raised the price of eggs as a result. Agreeing that the portion of the conspiracy carried out through the Certified Program raised prices, the jury awarded Plaintiffs compensation for overcharges they paid.

Defendants argue they should not have been held responsible for the *entire* effect of the UEP Certified Program—even though that program was carried out exactly as Defendants themselves intended. Instead, they believe they should be held accountable only for the reduced production by those participants that the jury explicitly found to be members of their conspiracy. Defendants alternately describe this argument as one of market power, causation, or proof; and at times, their argument impugns the jury's verdict on both liability and damages.

Defendants' argument suffers from fundamental flaws, legal and factual. Whether evaluated as a matter of conspiracy law, antitrust law in general, antitrust law relating to associations, or antitrust causation; the law is consistent, as it should be, in providing that a defendant is accountable for the effects of a conspiracy in which that defendant participated. An antitrust conspiracy, like any conspiracy, can be carried out through non-conspirators. The conspirators are responsible for the effects of their actions, including effects implemented by non-conspirators. And this is uniquely true where one of the conspirators is a trade association that

26

served as a hub through which the conspiracy was implemented. As one district court has explained in addressing similar facts, Defendants' reasoning would enable horizontal conspirators "[t]o avoid antitrust scrutiny" by "simply implement[ing] their conspiracy through an unknowing third party"—a result the antitrust laws do not "countenance." *In re Tableware Antitrust Litig.*, 485 F. Supp. 2d 1121, 1125 (N.D. Cal. 2007).

The involvement of parties not explicitly found by the jury to have been conspirators, therefore, was not a legal bar to liability or damages. It simply raised a factual question of causation for the jury: Were the injuries claimed by Plaintiffs, including those stemming from the UEP Certified Program as a whole, caused by Defendants' conspiracy? *See generally Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700–02 (1962) (holding that the jury "should be allowed to determine whether respondents' conduct materially contributed to the failure of the Imperial venture, to Continental's damage" because causation of injury is a factual issue within the jury's purview). The Court properly instructed the jury on that question, including that Plaintiffs could be awarded compensation only for damages directly resulting from the conspiracy and not those stemming from lawful acts, including the lawful acts of non-conspirators. (Tr. 7295-300.) And after hearing testimony and arguments, including the same arguments Defendants now make in their Rule 50 motions, the jury reasonably answered this question in the affirmative: that even though not every UEP-certified producer was a co-conspirator, Defendants were responsible for price increases caused by the UEP Certified Program. This Court should not disturb the jury's finding. *See Tart v. Ill. Power Co.*, 366 F.3d 461, 478 (7th Cir. 2004) (reversing grant of Rule 50 motion and noting that "jury was not obliged to believe" defendant's explanations of the facts and "the verdicts are clear indications" that the jury rejected those explanations).

**1.    Under Settled Law, Defendants Are Liable For The Entire Damage They Caused, Even If It Involved The Actions Of Third Parties.**

Defendants argue that they are not responsible "for indisputably lawful conduct of all other UEP members from September 2004-December 2008" and that the jury's damages verdict must be discarded on this basis. (Dkt. 622 at 13 (Cal-Maine); Dkt. 611 at 11-12 (Rose Acre); Dkt. 608 at 11-14 (UEP).) Defendants' argument is inconsistent with (a) conspiracy law; (b) antitrust law; (c) rules of causation that govern the calculation of damages; and (d) case law applying these principles to trade associations. Each of these principles, standing alone, require that the Court reject Defendants' attempts to evade responsibility for the consequences of the conspiracy they created and carried out.

**a.  Conspiracy Law.** First, as a general matter, conspirators are liable for the injuries caused by their actions, even if those actions were taken by non-conspirators. As Plaintiffs explained in their earlier filings, (Dkt. 597, 600), and their argument to the Court, (Tr. 6819-74), a bedrock principle of conspiracy law is that a conspirator is responsible for its own actions, as well as actions taken in furtherance of the conspiracy by co-conspirators and unwitting third parties alike. In myriad contexts, wrongdoers cannot escape the full consequences of their actions by using unknowing parties to carry out their scheme. *See, e.g.*, *Stansell v. Revolutionary Armed Forces of Colom.*, 45 F. 4th 1340, 1354 (11th Cir. 2022) (unwitting parties can become "cogs in a criminal scheme"); *United States v. Johnson*, 165 F.2d 42, 45 (3d Cir. 1947) ("an innocent act by a third party" can be part of a conspiracy if it is "caused by a previous act or contact on the part of one of the conspirators"). *Cf.* 18 U.S.C. § 2(b) (whoever "causes an act to be done" by another is punishable as a principal).[13]

---

[13] The court in *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772 (N.D. Ill. 2017), employed similar rationale in discussing the scope of the alleged conspiracy. One of the ways in which the defendants

Thus, a drug trafficker might carry out a narcotics conspiracy via an unwitting courier who transports narcotics in baby formula bottles; the courier's lack of knowledge means the courier should not be punished, but it does not make the *trafficker* any less responsible for the narcotics contained inside. If the transport of those narcotics was the direct result of the conspiracy, each conspirator is accountable for them.

**b. Antitrust Law.** This rule holds true, as it must, in the antitrust context. *In re Tableware Antitrust Litig.*, 485 F. Supp. 2d 1121, is directly on point. In *Tableware*, plaintiffs alleged that two retailers (May and Federated) conspired with two manufacturers (one of which was Waterford) to boycott the retailers' competitor (Bed, Bath, and Beyond). *Id.* at 1122. The court granted summary judgment to Waterford, a defendant retailer, concluding that there was insufficient evidence that Waterford had joined in a horizontal conspiracy. *Id.* at 1123-24. May and Federated responded by again moving for summary judgment. *Id.* at 1123. They argued that the court's grant of summary judgment in favor of Waterford amounted to a finding that "no antitrust injury exist[ed] between plaintiffs and the retailers" and that the retailers thus must be dismissed. *Id*. They argued that the manufacturers' apparently legal and voluntary conduct broke the causal chain between the retailers' actions and the plaintiffs' injury. *Id.*

The court rejected the retailers' argument and denied their motion for summary judgment. *Id*. at 1124. The court explained that the argument was based on a "rigid dichotomy between

---

in *Broiler Chicken* were alleged to have carried out the conspiracy was through Agri Stats, an entity that produced subscription reports. *Id.* at 781, 800. The defendants there sought dismissal on grounds that the alleged conspiracy was not plausible, in part because Agri Stats was not alleged to be a co-conspirator, but the court rejected its relevance: "Plaintiffs clearly allege … that the information provided by Agri Stats simply facilitated the conspiracy. It was a tool Defendants used to help implement their conspiracy. Agri Stats does not have to be a co-conspirator or a secret to play this alleged role, possibility unwittingly." *Id*. at 800. In other words, Judge Durkin held Agri Stats did not need to be a knowing conspirator in order for it to be used to facilitate the conspiracy and for the defendants—if the allegations had been proven—to have been held responsible for the consequences of its use of Agri Stats. *See Id.*

29

conspiratorial and unilateral conduct" not supported under antitrust law. *Id.* Waterford's dismissal

from the case, the court continued, meant only that there was "insufficient evidence to establish an

agreement [by the manufacturers] to take part in the <u>horizontal</u> conspiracy between the retailers"—

*not* that the manufacturers' conduct had no bearing on the plaintiffs' antitrust injury. *Id.* at 1124

(emphasis in original). As the court explained, "otherwise 'lawful' activity is not shielded from

the antitrust laws when the activity is 'part and parcel' of an effort to restrain trade. *Id.*[14]

The court In *Tableware* also explained why the rule must be as it is, holding conspirators

accountable for injures they cause (even if non-conspirators are involved), rather than as

Defendants claim, under which they would be excused for any harm attributable to the actions of

a non-conspiring third party. Any other rule, the court explained, would obliterate the ability to

enforce antitrust violations:

> Apart from running against the case law, Federated's formalism also errs as a matter
> of policy. Consider the logical endpoint of Federated's artificial dichotomy
> between conspiratorial and unilateral conduct. To avoid antitrust scrutiny,
> horizontal conspirators could simply implement their conspiracy through an
> unknowing third party—for example, by delivering the terms of conspiracy through
> a courier. Because this courier cannot be considered a "conspirator," as he is
> unaware of the horizontal conspiracy, he must be acting unilaterally, at least in
> Federated's view. And any injury flowing from the courier's unilateral conduct is

---

[14] The court in *Tableware* relied for its reasoning on *ES Development, Inc. v. RWM Enterprises, Inc.*, 939 F.2d 547 (8th Cir. 1991), where car dealers conspired to restrain trade but the effectiveness of their agreement depended on car manufacturers, who were not alleged to be conspirators, to take action. The plaintiff sued the dealers—but not the manufacturers—and prevailed in a jury trial. *ES Dev.*, 939 F.2d at 554-55. As the *Tableware* court explained, the Eighth Circuit's decision to uphold the verdict despite the role played by the manufacturers, who were not liable, revealed the fatal flaw in May's and Federated's argument in their own case:

> The *ES Development* plaintiff could not have been injured, as a causal matter, unless the car manufacturers complied with the dealers' demands, yet the court found that the dealers conspired horizontally and injured the plaintiff with nary a mention of the absent manufacturers' role. This outcome cannot be squared with Federated's theory that non-conspiratorial conduct must be unilateral; if that were so, plaintiff could not have suffered an antitrust injury in *ES Development* without a finding that the manufacturers joined the conspiracy.

485 F. Supp. 2d at 1124.

not antitrust *injury*. Hence, Federated's reasoning would enable conspirators to immunize themselves via third party *non-conspirators*. That is not what the antitrust laws countenance.

485 F. Supp. 2d at 1125 (emphases added); *accord Relevant Sports LLC v. U.S. Soccer Fed. Inc.*, 61 F.4th 299, 306 (2d Cir. 2023) ("Competitors do not avoid antitrust liability by hiding behind or acting through third-party intermediaries."); *ES Dev.*, 939 F.2d at 554-55 (conspirators are liable for harm caused through actions of non-conspirators).

**c. Rules Of Causation.** Consistent with the above-described rules, there also is the well-established principle that a party is liable for all antitrust damages it proximately causes. *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535-37 (1983). In *AGC*, the Court addressed whether a conspiring defendant could be liable for having damaged the plaintiff. The Supreme Court listed six factors to be applied in assessing proximate cause in antitrust cases: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment. *Id.* at 537-45.[15]

Applying the *AGC* factors, the Seventh Circuit in *Sanner v. Board of Trade*, 62 F.3d 918, 929 (7th Cir. 1995), held that antitrust injury is not limited to harm "directed" by the defendant; it

---

[15] Plaintiffs' evidence here established all six factors. The jury found a direct causal connection between the antitrust violation and Plaintiffs' harm. The evidence showed Defendants acted with the improper motive to limit supply and increase price. Plaintiffs suffered an overcharge, precisely the type of consumer injury the antitrust laws were intended to prevent. The overcharge was the direct result of the restrictive measures in the UEP Certified Program, and those damages were not speculative. Dr. Baye testified as to the causal link and demonstrated that link to a 99% degree of certainty. Finally, the Third Circuit has already held that Plaintiffs were the proper party to bring this case. *See In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262 (3d Cir. 2018). There is no chance of duplicative recovery as Plaintiffs seek damages only on their direct purchases from the Defendants and co-conspirators found by the jury to be liable.

encompasses all harm that was the "intended effect" of the conspiracy. Thus, in *Sanner*, soybean farmers who traded in the soybean cash market challenged a Chicago Board of Trade rule that governed the soybean futures market as violating, among other laws, the Sherman Act. *Id.* at 920-21. The district court dismissed the antitrust claim, finding that the farmers could not complain of the rule because the rule was directed only at futures traders, but the Seventh Circuit Reversed, reasoning as follows:

> [T]he CBOT allegedly intended to impact both the cash and futures markets to bring down prices in both markets … the cash and futures markets for soybeans are so closely related that a directive issued toward one promised to invariably impact the other.

*Id.* at 929-30 (relying on *Blue Shield of Va. v. McCready,* 457 U.S. 465 (1982), including its statement that injury under antitrust laws is cognizable if it "was inextricably intertwined with the injury the conspirators sought to inflict").

Far from limiting antitrust injury to the harm caused only by certain discrete actions or players, the Seventh Circuit in *Sanner* looked more broadly to injury that was fairly traceable to the defendants' conspiracy.

**d. Antitrust Liability Of An Association**. Defendants' liability for the harm that flowed from participation in UEP's supply-management programs is particularly clear because two of the defendants—USEM and UEP—were associations. Long-standing antitrust authority permits—indeed, compels—a verdict for a plaintiff that proves an association engaged in an unreasonable restraint of trade, even without proof that each member of the association that participated in the challenged practice did so based on an anticompetitive reason. In fact, the Supreme Court has found that associations' rules can be antitrust violations even when the members' market share is a fraction of what it was here.

32

In *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), a voluntary society of professional engineers, whose membership accounted for only about 21% of all registered engineers in the country, adopted a Code of Ethics. That Code, among other things, banned competitive bidding. *Id.* at 681-83. As here, the Society touted that rule as a societal benefit by claiming that "the practice of awarding engineering contracts to the lowest bidder, regardless of quality, would be dangerous to the public health, safety, and welfare." *Id.* at 685. The government sued the Society—but none of its members—for violation of the Sherman Act. Applying the rule of reason, the Supreme Court affirmed the lower courts' holding that the ethical rule was an antitrust violation for which the Society was liable. *Id.* at 696-99. The Court did not require a searching analysis of which members, if any, abided by the ethical rule because they nefariously desired to raise prices or because they innocently agreed with the Society's assertion that it protected the public interest. Nor did it require the government to name any of the Society's members as defendants or co-conspirators.

*National Society of Professional Engineers* is not an outlier. The Supreme Court has "repeatedly found instances in which members of a legally single entity violated § 1 [of the Sherman Act] when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191-92 (2010) (collecting cases). In *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), plaintiffs challenged an NCAA rule restricting the broadcast of college football games. The NCAA adopted that rule based on a vote of members. *Id.* at 90. Some members voted against the rule; those that voted for the rule undoubtedly did so for a variety of reasons. The Court did not scrutinize the motivations of the members, instead holding that the NCAA violated the Sherman Act when its members followed the NCAA-

33

implemented plan that restricted the right to televise college football games. *Id.* at 119-20; *see also Nat'l Collegiate Athletic Ass'n v. Alston,* 141 S. Ct. 2141 (2021) (affirming liability for association rule that was carried out by member schools without proof member schools were conspirators); *Assoc. Press v. United States*, 326 U.S. 1, 18-19 (1945) (AP violated Sherman Act when its members complied with AP-implemented bylaws prohibiting the sale of news to non-members); *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 435-36 (1990) (association violated the Sherman Act by adopting a work stoppage rule regardless of the fact that the rule, and many participants, were motivated by goals that benefited society).[16]

These cases demonstrate that an association is liable for the harm it causes, even if others are involved in the decision and its implementation.

### 2. The Jury's Verdict Comports With These Longstanding Principles.

The jury's verdict should stand. As an initial matter, contrary to Defendants' representation, there is nothing inconsistent about the jury's findings on liability and damages. Defendants assert that in answering Question 8, the jury found that—other than Cal-Maine, Rose Acre, Wabash Valley, and Moark—"the remaining 172 egg producers that joined the UEP Certified Program *did not* participate in the alleged conspiracy." (Dkt. 608 at 11 (UEP); *see also,*

---

[16] Defendants rehash their assertion that Plaintiffs (and now the jury) seek to hold Defendants liable for their mere participation in a trade association, (Dkt. 622 at 11-12 (Cal-Maine); Dkt. 608 at 14 (UEP)), an argument the Court already rejected in its ruling on Plaintiffs' *Santiago* proffer, *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11-CV-8808, 2023 WL 6065308, at *13 (N.D. Ill. Sept. 18, 2023) ("Here, producers went above and beyond run-of-the-mill membership and participation. By placing their executives in various roles on UEP and USEM boards and committees, they played key roles in developing and approving the conspiracy's supply-reducing initiatives. Then, as UEP vocally implored members to play along, the competing companies adopted and participated in them, nearly in unison."). As discussed above, Plaintiffs amply proved the existence of a conspiracy well beyond mere membership in an association.

*e.g.,* Tr. 6873 (counsel for Rose Acre arguing, "And the jury found that the other members of the Certified Program were not co-conspirators.").) This is incorrect. As the Court has explained:

> Question 8 asked if everybody was in on it. ... Question No. 8 did not ask if no one else was involved. In other words, the fact that not everyone was involved does not necessarily mean that no one else was involved. Those are two different propositions.

(Tr. 7334.) As a result, the jury's verdict in the liability phase was that UEP, USEM, Cal-Maine, Rose Acre, Wabash Valley, and Moark conspired together to unreasonably restrain trade, including by implementing the UEP Certified Program, and that Michael Foods did not. The jury made no explicit findings about any other producer.[17]

The findings that the jury did make, including regarding harms directly caused by Defendants' conspiracy, were well supported by the evidence and were consistent with the law. Defendants argue that the verdict should be overturned because "Plaintiffs adduced no evidence sufficient to support finding a 177-member conspiracy. Plaintiffs did not elicit any evidence that all 177 egg producers shared a conscious commitment to a common scheme to restrict the supply of eggs." (Dkt. 608 at 11-12 (UEP).) But that is the same flawed "rigid dichotomy between conspiratorial and unilateral conduct" upon which the *Tableware* defendants relied. The jury was properly instructed on the fundamental principles of conspiracy law, antitrust law, and causation discussed above. Applying these principles to the facts, the jury reasonably found that Defendants conspired to impose unlawful and unreasonable restraints of trade through exports, short-term

---

[17] Similarly, undeterred by the jury's liability finding that Cal-Maine, UEP, and other producers conspired to unreasonably restrain trade and did so by means of the UEP Certified Program, Cal-Maine—a public company—issued a statement two days after the damages verdict claiming, "Significantly, the jury found that the UEP Certified Program itself does not constitute a restraint of trade." Cal-Maine Foods, Securities and Exchange Commission Form 8-K (filed Dec. 1, 2023), available at https://www.calmainefoods.com/investors/sec-filings/. The jury, of course, made no such finding.

measures, and the UEP Certified Program, each of which garnered the participation of large swaths of its membership; and that the claimed harm was the "direct result" of the conspiracy.

UEP—a trade association and the hub of conspiratorial communication—was the sponsor of the UEP Certified Program. At its inception, the program was a supply management program designed to resolve the nation's over-supply of eggs on a long-term basis. USEM, another association, likewise carried out the exports. As all defendants recognized, however, to be successful these measures required widespread participation by egg producers and broad support by customers. UEP, USEM, and conspiring egg producers such as Cal-Maine and Rose Acre, facilitated that participation and support. By July 2002, 70% of the market was UEP certified, yet it was several months before any buyers added UEP certification to their specifications; by the mid-2000s, 95% of the market was UEP certified. (Pl. Tr. Ex. 824 at 6; Tr. 2364.)

Defendants intended this precise result. The success of the conspiracy depended on broad producer participation. As Mr. Baker testified, no producer could control supply on its own; each producer depended on competitors coming together to do so. (Tr. 1228, 1236.) So, Defendants and their co-conspirators induced producers to engage in supply restriction efforts, (*see, e.g.*, Pl. Tr. Ex. 210 at 2); egg prices went up as intended, (Tr. 2581-89); and Plaintiffs paid more for eggs as a result, (Tr. 6969-70). In other words, the injury caused by producer participation in the UEP Certified Program "was inextricably intertwined with the injury the conspirators sought to inflict." *Sanner*, 62 F.3d at 929 (quoting *McCready,* 457 U.S. at 483-84). It does not matter whether other producers entered the program with nefarious intentions, benevolent purposes, or mixed motives. *See Alston*, 141 S. Ct. at 2159 (the Supreme Court "has regularly refused … requests from litigants seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition.").

36

### 3. The Jury Verdicts Comport With Antitrust Law Regarding Market Power.

Defendants also attack the jury's verdicts as incompatible with the evidence of Rose Acre's, Cal-Maine's, Moark's, and Wabash Valley's combined market power. (Dkt. 622 at 9-11, 13-14 (Cal-Maine); Dkt. 611 at 7-8 (Rose Acre); Dkt. 608 at 10-11 (UEP).) This attack fails for several reasons, both legal and factual.

First, market power is irrelevant. Where, as here, a plaintiff has proven anticompetitive effects of conspirators' conduct, there is no need to establish market power. *See FTC v. Ind. Fed'n. of Dentists*, 476 U.S. 447, 460-61 (1986). "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Id.* (quoting 7 Phillip E. Areeda, Antitrust Law ¶ 1511, at 429 (1986)). Here, the jury found that Defendants and their co-conspirators did "unreasonably restrain[] trade in a relevant market," causing injury to Plaintiffs. (Dkt. 582.)

Second, even if Plaintiffs needed to establish market power, its existence was a factual issue properly submitted to and decided by the jury. The Court instructed the jury that market power was a proper consideration in evaluating anticompetitive harm and explained that market power is "an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market." (Tr. 6143.) The Court further instructed the jury as to facts to consider in assessing market power. (*Id.*) The jury's findings on liability and damages reflect that Plaintiffs proved the conspiracy profitably raised prices for a sustained period of time—as found by Dr. Baye's models and corroborated by the documentary record.

That record showed that Defendants collectively enjoyed significant market power. Because the jury found UEP and USEM to be members of the conspiracy along with Rose Acre, Cal-Maine, Moark, and Wabash Valley, any proper market power analysis easily clears the "20%-25%" market power hurdle that Defendants claim in their cited cases. Defendants' argument to the contrary conveniently omits two parties the jury found liable: UEP and USEM. Those trade associations enjoy the combined market power of their member producers—more than 95% percent. (Tr. 2364.) In contrast, the National Society of Professional Engineers that the Supreme Court found liable only counted 21% of the professional engineers as its members. *See Nat'l Soc'y of Prof. Eng'rs*, 435 U.S. at 681-82. *See generally Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 604 (7th Cir. 1984) (a plaintiff can prove a trade association's market power by showing the association's "members as a group have a substantial share of the market"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1374 (5th Cir. 1980) (an association has market power where its members have market power). Tellingly, none of Defendants' cases that supposedly support market-power analysis involved a trade association. *See, e.g.*, *Republic Tobacco Co. v. N. Atl. Trading Co.*, Inc., 381 F.3d 717, 736-37 (7th Cir. 2004); *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 773 (N.D. Ill. 2015).

The jury's verdict, in fact, reflects its consideration of UEP's market share through membership in its Certified Program. The jury did not award Plaintiffs all damages they sought; it instead compensated each Plaintiff for 70% of their overcharges. This is significant in light of Defendants' invitation to the jury in closing argument to award damages that "correspond[] with the conspiracy's market share." Tr. 7381 (closing argument for Cal-Maine). The 70% figure selected by the jury corresponds with the UEP Certified Program's market power as of July 2002.

38

As Plaintiffs mentioned in their opening statement in the damages phase, around the time that FMI endorsed the UEP Certified Program (i.e., before any customers had asked for it), the producers signing on to the program constituted 70% of national market share. (*E.g.*, Tr. 6930; Pl. Tr. Ex. 824 at 6.).[18]

Thus, even accepting Defendants' erroneous claim that they should not be held liable for the *total* effects of the UEP Certified Program, but only those attributable to participation by producers who joined with the intent to restrict supply, that *still* would not be enough to overturn the jury's damages verdict. *See Passananti*, 689 F.3d at 659 (jury verdict will not be disturbed if it could reasonably be based on the evidence).

### 4. Defendants' Cited Cases Do Not Support A Different Result.

None of the cases Defendants cite in support of their causation argument are on point. Unlike *Tableware*, none deals with facts similar to those presented here. Unlike *Professional Engineers, NCAA, Alston, AP*, or *Superior Court Trial Lawyers*, none addresses the liability of associations. Unlike *AGC* or *Sanner*, none addresses proximate causation. At best, Defendants' cases contain quotes unmoored from the issues in this case.

For instance, Defendants rely on *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946), and *In re Dealer Management Systems Antitrust Litig.*, No. 18 C 864, 2023 WL 4305901, at *34 (N.D. Ill. June 29, 2023), for the proposition that the jury may not assess damages not caused by Defendants. But those cases are consistent with the Court's instructions and the jury's findings. As the court explained in *Dealer Management*, damages for an antitrust violation may "reflect

---

[18] Although it is unnecessary for the Court to address this point because Defendants would be responsible for the effects of the UEP Certified Program regardless of whether the conspiracy was limited to or broader than the six entities that were the subject of the jury's findings, the jury's award may also reflect that it believed that the 70% of producers who joined the Certified Program around the time or before FMI's endorsement (and therefore prior to any customer "demands") were co-conspirators.

only the losses directly attributable to *unlawful* competition." *Id.* "If a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then no damages may be recovered under the antitrust laws." *Id.* Similarly, Defendants cite *MCI Communications Corp. v. AT&T*, 708 F.2d 1081 (7th Cir. 1983), where the plaintiff did not calculate damages stemming only from the defendant's unlawful behavior, versus harm caused by certain of the defendant's lawful acts, so the Seventh Circuit remanded for a new trial on damages. *Id*. at 1161.

The Court's instructions to the jury and the Plaintiffs' damages theory were in accordance with this case law. As the Court informed the jury, its award of damages needed to be the "direct result" of the conspiracy and must not compensate for harm not caused by Defendants. (Tr. 7298.) And Dr. Baye's calculations of overcharges *did* reflect only those losses directly attributable to unlawful competition: the UEP Certified Program, which the jury found was an object of Defendants' conspiracy to unlawfully restrain trade.

Significantly, none of the cases Defendants cite holds that the effects of an anticompetitive scheme can *never* become part of antitrust injury if unwitting actors also caused the harm. The rule, in fact, is precisely the opposite: where, as here, the conspiracy relied on lawful actors to effectuate its goals, defendants who entered into the conspiracy are responsible for the damages the conspiracy caused, even if they are based in part on the actions by those lawful actors. *See Tableware*, 485 F. Supp. 2d at 1124; *accord Clipper Express v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263 (9th Cir. 1982) ("An antitrust violation does not enjoy immunity simply because an element of that violation involves an action which itself is not illegal."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 35 (D.D.C. 2008) ("'Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the [Sherman Act] forbids,

40

they come within its prohibition.'" (quoting *Jung v. Ass'n of Am. Med. Colleges*, 339 F.Supp. 2d 26, 37 (D.D.C. 2004)).

Defendants also cite *Marion Diagnostics Center v Becton Dickenson & Co.*, 29 F. 4th 337, 347-348 (7th Cir. 2022), for the proposition that "it does not make sense" to hold a party liable for alleged injuries arising from a conspiracy in which the parties are not a member. (Dkt. 599 at 6.) But the *Marion* plaintiffs lacked standing because their alleged injury "[was] not fairly traceable to [defendant] Cardinal's conduct." 29 F. 4th at 348. The *Marion* plaintiffs alleged two unrelated vertical conspiracies, one of which involved Cardinal and the other of which caused the harm for which the plaintiffs sought compensation. *Id*. at 340. The Seventh Circuit held that because the alleged conspiracies were unrelated and the plaintiff suffered injury only from a conspiracy not involving Cardinal, the plaintiffs lacked standing to sue Cardinal. *Id.* Here, of course, the evidence and the issue are different: Plaintiffs' injury was fairly traceable to Defendants' hub and spoke conspiracy. And the evidence showed that Defendants specifically designed the conspiracy to induce other producers to join the programs so they could effectively limit production, raise prices, and cause the harms for which the jury awarded Plaintiffs compensation.

Finally, Defendants cite several cases for unremarkable propositions relating to proof a party joined a conspiracy. *See, e.g, In re Sulfuric Acid Litig.*, 743 F. Supp. 2d 827, 863-64 (N.D. Ill. 2010); *United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007). In this case, the standard for joining a conspiracy is not in doubt. The Court instructed the jury as to the requirement for a knowing agreement. The jury found Defendants entered into a conspiracy. Defendants are liable

for the natural and intended consequences of their conspiracy, including the market effects of third-party producers joining the UEP Certified Program—just as Defendants wanted.[19]

In short, the foundation of Defendants' attack on the jury's verdict is a flawed legal theory that crumbles under the weight of the decisions discussed above. Plaintiffs' case never hinged on a finding that every member of the UEP Certified Program was a knowing co-conspirator. To require as much would shield Defendants from the totality of the "losses directly attributable to" their creation and implementation of the UEP Certified Program, *MCI*, 708 F.2d at 1161, a result the antitrust laws would not countenance, *Tableware*, 485 F. Supp. 2d at 1125, especially in light of the hub and spoke conspiracy that involved UEP.

### 5. The Court Properly Admitted Dr. Baye's Testimony.

Finally, UEP argues that the Court should have excluded Dr. Baye's testimony. (Dkt. 608 at 8-9). First, to the extent that this argument is a criticism of Dr. Baye's methodology, it comes too late. The time to raise *Daubert* challenges has long passed, and Defendants cannot raise an argument in a post-trial motion that was untimely when made. The argument is further waived in that Defendants raised it at trial for the first time after Dr. Baye testified in Phase 1. The jury already heard his description of his opinions and model. It was allowed to rely on that testimony in Phase 1. A Rule 50 motion is the wrong time to claim Dr. Baye was not qualified to testify consistent with his report.

---

[19] For this reason, Defendants' citation to cases for the proposition that "it is membership in a conspiracy that gives rise to liability" (Dkt. 599 at 7) have no bearing here. *See, e.g., Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011); *Kleen Prods. LLC. v. Int'l Paper*, 306 F.R.D. 585, 609 (N. D. Ill. 2015), *aff'd* 831 F. 3d 919 (7th Cir. 2016). Plaintiffs did not seek to recover (and the jury did not award) a penny of damages from non-members of the conspiracy.

Second, the Court properly admitted Dr. Baye's analysis. He presented opinions regarding the monetary loss Plaintiffs suffered as a direct result of the conspiracy. Plaintiffs have consistently contended that Defendants' overarching conspiracy increased the prices of eggs and egg products. They proved to the jury's satisfaction that a consequence of Defendants' conspiracy was the price increase Dr. Baye quantified. As shown above, Defendants are liable for those consequences, even if they involved the participation of non-conspirators. Dr. Baye's testimony is consistent with the claims in this case, conspiracy law, and antitrust law.

Third, at most, Defendants' challenges reflect a fact issue that the jury resolved. In denying Defendants' prior motion, (Dkt. 566), the Court noted that Defendant's challenge presented factual issues that could be explored in cross-examination or through contrary evidence, (Dkt. 628). (The Court reserved the legal issues, which we show above do not justify excluding Dr. Baye's testimony.) The Defendants raised their arguments with the jury, which largely rejected them. The jury's verdict resolves the issue.

**Conclusion**

Plaintiffs proved every element of their claim. The Court properly instructed the jury, which attentively listened to and evaluated Defendants' arguments. Defendants had every chance to defend their conduct, but the jury rejected their arguments. The jury's verdict is supported by ample evidence and should be respected. The Court should deny Defendants' Rule 50 motions.

December 22, 2023                                    Respectfully submitted,

*Counsel for Plaintiffs Kraft Foods Global, Inc., General Mills, Inc., Nestlé USA, Inc. and The Kellogg Company*

 /s/ *Brandon D. Fox*
Andrianna D. Kastanek
Angela M. Allen
Joel T. Pelz
Michael T. Brody
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
akastanek@jenner.com
aallen@jenner.com
jpelz@jenner.com
mbrody@jenner.com

Brandon D. Fox
Amy M. Gallegos (*admitted pro hac vice*)
Sati Harutyunyan (*admitted pro hac vice*)
JENNER & BLOCK LLP
515 S. Flower St.,
Suite 3300
Los Angeles, CA 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
bfox@jenner.com
agallegos@jenner.com
sharutyunyan@jenner.com