**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-8808 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNITED EGG PRODUCERS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

A dozen years after this antitrust lawsuit hit the docket, it finally went to trial. That timeline was fitting. After all, this case is about eggs. More specifically, it's about a conspiracy to reduce the supply of eggs.

Plaintiffs are four multinational food manufacturers: Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc. They use eggs in lots of food products, like waffles, pasta, ice cream, and cookie dough.

Plaintiffs originally sued a basket of egg producers, but a number of them settled before trial. In the end, four Defendants were left standing. The group included two of the nation's largest egg producers, Cal-Maine Foods, Inc., and Rose Acre Farms, Inc. The group also included two industry associations, United Egg Producers and United States Egg Marketers. Two Defendants produce eggs, and two Defendants promote eggs.

It's Big Food against Big Egg. Plaintiffs claimed that Defendants engaged in a conspiracy to reduce the supply and increase the price of eggs. The alleged conspiracy included three facets: animal-welfare rules, exports, and so-called "short-term measures" to reduce the production of eggs.

Plaintiffs alleged what's known as a hub-and-spoke conspiracy. The basic idea is that a leading player (the hub) orchestrates a conspiracy that is carried out by secondary co-conspirators (the spokes). Here, the industry associations served as the hub. Cal-Maine Foods, Rose Acre Farms, and a few other producers (Moark, Michael Foods, and Wabash Valley) allegedly were the spokes around the "rim."

The parties engaged in discovery for years in another district, as part of a coordinated MDL proceeding. In the end, the case came back to Chicago. This Court presided over a seven-week jury trial.

The jury heard lots of evidence. The parties presented scores of exhibits. The jury heard from dozens of witnesses, including in-person testimony, remote testimony by video, and deposition designations. The jury was treated to high-level advocacy. The caliber of the lawyering at trial was top-notch, from both sides.

When it was all said, and when the presentation of the evidence was all done, the jury concluded that Defendants had engaged in a conspiracy to restrict the supply of eggs. The jury found that the conspiracy consisted of all three prongs alleged by Plaintiffs.

The jury also found that two non-defendant producers (Moark and Wabash Valley) participated in the conspiracy. But the jury found that the other producer, Michael Foods, did not participate in the conspiracy. The jury also found that Plaintiffs suffered an injury from October 2004 to December 2008, but not later.

In total, the jury awarded about $17.8 million in damages. Trebled, the damages award comes out to more than $53 million.

Before the jury returned a verdict, Defendants moved for judgment as a matter of law under Rule 50(a). The Court took the motions under advisement pending a jury verdict. With the verdict now in hand, the Court returns to the motions.

For the reasons explained below, the Court denies Defendants' motions for judgment as a matter of law under Rule 50(a) (Dckt. Nos. 607, 610, 621).

## Background

This case is about a conspiracy to reduce the supply of eggs.

Giving a complete overview of everything that transpired would be a tall order, and then some. The case is nearly 13 years old. And the documentary record stretches back to the 1990s.

The docket here, in the Northern District of Illinois, spans more than 700 entries. And even then, those 700 docket entries don't include the filings that took place during the seven years when the case was before an MDL court in Philadelphia.

This Court presided over a seven-week trial, and issued many rulings along the way. The trial transcripts are more than 7,400 pages long.

As one would expect, the parties traversed a lot of ground at trial. This Court can't capture everything that happened before and during the trial. The Court will simply offer a high-level overview before turning to the parties' arguments.

## I.    The Parties

The case involves four Plaintiffs: Kraft Foods Global, Inc., The Kellogg Co., General Mills, Inc., and Nestle USA, Inc. As any reader undoubtedly knows, they are large food processing companies. You probably have some of their food in your pantry and in your fridge.

The four Plaintiffs buy egg products. They purchase eggs to use as ingredients in their food, like mayonnaise, pasta, ice cream, cookie dough, and waffles.

At first blush, you might think that this case involves the sale of eggs in their shells. One could imagine a producer shipping pallets of eggs to a big food producer like Kraft or Kellogg, who would then crack the eggs and go from there.

The case involves the sale of so-called "egg products." The jury heard lots of testimony about shell eggs and egg products. Plaintiffs purchased only egg products, not shell eggs. *See* 10/30/23 Trial Tr., at 2589:11 – 2590:7 (Dckt. No. 653) (Baye).

Shell eggs, also known as table eggs, are the eggs that you see on grocery store shelves. *See* 10/30/23 Trial Tr., at 2416:2 – 2417:18 (Dckt. No. 652) (Manion). Envision any all-American egg, just waiting to get cracked. That's a shell egg.

Egg products, on the other hand, involve various forms of the goo inside the shells. Basically, some egg producers make the eggs, and then crack the eggs. At that point, the egg producers make products from what comes out of the shells. So egg products come from shell eggs. *See* 11/9/23 Trial Tr., at 4903:2-10 (Dckt. No. 669) (Marshall).

The term "egg products" encompasses whatever an egg producer does with the inside of a shell egg. Egg products include frozen, liquid, and dried eggs. *See* 10/24/23 Trial Tr., at 1644:14-18 (Dckt. No. 647) (Baker).

As an example, imagine if a food manufacturer wanted to buy a tanker truck of egg whites. An egg producer could crack the eggs, separate the whites from the yolks, and then fill up the truck with gallons of egg whites. That's an egg product. Other examples include liquid yolks or powdered whites.

The shell eggs are transformed into egg products through a process called "breaking." *Id.* "Breaking" is just what is sounds like: the shells are cracked. The eggs can be kept whole or

separated out into whites and yolks. Once the eggs are cracked, and the innards spill out, the egg producers can make whatever the customers want.

At bottom, shell eggs and egg products are both eggs. But it takes some work to change a shell egg into an egg product.

Defendants Cal-Maine Foods and Rose Acre Farms are egg producers. They make and sell eggs.

Cal-Maine did not sell eggs or egg products to any of the Plaintiffs. It mostly operated in the shell egg business, selling to grocery chains.

Rose Acre sold egg products to all four Plaintiffs. *See* Dr. Baye Supp. Appx. 6, at 7–8 (Dckt. No. 595-3). Kraft was its biggest customer, by a long shot. Between October 2004 and December 2008, Rose Acre sold more than $70 million worth of egg products to Kraft. *See* 11/29/23 Trial Tr., at 6965:22-24 (Dckt. No. 682). In that same timeframe, Rose Acre sold over $10 million in egg products to the other three Plaintiffs (combined), including Nestle ($6,577,046), General Mills ($3,948,967), and Kellogg ($213,359). *Id.* at 6965:13 – 6966:2. Rose Acre also sold shell eggs to grocery stores.

Defendants United Egg Producers (UEP) and United States Egg Marketers (USEM) are industry associations. UEP is an egg industry trade association. USEM is an organization run by UEP management, and it was primarily involved in egg exports.

The jury also heard evidence about other producers, including non-defendants Michael Foods, Wabash Valley, and Moark. Michael Foods sold egg products to all four Plaintiffs. *See* Dr. Baye Supp. Appx. 6, at 7–8 (Dckt. No. 595-3). Wabash Valley sold egg products to Kellogg. *Id.* Moark did not sell to Plaintiffs.

## II.     The Conspiracy

In the operative complaint, Plaintiffs alleged that Defendants conspired to reduce the supply of eggs and increase egg prices, from at least 1999 to 2008, in violation of the Sherman Act, 15 U.S.C. § 1.  *See* Second Am. Cplt., at ¶¶ 119, 194 (Dckt. No. 73-17).

Plaintiffs alleged a so-called "hub-and-spoke" conspiracy.  *See* 10/19/23 Trial Tr., at 668:5-10 (Dckt. No. 640).  Basically, they alleged that UEP served as the "hub" of the conspiracy, along with USEM.

Both UEP and USEM had committees.  Executives from various egg producers served on those committees.  Plaintiffs contended that those producers – which included Defendants Cal-Maine and Rose Acre, as well as non-defendants Wabash Valley, Moark, and Michael Foods – were the "spokes" in the hub-and-spoke conspiracy.

Plaintiffs alleged a conspiracy with three prongs.  The goal of each prong was to reduce the number of eggs.

At a high level, the three prongs included (1) adopting so-called "short-term measures" to reduce the number of hens, or limit their ability to lay eggs; (2) exporting eggs to reduce domestic supply; and (3) adopting an animal-welfare program called the UEP Certified Program to increase the amount of space available in cages for egg-laying hens (leading to fewer hens in each cage, and thus fewer eggs).

### A.     The Short-Term Measures

Plaintiffs alleged that Defendants reduced supply through three short-term measures: (1) early slaughters; (2) hatch reduction; and (3) early molts.  *See* Pls.' Exs. 257, 260, 434.  The measures were proposed by the UEP Marketing Committee and recommended to UEP members.

6

*See, e.g.*, Pls.' Ex. 257.  Each measure decreases the number of egg-laying hens, which, in turn, decreases the number of eggs.

The first short-term measure involved early slaughter.  As the name suggests, early slaughter means eliminating egg-producing hens ahead of schedule.  *Id.*  Basically, Plaintiffs contended that Defendants agreed to kill birds that were still producing a lot of eggs.  And fewer egg-laying hens means fewer eggs.  Dead hens lay no eggs.

The second short-term measure involved hatch reduction.  Hatch reduction refers to decreasing the number of "pullets" that are hatched and placed into henhouses.  *Id.*  A pullet is a young female chicken that does not yet lay eggs.  *See* 11/9/23 Trial Tr., at 4735:16-18 (Dckt. No. 668) (Hurd).  (Apparently, a "chick" is a male or a female bird.)

When baby birds hatch, egg producers separate the females from the males.  The females grow up to become egg-laying hens.  Egg producers can decide how many pullets to hatch.  And if egg producers decide to hatch fewer pullets, that's fewer little birds.  Fewer little female birds means that there will be fewer big hens laying eggs.  And fewer egg-laying hens means fewer eggs.

The third short-term measure involved molting.  Molting refers to the process by which birds shed their feathers.  When birds molt, they stop producing eggs.  So, molting causes a temporary decrease in the number of hens that are laying eggs.

Birds naturally molt.  *See* Pls.' Ex. 245, at 13.  However, egg producers would "force molt" birds – meaning, withdraw feed from birds to induce them to lose their feathers.  *See* 10/24/23 Trial Tr., at 1642:9 – 1643:2 (Dckt. No. 647) (Baker); 11/9/23 Trial Tr., at 4769:15-16 (Dckt. No. 668) (Hurd); *see also* Defs.' Ex. 444.

As one witness explained, "molting means you're stopping egg production. The bird can have a chance to rejuvenate, and then you have another whole round of egg production. Sometimes it can go to three cycles, two molts in the past. So you think about molting from a natural situation, a bird's molt, they lose feathers, et cetera, but in this case, it's a chance for the bird to be rejuvenated after several weeks of producing eggs every 28 hours." *See* 11/1/23 Trial Tr., at 3129:13-20 (Dckt. No. 657) (Armstrong); *see also id.* at 3423:20-25 (Dckt. No. 659) (Armstrong) ("Forced molting means that by whatever means the bird is moved into a molt and the bird then is rejuvenated. So they stop lay. They lose weight. They rejuvenate. A feed withdrawal molt is a specific type of forced molt where you're removing feed. And years ago, it used to be feed and water.").

Forced molting is like turning off the engine of egg production. No food for hens, no eggs. By molting birds early, egg producers could temporarily decrease the number of eggs available for sale.

The jury heard some testimony that after a bird molts, "it comes back in higher egg production." *See* 11/9/23 Trial Tr., at 4737:13 (Dckt. No. 668) (Hurd). Maybe a time out in egg laying leads to more eggs laid after the respite.

### B. Exports

The second prong of the conspiracy involved exports. USEM (controlled by UEP's management) was at the helm of this prong of the scheme. USEM member companies voted about whether to export eggs to other countries. *See* Pls.' Exs. 178, 226. Taking eggs out of the United States reduces the number of eggs available for sale domestically. An egg can't be in two continents at once.

If a majority of USEM members approved an export, all members were required to export eggs – regardless of whether they had enough eggs on hand. *See* 11/7/23 Trial Tr., at 4106:4-20 (Dckt. No. 664) (Hinton).

Sometimes members would lose money on exports. *Id.* That is, sometimes members would purchase eggs from other producers at market value, and then export those eggs for less than they paid. *Id.*

**C.     The UEP Certified Program**

The final prong of the conspiracy – and at trial, the most important part – was an animal-welfare program called the UEP Certified Program. The UEP Certified Program set guidelines for the treatment of hens. *See* Defs.' Ex. 433.

The UEP Certified Program started incubating in 1999. UEP formed a Scientific Advisory Committee. The Committee prepared a report with recommendations for UEP's guidelines in 2000. *See* Pls.' Ex. 245.

At first blush, the guidelines focused on making life happier for hens. Specifically, the Scientific Advisory Committee made recommendations about cage-space restrictions, backfilling, early molting, and other topics.

In 2002, UEP promulgated an initial version of the guidelines, in the form of the UEP Certified Program. *See* Defs.' Ex. 433. In other words, the Scientific Advisory Committee did not *create* the certified program. *See* 11/01/23 Trial Tr., at 3170:17-23 (Dckt. No. 657) (Armstrong). Instead, UEP and its members developed the UEP Certified Program to *enact* some of the Scientific Advisory Committee's recommendations. *Id.* at 3146:17-24. And UEP adopted many of the Committee's recommendations. *See* Defs.' Exs. 426, 433.

The UEP Certified Program hatched in mid-2002. *See* 10/23/23 Trial Tr., at 1203:7-8 (Dckt. No. 644) (Baker); *see also* 10/31/23 Trial Tr., at 2836:14-16 (Dckt. No. 655) (Baye). By April 2002, one hundred egg producers across the country had signed on the dotted line, and joined the program. *See* 10/23/23 Trial Tr., at 1283:6-11 (Dckt. No. 645) (Baker).

Individual egg producers could join the program. *See* 11/9/23 Trial Tr., at 4700:23-25 (Dckt. No. 668) (Hurd). By joining the UEP Certified Program, egg producers committed to following the rules. In turn, egg producers received a benefit. They gained the ability to portray themselves as UEP Certified Producers. And they could use the UEP Certified mark on their egg products. *Id.* at 4749:9-10.

Egg producers who joined the program, and used the mark, could tell their customers that their eggs were "certified." *See* 11/6/23 Trial Tr., at 3807:9-11(Dckt. No. 662) (Hardin). The UEP Certified mark communicated a message to the world: the eggs were laid by hens who lived in henhouses that met animal-welfare standards. The mark told customers that the hens enjoyed a certain quality of life.

Egg producers did not have to be a member of UEP to become a certified producer. *See* 11/9/23 Trial Tr., at 4748:7-9 (Dckt. No. 668) (Hurd). And not every UEP member became a certified producer. *Id.* at 4748:10-12.

When an egg producer *did* join the UEP Certified Program, it made some commitments. For example, egg producers had to commit to the "100% Rule." *See* Pls.' Exs. 85, 193. Basically, a producer who signed up to the UEP Certified Program needed to commit all the way. That is, the producer had to implement the welfare guidelines across the board at "100%" of its facilities. *See* Pls.' Ex. 193. If an egg producer wanted to enjoy certification status, every

henhouse – on every farm in an egg producer's basket – had to meet the guidelines. *See* 10/23/23 Trial Tr., at 1293:17 – 1294:9 (Dckt. No. 645) (Baker).

UEP kept track of whether an egg producer followed those guidelines. A producer couldn't use the UEP Certified mark indefinitely, unchecked and unrestrained. Instead, the Certified Program had an annual certification process. *See* 10/25/23 Trial Tr., at 1930:15-20 (Dckt. No. 649) (Baker).

The annual certification involved audits. An egg producer needed to pass the audit to keep its status in the program. *See* 10/24/23 Trial Tr., at 1719:22-25 (Dckt. No. 647) (Baker); *see also* 11/9/23 Trial Tr., at 4748:23 – 4749:2 (Dckt. No. 668) (Hurd); 11/02/23 Trial Tr., at 3395:6–10 (Dckt. No. 659) (Armstrong).

The audit team would contact the producer, and set up a date. *See* 11/9/23 Trial Tr., at 4808:14-15 (Dckt. No. 669) (Hurd). The auditors would show up on-site. *Id.* They would walk around the henhouses. *Id.* at 4804:19-24. They would look at the conditions, and count birds in cages. *Id.* The audits would dock producers who fell short of the guidelines. *See* 11/9/23 Trial Tr., at 4760:1-5 (Dckt. No. 668) (Hurd).

At this point, the Court needs to say a word on the specific standards that the UEP Certified Program set. The guidelines changed as the program evolved. *See* 10/31/23 Trial Tr., at 2714:10-12 (Dckt. No. 654) (Baye). But the Court will cover the key features.

Start with backfilling. In 2005, the UEP guidelines added a "backfilling ban." Backfilling is the process by which dead or injured birds – which are no longer producing eggs – are replaced with productive, healthy birds. *See* Defs.' Ex. 522, at 14.

Imagine if a cage included five hens, and one of the hens died. Replacing the dead chicken with a live chicken is backfilling. Backfilling means that, if a hen dies before its

11

productive life is over, the egg producer can fill the cage back to capacity. Backfilling avoids partially-empty cages. *See* 11/2/23 Trial Tr., at 3376:1-8 (Dckt. No. 659) (Armstrong).

Participants in the UEP Certified Program were barred from backfilling. *See* Reickard Testimony, at 175:20-23 (Dckt. No. 650). If the UEP found out that a producer backfilled, it would make the producer destroy the birds. *Id.*

Another marquee feature of the UEP Certified Program was the cage space guidelines. The cage-space guidelines set rules for how much space each bird needed to have in a cage. The cage-space guidelines influenced how much space a bird had to wiggle her wings. Put differently, the guidelines set cage-space minimums, so birds had "more room to move." *See* 11/07/23 Trial Tr., at 4050:6-16 (Dckt. No. 664) (Hinton).

The UEP Certified Program phased in different cage-space requirements, over time. For example, at one point the cage-space requirement was 56 square inches per bird. Later, the requirement grew to 64 square inches per bird. After that, the hens gained another 3 inches, when the requirement grew to 67 square inches per hen. *See* 10/31/23 Trial Tr., at 2714:10-12 (Dckt. No. 654) (Baye).

Putting those numbers in perspective, an average piece of paper is 8.5 inches by 11 inches. That's 93.5 square inches. So, 67 square inches isn't very much space. Imagine a hen sitting on two-thirds of this piece of paper, with 26 square inches to spare.

This opinion is 79 pages long. That's 7,386.5 square inches (8.5 inches x 11 inches x 79 pages). Imagine if the pages of this opinion were separated, and laid down on a parking lot. And imagine if a bunch of hens were put on the opinion, at a rate of 67 square inches per hen. It would be enough room for 110 hens. That's a lot of chicken sitting on just one opinion.

The CEO of Cal-Maine, Dolph Baker, testified about how the UEP Certified Program led to fewer hens and fewer eggs:

> Q:    But Cal-Maine did comply with the UEP Certified Program, correct?
>
> A:    Correct.
>
> Q:    And as a result, Cal-Maine had fewer birds in existing cages, correct?
>
> A:    In existing cages, correct.
>
> Q:    And also had fewer birds in each henhouse, correct?
>
> A:    Yes.
>
> Q:    And there was less egg production coming out of those henhouses, correct?
>
> A:    In existing houses, correct.

See 10/23/23 Trial Tr., at 1276:7-17 (Dckt. No. 645) (Baker).

By way of analogy, consider a carton full of eggs. It's easy to envision 12 eggs happily sitting in the container. Then, imagine if someone set a rule requiring each egg to be at least two inches away from any other egg. That rule would reduce the number of eggs in each carton.

The same goes for the henhouse. A henhouse is full of cages, and each cage can fit a certain number of birds. Each bird would have, on average, a certain amount of space.

A rule that establishes a minimum amount of space per hen would change the ballgame. Imagine if a cage had 250 square inches of space. Maybe a producer would have six hens in that cage, laying eggs. That's an average of less than 42 square inches per chicken (250 square inches ÷ 6 hens = 41.6 square inches/hen).

Then, imagine if the producer agreed that each hen would have at least 56 inches of space. All of a sudden, a cage with 250 square inches of space couldn't hold six hens. A cage

13

with 250 square inches of space could hold only four hens (250 square inches ÷ 56 square inches/hen = 4.46 hens).

All else being equal, more space per bird equals fewer birds in the cage.

Fewer hens could fit in each cage. And fewer hens would lead to fewer eggs from the hens in that cage. That's because four hens produce fewer eggs than six hens. (That's the theory, anyway. It was hotly contested at trial.)

Plaintiffs contended that the animal-welfare aspect to the UEP Certified Program (including the cage-space requirements) was a ruse in the roost. According to Plaintiffs, the real purpose of the UEP Certified Program was to restrict the supply of eggs. As Plaintiffs saw it, more space for hens equaled fewer hens. Fewer hens meant fewer eggs. And fewer eggs meant higher prices.

For their part, Defendants argued at trial that the UEP Certified Program was a bona fide effort to satisfy customer demand. In Defendants' view, the UEP Certified Program was a natural response to pressure from animal-welfare groups, buyers, and end consumers. According to Defendants, they felt pressure to make life better for hens.

In that vein, Defendants presented substantial evidence that the grocery stores and other customers demanded animal-welfare standards. So did consumers. And so did animal-rights groups.

For example, before adoption of the UEP Certified Program, Cal-Maine lost McDonald's as a customer after McDonald's demanded producers expand the size of cages for their hens. *See* Defs.' Ex. 182. And within a few years of the creation of the UEP Certified Program, grocery chains like Walmart and Kroger would purchase eggs only from UEP Certified producers. *See* Defs.' Exs. 329, 374, 639.

14

According to Defendants, they were simply responding to market demand when they implemented the cage-space restrictions in the UEP Certified Program. The jury heard evidence that the UEP Certified Program was a legitimate animal-welfare program. Specifically, Defendants pointed out that the UEP created the standard after following the guidance of a Scientific Advisory Committee.

That Committee consisted of an all-star team. *See* 11/1/23 Trial Tr., at 3085:25 (Dckt. No. 657) (Armstrong) ("I was very, very pleased. We put our dream team together."). It was chaired by a leader in the field, Dr. Jeffrey Armstrong, who has degrees in physiology, and specializes in the reproductive physiology of farm animals. *See* 11/1/23 Trial Tr., at 3074:19-25 (Dckt. No. 657) (Armstrong). Reproductive physiology of farm animals is what it sounds like – how animal reproduction works. *Id.* at 3075:1-10.

In sum, the jury learned about the UEP Certified program, and about its standards. And the jury heard dueling views about the purpose of the program.

Again, Plaintiffs alleged that the UEP Certified Program was a backdoor way to restrict supply. Plaintiffs told the jury that the program required the birds to have more space. More space equals fewer hens in each cage. And fewer hens means fewer eggs.

**D.    The United Voices Newsletters.**

Along the way, the jury heard lots of evidence about an industry publication prepared by UEP called United Voices. The United Voices newsletter contained a series of discussions about conditions in the egg market. As an aside, United Voices is an awkward name for an industry publication in an antitrust case.

Plaintiffs presented plenty of evidence that the UEP used the United Voices newsletters to promote a conspiracy. *See, e.g.*, Pls.' Ex. 268 (April 19, 1999 United Voices editorial from

15

Ken Looper, a Cal-Maine executive and the then-UEP chairman, recommending industry-wide "hen disappearance" to keep prices up) ("The key to profitable prices the last half of 1999 is the number of old hens that disappear between now and December 31, 1999.").

Plaintiffs also presented evidence that the industry coordinated joint action through UEP meetings and materials. *See, e.g.*, Pls.' Ex. 386 (UEP Marketing Committee report from October 14 and 15, 1999 stating that Cal-Maine CEO Dolph Baker, also chair of the Committee, moved to recommend industry measures to reduce supply) ("Committee Chairman Dolph Baker and UEP Chairman Ken Looper presented a number of statistical reports showing a history of hen inventory and egg prices. . . . They suggested that if the egg industry did not voluntarily adjust the supply side of our business, very quickly, that prices would be at record low figures and all those producing eggs would realize severe financial losses."); Pls.' Ex. 1 (August 2, 1999 report from Don Bell, a UEP consultant, suggesting an industry-wide reduction in flock size, chick hatches, and a policy of minimum floor space) ("You will also be asked if you would participate in a supply adjustment program. Don Bell has suggested that corrections in the nation's flock size can be attained by one of several means. They include: . . . [a]n industry-wide policy of a minimum floor space allowance[.]"); Pls.' Ex. 641 (UEP Marketing Committee meeting minutes from June 4, 2001) ("Baker stated the purpose of the call was to consider an action plan to address the current over supply of shell eggs. . . . Baker noted that he and Gregory had submitted for the committee's consideration recommendations of an action plan that called for early hen disposal and early molt. Larry Seger stated that we need to recognize the reasons and understand the logic that has created our current over supply problem."); Pls.' Ex. 788 (March 2008 presentation from UEP President Gene Gregory – shared internally at Moark – reporting on the

"market benefits" of the Program); Pls.' Ex. 193 (October 9, 2002 motion by Moark executive for the UEP Certified Program to adopt the 100% rule, which carried).

## III.    Procedural History

With those facts in mind, the Court turns to the procedural history.  Plaintiffs filed suit in December 2011.  *See* Cplt. (Dckt. No. 1).  A lot has happened in the decade-plus since this case first hit the docket.

Soon after Plaintiffs filed their complaint, the case was transferred to the Eastern District of Pennsylvania by the Judicial Panel on Multidistrict Litigation.  *See* 1/3/12 Transfer Order (Dckt. No. 13).  The case was one of several egg antitrust cases that were consolidated for pretrial purposes.  *See* Case Mgmt. Order No. 1, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2008) (Dckt. No. 3); *Conditional Transfer Order*, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2011) (Dckt. No. 605).

For seven and a half years, the parties litigated in the Eastern District of Pennsylvania before Judge Pratter.  *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa.).  The parties completed discovery and filed dispositive motions before Judge Pratter.  *See* Joint Status Report, at 2 (Dckt. No. 234).

The MDL court narrowed the case.  For starters, Judge Pratter granted Defendants' motion to dismiss as time-barred claims for damages from the period before September 24, 2005.  *See In re Processed Egg Prods. Antitrust Litig.*, 2013 WL 4504768, at *8 (E.D. Pa. 2013).

Initially, the MDL court granted Defendants' motion for summary judgment, dismissing all claims based on egg products for lack of antitrust standing.  *See In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 4670983, at *4 (E.D. Pa. 2016).  But the Third Circuit reversed on appeal.  *See In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 276 (3d Cir. 2018).

After remand, Defendants moved for summary judgment again. This time, they argued causation. Defendants argued that Plaintiffs failed to demonstrate "that a reduction in the overall supply of eggs *caused* an increase in the price of egg products." *See In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 506 (E.D. Pa. 2019) (emphasis in original).

Judge Pratter denied Defendants' second motion for summary judgment. The MDL court concluded that Plaintiffs had "produced evidence that allows them to argue that an overall reduction in the supply of eggs could have affected egg products prices." *Id.* at 507. Judge Pratter explained that Plaintiffs could argue that prices for egg products increased because the egg supply fell at large.

After denying Defendants' second summary judgment motion, Judge Pratter suggested sending the case back to this district, where it was initially filed. *See* Remand Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2019) (Dckt. No. 1917). "Pretrial proceedings in this case have been completed, and this case is ready for trial in the transferor district." *Id.* at 1.

The Judicial Panel on Multidistrict Litigation agreed and remanded the case in 2019. *See* Conditional Remand Order (Dckt. No. 14). The case was originally assigned to Judge Norgle, who presided over the case until he retired from public service in October 2022. *See* 9/16/19 Exec. Comm. Order (Dckt. No. 15); 10/5/22 Exec. Comm. Order (Dckt. No. 226). A spate of reassignments followed, until the case finally arrived on this Court's docket. *See* 11/21/22 Exec. Comm. Order (Dckt. No. 236).

As an aside, Judge Pratter presided over two trials brought by other plaintiffs in the MDL proceedings. UEP, USEM, and Rose Acre went to trial in those cases. Cal-Maine did not.

The juries in both of those cases reached defense verdicts.  *See* Judgment Order, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. 2018) (Dckt. No. 1767); Joint Status Report, at 3 (Dckt. No. 234).  The Third Circuit upheld the judgments in both cases.  *See In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719 (3d Cir. 2020); *In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x 142 (3d Cir. 2021).

## IV.    The Trial

After reassignment, this Court scheduled trial for October 2023.  *See* 12/19/22 Order (Dckt. No. 249).  The Court granted Defendants' motion to bifurcate the trial into two phases:  a liability phase and a damages phase.  *See* 7/18/23 Order (Dckt. No. 261); 8/11/23 Mem. Opin. & Order (Dckt. No. 272).

The Court turned to the motions *in limine*.  *See* 12/14/22 Order (Dckt. No. 247).  The parties filed nearly twenty motions *in limine*, covering a lot of ground.  *Id.*  To help the parties prepare for trial, the Court issued rulings on each motion *in limine* before trial.  *See* 8/11/23 Order (Dckt. No. 275); 8/21/23 Mem. Opin. & Order (Dckt. No. 277); 8/31/23 Mem. Opin. & Order (Dckt. No. 285); 8/31/23 Mem. Opin. & Order (Dckt. No. 286); 8/31/23 Mem. Opin. & Order (Dckt. No. 287); 9/15/23 Mem. Opin. & Order (Dckt. No. 292); 9/18/23 Mem. Opin. & Order (Dckt. No. 294); 9/19/23 Order (Dckt. No. 296); 9/19/23 Order (Dckt. No. 297); 9/19/23 Order (Dckt. No. 298); 9/19/23 Order (Dckt. No. 299); 9/19/23 Order (Dckt. No. 300); 9/19/23 Order (Dckt. No. 301); 9/19/23 Order (Dckt. No. 302); 9/19/23 Order (Dckt. No. 303); 9/19/23 Order (Dckt. No. 304); 10/16/23 Order (Dckt. No. 368); 10/16/23 Order (Dckt. No. 369).

Jury selection began on October 17, 2023, and the jury heard closing arguments in the liability phase of the trial on November 17, 2023.  At trial, the jury heard from a wide range of

witnesses, including expert witnesses and fact witnesses, and the parties introduced scores of exhibits into evidence. *See* Parties' Admitted Exhibits (Dckt. No. 542).

The mountain of exhibits included many editions of UEP's newsletter, United Voices. *Id.* The United Voices newsletter contained a series of discussions about egg market conditions.

Plaintiffs also introduced minutes from UEP committee and board meetings, along with internal memoranda from Rose Acre and Cal-Maine. *Id.* Defendants introduced exhibits in support of their theory that the UEP Certified Program was a customer-led initiative, including communications sent by personnel from grocery chains. *Id.*

Many witnesses testified in person.

The jury heard in-person testimony from a handful of executives from Cal-Maine and Rose Acre, including Cal-Maine CEO Dolph Baker and Rose Acre CEO Marcus Rust. The jury also heard in-person testimony from people who formerly and currently buy eggs for Plaintiffs, including Scott Manion (Kraft) and Kelley Tobey (Kellogg).

Each side called an economist as an expert witness. Plaintiffs offered expert testimony from Dr. Michael Baye. Defendants offered expert testimony from Dr. Jonathan Walker.

The Court allowed one witness, former Walmart egg buyer Gary Pickett, to testify remotely. *See* 8/11/23 Order (Dckt. No. 275).

Given the age of the case, many witnesses had passed away or were otherwise unavailable. So, the jury heard testimony from many witnesses by deposition designation. The jury heard some read-in testimony from the prior trials, too. The parties raised objections to many lines of designated testimony. *See* 10/20/23 Order (Dckt. No. 381).

The Court went through the objected-to testimony, line by line, each night of trial. It provided the parties with its rulings in an easy-to-read chart format so that they could prepare the

20

videos to show the jury. *See* 10/23/23 Order (Dckt. No. 387) (Bell); 10/25/23 Order (Dckt. No. 402) (Reickard); 10/26/23 Order (Dckt. No. 412) (Rust); 11/1/23 Order (Dckt. No. 443) (Tran); 11/3/23 Order (Dckt. No. 457) (Airoso); 11/3/23 Order (Dckt. No. 458) (Amundson); 11/3/23 Order (Dckt. No. 459) (Brown).

Overall, the parties engaged in spirited debate about a wide range of issues throughout the trial. The length of the docket – which now spans 700-plus entries – reflects the level of disagreement between the sides. The Court presided over many discussions outside the presence of the jury, at breaks and after hours. The parties didn't agree about much, and the Court heard both sides out.

As one might expect, jury instructions were a heavy lift for the Court and the parties alike. The Court presided over six jury instructions conferences. The Court heard extensive argument on the proposed instructions and the jury verdict form. *See* 11/16/23 Order (Dckt. No. 554).

Some of the hearings were lengthy (which is fine). The fifth jury instructions conference lasted about six hours. *See* 11/16/23 Order (Dckt. No. 535).

One of the main sticking points was whether the rule of reason, or a *per se* rule, applied to the restraints in question. The Court ultimately ruled that the rule of reason – not the *per se* rule – applied. *See* 11/15/23 Order (Dckt. No. 527); 11/16/23 Order (Dckt. No. 539).

Restraints of trade are only unlawful under the Sherman Act if they are unreasonable. *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021).

"[M]ost antitrust claims are analyzed under a rule of reason[.]" *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (cleaned up); *see also Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012). However, the *per se* rule applies in a small set of cases where "experience with [that]

particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982).

The Court gave a lengthy oral ruling explaining its decision to apply the rule of reason to each prong of the conspiracy. *See* 11/21/23 Tr. (Dckt. No. 680).

The Court addressed the UEP Certified Program first. The record contained substantial evidence of customer demand for UEP Certified eggs. The record also contained evidence about the benefits of creating an industry standard. And the UEP Certified Program did not constitute a naked supply restriction, since it didn't prevent egg producers from building more henhouses or farms, expanding their flock sizes, or adding more cages. If they wanted to, a producer could build more hen houses (with roomier cages), and add more hens to the flock.

The jury also heard evidence that reducing the number of hen-laying eggs in each cage would not necessarily reduce the number of eggs. The idea was that happier chickens are more productive chickens. And fewer, happier chickens might produce more eggs than a greater number of unhappy chickens.

Overall, the rule of reason applies when courts do not have enough experience with a certain type of restriction that they can confidently declare that it will have anticompetitive effects. And here, this Court could not declare definitively that the conduct would have anticompetitive effects. At a high level, it is easy to say that a reduction in supply of eggs would increase prices. But it is harder to say that the animal-welfare rule would reduce the supply of eggs. And it was even harder to declare that the rules were anticompetitive given customer demand.

Then, the Court turned to the short-term measures. Some evidence in the record suggested that early molting could actually *increase* supply. In a similar vein, some evidence

suggested that early slaughter could increase supply, too, assuming that less productive chickens were replaced with more productive birds.

Finally, the Court addressed exports. The record included some evidence that producers exported eggs at a loss. But the record was mixed. USEM voted on exports several weeks in advance of the scheduled export date – and prices could change between the vote and the export date. *See* Walker Report, at 104 (Dckt. No. 502-1). Additionally, some evidence in the record suggested that, even if producers lost money on certain individual exports, exports were a net gain. *See* Pls.' Ex. 635.

Overall, the record included some evidence that each of the alleged restraints was procompetitive. And federal courts do not have a lot of experience with these types of restraints, especially when it comes to consumer demand and animal welfare. So in the end, the Court instructed the jury using the rule of reason.

At the close of evidence in the liability phase, Defendants filed motions for a directed verdict under Rule 50(a). *See* Dckt. Nos. 520, 522, 524. The Court deferred briefing on those motions pending completion of the trial.

The jury began deliberating on November 17, 2023, and continued deliberating on November 20, 2023. *See* 11/17/23 Order (Dckt. No. 555); 11/20/23 Order (Dckt. No. 560). The jury reached its verdict on November 21, 2023. *See* 11/21/23 Order (Dckt. No. 562).

The jury returned a verdict in favor of Plaintiffs. *Id.* It found that Defendants had participated in a conspiracy to restrict the supply of eggs and that the conspiracy included the short-term measures, the exports, and the UEP Certified Program. *See* Phase 1 Jury Verdict, at 2–3 (Dckt. No. 582).

23

Plaintiffs prevailed on some, but not all, of the period. The jury concluded that Plaintiffs suffered an injury from October 2004 through December 2008. *Id.* at 6. But it found that Plaintiffs did not suffer an injury from 2009 to 2012. *Id.*

One of the hotly-contested issues was whether other producers were members of the alleged conspiracy. So this Court included a question on that topic in the jury verdict form. The form asked the jury to decide whether three non-parties – Michael Foods, Moark, and Wabash Valley – participated in the conspiracy to reduce the supply of eggs.

The jury found that Moark and Wabash Valley were part of the conspiracy. *Id.* at 4. But it found that Michael Foods did *not* participate in the conspiracy. *Id.*

In a similar vein, the verdict form also asked the jury to decide whether "every egg producer who joined the UEP Certified Program through 2008 (whether or not a member of UEP) participated in the conspiracy to restrict the supply of eggs." *Id.* at 7. The jury answered "NO." *Id.*

Because the jury returned a Plaintiffs' verdict on liability, the trial headed to phase two (meaning, the damages phase).

Before the damages phase, Plaintiffs filed a statement about the damages that they intended to seek. *See* Plaintiffs' Statement Regarding Damages (Dckt. No. 592). Plaintiffs revealed that they intended to seek $25,396,542 as overcharges from the supply restrictions in the UEP Certified Program. *Id.* at 2. Plaintiffs also intended to seek $5,746,961 in damages from the exports. *Id.* at 3.

The Court issued a number of oral rulings on pending motions before the damages phase began. *See* 11/28/23 Order (Dckt. No. 625); 11/28/23 Order (Dckt. No. 626); 11/28/23 Order (Dckt. No. 627); 11/28/23 Order (Dckt. No. 628). This Court trimmed a few of Plaintiffs'

witnesses due to late disclosures. *See* 11/28/23 Order (Dckt. No. 626) ("The disclosure is an expert gap filler, a belated backdoor backstop for opinions that Plaintiffs' own expert could not and did not provide. It's backfilling, as it were."). The rulings had the effect of reducing the amount of damages that Plaintiffs requested from the jury.

During the damages phase, the jury heard a second round of testimony from Dr. Baye (Plaintiffs' expert) and Dr. Walker (Defendants' expert). *See* 11/2/9/23 Order (Dckt. No. 629).

In the end, Plaintiffs requested only nominal damages for the short-term measures, and for the exports. *See* 11/30/23 Trial Tr., at 7304:18 – 7305:1 (Dckt. No. 684) (Plaintiffs' Damages Closing Argument) ("[W]e're only seeking nominal damages for the short-term measures and the exports. . . . [B]ecause there was injury, and . . . the exact damages are not quantifiable[.]").

Plaintiffs also asked the jury to award damages for the UEP Certified Program. *Id.* at 7324:16-23. They rooted their request in Dr. Baye's regression analysis. *Id.* at 7325:11-12. Altogether, Plaintiffs asked the jury to award about $25.4 million. *Id.* at 7325:11-16 (derived from $18.3 million for Kraft Foods Global, $4.6 million for The Kellogg Company, $1.3 million for General Mills, and $1.2 million for Nestle).

The jury awarded Plaintiffs nominal damages for the exports and short-term measures. *See* Phase 2 Jury Verdict, at 3 (Dckt. No. 634). The jury awarded $1 to each of the four Plaintiffs for the short-term measures, and $1 to each of the four Plaintiffs for the exports. That's $8.

The jury awarded more substantial damages for the portion of the conspiracy involving the UEP Certified Program. *Id.* at 4. It awarded $12,830,502 to Kraft, $3,223,766 to Kellogg,

$913,928 to General Mills, and $809,383 to Nestle. *Id.* In total, that amount comes out to about $17.8 million. Trebled, the damages are more than $53 million.

At the close of the evidence during the damages phase, Defendants filed revised motions for judgment as a matter of law under Rule 50(a) that addressed the sufficiency of evidence on damages (in addition to their prior arguments about liability). *See* Dckt. Nos. 607, 610, 621. In light of Defendants' amended filings, the Court deemed the original filings superseded. *See* 11/30/23 Order (Dckt. No. 631). The Court told that parties that it would rule on the updated version of the motions under Rule 50(a). *Id.*

## Legal Standard

Rule 50 of the Federal Rules of Civil Procedure permits a court to override a jury's verdict and enter judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *See* Fed. R. Civ. P. 50(a)(1).

Rule 50 imposes a "high bar." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). "Only if no rational jury could have found for the nonmovant may [a court] disturb the jury's verdict." *Id.* A district court must not set aside a jury verdict lightly.

The district court must "give the nonmovant 'the benefit of every inference' while refraining from weighing for [itself] the credibility of evidence and testimony." *Id.* (quoting *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018)). The court looks at the "entire trial," but it "must 'disregard all evidence favorable' to the movant that 'the jury is not required to believe.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51 (2000)).

26

The burden is heavy, and the climb is steep. The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court may grant judgment as a matter of law only when "there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

### Analysis

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *See* 15 U.S.C. § 1. The Supreme Court interprets the Sherman Act as having a "reasonableness" requirement. It "has long recognized that Congress intended to outlaw only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added).

To prevail on a section 1 claim, "a plaintiff must show the following three prongs: '(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury.'" *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (quoting *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012)).

With that framework in mind, the Court turns to Defendants' arguments about why the jury verdict cannot stand. Defendants challenge the jury verdict on a number of different grounds.

First, Defendants argue that there is no evidence that Rose Acre and Wabash Valley agreed to participate in a conspiracy.

Second, Defendants contend that Plaintiffs failed to prove the existence of market power.

Third, Defendants challenge the verdict about the exports and short-term measures.

27

Fourth, Defendants believe that a conspiracy could not have existed because of the lack of enforcement mechanisms.

Finally, Defendants question the sufficiency of the evidence about an antitrust injury before August 2005.

I.      **The Existence of an Agreement**

The Court begins with whether Plaintiffs presented sufficient evidence of an agreement to conspire.

The argument is somewhat limited. Rose Acre argues that there was insufficient evidence that it joined a conspiracy. Defendants make a similar argument about Wabash Valley, a non-defendant.

But the other Defendants make no such argument about themselves. Cal-Maine does not argue that the jury did not hear sufficient evidence that it joined a conspiracy. The two industry groups, UEP and USEM, don't take issue with the sufficiency of the evidence, either.

So, for present purposes, the only question is whether the jury heard sufficient evidence that Rose Acre and Wabash Valley participated in a conspiracy.

Plaintiffs' theory was based on what's known as a "hub-and-spoke conspiracy." "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (7th Cir. 2015). "A hub-and-spoke conspiracy is simply a collection of vertical and horizontal agreements." *Id.*

A hub-and-spoke conspiracy "requires a plaintiff to allege both that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020).

As an aside, from a rhetorical standpoint, the hub-and-spoke metaphor might need a little TLC. It conveys the concept of a center, and a periphery, with some interconnectivity. But that's about it. When people look at wheels on a bicycle, they probably don't ponder the spokes and the rim very much. The analogy feels like a flat tire. *See In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d at 1192 ("Of course, homespun metaphors for complex economic activities go only so far.").

Maybe a better analogy is a bullhorn. The person at the center of the conspiracy is holding a megaphone. That central character blasts a message out to everyone in earshot, and gets other people to do their bidding and participate in the alleged conspiracy. The group then agrees amongst themselves to get on board and get in the game. There's a leading player, and lackeys who sign up, join in, and pile on.

A bullhorn theory – with a central spokesperson, delivering a message to all – seems more intuitive than a theory about a wheel that spins round and round. It's like a mob boss, and a mob.

Another possible analogy is a coach and a team. A coach barks out orders to the basketball team, giving direction and telling people what to do. And then, the squad takes in the message and works together to achieve the common objective. Everyone is on the same team, but there is a central authority calling the shots and running the show.

Terminology aside, the idea is that the conspiracy had a center of gravity. Here, the industry associations conceived and coordinated the conspiracy, and communicated the message to the producers. And then the producers joined in. The UEP and USEM were at the center, and the producers were around the rim.

Plaintiffs alleged a conspiracy to restrict supply. So they had to show that the "spokes" in the hub "would not have attempted to inflate prices without assurance that each distributor was abiding by the agreement and behaving in the same way." *Marion Healthcare*, 952 F.3d at 842.

"Proof that the rim or horizontal conspiracy exists can consist of evidence of direct communication among the conspirators, but such communications are not necessary. The existence of a rim conspiracy can be inferred if the vertical agreements contravene the horizontal competitors' own interests had they acted independently. In other words, if the evidence suggests the horizontal competitors would not have undertaken the common action without reasonable assurances all competitors would agree to the vertical agreement, proof of the horizontal agreement can be established." *See* 1 J. Kalinowski, Antitrust Laws and Trade Regulation § 11.04[4] (2d ed. 2024).

Defendants argue that Plaintiffs offered insufficient proof about whether certain alleged co-conspirators agreed to join the scheme. The Court will address sufficiency of the evidence for Rose Acre first, then turn to Wabash Valley.

Before diving in, the Court reiterates one overarching point. Four Defendants went to trial. Only one of the four Defendants, Rose Acre, now argues that the evidence was insufficient to support a finding that it participated in a conspiracy. The other three Defendants – Cal-Maine, UEP, and USEM – do not argue that the jury heard insufficient evidence of a conspiracy.

30

*Rose Acre*

Rose Acre argues that Plaintiffs offered "no proof that Rose Acre joined the Certified Program because it was agreeing with other egg producers to reduce the supply of eggs." *See* Def. Rose Acre's Mem., at 12 (Dckt. No. 611). That's incorrect.

The evidence plausibly supports the inference that Rose Acre knew that the UEP was coordinating a conspiracy to reduce supply. And the evidence supports the inference that Rose Acre knew this reality both before joining and while it was part of the UEP. But Rose Acre nonetheless chose to join and stay with the UEP and the UEP Certified Program.

After reviewing the record as a whole, and drawing all reasonable inferences in favor of Plaintiffs, the Court concludes that the record includes enough evidence to support a finding that Rose Acre joined the UEP Certified Program to restrict supply.

Rose Acre was not historically part of the UEP. But Rose Acre joined the UEP and agreed to participate in the UEP Certified Program in 2002. *See* 11/8/23 Trial Tr., at 4347:3-23 (Dckt. No. 666) (Rust); 11/07/23 Trial Tr., at 4046:19 – 4047:1 (Dckt. No. 664) (Hinton).

Rose Acre could have participated in the UEP Certified Program, without becoming a member of the UEP. But Rose Acre wanted to be "involved totally with the process" of developing the program. *See id.* at 3359:19-20; *see also* Pls.' Ex. 501 (2005 letter from Rose Acre to Kraft in which Rose Acre stated that it was a "*big part* of this program since its inception [i]n 2002.") (emphasis added).

After Rose Acre joined the UEP, Rose Acre CEO Marcus Rust served on UEP's board of directors, and he and other executives were on various committees of the UEP. *See* 11/8/23 Trial Tr., at 4359:25 – 4360:7 (Dckt. No. 666) (Rust). Rust wanted to serve on the board of directors so that he could get "a vote at the table." *Id.* at 4360:14-15.

31

Plaintiffs presented testimony that could support an inference that Rose Acre joined the UEP to participate in the conspiracy to reduce supply. Much of the testimony came from Rose Acre CEO Marcus Rust himself.

Rust's testimony revealed that even *before* joining the UEP, he was suspicious that the UEP was coordinating supply restrictions:

> Q:    Is one of the things that you were suspicious of, prior to joining UEP, is that UEP was coordinating egg producers to restrict the supply of eggs to boost prices?
>
> A:    We were suspicious.

*See* 3/5/14 Rust Dep. Tr., at 186:21 – 187:3 (Dckt. No. 392-56).

At trial, Rust testified that after Rose Acre joined the UEP, he "always" had concerns that the UEP was coordinating a supply restriction to boost prices:

> Q:    The concern that you and your mother had when you were talking on March 26th, 2002 was that the UEP was coordinating egg producers to restrict supply of eggs to boost prices?
>
> A:    We always had that concern, not necessarily that night, but we always had that concern.
>
> Q:    So by "always," do you mean from that time till the end of 2008? Did you have that concern the whole time?
>
> A:    It was always an underlying thing that, you know, we thought about.

*See* 11/8/23 Trial Tr., at 4472:1-9 (Dckt. No. 667) (Rust). And again:

> Q:    Now, you have testified about the concerns you had going into the program about whether it was a supply management program designed to reduce the number of birds to raise domestic prices, right, sir?
>
> A:    Yes.

*See* 11/8/23 Trial Tr., at 508:11-15 (Dckt. No. 667) (Rust).

Plaintiffs also introduced an email sent by Marcus Rust to his brother (John Rust) in February 2008, where Marcus relayed those same suspicions. The email suggested that the animal-welfare program was a disguised effort to boost prices. "I don't think we have anything to be ashamed of by putting as many birds per cage as conditions permit as that is doing what is economically right for customers . . . rather than trying to restrict cage space *to boost prices under the alleged agenda of animal rights*." *See* Pls.' Ex. 574 (emphasis added).

Marcus Rust was not the only person at Rose Acre with suspicions. He testified that some members of his family also suspected that the purpose of the UEP Certified Program was to boost prices. *See* 3/5/14 Rust Dep. Tr., at 188:1 – 189:4 (Dckt. No. 392-56) ("Q: Some of your family members were suspicious of that [*i.e.*, using animal welfare as a guise to boost prices]? A: Yes."); *see also* Pls.' Ex. 208 (a handwritten note from March 2002 from Lois Rust to Ky Hendrix reading: "KY, talked to Marcus last night about UEP guidelines. They are good, but we are *concerned with* what looks like *the underlying purpose of the whole thing*") (emphasis added).

Plaintiffs also introduced a memorandum dated March 14, 2002, that could further imply that others at Rose Acre knew the true rationale behind the UEP Certified Program. *See* Pls.' Ex. 213.

In the memorandum, Ky Hendrix (a Rose Acre employee and Marcus Rust's brother-in-law) opined that profit – not animal welfare – was the motivating force behind the UEP Certified Program. He wrote, "I don't really know what this whole motive is but *I think there is more to it than Animal Welfare*. I think some people think [the UEP Certified Program] will *make them rich or something*." *See* Pls.' Ex. 213.

33

Hendrix sent the memorandum to other members of the Rust family (Lois Rust, Anthony Rust, and Marcus Rust), as well as other top Rose Acre employees (Victor Rigterink and David Hurd). *Id.* The Rust family's matriarch, then-Rose Acre President and CEO Lois Rust, also saw it and made handwritten notations on top of it. *Id.*; *see also* 10/26/23 Trial Tr., at 2238:24 – 2239:2 (Dckt. No. 651) (Rust); 11/8/23 Trial Tr., at 4350:24 – 4351:1 (Dckt. No. 666) (Rust).

Plaintiffs presented evidence that Rose Acre didn't do anything about its suspicions while it was a part of UEP. Marcus Rust testified that he didn't do anything about his suspicions while Rose Acre was part of the UEP:

> Q:    Did you believe between 2002 and 2008 that there were some producers who were trying to use the certified program as an economic tool?
>
> A:    We suspected that at times.
>
> Q:    Well, you suspected it based on what they said?
>
> A:    Sometimes.
>
> Q:    What [sic] you heard?
>
> A:    Just, yeah, in general.
>
> Q:    And did you write to them and say you shouldn't be doing that?
>
> A:    No. It wasn't in my place to tell someone how to run their business.

*See* 11/8/23 Trial Tr., at 4512:8-19 (Dckt. No. 667).

Plaintiffs also presented evidence that Rose Acre was not merely complacent, but was a willing participant in the conspiracy.

The jury heard testimony from Rust that Rose Acre supported the 100% Rule to prevent other companies from gaining a market advantage (again, the 100% Rule requires that all of a

34

UEP Certified producer's eggs be certified). *See* 10/30/23 Trial Tr., at 2365:7-12 (Dckt. No. 652) (Rust) ("Q: Okay. So you thought that if somebody wanted to make a certified egg and truthfully sell it as a certified egg and also make an uncertified egg and sell it as an uncertified egg, that he would have a competitive advantage over you? A: Yes."); *see also* 11/8/23 Trial Tr., at 4523:13 – 4524:2 (Dckt. No. 667) (Rust); Pls.' Ex. 119, at 1 (December 30, 2005 email from Marcus Rust to Gene Gregory in which Rose Acre threatened to "drop out of UEP if . . . leeway [was] granted" on the 100% Rule); Pls.' Ex. 292 (an August 2007 draft letter from Rose Acre to the USDA urging the USDA to reconsider its program that did not require 100% commitment across a producer's facilities).

Plaintiffs also presented evidence that Marcus Rust wanted to ensure privacy for conference calls discussing "pricing issues." *See* Pls.' Ex. 50 (August 9, 2007 email from Marcus Rust to Larry Seger stating that "anytime we are talking of issues that would stabilize and possibly influence the market [the call] should be held on a little more stricter conf call level"). A reasonable jury could infer that Rust wanted to maintain confidentiality because Rose Acre agreed to conspire to restrict egg supply. *See, e.g.*, *Cont'l Distrib. Co. v. Somerset Importers, Ltd.*, 411 F. Supp. 754, 757 (N.D. Ill. 1976) ("Ordinarily, secrecy and concealment are essential features of a successful conspiracy."); *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 127 (7th Cir. 1978).

A desire for confidentiality isn't necessarily nefarious. People want confidentiality for all sorts of legitimate reasons. The notion that Rose Acre wanted confidentiality to hide a conspiracy is not a necessary inference. And it may not be the most reasonable inference, either. But it is a plausible inference that a reasonable jury could draw, especially in light of the record as a whole.

35

Rose Acre did not join the USEM until 2006. 11/8/23 Trial Tr., at 4373:1-2 (Dckt. No. 666) (Rust). After Rose Acre joined the USEM, Marcus Rust served on the USEM board and on its export committee. *Id.* at 4373:8-16.

Rose Acre participated in some exports at a loss. *See* 11/7/23 Trial Tr., at 4157:7-14 (Dckt. No. 665) (Hinton). A reasonable jury could infer that the company was willing to lose money on exports because it knew that exports would decrease the supply of eggs in the United States, thus leading to increased domestic prices. *See* 10/30/23 Trial Tr., at 2357:11-14 (Dckt. No. 652) (Rust) (testimony from Marcus Rust that "a small change in the egg supply can have a big impact on the price of eggs").

To be sure, Rose Acre executives testified that they joined the Certified Program because of customer demand for an animal-welfare program. *See* Def. Rose Acre's Mem., at 12 (Dckt. No. 611). The jury heard it, but didn't buy it.

In sum, Plaintiffs introduced enough evidence for a reasonable jury to find that Rose Acre agreed with other egg producers to reduce the supply of eggs. A reasonable jury could have found that Rose Acre agreed to join the UEP Certified Program to reduce egg supply.

### *Wabash Valley*

Defendants argue that Plaintiffs failed to prove that non-defendants Wabash Valley and Michael Foods were knowing members of the conspiracy to restrict supply. *See* Def. Cal-Maine's Mem., at 6 (Dckt No. 622) ("Plaintiffs failed to prove either MFI or Wabash Valley were knowing members of an alleged conspiracy to restrict supply.").

Part of the argument has fallen by the wayside. The jury found that Michael Foods did *not* participate in the conspiracy. *See* Phase 1 Jury Verdict, at 4 (Dckt No. 582).

So, the Court will simply focus on the sufficiency of the evidence about Wabash Valley.

36

A plaintiff must prove the knowing involvement of each co-conspirator in the alleged conspiracy. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 430 (1978). Attendance at industry meetings isn't enough for antitrust liability. *See In re Broiler Chicken Antitrust Litig.*, 2023 WL 7220170, at *23 (N.D. Ill. 2023).

As Defendants see it, the record offers slim pickings about Wabash Valley. According to Defendants, the evidence in the record shows only that the affiliates of Wabash Valley attended certain meetings and sold exports. *See* Def. Cal-Maine's Mem., at 6 n.1 (Dckt No. 622). Not so.

Wabash Valley CEO Larry Seger served key roles in both UEP and USEM. Seger was chairman of USEM and on its board of directors. *See* Pls.' Exs. 179, 244, 635. As USEM chairman, Seger decided (with Gene Gregory) whether to take an export to USEM's committee for a vote. *See* 10/26/23 Trial Tr., at 2160:14 – 2162:13 (Dckt. No. 650) (Reickard); 10/26/23 Trial Tr., at 2186:25 – 2187:11 (Blizzard).

Likewise, Seger was on the UEP Marketing Committee and the UEP Board of Directors. He voted for the short-term measures that passed. *See* Pls.' Exs. 410, 641, 827.

The jury also heard that Wabash Valley played a role in shaping the UEP Certified Program. For instance, the jury heard that Seger seconded a successful motion for the 100% Rule. *See* Pls.' Ex. 85 (October 10, 2006 Animal Welfare Committee meeting minutes) ("Motion: It was moved by Hendrix and seconded by Seger that stated the following: 'Any company which sells or markets UEP Certified shell eggs or egg products may be approved to sell UEP Certified shell eggs and egg products if, and only if, the following schedule is met and maintained: . . . 2011 – 100% of all shell eggs and egg products sold or marketed as Certified.'") (emphasis omitted).

The evidence wasn't overwhelming. But it was enough (maybe *just* enough).

Based on the record, a reasonable jury could have concluded that Wabash Valley was a knowing co-conspirator, not simply an attendee at trade association meetings.

*     *     *

In sum, a reasonable jury could find that Rose Acre and Wabash Valley were knowing co-conspirators. That conclusion wasn't inevitable. But on this record, it was permissible.

## II.  The Relevant Market

Next, Defendants make an argument about the connection between shell eggs and egg products. Remember, egg products are anything made from the liquid inside a shell egg.

The argument is about whether an increase in the price of shell eggs would lead to an increase in the price of egg products. Defendants argue that Plaintiffs "failed to present evidence that the purported conspiracy caused an increase in the price of *egg products*," as opposed to simply the price of shell eggs. *See* Def. Rose Acre's Mem., at 13 (Dckt. No. 611) (emphasis in original).

Plaintiff's expert, Dr. Baye, analyzed the effects of the UEP Certified Program on the overall supply of eggs. *Id.* at 14. Defendants take issue with his analysis. As they see it, Plaintiffs failed to show that a reduction in total egg supply would have affected the available supply of egg products. *Id.*

To prove an antitrust violation, a plaintiff must show an unreasonable restraint of trade in a relevant market. *See Always Towing & Recovery, Inc.*, 2 F.4th at 703; *see also Agnew*, 683 F.3d at 335 ("Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area."). "A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharmacy, Inc. v.*

*Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

The key concept is substitutability, meaning the ability to switch from one product to another. One can look at substitutability from the buy side or the sell side. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) ("In defining a market one must consider substitution both by buyers and sellers . . . ."). The "buy" side looks at demand. The "sell" side looks at supply.

Basically, buyers can switch from one product to another. They can buy Product X instead of Product Y. And suppliers can switch from one product to another, too. They can make Product X instead of Product Y. If either situation accurately describes the market, then the market has substitutability.

From the buy side, a market is defined by considering "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change, such as a reduction in product quality or service." *See* 2 J. Kalinowski, Antitrust Laws and Trade Regulation § 24.04[3] (2d ed. 2024).

By way of example, imagine if the price of feathers went up, causing the price of down-filled pillows to rise. A customer in the market for a pillow might opt for a memory foam pillow instead.[1] So, the two pillows might be substitutes from the demand side – a customer could switch from one type of pillow to another.

From the supply side, manufacturers can make changes too. An ability to shift production from one product to another can reveal that the products are substitutes.

---

[1] Not every sleeper would view a foam pillow as a substitute for a feather pillow. But don't fight the hypo.

"Supply substitution factors, i.e., possible production responses, are evaluated in the context of identifying market participants, measuring market shares and assessing competitive effects and entry conditions." *Id.* "Even if two products are completely different from the consumer's standpoint, if they are made by the same producers an increase in the price of one that is not cost-justified will induce producers to shift production from the other product to this one in order to increase their profits by selling at a supracompetitive price." *See Marshfield Clinic*, 65 F.3d at 1410–11. In plain English, a manufacturer will switch to make the product that maximizes its profit given the raw materials that it has available.

For example, imagine if a company has a license to make T-shirts for Major League Baseball teams. Envision a world where the White Sox are having a lousy season, so the demand for White Sox T-shirts hits rock bottom. And then, imagine that the Cubs are having a great season, and the demand for Cubs gear goes through the roof.

A Sox fan probably wouldn't view a Cubs shirt as an adequate substitute (and vice versa). But the factory owner could easily shift production to get in on the red-hot market for Cubs gear. That's supply-side substitutability. A producer could switch production from one product to another.

A product can be a substitute for another product from the buy side or the sell side. It doesn't have to be both. That is, a *consumer* could view a feather pillow and a foam pillow as substitutes, even if it is difficult for a pillow manufacturer to switch from one pillow to another. On the flipside, a T-shirt *manufacturer* could view a Cubs T-shirt and a Sox T-shirt as substitutes, even if a Cubs fan wouldn't be caught dead in a Sox T-shirt (and vice versa).

Substitutability from the buy side or the sell side is enough to establish a relevant market. At the end of the day (and the trial), the relevant market is a question of fact for the jury. "The

40

decision as to what constitutes the relevant market is a question of fact to be determined by the judge or jury as the case may be.  The factfinder's determination can be overturned only if it is clearly erroneous."  *See* 2 J. Kalinowski, Antitrust Laws and Trade Regulation § 24.01[4][b] (2d ed. 2024).

Before closing arguments, the jury received instructions about the meaning of a relevant market.  *See* Jury Instructions, Instruction No. 36, at 39–40 (Dckt. No. 545).  The jury instruction covered substitutability from both the buy side and the sell side.  *Id.* ("You may consider whether two products are in the same product market from the supplier's perspective, or from the buyer's perspective.").

The Court also instructed the jury on the positions of the parties about the relevant market.  The jury instructions made clear that Plaintiffs viewed shell eggs and egg products as one relevant market.  And the instructions made clear that Defendants viewed them as two separate markets.

The Court instructed the jury:  "In this case, Plaintiffs contend that the relevant product market is the market for eggs, including shell eggs and egg products.  Defendants contend that shell eggs and egg products are not in the same relevant product market.  You must decide whether shell eggs and egg products are in the same product market."  *Id.*

In the end, the jury necessarily found that shell eggs and egg products are in the same product market.  The jury found that Defendants conspired to restrict the supply of eggs.  *See* Jury Verdict, at 3–4 (Dckt. No. 582).  The jury also found that the conspiracy unreasonably restrained trade "in a relevant market," and that the conspiracy caused Plaintiffs to suffer an injury.  *Id.* at 5.

Plaintiffs did not buy shell eggs – they bought egg products. So, by definition, the jury necessarily found that the conspiracy to restrict the supply of eggs increased the price of egg products and injured Plaintiffs. In other words, the jury verdict is consistent with the view that the relevant market included both shell eggs and egg products. On this record, those findings are not clearly erroneous.

From the buy side, the jury did not hear much evidence that shell eggs and egg products are substitutes. A customer like Kraft or Kellogg can't simply swap shell eggs and egg products (not without a lot of cracking, anyway). Plaintiffs' recipes called for certain egg products. They couldn't swap egg products for shell eggs in recipes for their mayonnaise and ice cream. *See, e.g.*, 10/30/23 Trial Tr., at 2416:1 – 2417:13 (Dckt. No. 652) (Manion).

The same goes for consumers at the grocery store. If you're planning to make omelets for your brunch, you're undoubtedly going to grab a dozen shell eggs. A package of powdered egg yolks probably won't cut it. That's a recipe for a bad brunch.

From the demand side, egg products and shell eggs seem like separate product markets. If you need liquid egg yolks, and only liquid egg yolks, then getting a delivery of shell eggs probably wouldn't get you very far.

But from the supply side, the story is different. Plaintiffs offered evidence suggesting that shell eggs and egg products were in a single product market from the supply side. Producers could switch from selling eggs to selling egg products (and vice versa).

For starters, Dr. Baye (Plaintiffs' expert) testified that the relevant market consisted of shell eggs and egg products because "an egg is an egg is an egg." *See* 10/30/23 Trial Tr., at 2582:2 (Dckt. No. 653) (Baye); *see also id.* at 2593:8-15 (opining that the "relevant market includes all eggs for human consumption in the United States regardless of whether they are

shell eggs or egg products"). That truism isn't that illuminating. But the broader point was about the ability of a producer to shift from producing shell eggs to egg products (and vice versa).

The jury heard testimony by Dr. Baye about the ability of egg producers to shift production. "The egg is the essential input. And producers have the ability to substitute, to divert eggs coming out of the bottom of their hens into shell eggs or into egg products. And if the price of egg products goes sky-high but the price of shell eggs didn't increase, then they could divert some eggs to making egg products potentially to defeat that price increase." *See* 10/30/23 Trial Tr., at 2596:5-11 (Dckt. No. 653) (Baye).

Basically, a producer like Rose Acre owns a bunch of hens that lay a bunch of eggs. At that point, a producer has a choice. The producer could sell the eggs as is, shell and all. Or, the producer could crack the eggs, and turn the shell eggs into an egg product like powdered egg whites or frozen whole eggs. Based on market conditions, a producer could decide to crack, or not to crack.

Some producers, such as Rose Acre, produced both shell eggs and egg products at the same facilities. So, those producers could shift from producing shell eggs to egg products (or vice versa) in response to market changes. *See, e.g.*, Pls.' Ex. 401 (December 3, 2004 email from Gene Gregory to Don Bell) (stating that breaking companies planned to sell shell eggs when they had excess eggs or when shell egg prices increased); 10/23/23 Trial Tr., at 1214:10-12 (Dckt. No. 644) (Baker) (confirming that Wabash Valley sold both egg products and shell eggs).

Plaintiffs supported their theory by pointing to egg prices on a market index called the Urner Barry index. *See* 10/30/23 Trial Tr., at 2581:21-25 (Dckt. No. 653) (Baye). The Urner

Barry index contains market data about the prices of lots of different kinds of food, like red meat, poultry, eggs, seafood, and so on.

Plaintiffs offered evidence showing that the price of breaking stock (*i.e.*, eggs used for egg products) as reported on Urner Barry was tied to the price of shell eggs. *See* Pls.' Ex. 37 (January 3, 2008 United Voices newsletter tying the increase in shell egg prices to an increase in egg product prices for 2007) ("Shell egg prices likely were the driving force for all forms of eggs."); Pls.' Ex. 627 (November 22, 2006 letter from UEP's Gene Gregory stating that exports increased the price of both shell eggs and breaking stock); Pls.' Ex. 279 (United Voices newsletter from February 14, 2007 stating that exports had increased both shell egg and egg product prices) ("[W]e must conclude that these exports have had a major positive impact upon shell egg prices and the financial conditions of shell egg producer/marketers. Likewise, the exports have improved, to a lesser degree, breaker stock prices and have benefited those producers selling eggs based upon the Urner Barry breaking stock quote."); Pls.' Ex. 362 (April 27, 2007 statement from Gregory that both shell egg and breaking stock prices rose due to an export) ("Since mid-October 2006, USEM has accepted four (4) exports for a total of 890 container loads (approximately 712,000 cases). During this period the Urner Barry Midwest Large quote has averaged 24.5 cents per dozen more than during the same period a year earlier. During the same period the Urner Barry Central Breaking Stock quote has averaged 15.5 cents per dozen more than the comparable period a year earlier.").

Additionally, Cal-Maine CEO Dolph Baker testified that a decrease in domestic egg supply would lead to an increase in both the prices of eggs and the prices of egg products. He testified:

> Q:     And the fewer eggs in the U.S. market, the higher both shell eggs
>         and egg products are on the Urner Barry system, correct?

44

A:      Correct.

*See* 10/24/23 Trial Tr., at 1514:9-12 (Dckt. No. 646).

Overall, Plaintiffs presented enough evidence for a jury to find that the prices of shell eggs were linked to the prices of egg products.  Plaintiffs also presented evidence that at least some egg producers had the capability to shift production in response to a change in prices.

In sum, the jury heard enough evidence to find that shell eggs and egg products were in the same market.  Plaintiffs offered evidence that the relevant market included all eggs, cracked and uncracked.  Defendants presented evidence that shell eggs and egg products were in different markets.  Each side put their best foot forward, and the jury ultimately made the call.  On this record, that decision was within the field of play.

## III.    Market Power

Defendants' next set of arguments focuses on market power.  In essence, Defendants contend that Plaintiffs needed to prove that Defendants had significant market power to show that Defendants' actions caused anticompetitive effects and injury.  *See* Def. Rose Acre's Mem., at 8 (Dckt. No. 611); Def. Cal-Maine's Mem., at 9 (Dckt. No. 622).

In a rule of reason case, plaintiffs must show "anticompetitive effects," either directly or indirectly.  *See Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018).  Direct evidence consists of "proof of actual detrimental effects, such as a reduction of output . . . ."  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986); *see also* 1 J. Kalinowski, Antitrust Laws and Trade Regulation § 12.02[2][a] (2d ed. 2024) ("Whether a restraint has had an actual adverse impact on competition is determined by considering evidence of increased prices, reduced output or decreased quality, among other things.").  "Indirect evidence would be proof of market power

plus some evidence that the challenged restraint harms competition." *See Am. Express Co.*, 585 U.S. at 542; *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000).

"Market power" is the ability "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Courts must "conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *See Am. Express Co.*, 585 U.S. at 541 (cleaned up). "In determining the existence of market power," courts "examine[] closely the economic reality of the market at issue." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992).

Here, the jury concluded that four egg producers were co-conspirators: Cal-Maine (a Defendant), Rose Acre (same), Wabash Valley (a non-defendant), and Moark (same). *See* Phase 1 Jury Verdict, at 4 (Dckt. No. 582). Those four producers collectively held 15.5% market share. *See* Defs.' UEP & USEM Mem., at 10. That's a small piece of the egg pie.

In Defendants' view, that percentage is insufficient as a matter of law to show that the conspiracy adversely affected competition in a significant way. *See* Def. Cal-Maine's Mem., at 10 (Dckt. No. 622). That is, producers who control only 15% of the output can affect prices only so much.

Plaintiffs come at the concept of market power from a different angle. *See* Pls.' Mem., at 37 (Dckt. No. 688). As they see things, the proper measure for market power isn't the market share of the four egg producer co-conspirators. Instead, the right measure is the market share of the memberships of UEP and USEM. *Id.* at 38.

*Conceptualizing the Market Power Issue*

In antitrust cases involving trade associations, courts often look at the market share of the members as a whole to determine whether the association had market power. *See Ind. Fed'n of Dentists*, 476 U.S. at 451 (concluding that the Indiana Federation of Dentists could be held liable where it enlisted nearly 100% of dentists in a certain geographic region to adopt its anticompetitive practice); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (concluding that the proper measure for determining the American Medical Association's market power was the market share of its members); *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 604 (7th Cir. 1984) (stating that market power could be shown by showing that "members as a group have a substantial share of that market"); 14 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1477 (4th ed. 2024) (explaining that, in some cases, an "organization's acts could be attributed to its members as a continuing conspiracy").

The rationale is that, in most of the antitrust cases involving associations, the association imposes a binding rule on all of its members in restraint of trade. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs. v. United States*, 435 U.S. 679, 683–84 (1978) (addressing an engineering association's ethics code that barred all engineer members from engaging in competitive bidding); *Associated Press v. United States*, 326 U.S. 1, 4 (1945) (addressing Associated Press bylaws that "prohibited all AP members from selling news to non-members"). In other words, even if some members of a trade association are not part of the antitrust conspiracy, the conspirators are able to harness the market power of those members.

This rationale holds up even if the association's rule is not technically binding on the members. For example, courts have looked at the market power of all of the members of a trade

association in cases where the trade association programs were optional as far as the *association's* requirements went – but were effectively mandatory because of government regulations. *See, e.g.*, *Am. Soc'y of Mech. Eng'rs., Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 559 (1982) (stating the association's "advisory" codes were essentially mandatory as they were incorporated in federal, state, and municipal laws); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 495 (1988) (explaining that the electric codes at issue were adopted by a "substantial number" of state and local governments without any edits and were also required by many underwriters, inspectors, contractors, and distributors).

Turning to the case at hand, a few different ways of conceptualizing the market power issue come to mind.

One could look at the combined market share of the co-conspirator producers (15.5%), as Defendants suggest. Or one could look at the combined market share of the larger trade associations, as Plaintiffs suggest.

UEP membership isn't a perfect fit for membership in the UEP Certified Program. As Defendants point out, UEP members weren't required to join the UEP Certified Program. So, some producers were members of UEP but weren't part of the Program. On the flipside, some producers weren't members of UEP but *were* part of the Program. *See* 10/31/23 Trial Tr., at 2753:4 – 2754:2 (Baye); Defs.' Ex. 1240 (listing "Non-Member Certified Companies").

The circles overlap, but not entirely. Some UEP members did not join the UEP Certified Program. And some producers joined the UEP Certified Program, even though they were not members of the UEP.

So, if one wants to look at the combined market share of the larger trade associations, there are two ways one could do it. One could look at all producers that were members of UEP,

meaning the industry group. *See* 11/8/23 Trial Tr., at 4423:2 (Dckt. No. 666) (Rust) (stating that 70% to 80% of the industry was involved in the UEP). Alternatively, one could consider the market share of all producers that participated in the UEP Certified Program. *See, e.g.*, 10/30/23 Trial Tr., at 2364:4-9 (Dckt. No. 652) (Rust) (stating that, at the height of the UEP Certified Program, about 95% of egg production facilities were committed to the Program).

If the Court looks only at the individual co-conspirators, the 15.5% market share of the producers isn't enough to satisfy the market power requirement in a section 1 case. *See, e.g.*, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987) (stating that "a 20%-25% market share or less does not constitute market power"); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 773 (N.D. Ill. 2015) (St. Eve, J.) (citing *Valley Liquors* for the proposition that a 17% market share was insufficient to show market power).

The argument for market power is more powerful if one looks at the market share of all participants in the UEP Certified Program, or at the market share of all members of UEP. Under either metric, the market share would be 70% or above – falling comfortably within the market-share percentage that courts consider sufficient to prove market power. *See, e.g.*, *Valley Liquors*, 822 F.2d at 666 (explaining that "approximately 70%-75% of market share constitutes market power"); *see also* 1 J. Kalinowski, Antitrust Laws and Trade Regulation § 12.02[2][b] (2d ed. 2024) ("The share necessary to prove market power is not clear cut; typically, at least a 30 percent market share is required.").

Here, the Court concludes that the jury could look at the market share of all of the members of the UEP Certified Program to determine whether the co-conspirators had market power. The rationale behind looking to associational membership when determining market power applies here. The idea is to capture what's *really* happening in the market. *See, e.g.*,

*Eastman Kodak Co.*, 504 U.S. at 467. And in reality, 95% of egg production facilities were committed to the UEP Certified Program at its height. *See* 10/30/23 Trial Tr., at 2364:4-9 (Dckt. No. 652) (Rust).

To get such a large portion of the industry on board, Defendants worked to get other industries on board, too. The jury heard evidence that Defendants created momentum for the UEP Certified Program by soliciting support from their customers. There was a push-and-pull dynamic – Defendants *responded* to demand, and *helped create* demand, for the animal-welfare protections.

For instance, Plaintiffs introduced evidence about how Defendants lobbied the Food Marketing Institute – a grocery store trade organization – to adopt the UEP guidelines. Defendants lobbied individual grocery chains like Kroger, too. *See, e.g.*, Pls.' Ex. 861 (email from UEP's Gene Gregory to Food Marketing Institute's Karen Brown dated October 18, 2004, asking for "[a]ny help that you can provide in keeping your members committed to the program"); Defs.' Ex. 670 (March 20, 2002 email from Kroger employee to Brown stating that "UEP is pressuring suppliers to Kroger to 'sign up on the UEP standards'" and that "[s]uppliers seem to be trying to scare companies like Kroger"); Pls.' Ex. 220, at 1 (UEP Board of Directors meeting minutes from January 2002 noting that UEP was working to get "FMI, NCCR, GMA, and NRA to assure that they accept the UEP guidelines"); Pls.' Ex. 362, at 2 (United Voices from April 2007 stating that UEP had hosted a meeting of retailers to inform them about the Program).

If a grocery store adopted the UEP guidelines, then that grocery store would buy only UEP Certified eggs, meaning eggs produced at facilities that complied with the UEP Certified Program.

Plaintiffs also introduced evidence about customer resistance to the UEP Certified Program. Defendants promoted the program even though some customers had little or no interest. *See, e.g.*, Pls.' Ex. 198 (letter from UEP President Al Pope stating that "very few" customers were "asking that [the UEP Certified] guidelines be part of their specifications" as of July 16, 2002); Pls.' Ex. 180 (February 3, 2002 letter from UEP's Gene Gregory to Animal Care Certified Companies stating: "It is disappointing to hear from some of you that your customer is unwilling to pay your increased costs to meet these guidelines."); Pls.' Ex. 338 (August 22, 2003 email from Gregory to Food Marketing Institute leader Karen Brown stating that a grocery store chain, Albertson's, was "saying to some bidders that they don't have to be on the [UEP Certified] program"); Pls.' Ex. 861 (October 18, 2004 email from Gregory to Brown stating: "We are also hearing from some of your members that they are no longer requiring [UEP] Certified eggs so you may be losing some of your member support for the program that we all worked on for so long and hard."). UEP Certified eggs were more expensive, and not all customers were willing to pay higher prices for eggs.

The record included evidence that Defendants began developing the UEP Certified Program before grocery stores showed interest. The UEP Scientific Advisory Committee was formed in 1999 and rolled out its recommendations for the UEP Certified Program Guidelines in September 2000. *See* Pls.' Ex. 245 ("Recommendations for UEP Animal Welfare Guidelines"). The UEP Certified Program went into effect in April 2002. *See* Defs.' Ex. 433 ("United Egg Producers Animal Husbandry Guidelines for U.S. Egg Laying Flocks 2002 Edition").

The grocery stores didn't begin requiring the UEP Certified Program until months or years later. *See, e.g.*, Defs.' Ex. 226 (email chain showing that Walmart changed its specifications to require the UEP Certified Program in August 2004 – two years after the

Program began); Defs.' Ex. 674 (June 2002 recommendations from the Food Marketing Institute and National Council of Chain Restaurants that their members use the 2002 UEP Certified Program guidelines "with their suppliers of eggs and egg products"); 11/6/23 Trial Tr., at 3831:1-23 (Dckt. No. 662) (Hardin).

By getting other egg producers' biggest customers to mandate the Program, Defendants essentially made the Program mandatory for those producers. That's especially true in light of the 100% Rule, which required a producer to meet the UEP guidelines across all of its facilities once it signed up for the Program. *See* Pls.' Ex. 193 (October 9, 2002 Animal Welfare Committee meeting minutes stating that "a company must commit to implementing the welfare guidelines on 100% of all production facilities regardless of how or where eggs may be marketed"). If a producer wanted to keep a customer who required the UEP Certified Program, then that producer could only sell UEP Certified eggs to all of its customers. In other words, the jury could have found that the Program was effectively mandatory for non-conspirator producers to join, even if it wasn't required by the UEP. *See, e.g.*, *Indian Head, Inc.*, 486 U.S. at 495.

Based on the record, a reasonable jury could find that Defendants targeted the grocery industry with the hope of reducing egg supply and boosting egg prices. In other words, a reasonable jury could find that Defendants roped in egg producers' customers – under the guise of animal welfare – to force egg producers to get on board with the Program. After reaching that conclusion, a jury could find that the proper measure for market power was the percentage of producers who participated in the Certified Program.

### *The Effect of Non-Conspirators' Participation on the Market*

Defendants argue that Plaintiffs' preferred formulation of market power fails because the jury did not find that all UEP Certified Program participants were members of the conspiracy. *See* Defs.' UEP & USEM Mem., at 13 (Dckt. No. 608).

In a section 1 case, plaintiffs must show that the defendants, and any non-defendant co-conspirators, were knowing members of the conspiracy. "'[C]onspiracy' in section 1 [of the Sherman Act] is simply a pejorative term for a contract, both 'conspiracy' and 'contract' signifying an agreement, a meeting of minds." *United States v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012).

The jury answered "no" to the question whether every egg producer who joined the UEP Certified Program participated in the conspiracy to restrict the supply of eggs. *See* Phase 1 Jury Verdict, at 7 (Dckt. No. 582). In a similar vein, the jury found that Michael Foods did not participate in the conspiracy to restrict the supply of eggs. *Id.* at 4.

In Defendants' view, the jury needed to find that every member of the UEP Certified Program participated in a conspiracy to reduce the supply of eggs to find for Plaintiffs. *See* Defs.' UEP & USEM Mem., at 13 (Dckt. No. 608). Basically, Defendants believe that they're only liable for the effects of every member's participation in the Program if all members were in the conspiracy. Not so.

Antitrust co-conspirators can be held liable for the intended effects of their conspiracy. *Cf. Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) ("The purpose of the proximate causation requirement – in both antitrust and tort law – is to avoid speculative recovery by requiring a direct relation between the plaintiff's injury and the defendant's behavior."); *United States v. Aiyer*, 470 F. Supp. 3d 383, 404 (S.D.N.Y. 2020), *aff'd*,

33 F.4th 97 (2d Cir. 2022) ("Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which [section 1 of the Sherman Act] forbids, they come within its prohibition.") (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 35 (D.D.C. 2008)); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (explaining that antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation" by being "the type of loss that the claimed violations would be likely to cause") (cleaned up); *In re Tableware Antitrust Litig.*, 485 F. Supp. 2d 1121, 1124 (N.D. Cal. 2007) ("[O]therwise 'lawful' activity is not shielded from the antitrust laws when the activity is 'part and parcel' of an effort to restrain trade.").

Producers that conspire to create a stampede of producers are responsible for the anticompetitive effects caused by those producers, even if the other producers weren't in on the conspiracy. If a buyer gets trampled by the stampede of producers, then the conspirators are liable for the trampling, even if the hooves belonged to a non-conspirator.

Plaintiffs introduced evidence about Defendants' campaign to get other producers to adopt the UEP Certified Program. *See, e.g.*, Pls' Ex. 210, at 2–3 (March 25, 2002 editorial from UEP's Gene Gregory titled "YOU SHOULD IMPLEMENT GUIDELINES" urging producers to join the UEP Certified Program); Pls.' Ex. 637, at 1 (United Voices newsletter dated April 8, 2002 touting the "large sign up for 'certified company' status"). Getting the industry on board was Defendants' goal, and Defendants used numerous means to achieve their goal. The means included the 100% Rule and putting pressure on grocery stores to get on board.

More broadly, Plaintiffs introduced evidence suggesting that Defendants devised the UEP Certified Program with the intent to reduce egg supply. *See, e.g.*, Pls.' Ex. 223 (editorial from

UEP President Al Pope urging producers to adopt the Program to avoid "projected losses . . . . . substantial losses at that!!!") (elongated ellipsis in original); Pls.' Ex. 1 (1999 proposal from Don Bell suggesting an "industry-wide policy of a minimum floor space allowance" to reduce egg supply); Pls.' Ex. 213 (March 14, 2002 statement from Rose Acre's Ky Hendrix stating that "some people" thought the UEP Certified Program would "make them rich"); Pls.' Ex. 159 (February 10, 2004 statement from Gene Gregory explaining that the UEP "downplayed" the effects of the UEP Certified Program on prices, even though it was a "major reason" why "egg producers [were] enjoying good times").

Plaintiffs presented evidence suggesting that Rose Acre and Cal-Maine played a critical role in developing the UEP Certified Program, too. For example, the jury heard testimony from Rose Acre CEO Marcus Rust that the company would not have joined the Program unless it could play a role in its development. *See* 11/8/23 Trial Tr., at 4348:25 – 4329:3, 4359:5 – 4361:4 (Dckt. No. 666) (Rust); 10/23/23 Trial Tr., at 1283:16-22 (Dckt. No. 645) (Baker). To that end, Rust served on the UEP board and voted on whether to add certain components to the Program. *Id.* Cal-Maine executives likewise played key roles in the UEP and voted on changes to the Program. *See* 10/23/23 Trial Tr., at 1270:17 – 1271:17, 1280:14 – 1281:1 (Dckt. No. 645) (Baker); 11/6/23 Trial Tr., at 3826:20 – 3827:18 (Dckt. No. 662) (Hardin).

Based on the record at trial, a reasonable jury could have found that Defendants bear responsibility for the supply restrictions by non-conspirators. That is, a reasonable jury could have found that Defendants encouraged non-conspirators to join the UEP Certified Program, and did so for anticompetitive reasons. A reasonable jury also could have found that Defendants lobbied the customers of other producers to buy eggs from UEP certified producers, and did so to force the hands of other producers through the back door. A reasonable jury could have found

that Plaintiffs got exactly what they wanted:  non-conspirator producers joined the UEP Certified Program, leading to a larger reduction in supply.

Holding Defendants liable for the unwitting conduct of non-conspirators also aligns with conspiracy law writ large.

For instance, "suppose a stranger asks you to help him carry a box to a house across the street, and you oblige.  Unbeknownst to you the house is a stash house and the box contains cocaine.  You are not guilty of conspiring to distribute illegal drugs, even though you have assisted in that distribution."  *United States v. Macias*, 786 F.3d 1060, 1061 (7th Cir. 2015).

*You* wouldn't be guilty as an unknowing helper.  But if that stranger worked with others to distribute cocaine, he's still part of a criminal conspiracy.  The existence of an unwitting assistant does not absolve the knowing co-conspirators of criminal liability.

The same principle applies in tort law.  If a tortfeasor's actions partially contributed to a harm, the tortfeasor isn't off the hook simply because a third party also contributed to that harm.  *See, e.g.*, *Hunter v. Mueske*, 73 F.4th 561, 568 (7th Cir. 2023).  That principle rings especially true when the tortfeasor intended for the third party to engage in the harmful behavior.  *See United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017) (explaining that proximate causation exists when "the [plaintiff's] injury is of a type that a reasonable person would see as a likely result of his or her conduct") (cleaned up).

Imagine if a carpenter built a table and chairs.  All of the chairs look the same, but in reality, one of them is wobbly – and the carpenter knows that this chair will collapse if anyone puts weight on it, causing any unsuspecting sitter to take a tumble.  The carpenter doesn't tell anybody about the wobbly chair.  But he asks his wife to seat his brother there at a dinner party, expecting that the brother will fall.

Say that the brother takes his seat, then falls. Hard. He breaks a couple of bones. The carpenter still would bear liability in intentional tort for his brother's injury, even though his unwitting wife is the one who told the brother where to sit.

Likewise, Defendants can't escape antitrust liability because some egg producers entered the UEP Certified Program without joining the conspiracy to reduce the supply of eggs. *See Supreme Auto Transp., LLC*, 902 F.3d at 743 (analogizing the proximate causation requirement in tort to the antitrust standing requirement in Sherman Act cases).

Here's the bottom line. The jury heard sufficient evidence that the UEP Certified Program was designed to reduce the supply of eggs, even if each individual participant in the program did not intend to reduce supply and did not participate in the conspiracy. Based on that record, the conspirators are responsible for the unwitting participation of non-conspirators.

To be sure, some egg producers may have joined the UEP Certified Program for non-conspiratorial purposes. For example, some egg producers might have joined the UEP Certified Program after the Program became required by customers. *See, e.g.*, Defs.' Ex. 198 (July 11, 2002 letter from Publix requiring suppliers to follow the UEP Certified guidelines); Defs.' Ex. 1180 (March 12, 2003 letter from Winn-Dixie to Cal-Maine requesting that the UEP Program logo appear on all of its egg containers); Defs.' Ex. 899 (August 31, 2005 letter from Walmart's Gary Pickett stating that Walmart "requires" the UEP Certified logo on its egg cartons).

Even so, a reasonable jury could find that Defendants got exactly what they wanted – *i.e.*, support for the UEP Certified Program by major egg buyers, so that egg producers could enjoy elevated prices.

Put simply, Defendants who collude to reduce supply are liable for any damage to the market caused by unknowing participants. If Defendants wanted to decrease supply through the UEP Certified Program and got other producers on board by touting the Program as an animal-welfare initiative, Defendants are on the hook for any price increases caused by those unwitting producers.

### *Quantification of Anticompetitive Effects*

Defendants point out that the model created by Plaintiffs' expert, Dr. Baye, quantified the effects of the UEP Certified Program as *a whole – i.e.*, it did not isolate the impact of the effects of the alleged co-conspirators' behavior on egg prices. *See* Defs.' UEP & USEM Mem., at 11 (Dckt. No. 608); Def. Rose Acre's Mem., at 8 (Dckt. No. 611). Dr. Baye measured the effects of the participation of 177 egg producers in the UEP Certified Program, not the effects of the participation of Rose Acre, Cal-Maine, Wabash Valley, and Moark. *See* Defs.' UEP & USEM Mem., at 11. So, Defendants believe that there's a mismatch between the conspiracy that Plaintiffs proved and Dr. Baye's quantification of anticompetitive effects. *Id.* at 11–12; Def. Rose Acre's Mem., at 9.

That's incorrect. As the Court explained, the enlistment of other producers in the UEP Certified Program – even if they were not co-conspirators – had the direct and intended effect of reducing the supply of eggs.

A reasonable jury could find that Defendants intended and caused non-conspirators to join the UEP Certified Program. By getting other producers to go along for the ride, Defendants put in motion a program to reduce egg supply and, ultimately, increase egg prices.

Defendants can be held liable for the anticompetitive effects of the Program that they intended – even if those anticompetitive effects were achieved, in part, due to the actions of

non-conspirators. So, Dr. Baye's model, which looked at the UEP Certified Program as a whole, captured the effects of the conspiracy as proved by Plaintiffs.[2]

*    *    *

At bottom, Defendants can be held liable for the intended effects of the UEP Certified Program. The jury found that Defendants developed the UEP Certified Program with the aim of restricting domestic egg supply. Defendants wanted to raise prices in the United States – and the jury found that the Program worked. Defendants can be held responsible for the intended effects of their illegal scheme, even if they needed unwitting participants to achieve their goals.

For these reasons, a reasonable jury could find sufficient market power for a section 1 violation. That is, a reasonable jury could have looked at the percentage of domestic egg supply committed to the UEP Certified Program – up to 95% – rather than solely at the combined market share of the egg producer co-conspirators.

## IV. Exports & Short-Term Measures

The next issue involves two of the three prongs of the conspiracy: exports and short-term measures.

During the damages phase of the trial, Plaintiffs basically abandoned both ships. They asked the jury to award nominal damages – and *only* nominal damages – for the exports and short-term measures. And that's what the jury did. The jury gave each Plaintiff $1 for each of the two prongs, for a total of $8.

So, at the end of the day, exports and short-term measures were much ado about nothing. Or, at best, they were much ado about $8. ($1 for short-term measures + $1 for exports x

---

[2] Similarly, the jury's determination that relevant market included both shell eggs and egg products, discussed above, permitted the use of Dr. Baye's model.

4 Plaintiffs = $8).  The jury heard a lot of testimony for a whopping $8, roughly the price of an omelet.

As Defendants see things, no reasonable jury could have found that the exports and short-term measures caused significant anticompetitive effects.  *See* Defs.' UEP & USEM Mem., at 5 (Dckt. No. 608).  Defendants argue that short-lived, sporadic measures could not have impacted prices.  *See* Def. Rose Acre's Mem., at 5–6 (Dckt. No. 611).

An antitrust plaintiff must show "significant anticompetitive effects in the relevant market."  *NCAA v. Alston*, 594 U.S. 69, 82 (2021).  Defendants' argument seems to combine two different concepts:  the length of the restriction, and the existence of an impact.

There is some case law suggesting that short-term market impacts are insufficient to establish antitrust liability.  *See, e.g.*, *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (holding that a "temporary decline in the number of competitors" lasting four to ten months was "not significant enough to be classified as an injury to competition under the Sherman Act"); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n, Inc.*, 672 F.2d 1280, 1288 (7th Cir. 1982) (concluding that plaintiff had "pointed to no significant competitive injury flowing from its temporary denial" of associational membership); *Colorado Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 697 (10th Cir. 1989).

Still, under the law of this Circuit, a monopoly can violate the antitrust laws even if the anticompetitive effects don't last very long.  *See Peto v. Howell*, 101 F.2d 353, 356 (7th Cir. 1938) ("[I]t is not to be conceived that a monopoly of all that part of interstate commerce in the city of Chicago for one day is any less a violation of the law than a monopoly over the same product and the same market for thirty days or for a year."); *see also Thompson's Gas & Elec.*

*Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 867 (N.D. Ill. 2010) (explaining that *Peto*

remains "good law in this circuit"); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767

F. Supp. 2d 880, 904 (N.D. Ill. 2011) (citing *Peto* for the proposition that "even a one-day or

one-month monopoly is forbidden").

Put differently, a short-term restraint "could be of sufficient duration to cause

anticompetitive effects." *See In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 55

(S.D.N.Y. 2012) (citing *Thompson's Gas & Elec. Serv.*, 691 F. Supp. 2d at 867).

That body of case law largely deals with monopolies. But a short-lived *conspiracy* is in

many ways worse than a short-lived *monopoly*. *Cf. Copperweld Corp. v. Indep. Tube Corp.*, 467

U.S. 752, 768 (1984) ("Concerted activity subject to § 1 is judged more sternly than unilateral

activity under § 2."); 7 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of

Antitrust Principles and Their Application ¶ 777a (4th ed. 2024) ("[T]he standard for a § 2

violation is significantly stricter in its power assessment, [but] it is broader and less categorical in

its definition of proscribed conduct."); 1 J. Kalinowski, Antitrust Laws and Trade Regulation

§ 2.04[2] (2d ed. 2024) ("Courts have said that Section 1 is more rigorous, that is, more likely to

condemn conduct, than is Section 2.").

Defendants did not merely engage in exports or short-term measures on a one-off basis.

The jury heard evidence indicating that the UEP recommended early molts and early slaughters

on multiple occasions over a years-long period. *See, e.g.*, 10/30/23 Trial Tr., at 2566:17 –

2567:19 (Dckt. No. 653) (Baye); Pls.' Ex. 257 (November 22, 1999 UEP Marketing & Price

Discovery Committee meeting minutes), Pls.' Ex. 641 (June 4, 2001 UEP Shell Egg Marketing

Committee meeting minutes); Pls.' Ex. 403 (December 17, 2001 UEP Marketing Committee

meeting minutes).

The jury also heard testimony that USEM members voted for exports on multiple occasions over several years. *See, e.g.*, 10/30/23 Trial Tr., at 2591:16 – 2593:7 (Dckt. No. 653) (Baye); Pls.' Ex. 242; Pls.' Ex. 229; 10/23/23 Trial Tr., at 1056:6-19 (Dckt. No. 644) (Baker).

So, the jury heard evidence that the exports and short-term measures took place over an extended period of time, even if they were on-again, off-again.

The jury also heard evidence that the exports and short-term measures had an impact on egg prices. All told, Plaintiffs introduced sufficient evidence for a reasonable jury to find anticompetitive effects from the exports and short-term measures.

### *Short-Term Measures*

Start with the short-term measures (again, early slaughter, hatch reduction, and forced molting). Plaintiffs produced some evidence that the short-term measures raised prices. The evidence was less than overwhelming. But it was there.

Much of the evidence came from the memos that the UEP sent to its members. Again and again, the UEP told its members that the short-term measures would lead to greater profits. *See, e.g.*, Pls.' Ex. 268, at 1 (article in United Voices newsletter dated April 19, 1999 by UEP Chairman and Cal-Maine executive Ken Looper with the headline "HEN DISAPPEARANCE – KEY TO PROFITS"); Pls.' Ex. 402, at 2 (UEP Marketing Committee May 11 and May 12, 2004 meeting minutes) (Committee Chairman and Cal-Maine executive Dolph Baker successfully moved to recommend that the industry early molt hens and dispose of hens early "for the financial stability of the industry"); Pls.' Ex. 151 (May 14, 2004 letter from UEP Senior Vice President Gene Gregory urging producers to adopt the Committee's recommendations "to assure yourself of profitable practices"); Pls.' Ex. 137, at 2 (January 24, 2005 UEP Marketing Committee meeting minutes) (Baker "reported that all egg producers should review their profit

and loss information for the weeks between Easter and Labor Day," and "suggested that this review would confirm that supply exceeded demand and that shell producers have lost money most every year"); Pls.' Ex. 241, at 1 (December 20, 2000 letter from Gregory to UEP Marketing Committee members stating that the Marketing Committee's "reasonable recommendations of reducing the flock size and reducing the chick hatch" led to "an unbelievable year").

Cal-Maine CEO Dolph Baker confirmed the connection between short-term measures and egg prices. He testified that it was a regular practice of the UEP Marketing Committee to make recommendations for early molt and early slaughter when he felt that egg prices were too low. *See* 10/20/23 Trial Tr., at 1057:7-15 (Dckt. No. 643) (Baker).

Baker testified at length about the reason behind the short-term measures, including early molt and early slaughter. The goal was to increase the price of eggs:

> Q:  The reason to do this supply adjustment program is because you felt that there were too many hens laying eggs in the industry at the time?
>
> A:  In the slowest demand period of the year. A recommendation, yes.
>
> Q:  And the slowest demand period of the year, too many hens means low prices, correct?
>
> A:  Correct.
>
> Q:  And you were hoping to do something about that by reducing the number of hens in the U.S. market, correct?
>
> A:  Correct.
>
> Q:  And by adjusting the egg supply through the supply adjustment program, you were hoping to improve price, correct?
>
> A:  Or lose less, yes.

*See* 10/20/23 Trial Tr., at 1056:6-19 (Dckt. No. 643) (Baker). And again:

> Q:     And you asked for producers to molt hens ahead of schedule through forced molting to reduce the supply of eggs in the United States, correct?
>
> A:     For a short period of time, yes, sir.
>
> Q:     And the short period of time that you're saying occurred several different times throughout 1998 and 2008, correct?
>
> A:     Yes, sir.
>
> Q:     Mr. Baker, you personally advocated for these early slaughter and molting programs through your marketing committee, correct?
>
> A:     That would be correct.

*See* 10/20/23 Trial Tr., at 1040:10-20 (Dckt. No. 643) (Baker).  And again:

> Q:     The reason for the supply reduction program was to raise the price of eggs, correct?
>
> A:     Possibly. You know, this was after Easter.  We – the lowest demand period of the year.
>
> Q:     So after Easter, you wanted Cal-Maine and its competitors to reduce the number of hens that were laying eggs to be sold in the United States, correct?
>
> A:     Correct.

*See* 10/20/23 Trial Tr., at 1055:10-17 (Dckt. No. 643) (Baker).  And again:

> Q:     And your committee passed this motion because you and your other egg producers on the committee wanted the industry to decrease supply after Easter, correct?
>
> A:     Historically, the market goes low after Easter, yes.  We were just putting out a recommendation.
>
> Q:     And you were hoping that by putting out this recommendation that the industry would reduce their supply of eggs after Easter, correct?
>
> A:     Hoping, yes, sir.

*See* 10/23/23 Trial Tr., at 1280:5-13 (Dckt. No. 645) (Baker).

A reasonable jury could infer that the CEO of the nation's largest egg company knows a thing or two about egg prices. Baker is well situated to know what moves prices, and what doesn't. At the very least, a reasonable jury could take his admissions at face value.

A reasonable jury could draw a reasonable inference from Baker's testimony. The UEP Marketing Committee recommended short-term measures to reduce the number of eggs and raise prices. So maybe the short-term measures led to higher prices after all. It is not unreasonable to think that egg producers would have an understanding of egg prices, and what makes them go up or down.

Some of the exhibits included estimates about the effects of the short-term measures on the markets, too. The exhibits suggested that small reductions in flock size could affect prices.

For example, Dolph Baker's "Industry Statistics And Economics Report" showed that reducing the flock size by 5 million hens could lead to a price increase between 16 and 23 cents (depending on the level of demand). *See* Pls.' Ex. 591, at 4; *see also* Pls.' Ex. 788, at 8 (a March 2008 presentation by Gene Gregory showing that a 1.65% reduction in egg production between Easter and Labor Day in 2007 caused a market increase of 37.3 cents over the previous year); Pls.' Ex. 241, at 3 (Gregory estimating that Marketing Committee recommendations, coupled with exports, led to a "conservative" increase in revenue of $209,057,000 for shell egg producers in 2000); Pls.' Ex. 242, at 2 (Gregory estimating in December 2000 that recommendations of the UEP Marketing Committee led to "revenues of approximately $400 million over the forecast for the year").

Defendants urge the Court to set aside the statements of Gene Gregory, the former President of the UEP. *See* Def. Rose Acre's Reply, at 19 (Dckt. No. 702). Defendants point out

that the Court ruled that Plaintiffs could not use Gregory's statements to prove damages during phase 2 of the trial. *Id.*

During the damages phase, this Court did limit the ability of Plaintiffs to rely on statements made by Gene Gregory. But this Court did not throw all of his statements about the market out the window, either.

This Court limited Plaintiffs' ability to rely on Gene Gregory during the damages phase, for a few different reasons. First, Plaintiffs unveiled a new damages theory about exports after the liability phase, and pointed to statements by Gene Gregory to support that new theory. *See* Pls.' Statement Regarding Damages, at 3–4 (Dckt. No. 592). This Court ruled that the disclosure was far too late. *See* 11/28/23 Order (Dckt. No. 627) ("[T]he opinions and statements of Gene Gregory are not admissible to the extent that Plaintiffs intended to use them as building blocks to support a new, previously undisclosed theory of damages.").

Second, Plaintiffs attempted to stretch the statements by Gregory too far. They pointed to a statement by Gregory that Urner Barry Midwest Large prices went up by 24.5 cents per dozen, and Central Breaking Stock prices went up by 15.5 cents per dozen, from October 2006 to April 2007. *See* Pls.' Statement Regarding Damages, at 3 (Dckt. No. 592). Plaintiffs wanted to use that statement to support a request for damages of $5,746,961 based on the egg exports.

This Court exercised its discretion and decided that Plaintiffs were trying to offer expert testimony through the backdoor. "[M]any of the statements in question by Gene Gregory appear to be improper lay opinions that would exceed the boundaries of Rule 701. For example, testimony that Export X led to Price Increase Y is the type of analysis that an expert ordinarily would perform. It requires specialized knowledge within the meaning of Rule 701 and 702. But here, Plaintiffs' own expert was unable to offer that opinion, so this Court is dubious of an

attempt to admit would-be expert testimony of Gene Gregory through the backdoor." *See* 11/28/23 Order (Dckt. No. 627).

And even then, this Court did not bar Plaintiffs from relying on the statements of Gregory when making their case for damages. They simply couldn't use his statements to support a previously undisclosed damages theory. And they couldn't hang their hat on his statements as if he offered expert testimony. *Id.* ("That said, this Court did not grant the motion in full. It is theoretically possible that Plaintiffs could use some statements by Gene Gregory to support some aspect of the damages theory given by Dr. Baye. So, this Court did not categorically rule that any and all statements by Gene Gregory are out of bounds during the damages phase. But any attempt to build something new is too much, too late.").

Dr. Baye could not quantify the connection between the short-term measures and price increases. But his testimony did offer a little something, directionally speaking. He testified that an agreement between competitors to reduce the number of egg-laying hens would, almost by definition, reduce supply and increase prices.

> Q: Dr. Baye, did you create an econometric model to measure the impact of the short-term measures, like coordinated slaughters and hatch reductions on the nation's flock size?
>
> A. I did not.
>
> Q: How come?
>
> A: Well, as I looked at the record, they're very sporadic over time. It wasn't a unified program. There are random events that occur both – throughout the time period; and, therefore, it's not feasible to econometrically identify the impact of those. And you probably don't need an economist anyway. *I mean, if they were slaughtering birds, it would reduce the number of birds. That's pretty – pretty simple, I think.* But I can't identity – I can't quantify the impact of those.

*See* 10/30/23 Trial Tr., at 2566:17 – 2567:5 (Dckt. No. 653) (Baye) (emphasis added).

Overall, Plaintiffs offered some evidence that the short-term measures resulted in higher prices. The evidence was not particularly compelling. But it was (just) enough. Based on the trial record, a reasonable jury could find that the short-term measures had anticompetitive effects, even if Plaintiffs' own expert couldn't measure it.

***Exports***

Plaintiffs likewise introduced enough evidence for a reasonable jury to find that the exports had a substantial anticompetitive effect.

For starters, Baker admitted that Defendants reduced the domestic supply by exporting eggs. *See* 10/20/23 Trial Tr., at 1055:14-16 (Dckt. No. 643) (Baker) ("Q: By exporting millions of eggs out of the U.S., you restricted the number of eggs for sale in the U.S., correct? A: Yes.").

And Baker admitted that the "goal" for exports was to "improve prices in the short term." *Id.* at 1158:10-16. Baker testified:

> Q: And you agree that the intent of taking a large volume export order for a short period of delivery is to reduce the domestic supply and thereby increase the domestic price of eggs, correct?
>
> A: Yes, sir.

*See* 10/23/23 Trial Tr., at 1183:15-19 (Dckt. No. 644) (Baker).

Plaintiffs also introduced exhibits from Gene Gregory (again, the UEP President) stating that the industry exported eggs to increase egg prices. *See, e.g.*, Pls.' Ex. 374, at 2 (November 4, 2002 United Voices newsletter) ("[t]he greater the loss, the better the export. The *very reason for taking the export is to remove domestic supply* on a timely basis that will have the greatest impact upon the domestic market.") (emphasis added); Pls.' Ex. 694 (November 7, 2006 letter from Gene Gregory to USEM Members) ("The reason for taking an export is to improve U.S.

domestic market conditions.  We believe you have accomplished this goal . . . ."); Pls.' Ex. 159

(February 2004 email from Gene Gregory stating that exports have led to "improved prices").

The jury also saw multiple rough estimates from Gregory about the positive effects of

exports on egg prices.  *See, e.g.*, Pls.' Ex. 189 (November 2002 estimate that domestic egg prices

increased by 21 cents per dozen due to a 250-container export order), Pls.' Ex. 242 (December

2000 United Voices newsletter estimating that an export order for 34 containers led to "an

industry-wide revenue gain of approximately $30 million dollars during this export period");

Pls.' Ex. 279 (February 2007 United Voices newsletter concluding that "exports have had a

major positive impact upon shell egg prices and the financial conditions of shell egg

producer/marketers" and estimating that prices rose by 23.9 cents per dozen because of an export

order); Pls.' Ex. 356 ("During the period of delivery [of an export in 2008], the Urner Barry

quote rose by 30 cents per dozen.  **We, therefore, conclude that this export was of great value**

**to your company and the industry as a whole**.") (emphasis in original); Pls.' Ex. 307, at 1

(May 2003 United Voices estimating that USEM exports from late October 2003 through mid-

March 2004 had "contributed nearly $300 Million to the industry recovery").

Again, Gregory's musings were not particularly compelling.  He was not an economist.

He was a pitch-person for the industry.  He was cheerleading the effort to improve the market for

egg producers.  So his views about eggs had a grain of salt.

Gregory's rough estimates weren't enough to provide a basis for a damages calculation

(especially a previously undisclosed calculation).  Still, the jury could consider Gregory's

statements for what they were worth.  Gregory's statements provided a piece of the puzzle, and

supported the notion that exports increased domestic prices.

Overall, the jury heard enough evidence to reach the conclusion that exports had substantial anticompetitive effects.

### Dr. Baye's Failure to Quantify

Next, Defendants take aim at the testimony of Plaintiffs' expert, Dr. Baye. They point out that Dr. Baye could not quantify, with scientific certainty, the effects of the exports and short-term measures on egg supply. *See* Defs.' UEP & USEM Mem., at 5–9 (Dckt. No. 608).

Dr. Baye testified that the short-term measures were not a sustainable way to boost prices. *See* 10/30/23 Trial Tr., at 2567:6-16 (Dckt. No. 653) (Baye). He testified that coordinated early slaughters across the industry could cause short-term price increases. *Id.* at 2567:10-16. He just couldn't quantify those effects:

> Q:    Dr. Baye, is it your view that the short-term flock reduction measures were unsuccessful?
>
> A:    I think it's fair to say they were unsuccessful.
>
> Q:    How come?
>
> A:    Well, I mean, they're not – it's not – you can't sustain higher prices by killing birds. Right? That's not a sustainable way of raising prices. You might be able to have an early slaughter and lead to some short-term increases in price if you coordinate those slaughters across everyone in the industry, but that's not a way to sustain price increases as a matter of economics in the long run.
>
> Q:    Okay. So when you say they're not successful, you mean they wouldn't have a sustained impact on price?
>
> A:    That's correct. That's correct.

*See* 10/30/23 Trial Tr., at 2567:6-19 (Dckt. No. 653) (Baye).

Similarly, Dr. Baye could not quantify the impact of the exports using econometrics because the effects were temporary. *Id.* at 2590:12 – 2591:6. Still, he came up with a "crude estimate" of how exports might have impacted prices. *Id.* at 2591:7 – 2593:7. Indeed, Dr. Baye

70

testified that "as a matter of impact, these [exports] would have materially impacted domestic prices." *Id.* at 2593:6-7. Dr. Baye explained:

> [A] small decline in supply, U.S. supply, by shipping them overseas leads to a fairly significant increase in price. Now, the challenge I have here is I don't know – it's hard to know exactly how long-lived these price increases are. I cannot say with a degree of scientific certainty how much the plaintiffs overpaid as a result of these price increases, but just as a matter of economics, these would have materially impacted domestic prices.

*See* 10/30/23 Trial Tr., at 2592:24 – 2593:7 (Dckt. No. 653) (Baye).

The inability to quantify goes more to *damages* than to *injury*. Plaintiffs could show that they were injured – they just couldn't answer the question "how much." That's why Plaintiffs sought nominal damages of $1 each for the exports and short-term measures. *See MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("The courts have always distinguished between proof of *causation* of damages and proof of the *amount* of damages.") (emphasis in original); *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1147 (8th Cir. 1981) (affirming the denial of damages where the district court found that the plaintiff failed to prove the amount of damages due to an antitrust violation, but remanding the case for an award of nominal damages because the plaintiff "established that it had been excluded from the . . . market by the tying arrangement"); *Sciambra v. Graham News*, 892 F.2d 411, 415 (5th Cir. 1990) ("Even if there is insufficient proof of the amount of damages, however, proof of an antitrust violation and the fact of damage is a sufficient basis for an award of nominal damages."); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969) (opining that "proof of some damage flowing from the unlawful conspiracy" is sufficient to prove the fact of damage, and "inquiry beyond this minimum point goes only to the amount and not the fact of damage").

To put this point in perspective, imagine that someone stole your wallet. Imagine that you knew you had some cash in there, but you weren't sure exactly how much. You still suffered an injury, even if you can't quantify whether you lost $40 or $100.

That's the principle on display here. Plaintiffs showed that they suffered an injury of some kind. They couldn't pin down an exact dollar amount. So, they only asked for $1.

Plaintiffs' evidence did not weigh heavily on that side of the scale. Plaintiffs' expert, Dr. Baye, looked at whether the exports and short-term measures had any measurable effect on prices. Dr. Baye came up empty. He found no discernible price increase from the exports and short-term measures.

The fact that the expert could not measure the damages took a lot of air out of the balloon when it came to the exports and short-term measures. But it didn't entirely pop it. There was other evidence propping it up. Not a lot of evidence – but (just) enough.

In sum, Plaintiffs presented sufficient evidence for a reasonable jury to conclude that the exports and short-term measures caused anticompetitive effects and injured them.

## V.    Lack of Enforcement Mechanisms

Next, Defendants argue that Plaintiffs could not have shown an unreasonable restraint of trade because UEP lacked a means to enforce the recommendations of its committees. *See* Def. Cal-Maine's Mem., at 4 (Dckt. No. 622). As Defendants see things, Plaintiffs "only established that UEP *hoped* that members would follow their recommendations but could do nothing about it if members declined to do so." *Id.* at 5 (emphasis in original).

The lifeblood of a conspiracy is concerted behavior. The group must stick as a group to achieve the goal of less supply and higher prices. Cheaters who don't play along – say, by

failing to reduce production or raise prices – undermine the effectiveness of the conspiracy itself. It's hang together, or fall apart.

Typically, conspirators have a stick in their back pockets to punish cheaters. The absence of a punishment mechanism cuts against the inference of a conspiracy. "Game theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Kleen Prod. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993) (citing Richard A. Posner, Economic Analysis of Law 265–66 (3d ed. 1986))); *see also* 20 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 2031 (4th ed. 2024) ("In order to collude successfully, the participants in a cartel must be able to reduce their output and raise their price, and also prevent 'cheating' by cartel members.").

Potential punishment prevents cheating. And preventing cheating is one of the things that makes a conspiracy work.

On this record, the jury could have come out either way. The jury could have found that there was no conspiracy because there was little or no enforcement mechanism. But there was evidence on the other side of the ledger, too.

Plaintiffs offered evidence of "soft" enforcement measures. For example, UEP published a list of companies that agreed to the short-term recommendations. *See* Pls.' Ex. 599, at 2 (November 2004 United Voices newsletter stating that "Companies making their intentions known during the meeting were . . ."). Cal-Maine executive Ken Looper (who was then UEP chairman) published an editorial in the United Voices expressing his support for this measure.

"Beginning this month we will *keep score* by publishing the actual hen disappearance compared to the objective that will determine the industry's level of profits." *See* Pls.' Ex. 268, at 1 (April 1999 United Voices newsletter) (emphasis added).

UEP also expected its members to let it know when they had followed through with the short-term measures. *See* Pls.' Ex. 377 (November 2004 letter from Gene Gregory to Cal-Maine's Dolph Baker about Cal-Maine's promises to early slaughter and reduce its hatch).

That's not a lot. But it is something. Naming and shaming can coax people to engage in certain behavior, even if it isn't the world's biggest stick.

USEM had a soft enforcement mechanism, too. All USEM members had to participate in an export if the majority of members voted to take the export. *See* 11/7/23 Trial Tr., at 4151:13-21 (Dckt. No. 665) (Hinton). Once an export was approved, USEM supplied the price and quantity of eggs that members had to provide. *See id.* at 4151:25 – 4152:3. So, if a member didn't have excess eggs on hand, the member would have to purchase eggs from competitors to fulfill its obligation – even if it meant taking a loss on the export. *See* 11/7/23 Trial Tr., at 4106:4-20 (Dckt. No. 664) (Hinton).

UEP used stricter enforcement measures for the Certified Program. UEP conducted audits of producers that participated in the Program. *See* Pls.' Ex. 193 (failed motion from 2002 to allow a 100-bird variance over the space requirement); Pls.' Ex. 47 (Rose Acre audit form from 2007); Pls.' Ex 37 (describing the audit procedures).

If UEP found evidence of backfilling (again, replacing a dead hen with a live hen in a cage), a producer would automatically fail the audit – and it would need to kill birds to stay in compliance. *See, e.g.*, Pls.' Ex. 109 (March 15, 2006 email from UEP's Linda Reickard) ("Those birds will need to be destroyed to remain in compliance. Backfilling is not allowed.");

74

Pls.' Ex. 68 (January 2007 email from UEP's Gene Gregory explaining that Michael Foods failed an audit because "the auditor found evidence of cages being backfilled"). The new chicken's neck was on the line.

Flunking the audit could have other consequences, too. A producer who failed an audit more than a few times could get booted from the UEP Certified Program. *See* 10/24/23 Trial Tr., at 1719:22-25 (Dckt. No. 647) (Baker). And then, the producer could not sell eggs with the UEP certification. And some customers demanded UEP Certified eggs.

Dr. Baye testified about how UEP's soft enforcements measures could lead to compliance. "You know, it's not like the UEP was threatening to boil anyone in oil if they, you know, cheated on the cage space restrictions or something, but what they designed, in my view, is a self-enforcing mechanism. And they did that by creating an environment where anyone in this particular environment had to be 100 percent committed to the certified program." *See* 10/30/23 Trial Tr., at 2607:22 – 2608:3 (Dckt. No. 653) (Baye).

Dr. Baye explained how the threat of decertification could act as an enforcement mechanism. "[J]ust that threat, that implicit threat of being decertified economic theory indicates can discipline the behavior of a trade association cartel and also smaller numbers of players that are attempting to collude." *See* 10/30/23 Trial Tr., at 2609:18-21 (Dckt. No. 653) (Baye).

The record included some evidence of enforcement mechanisms. But even if there was no such evidence, a lack of an enforcement mechanism would not be outcome dispositive. It simply makes an inference of an agreement less likely. *See Kleen Prod. LLC*, 910 F.3d at 937 ("It is true that a cartel may exist with only soft measures of control or ineffective enforcement."); *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 797 (N.D. Ill. 2017) (opining that plaintiffs did not need to allege the existence of an enforcement

mechanism when the conspiracy involved cutting production only during "certain limited periods of time" because the co-conspirators could have "contemplate[d] that after cutting production and successfully inflating prices, Defendants would be permitted to again increase production to take advantage of those price increases"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 969 (N.D. Ill. 2023) (rejecting defendants' argument that the court should grant summary judgment due to the lack of an enforcement mechanism and noting the existence of evidence of "soft measures, like the parties' back-and-forth emails and calls when their employees strayed off message").

A lack of enforcement mechanisms doesn't necessarily doom a section 1 claim. In any event, the jury heard about soft measures used by Defendants to enforce the conspiracy. Based on the record, the jury heard enough to reach the conclusion that Defendants conspired, even if the enforcement regime left something to be desired.

## VI. Antitrust Injury Before August 2005

Finally, Defendants argue that, as a matter of law, Plaintiffs failed to show antitrust injury for the period before August 2005. They point out that Dr. Baye's model did not show any "statistically significant effect" of the conspiracy on the market until August 2005. *See* Def. Cal-Maine's Mem., at 1–2 (Dckt. No. 622); *see also* Def. Rose Acre's Mem., at 8–9 (Dckt. No. 611).

If successful, the argument would shave off roughly 10 months of damages. The MDL court ruled that the statute of limitations barred "claims for damages occurring prior to September 24, 2004[.]" *In re Processed Egg Prod. Antitrust Litig.*, 2012 WL 6645533, at *8 (E.D. Pa. 2012). So, the argument applies to damages from October 2004 to August 2005. *See* Def. Cal-Maine's Mem., at 2 (Dckt. No. 622).

76

The jury expressly found that Plaintiffs suffered an injury from October 2004 to December 2008. *See* Phase 1 Jury Verdict, at 6 (Dckt. No. 582). It found no injury from 2009 to 2012. *Id.*

But the jury did not address whether Plaintiffs suffered an injury with any more specificity. That is, the jury didn't make a finding on whether Plaintiffs suffered an injury throughout the entire period from October 2004 to December 2008, or if they only suffered an injury during a subset of that timeframe.

Plaintiffs' expert, Dr. Baye, could not calculate statistically significant effects of the Certified Program for the period before August 2005. *See* 10/30/23 Trial Tr., at 2557:6 – 2559:21 (Dckt. No. 653) (Baye). So, Dr. Baye's model only captured damages from August 2005 to 2008. *See* 11/29/23 Trial Tr., at 6977:7-17 (Dckt. No. 682) (Baye).

Plaintiffs did not present any other calculations about damages to the jury – Dr. Baye was their only witness during the damages phase of the trial. So, any damages award only corresponds to damages from August 2005 onward.

Dr. Baye offered reasons about why the effects of the Certified Program became more pronounced a few years after the Program began. For one, Dr. Baye pointed to the fact that more egg producers, such as Michael Foods, entered the Program, eliminating the option to buy noncertified eggs. *See* 11/1/23 Trial Tr., at 2957:13 – 2598:2 (Dckt. No. 656) (Baye). Dr. Baye also pointed to implementation of the 100% Rule, which required companies in the UEP Certified Program to sell only UEP Certified eggs. *Id.* at 2598:3-16. In addition, the cage space restrictions increased at different phases of the Program. *See* 10/30/23 Trial Tr., at 2585:1-3 (Dckt. No. 653) (Baye).

A reasonable jury could have found that Plaintiffs suffered an (unquantified) antitrust *injury* for the period between September 2004 to August 2005. But a jury could not have awarded Plaintiffs *damages* for the period between September 2004 and August 2005. That's because the jury heard no evidence *quantifying* the injury for that period.

But the jury didn't award any damages from September 2004 to August 2005. Instead, Plaintiffs' damages calculations began in August 2005.

The jury heard about initiatives taken between September 2004 and August 2005 to reduce flock size to raise prices. *See* Pls.' Ex. 599 (November 2004 United Voices newsletter recommending reductions in flock size for the first half of 2005); 10/23/23 Trial Tr., at 1359:9 – 1361:8 (Dckt. No. 645) (Baker); Pls.' Ex. 142, at 3 (October 21 and 22, 2004 UEP Annual Board Meeting & Executive Conference Minutes, reflecting a recommendation from Cal-Maine CEO Dolph Baker for producers to "take care of the business for profits" by early molting and reducing flock size). Indeed, Plaintiffs presented evidence that a March 2005 initiative to reduce flock size led to increased prices. *See* Pls.' Ex. 336, at 12 (Cal-Maine 2007 10-K filing touting the industry initiative to reduce flock size). The jury could have concluded that Plaintiffs suffered an unquantifiable antitrust injury from these measures.

To be sure, Defendants pointed out that egg prices were at a low point in 2004. *See, e.g.*, Defs.' Ex. 1042 (United Voices newsletter from July 2004 bemoaning low egg prices); 11/9/23 Trial Tr., at 4910:15 – 4911:13 (Dckt. No. 669) (Marshall) (stating that 2005 and 2006 were "really bad years" for Rose Acre financially). Still, things can always be worse. A reasonable jury could have found that times were tough – but the going would have been even tougher if not for the conspiracy.

In sum, a reasonable jury could have found that Plaintiffs suffered antitrust injury for the period before August 2005. And even if a reasonable jury couldn't have reached this finding, Plaintiffs' damages award would be unchanged.

*   *   *

One final thought. Based on the record as a whole, this Court concludes that the jury heard enough evidence to support its verdict. That ruling does not mean that the evidence was overwhelming. The record was not so lopsided that the jury could have come out only one way. The jury verdict was not inevitable. The trial was hotly contested and hard fought, and the jury had its hands full.

In the end, the verdict was the province of the jury. And now, this Court plays a limited role. Here and now, the question is not whether the jury should have done what it did. The question is whether the jury heard enough to do what it did.

On this record, the jury heard enough to reach its decision. So it stands.

### Conclusion

For these reasons, Defendants' motions for judgment as a matter of law (Dckt. Nos. 607, 610, 621) are hereby denied.


Date:   September 30, 2024        _____

                                 Steven C. Seeger
                                 United States District Judge