UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRAFT FOODS GLOBAL, INC., THE KELLOGG COMPANY, GENERAL MILLS, INC., and NESTLÉ USA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-08808 |
| v. | ) ) | Judge Steven C. Seeger |
| UNITED EGG PRODUCERS, INC., UNITED STATES EGG MARKETERS, INC., CAL-MAINE FOODS, INC., and ROSE ACRE FARMS, INC., | ) ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) | |

**DEFENDANT CAL-MAINE FOODS, INC.'S MEMORANDUM OF
LAW IN SUPPORT OF ITS RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b),
OR FOR A NEW TRIAL PURSUANT TO RULE 59(a)**

**TABLE OF CONTENTS**

Page

A.  Plaintiffs Failed to Prove the Conspirators Had the Requisite Market Power, Warranting Either Judgment for Cal-Maine or a New Trial. ............................................... 1

    i.  Plaintiffs Did Not Establish a Relevant Market. ..................................................... 2

    ii.  Plaintiffs Did Not Establish Market Power. ......................................................... 4

    iii.  Plaintiffs Did Not Establish That the Proved Conspiracy (or Even the UEP Certified Program Itself) Actually Reduced the Supply of Eggs. ........................... 7

B.  The Novel "Bullhorn" Theory is Inconsistent with Law and the Evidence. ...................... 7

C.  No Short-Term Recommendation or USEM Export Adversely Affected Competition or Resulted in Antitrust Injury as a Matter of Law. ..................................... 16

    i.  Short-Term Recommendations. ............................................................................. 16

    ii.  USEM Exports. ..................................................................................................... 18

D.  UEP Lacked Enforcement Mechanisms to Enforce Short Term Recommendations, and Therefore It Could Not "Restrain Trade." ................................................................. 19

E.  As a Matter of Law, the "Conspiracy" Cannot Include Wabash Valley. ......................... 20

F.  Plaintiffs Do Not—and Cannot—Meet Their Burden of Proof on Damages Based on the Limited Conspiracy Found by the Jury and, therefore, Judgment Should be Vacated or Reduced to $0. .............................................................................................. 21

G.  There is No "Antitrust Injury" as a Matter of Law for Cal-Maine's Conduct *At Least* until August 2005. .............................................................................................. 24

Conclusion ..................................................................................................................................... 25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) (per curiam) ........................................................15, 16

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998) ........................................................................16

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ..................................................................1, 2, 5

*Always Towing & Recovery, Inc. v. Milwaukee*,
2 F.4th 695 (7th Cir. 2021) ............................................................................7

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ...................................................................14

*In re Brand Name Prescription Drugs Antitrust Litig.*,
No. 94 C 897, 1999 WL 33889 (N.D. Ill. Jan. 19, 1999) .................................15, 16

*In re Broiler Chicken Antitrust Litig.*,
702 F. Supp. 3d 635 (N.D. Ill. 2023) ......................................................14, 15, 21

*In re Folding Carton Antitrust Litig.*,
88 F.R.D. 211 (N.D. Ill. 1980) .....................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ...............................................................................13, 25

*Comcast v. Behrend*,
569 U.S. 27 (2013) .............................................................................22, 23, 24

*Consol. Metal Prods. Inc. v. Am. Petroleum Inst.*,
846 F.2d 284 (5th Cir. 1988) ..................................................................14, 19, 20

*Flodin v. Cent. Garden & Pet Co.*,
No. 21-CV-01631-JST, 2024 WL 4565340 (N.D. Cal. Oct. 23, 2024)...............................24

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
998 F.2d 391 (7th Cir. 1993) ......................................................................16, 25

*Gumwood HP Shopping Partners v. Simon Prop. Grp.*,
221 F. Supp. 3d 1033 (N.D. Ind. 2016) ..............................................................6

*Hannah's Boutique, Inc. v. Surdej*,
   112 F. Supp. 3d 758 (N.D. Ill. 2015) ................................................................. 1, 5

*Jack Russell Terrier Network v. Am. Kennel Club*,
   407 F.3d 1027 (9th Cir. 2005) ............................................................................ 14

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................................................................... 25

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
   354 F.3d 661 (7th Cir. 2004) ................................................................................ 1

*Mendez v. City of Chi.*,
   No. 18-CV-5560, 2024 WL 4661139 (N.D. Ill. Sept. 20, 2024) (slip op.) ....... 23, 24

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*,
   596 F.2d 573 (3rd Cir. 1979) .............................................................................. 14

*Moore v. Boating Indus. Ass'ns*,
   819 F.2d 693 (7th Cir. 1987) .......................................................................... 15, 16

*Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Assoc.*,
   672 F.2d 1280 (7th Cir. 1982) ............................................................ 8, 16, 17, 19

*In re Processed Egg Prods. Antitrust Litig.*,
   312 F.R.D. 124 (E.D. Pa. 2015) .......................................................................... 24

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   587 F. Supp. 2d 27 (D.D.C. 2008) ...................................................................... 13

*In re Tableware Antitrust Litig.*,
   485 F. Supp. 2d 1121 (N.D. Cal. 2007) .............................................................. 13

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
   401 F.3d 123 (3d Cir. 2005) ........................................................................... 19, 20

*Schachar v. Am. Acad. of Opthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989) ....................................................................... 2, 19, 20

*Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*,
   902 F.3d 735 (7th Cir. 2018) .............................................................................. 13

*Tunica Web Adver. v. Tunica Casino Operators Ass'n*,
   496 F.3d 403 (5th Cir. 2007) .............................................................................. 14

*United States v. Aiyer*,
   470 F. Supp. 3d 383 (S.D.N.Y. 2020) ................................................................ 13

*United States v. Tomkins*,
  No. 07 CR 227, 2012 WL 1357701 (N.D. Ill. April 19, 2012)................................................17

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978).........................................................................................................9, 21

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*,
  822 F.2d 656 (7th Cir. 1987) .............................................................................................1, 5

*Zenith Elecs. Corp. v. WH–TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) ...........................................................................................17, 18

## Statutes

Sherman Act Section 1................................................................................................. *passim*

## Other Authorities

Black's Law Dictionary (12th ed. 2024)............................................................................6

Fed. R. Civ. P. 50................................................................................................................1

Fed. R. Civ. P. 59.........................................................................................................1, 23

Fed. R. Evid. 104(a).........................................................................................................22

Fed. R. Evid. 701.........................................................................................................17, 18

Fed. R. Evid. 702................................................................................................18, 22, 23, 25

Cal-Maine Foods, Inc. ("Cal-Maine") respectfully renews its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure Rule 50(b) or for a new trial pursuant to Rule 59(a).[1] Cal-Maine incorporates by reference in their entirety the concurrently filed Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) or for a New Trial Pursuant to Rule 59(a) submitted by Defendants Rose Acre Farms ("Rose Acre"), United Egg Producers ("UEP"), and United States Egg Marketers ("USEM").

### A. Plaintiffs Failed to Prove the Conspirators Had the Requisite Market Power, Warranting Either Judgment for Cal-Maine or a New Trial.

The jury's verdict found the conspiracy to consist of four egg producers, UEP, and USEM. But "[t]he first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries . . . that matter under the federal antitrust laws." *Menasha Corp. v. News Am. Mktg. In-Store, Inc*., 354 F.3d 661, 663 (7th Cir. 2004); *see also Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). A showing of market power is an essential threshold matter under the Rule of Reason analysis, yet Cal-Maine, Rose Acre, Moark, MFI, and Wabash Valley together represented only 20.4% of the market, and without MFI (which the jury expressly found was not in the conspiracy) the number drops to 15.5%. 10/31/2023 Trial Tr. 2844:9–14. "The Seventh Circuit has held that in cases alleging a violation of Section 1 of the Sherman Act, 'a 20%-25% market share or less does not constitute market power.'" *Hannah's Boutique, Inc. v. Surdej*, 112 F.Supp.3d 758, 773 (N.D. Ill. 2015) (St. Eve, J.) (quoting *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987)). Plaintiffs' inability to show that these entities had sufficient market power to inflict antitrust injury is fatal to

---

[1] Defendants initially moved for judgment as a matter of law under Rule 50(a), ECF #607, 610, 621. The Court denied Defendants' motions, ECF #713, hereinafter the "Order", and subsequently entered judgment on behalf of the Plaintiffs on November 6, 2024, ECF #720.

Plaintiffs' Section 1 claim, which fails as a matter of law. *Id.*; *see also Schachar v. Am. Acad. of Opthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir. 1989).

The Court nonetheless "concluded that the jury could look at the market share of all the members of the UEP Certified Program to determine whether the co-conspirators had market power," Order at 49, and that "a reasonable jury could find that Defendants roped in egg producers' customers – under the guise of animal welfare – to force egg producers to get on board with the Program," *id.* at 52. The Court then stated, "[a]fter reaching that conclusion, a jury could find that the proper measure for market power was the percentage of producers who participated in the Certified Program." *Id.* But this rationale and conclusion is inconsistent with the evidence presented at trial, the jury's other findings, and the requirements under the law.

Under Section 1 of the Sherman Act, "a plaintiff's threshold burden under the Rule of Reason analysis involves the showing of **a precise market definition** in order to demonstrate that a defendant wields **market power**, which, by definition, means that the defendant can produce **anticompetitive effects**." *Agnew*, 683 F.3d 328 at 337 (emphasis added); *id.* at 335 (noting that under Section 1, a plaintiff must prove "a[n] . . . unreasonable restraint of trade in [a] relevant market; and . . . an accompanying injury"). Here, the evidence provided by Plaintiffs at trial fails to show any of these. The verdict must be set aside.

### i. Plaintiffs Did Not Establish a Relevant Market.

*First*, Plaintiffs failed to show that shell eggs ***and*** egg products comprise a single relevant market. The Court notes that "the key concept [in defining whether two products are in the same relevant market] is substitutability." Order at 38–39. Without demand-side substitutability, Plaintiffs were left to try to establish supply-side substitutability, which the evidence does not support. To explain how there may be supply-side substitutability, the Court provided the example of a t-shirt manufacturer that switches between producing White Sox and Cubs t-shirts. *See* Order

at 40. The Order stated that "the factory owner could easily shift production [from White Sox to Cubs t-shirts] to get in on the red-hot market for Cubs gear. That's supply-side substitutability." *Id.* The Court then suggested that like the t-shirt producer, an egg producer could easily shift production between shell eggs and egg products. But the t-shirt manufacturer comparison, and the suggestion that egg producers could "easily shift production" from shell eggs to egg products, does not match the facts, the evidence actually presented at trial.

While the Order described the process of producing egg products as simply "crack[ing] the eggs, separat[ing] the whites from the yolks, and then fill[ing] up the truck with [the egg products]," Order at 4–5, the evidence presented at trial painted quite a different picture. It was established (and unrefuted) that egg products production involves significant investment in capital-intensive equipment and processes, including machinery, storage facilities, and transportation methods. *See, e.g.*, 10/24/2023 Trial Tr. 1652:24–1653:10 (Baker explaining that Cal-Maine did not make necessary investments in egg products production because it was "much more technical than the shell egg business"); 11/7/2023 Trial Tr. 4021:14–4024:11 (Hinton explaining why egg products production is "more complex" than shell egg production, including requiring additional equipment and processes); 11/9/2023 Trial Tr. 4904:4–25 (Marshall describing the same). Egg products production involves enormous capital expenditures, recipes and ingredients for egg products created for a specific purpose and customers, and even building entirely new buildings and complexes to accommodate the required equipment. *See, e.g.*, 11/7/2023 Trial Tr. 4016:18–4017:4 (Hinton discussing Rose Acre building "a new building and equipment" to create egg products); 10/30/2023 Trial Tr. 2416:5-2417:46 (Manion testifying certain Kraft formulas required certain ingredients and specialized egg products).

Considering the evidence, the Court's conclusion that shell eggs and egg products are

supply-side substitutes akin to swapping a logo on t-shirts is plainly erroneous. The various and different kinds of egg products require much more and different investment than shell eggs. They are no more substitutable for one another than raw cotton would be substitutable for a 100% cotton White Sox t-shirt.

Next, as evidence of supply-side substitutability, Plaintiffs offered evidence that "the price of breaking stock . . . was tied to the price of shell eggs." Order at 44–45. But correlation between prices of products does not mean there is supply-side substitutability between products. Even if raw cotton is an input for both 100% cotton t-shirts and nightgowns, and an increase in the price of raw cotton lead to higher prices for cotton t-shirts and nightgowns, that does not make either t-shirts or nightgowns a supply-side substitute for one another, and it certainly does not make the raw cotton itself a supply-side substitute for either.

The Court noted that "that at least *some* egg producers had the capability to shift production [between shell eggs and egg products] in response to a change in prices." Order at 45 (emphasis added). While this tacitly acknowledges that many producers, including Cal-Maine, not only did not produce egg products, but *could not* produce egg products, the fact that *some* producers had the equipment and operations to produce both shell eggs and egg products does not make the different products "substitutes" for one another. That a business makes t-shirts and nightgowns and could divert resources away from one to produce the other does not mean that every company that makes t-shirts can do the same. Nor does it mean that t-shirts and nightgowns are substitutes for one another. The Court's holding on the relevant market is manifestly erroneous as a matter of fact and law, and substantially prejudicial to Cal-Maine.

### ii. Plaintiffs Did Not Establish Market Power.

Even if Plaintiffs had submitted competent evidence that egg products and shell eggs comprised a single relevant market, though they did not, they still did not establish that the

Defendants, or Defendants along with any non-conspirators who were ***actually*** coerced by Defendants, had market power in that market. In the Seventh Circuit, proof of substantial market power in a relevant market is a prerequisite to proving anticompetitive effects and injury in a Rule of Reason case. *Agnew*, 683 F.3d at 335. Plaintiffs failed to show either that the five alleged co-conspirator producers had sufficient market power in a relevant market (20.4% of the national flock) to cause substantial anticompetitive effects or injury. The four egg producers the jury found to be co-conspirators had only 15.5% share of the market measured by their share of the national flock. A market share of 15.5-20.4% forecloses a finding of antitrust injury as a matter of law. *See Valley Liquors, Inc.*, 822 F.2d at 666; *Hannah's Boutique, Inc.*, 112 F. Supp. 3d at 773.

Because of the insufficient market share of the egg producer conspirators, Plaintiffs needed to show that others somehow were involved, either by participation in the conspiracy or by being coerced by a conspiracy member to participate in the program and reduce supply. But Plaintiffs failed to prove any non-conspiring producers joined the UEP Certified Program because they were "coerced" by any of the conspirators.

The Order concluded that the jury could look at the market share of "all of the members of the UEP Certified Program to determine whether the co-conspirators had market power." Order at 49. The Court rationalizes this position by looking at what was "*really* happening in the market," including by suggesting that other producers were somehow bullied into joining the Certified Program by virtue of UEP having "lobbied" and "worked to get other industries," like grocers and trade organizations, on board with the Program. Order at 49–50. But there was no evidence in the record of any egg producers joining the UEP Certified Program due to UEP's (or any other conspirator's) coercion. Under the law, "coercion" means the "[c]ompulsion of a free agent by physical, moral, or economic force or threat of physical force," or to engage in "improper use of

economic power to compel another to submit to the wishes of one who wields it." *Coercion*, Black's Law Dictionary (12th ed. 2024). There was no evidence put into the record that supports a finding that anyone was coerced by anyone. Unless Plaintiffs put into the record actual proof of coercion leading to particular producers joining the UEP Certified Program, which they indisputably did not do, the market share of the other egg producers cannot be considered for purposes of assessing the conspiracy's impact on the market. *See Gumwood HP Shopping Partners v. Simon Prop. Grp.,* 221 F. Supp. 3d 1033, 1042–43 (N.D. Ind. 2016) (holding an expert's damages model failed to reliably measure effects of antitrust injury where it assumed a defendant's coercion caused each targeted retailer to not lease at plaintiff's mall).

Instead, the evidence as found by the jury was that UEP Certified producers like MFI joined the Certified Program for lawful reasons. *See, e.g.*, 11/7/2023 Trial Tr. 4223–27 (Pickett describing telling MFI he "would expect your SKU count to go down" if it were not selling UEP Certified products); 11/6/2023 Trial Tr. 3741:3–3745:14 (Hardin describing McDonalds requiring animal welfare guidelines in early 2000s); 11/8/2023 Trial Tr. 4559:8–4561:9 (Paramore describing Publix approaching him with concerns over PETA activism in the "late 90s or early 2000s"); *id.* 4566:12–4568:15 (Paramore confirming Publix was "very proactive" in 2002 regarding requiring animal welfare programs). As for UEP "lobbying" grocers, the evidence demonstrated that UEP had no meaningful impact. For instance, Walmart buyer Tony Airoso testified that it was after receiving correspondence from companies, including Cal-Maine, about the detriments of alternatives to the UEP Certified Program that Walmart ***stopped*** requiring UEP Certified eggs, rather than when it began requiring them. 11/3/2023 Trial Tr. 3650:11–51. Such "lobbying" plainly had no effect on Walmart, and in any event is irrelevant for purposes of the market power analysis. Airoso's testimony comports with the testimony of his predecessor, Gary Pickett, who confirmed

6

there was not "any doubt" that grocers like Walmart (literally, Fortune 1)[2] had the leverage in these types of discussions between egg suppliers and Walmart buyers. 11/7/2023 Trial Tr. 4227:4–19.

In short, Plaintiffs failed to prove which (if any) producers were actually coerced by UEP (or any other Defendant) into joining the UEP Certified Program. Speculation as to the motivations of non-Defendant producers is not enough. The Court itself recognized, "the jury didn't make any findings about why anybody else [other than the four producers] joined the UEP Certified Program." 11/28/2023 Trial Tr. 6848:4–6. The only evidence in the record is these non-parties joined the UEP Certified Program seeking the myriad pro-competitive benefits that the Court recognized. *See* 11/21/2023 Trial Tr. 6613–29 (the Court explaining the UEP Certified Program's pro-competitive benefits). Without evidence that UEP Certified producers joined the Program due to coercion by the co-conspirators, the Court's broad conception of market power does not withstand scrutiny, and resulted in manifest injustice to Cal-Maine and the other Defendants.

### iii. Plaintiffs Did Not Establish That the Proved Conspiracy (or Even the UEP Certified Program Itself) Actually Reduced the Supply of Eggs.

Plaintiffs failed to prove that the proffered (or proven) "conspiracy" restricted output. *Always Towing & Recovery, Inc. v. Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Assoc.*, 672 F.2d 1280, 1288 (7th Cir. 1982). This is underscored by the fact that the Certified Program itself had no supply limitations. No member of UEP had to join the Certified program, and every Certified producer could produce as many eggs as they wanted to and expand capacity as much as they desired. 11/8/2023 Trial Tr. 4502:20–4503:3 (Rust confirming that Rose Acre could produce "as many eggs" as it wanted to); 10/31/2023 Trial Tr. 2752:1–2753:24 (Dr. Baye confirming there were at least 30 egg producers

---

[2] *Walmart, Inc*., Fortune, *available at* https://fortune.com/company/walmart/ (last visited Dec. 4, 2024) (identifying Walmart as the world's largest retailer and the United States' largest company by revenue).

that were part of Certified Program but were not members of UEP). Dr. Baye focused on the so-called "effects" of the Certified Program (based on national flock sizes that included a host of independent egg producers as well as specialty eggs like organic and cage free eggs which are different products entirely) and, therefore, his analysis swept in the actions of hundreds of independent egg producers and different markets and types of shell eggs that were not impacted by the Certified Program. In addition, testimonial evidence established that Plaintiffs had no difficulty procuring non-certified egg products during the alleged conspiracy period. *See, e.g.*, 11/3/2023 Trial Tr. 3585:6–9 (Tobey confirming that Kellogg was always able to obtain the UEP Certified and non-certified egg products that it wanted). All these eggs and egg products were lumped in by Dr. Baye, even though Dr. Baye admitted that having the choice between a new and old product (like the choice that Plaintiffs had between UEP Certified eggs and commodity eggs), is an indicator of competition, and that "choices are procompetitive, absolutely." 11/1/2023 Trial Tr. 2952:5–25.

### B. The Novel "Bullhorn" Theory Is Inconsistent with Law and the Evidence.

The Court inappropriately attributed market power to the limited conspiracy found by the jury using a novel "bullhorn" theory of liability where (the Court postulated) the conspirators "agree[d] amongst themselves to get on board and get in the game." *See* Order at 29. But the hub-and-spoke conspiracy alleged by Plaintiffs requires proving, as the Order acknowledges, more than an agreement between the hub (UEP) and each co-conspirator spoke (the four producers); it requires an agreement between and among the spokes to create the "rim"—*i.e.*, the specific members of the conspiracy whose conduct was alleged to have injured the Plaintiffs.

But Plaintiffs failed to prove any rim; as evidenced by what the jury did find: MFI was not a conspirator, and being UEP Certified did not automatically mean that any producer was a part of the conspiracy. *See* Verdict, ECF #582. The jury's verdict shows that it found, at most, a limited

conspiracy between UEP and USEM and a handful egg producers (four) with insufficient market share and power to inflict an antitrust injury. Put differently, the only participants the jury found were within earshot of a "bullhorn" and took any action based on what they heard were Cal-Maine, Rose Acre, Wabash Valley, and Moark. No other producer was proved to "have knowing involvement" of the alleged conspiracy or was shown to have been coerced by any conspirator. *See* Order at 37 ("A plaintiff must prove the knowing involvement of each co-conspirator in the alleged conspiracy.") (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 430 (1978)). Just as with MFI, the jury's verdict expressly disclaims the notion that Plaintiffs proved any non-parties (in theory, every single Certified producer other than Cal-Maine, Rose Acre, Wabash Valley, and Moark), conspired to (or did) reduce supply.[3]

The jury's finding that not all UEP Certified producers were conspirators, combined with Plaintiffs' inability to provide proof that any non-conspirators were coerced by any co-conspirator into joining the UEP Certified Program, as well as the existence of competing animal welfare programs necessarily means that Plaintiffs cannot have met their burden of proof on liability. The Court cited criminal and tort cases explaining that use of an innocent bystander or "unknowing helper" to achieve an unlawful goal does not absolve a knowing bad actor of liability. Order at 56–57. But the Order cites no antitrust cases on this point because no such authority exists.

---

[3] The Order suggested Defendants argued the jury needed "to find that every member of the UEP Certified Program participated in a conspiracy to reduce the supply of eggs to find for Plaintiffs." Order at 53. Cal-Maine acknowledges it may have been possible for Plaintiffs to establish a conspiracy with the reach and power necessary to injure Plaintiffs without establishing that *every* UEP Certified producer was a conspirator. Had the jury returned a different verdict, that stated that the twenty largest egg producers (who had, for example, a 75% market share) each was in the conspiracy, or was each coerced by the conspiracy, Plaintiffs could have established a limited group of producers with market power sufficient to move the market such that it could injure Plaintiffs. But they did not. Plaintiffs voluntarily pursued a strategy where they focused on a handful of the largest egg producers and introduced virtually zero evidence related to any other producer, and no evidence that any non-conspirator producer was somehow "coerced." That premise was entirely theoretical.

A hypothetical illustrates why. Let's say activists attack the cotton industry contending that specialty cotton (specifically, Supima) is better for the environment. These activists attack retailers who sell non-Supima cotton goods, claiming the retailers are destroying the environment. Growing Supima cotton is expensive, including because the plants that provide Supima cotton require more growing space and yield lower crops. But retailers begin demanding goods made with Supima to stop the public attacks. In response, certain growers of raw cotton with 15% of the market share for raw cotton ("Original Growers") decide to expand into Supima cotton because the demand for Supima is increasing, and the demand for raw cotton is shrinking. (Some of these growers are also producers of cotton fabric, wherein raw cotton is spun into thread, woven, and converted into cloth. While cotton growers who make cotton fabric can hold their cloth and release it in the market when prices may be better; raw cotton growers who do not produce cotton fabric have to sell their inventory quickly before it rots.)

The Original Growers propose, through Trade Association A, that other raw cotton growers convert some of their fields to Supima, not only to meet the demands of customers, but also in hopes that prices will increase for raw cotton and 100% cotton fabric when more fields are devoted to Supima. Trade Association A develops a Supima certification program that any cotton grower can join and encourages cotton growers to rotate Supima cotton into their fields. There is no limit on how much cotton, either raw or Supima, that can be planted, although practically speaking, purchasing new fields, and preparing them for cultivation takes time. There is no evidence that the Original Growers ever communicated independently with one another or any other cotton growers; but Trade Association A is communicating with all members of Trade Association A touting the benefits of Supima cotton, including that cultivating it might improve prices for raw cotton and 100% cotton fabric.

Many cotton growers—both members and nonmembers of Trade Association A—decide to convert some of their fields to Supima cotton and seek Supima certification. Some Trade Association A members do not cultivate Supima; many do. There is considerable evidence that the retailers demand Supima cotton goods, activists appear mollified by the change, and Supima cotton is successful in the market. Trade Association A continues to tout the benefits of the Supima cotton and Supima certification to cotton growers and retailers alike.

Other cotton growers, some of whom are members of Trade Association A, decide to cultivate another specialty cotton—Pima cotton—rather than Supima. They believe that Pima is just as good for the environment as Supima cotton, and that these cottons are of comparable quality, but believe Pima cotton is easier to grow and results in a greater yield. They have no interest in Supima certification. Whether they hope that converting fields from raw cotton to Pima cotton will drive up the price of raw cotton is not known. Some of them also make cotton fabric, some of them do not. Their market share is 20% altogether.

"Certain Retailers" who purchase 100% cotton fabric (and who also required Supima cotton for other goods) bring a Section 1 price fixing lawsuit against numerous cotton growers, including growers of raw cotton who grow Supima cotton, raw cotton growers who grow Supima certified cotton, and raw cotton growers who cultivate Pima cotton. They claim that raw cotton growers conspired to fix prices for 100% cotton fabric by converting their fields from raw cotton to Supima cotton, and that the way they conspired was via Trade Association A and the Supima certification program. The Certain Retailers never define the scope of the conspiracy, but they contend it includes the Original Growers, Trade Association A, and certain other cotton growers who sought Supima certification. During the trial, the court finds that the Supima certification program has procompetitive benefits and is subject to a Rule of Reason analysis. There is no

evidence adduced at trial as to why most of the cotton growers join the Supima certified program. Nor do the Certain Retailers proffer evidence of communication between and among the cotton growers regarding their decisions to convert any of their fields to Supima cotton or obtain certification. After the trial, the jury returns a verdict in favor of the Certain Retailers and finds the Original Growers with 15% market share conspired with Trade Association A to fix prices for 100% cotton fabric. But the jury also expressly finds (1) not all the other members of the Supima certification program are co-conspirators by virtue of being in the program, and (2) certain of the named alleged co-conspirators were not part of the conspiracy.

The foregoing hypothetical illustrates the mismatch between a "bullhorn" theory and the type of injury the antitrust laws are designed to redress: *i.e.*, economic injury from higher prices or lower output directly resulting from anticompetitive conduct (it also underscores why egg products and shell eggs are not substitutable). If a program has demonstrable pro-competitive benefits such as Supima certification (or UEP certification), and there are multiple different products that can meet those needs (here, Supima and Pima; there, conventional, UEP certified, or other specialty shell eggs (but not egg products)), even if, in our example, prices for 100% cotton fabric increased briefly as the cotton growing industry shifted production to specialty cotton, that does not mean that that any resulting price increase in raw cotton or 100% cotton fabric caused cognizable "injury," much less an *antitrust* injury to the Certain Retailers.

In short, unless plaintiff proffers competent evidence concerning ill motives or coercion of "unknowing helpers," in a Rule of Reason case such as this one, such entities must be assumed to be parties seeking out procompetitive benefits for independent reasons, entirely untethered to the aims of the alleged bad actor(s). Even characterizing them as "helpers" is inapt as it suggests an element of participation that is entirely unproven.

12

The Court points to a single case that analogizes the proximate causation requirement in tort to the antitrust standing requirement. Order at 57. However, the Seventh Circuit there affirmed dismissal of the plaintiffs' state law antitrust claims (no Sherman Act claims were at issue) because "they ha[d] not shown how their alleged injury could be traced to defendants' conduct" where the products at issue had "gone through numerous manufacturing alterations and lines of distribution." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc*., 902 F.3d 735, 744 (7th Cir. 2018).

Instead, the Order finds that conspirators may be held liable for a conspiracy's intended effects, even if effectuated through otherwise legal acts. But the cases the Court cites in support of this proposition involve the legal and innocent acts of *proven conspirators* used to effectuate conspiracies.[4] That is decidedly not the situation here, where the Court would hold Defendants responsible for compensating an alleged "injury" caused largely by wholly innocent acts of non-conspiring innocent parties engaging in pro-competitive conduct, innumerable of whom, like MFI, the jury expressly rejected as being in the conspiracy. Indeed, in the price-fixing context, courts have expressly held that defendants cannot be held liable for the conduct of non-conspirators even in a *per se* case where defendants' anticompetitive activity made it possible for competitors to charge higher prices, given the possibility of ruinous liability if the defendants were held

---

[4] *See* Order at 53–54 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (establishing that plaintiffs "must antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes **defendants' acts** unlawful.") (emphasis added); *Supreme Auto Transp.*, 902 F.3d at 743 (discussing existence of antitrust standing for indirect purchasers under myriad state antitrust laws and noting required showing of "direct relation between the plaintiff's injury and the **defendant's behavior**") (emphasis added); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008) (discussing conspirators meeting **with one another** at trade association meetings and promulgating information through publications as legal, innocent acts done to effectuate the conspiracy); *In re Tableware Antitrust Litig.*, 485 F. Supp. 2d 1121, 1124 (N.D. Cal. 2007) (discussing conspiring retailers (not nonparties) taking unilateral and legal actions could have still been in furtherance of a conspiracy: "the antitrust laws do not countenance such a concerted individual exercise of the otherwise legal rights **of the members of a conspiracy** to achieve a combined effect") (emphasis added) (citation omitted); *United States v. Aiyer*, 470 F. Supp. 3d 383, 406–07 (S.D.N.Y. 2020) (noting that "the coconspirators [not non-parties] used [the otherwise legal] 'means and methods' to effectuate the conspiracy")).

responsible to a greater degree than they would be from their own transactions. *See Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 583–87 (3rd Cir. 1979); *In re Folding Carton Antitrust Litig.*, 88 F.R.D. 211, 219 (N.D. Ill. 1980) ("[T]he claims of direct purchasers from non-conspiring suppliers involve their own unique problems of determining the effect of the violation.").

This Court's reasoning, if accepted, would make UEP a walking conspiracy based on facts that were neither proven nor found by the jury. *See* 11/28/2023 Trial Tr. 6821:22–2823:6 (Plaintiffs' counsel confirming that Plaintiffs' theory "depends on a supply restrictions by other [non-defendant, non-co-conspirator] egg producers" that were "implemented through UEP"). Courts have declined to read the Sherman Act in a manner that would turn associations into "walking conspirac[ies]." *Consol. Metal Prods. Inc.*, 846 F.2d at 293–94; *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010). Under Section 1, "every action by a trade association is not concerted action by the association's members." *Id.*; *see also Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 410–11 (5th Cir. 2007) (casino trade association's response on behalf of its members collectively to a group proposal to lease a web address did not constitute concerted action); *Jack Russell Terrier Network v. Am. Kennel Club*, 407 F.3d 1027, 1034–36 (9th Cir. 2005) (club and regional affiliates were incapable of conspiring to exclude breeders from membership when they were pursuing common goal of maintaining value of dog breed and defendants were not alleged to be actual or potential competitors); *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 673 (N.D. Ill. 2023) (neither "act[ing] in parallel with other defendants to reduce supply" nor "attend[ing] industry meetings . . . is sufficient evidence of agreement without evidence of communication."). This Court acknowledged these governing principles in its order on Plaintiffs' *Santiago* Proffer. ECF #294 at 29, 32.

14

To the contrary, courts have insisted upon showings of "some evidence of actual knowledge of, *and participation in*, the illegal scheme." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (per curiam) (rejecting "membership-ratification theory" basis for antitrust liability); *see also Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712 (7th Cir. 1987) ("[M]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws . . . . There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme . . . to establish a violation of the antitrust laws by a particular association member.") (citing T. Vakerics, *Antitrust Basics* § 6.13, at 6-37 to -38 (1985)). Indeed, "there is no such thing as an 'unwitting conspirator.'" *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1999 WL 33889, at *15 (N.D. Ill. Jan. 19, 1999), *aff'd in part and vacated in part*, 186 F.3d 781 (7th Cir. 1999) (citing *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963)). "When a Section 1 plaintiff relies upon circumstantial evidence to prove the existence of an illegal conspiracy, he 'must show that the inference of conspiracy is reasonable in light of the competing inference [] of independent action.'" *Id*.

Given this, all that supports the damages verdict is an erroneous finding that four egg producers are responsible for indisputably *lawful conduct* of all other UEP Certified members. But that premise is contrary to law. Plaintiffs put forward no evidence showing that every member of UEP had "actual knowledge" of, and intent to participate in, an alleged conspiracy or even that any non-Defendant producer other than Moark and Wabash Valley were involved in the conspiracy *at all*. *See In re Brand Name Prescription Drugs*, No. 94 C 897, No. 94 C 897, 1999 WL 33889, at *15; *AD/SAT, Div. of Skylight, Inc.*, 181 F.3d at 234; *Moore*, 819 F.2d at 712. This evidentiary

gap would need to have been bridged, either by showing knowing participation in or at least coercion by one or more co-conspirators, but Plaintiffs proffered no evidence to bridge it, and the jury expressly rejected that theory in any event during the liability phase of the trial.

**C.     No Short-Term Recommendation or USEM Export Adversely Affected Competition or Resulted in Antitrust Injury as a Matter of Law.**

This Court determined that short-term recommendations (*i.e.*, early molts and slaughters) and exports through USEM are properly assessed under a Rule of Reason. *See* ECF #561; *see generally* 11/21/2023 Trial Tr. 6596–657. Plaintiffs' claim of injury based on these two "legs of the stool" fails as a matter of law because Plaintiffs failed to adduce any evidence of antitrust injury directly linked to these measures. *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993); *Phil Tolkan Datsun*, 672 F.2d at 1288–89; *see also Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998). Plaintiffs argue that the failure of proof is one of damages (*see*, *e.g.*, 11/28/2023 Trial Tr. 6721:16–6722:2), but that is incorrect. Without competent, reliable evidence of antitrust injury resulting from these prongs of the alleged conspiracy, Plaintiffs failed to meet their burden to get to the jury on *liability*. *See Greater Rockford Energy*, 998 F.2d at 395. Allowing the jury to render a verdict was error.

**i.     Short-Term Recommendations.**

Plaintiffs' economic expert, Dr. Baye, agreed with Dr. Walker and admitted that early molts and slaughters were sporadic, and their economic impact (*i.e.*, what would have constituted antitrust injury) was not discernable and, thus, he was unable to measure any impact. 10/30/2023 Trial Tr. 2567:6–16 (testifying that "killing birds" is not a "sustainable way to raises prices"); 10/31/2023 Trial Tr. 2690:11–2691:12, 2819:2–12 (testifying that he could not quantify or measure the impact of molts and slaughters on price), 2805:19–2806:5; 2806:17–23, 2808:3–18, 2811:12–18, 2815:9–16 (testifying that he could not tell if a molt or slaughter had any economic

impact "with a degree of scientific certainty"); 11/14/2023 Trial Tr. 5545:13-22 (Dr. Walker testifying short-term measures did not result in supply reduction or higher prices). Plaintiffs did not meet their burden of proof as would be necessary to avoid judgment as a matter of law on this issue. *Phil Tolkan Datsun, Inc.*, 672 F.2d at 1288–89.

The Court's Order nonetheless concluded that the jury could have properly inferred injury using (1) Dr. Baye's testimony regarding a general "directional[]" impact of short-term measures and (2) Gene Gregory's and Dolph Baker's statements regarding impact.[5] Order at 66–68; *id.* at 61–62. This evidence, the Court acknowledges, consisted of "rough estimates from" non-expert UEP Executives who had every incentive to puff up numbers. *Id.* at 69. And while the Court acknowledged these lay opinions should have been taken with "a grain of salt," *id.*, they were fundamentally unreliable for the purposes for which Plaintiffs introduced them,[6] *see Zenith Elecs. Corp. v. WH–TV Broad. Corp.,* 395 F.3d 416, 420 (7th Cir. 2005) ("Reliable inferences depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert."); *United States v. Tomkins,* No. 07 CR 227, 2012 WL 1357701, at *11 (N.D. Ill. April 19, 2012) (holding that a lay witness "may not provide testimony which requires him to make connections for the jury based on that specialized knowledge").

The core problem remains: a total absence of credible testimony regarding any economic impact from these measures. As the Court had earlier acknowledged, Gregory's (and for that matter, Baker's) statements could not be used to reliably assess or measure the existence of

---

[5] Cal-Maine acknowledges that the Court appropriately limited use of Gregory's testimony during damages phase, but only to the extent Gregory's statements tried to "offer expert testimony [about specific damages] though the backdoor." Order at 66. The Court itself recognized that Gregory's opinions regarding the injury underlying Plaintiffs' damages theory were "improper lay opinions that would exceed the boundaries of Rule 701." *Id.*

[6] *See generally* Defs. Mot. to Exclude Opinions and Statements of Non-Expert Gene Gregory, ECF #579 (filed Nov. 27, 2023 and incorporated herein fully by reference).

antitrust injury. *See* Minute Entry, ECF #627 ("[M]any of the statements in question by Gene Gregory appear to be improper lay opinions that would exceed the boundaries of Rule 701. For example, testimony that Export X led to Price Increase Y is the type of analysis that an expert ordinarily would perform. It requires specialized knowledge within the meaning of Rule 701 and 702."); *see also Zenith Elecs. Corp.*, 395 F.3d at 419 ("A witness who invokes "my expertise" rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."). All that remained was Dr. Baye's testimony, which was clear: he could not identify any anticompetitive impact from the conduct beyond "a very crude estimate" of the impact of exports on domestic egg prices, hardly a reliable metric. 10/30/2023 Trial Tr. 2592:3-6. Plaintiffs did not establish they were injured by the measures.

### ii. USEM Exports.

Dr. Baye also testified to the lack of discernable anticompetitive effect of the USEM exports. 10/30/2023 Trial Tr. 2590:15–20; 10/31/2023 Trial Tr. 2696:6–21 (testifying that he could not determine with a degree of scientific certainty if any of the exports caused Plaintiffs to pay higher prices). This is not surprising, as exports functioned as a sporadic outlet for surplus eggs during periods of low demand or when product was at risk of spoilage. *See, e.g.*, 10/24/2023 Trial Tr. 1646:3–11 (Mr. Baker explaining that surplus eggs were exported because of their limited shelf life), 1885:12–19; Pl. Tr. Ex. 599 (Nov. 23, 2004 United Voices discussing how breakers were no longer buying surplus eggs). Egg products are different because they do not spoil (not unlike cotton fabric in the above analogy). Because Plaintiffs failed to show any discernable impact resulting from USEM shell egg exports, there is no anticompetitive effect as would be necessary to impose Section 1 liability as a matter of law. *Phil Tolkan Datsun, Inc.*, 672 F.2d at 1288.

### D. UEP Lacked Enforcement Mechanisms to Enforce Short Term Recommendations, and Therefore It Could Not "Restrain Trade."

Plaintiffs alleged a "hub and spoke" conspiracy where the "hub" was UEP and the "spokes" were Rose Acre, Cal-Maine, Wabash Valley, Moark, and MFI. The jury found the relationship between UEP and each of Cal-Maine, Rose Acre, Wabash Valley and Moark was a conspiracy that resulted in an unreasonable restraint on trade (*excluding* MFI). This finding is erroneous as a matter of law, however, because there can be no restraint of trade when UEP had no means by which to enforce its committees' recommendations against anyone, and based on the complete trial record, made no attempt to do so. The Seventh Circuit has been explicit that, in the context of alleged conspiracies between associations and members, "enforcement mechanisms *are* the 'restraints' of trade" and "[w]ithout them there is only uncoordinated individual action, the essence of competition." *Schachar*, 870 F.2d at 399 (emphasis added); *see also Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 133 (3d Cir. 2005) ("[A] trade association that . . . issues opinions, without constraining others to follow its recommendations, does not violate the Sherman act by unfavorably evaluating a manufacturer's product.") (internal quotation and citation omitted) (quoting and relying on *Consol. Metal Prods.*, 846 F.2d at 292).

The Order, in discussing these required enforcement mechanisms, notes that "the group must stick [together] as a group to achieve the goal of less supply and higher prices. Cheaters who don't play along . . . undermine the effectiveness of the conspiracy itself." Order at 73. But this description of a functional conspiracy does not match the evidence, or the conspiracy the jury actually found. Plaintiffs did not prove that UEP forced or coerced its members to adopt its recommendations. Plaintiffs' only evidence is that UEP could "shame" or "praise" egg producers in its newsletter, but neither constitutes a "coercion" as a matter of law. *Id*. at 293–96; *compare* Def. Tr. Ex. 1086 at 2 (Gene Gregory asking in United Voices if "anyone follow[ed] the

recommendation to dispose of flocks six weeks early" and asking if he was "wasting" his time urging producers to be more responsive), *with* Pl. Tr. Ex. 599 at 2 (United Voices publishing names of companies that had made "their intentions known" regarding UEP recommendations)*; see also* Def. Tr. Ex. 1041 (Gene Gregory asking in United Voices about flock size growing despite his recommendations); Def. Tr. Ex. 1086. Although evidence showed UEP *hoped* that members would follow its recommendations (and it was clear they often did not, *see, e.g.*, Def. Tr. Ex. 1086 at 2 (Gregory complaining about lack of response from producers related to recommendations); Def. Tr. Ex. 1041; Def. Tr. Ex. 1086 (Gregory noting flock size growing despite his recommendations)), UEP could do nothing about it if members declined to do so. *See* 10/23/2023 Trial Tr. 1145:13–22. Sheer hope of participation is insufficient to establish a restraint of trade. *See Santana Prods., Inc.,* 401 F.3d at 133; *Schachar*, 870 F.2d at 399; *Consol. Metal Prods. Inc.*, 846 F.2d at 292.

Moreover, not unlike the Supima and Pima cotton analogy above, UEP could not limit egg supply or force anyone to join or stay in the UEP Certified Program, did not require membership in UEP to join the program, and in fact, had members who never joined the program (or developed competing programs). *See, e.g.*, 10/31/2023 Trial Tr. at 2753:15–24 (Dr. Baye confirming that approximately 30 of 177 Certified producers in 2004 were not UEP members); 11/7/2023 Trial Tr. 4221:2–11 (Pickett discussing Sparboe's animal welfare program). Accordingly, UEP committee recommendations do not constitute "restraints" on trade as a matter of law, and any holding to the contrary is manifestly erroneous. *Schachar*, 870 F.2d at 399.

### E. As a Matter of Law, the "Conspiracy" Cannot Include Wabash Valley.

Plaintiffs failed to prove Wabash Valley was a knowing member of an alleged conspiracy to restrict supply. *See* Verdict, ECF #582; *see also* Oct. 16, 2023, Prelim. Jury Instr. at 10; 10/19/2023 Trial Tr. 646:3–9. To prove Wabash Valley was part of a conspiracy, Plaintiffs would have had to adduce evidence of its *knowledge* and *intent* to further the purposes of the alleged

20

conspiracy. But Plaintiffs made no such showing. The Order glosses over the sparsity in the record of Wabash Valley's involvement in the alleged conspiracy, noting that the only examples of evidence in the record were that Wabash Valley executives attended meetings, served roles in UEP and USEM, and voted on short-term recommendations and aspects of the UEP Certified Program. Order at 37. But the law is clear that "attend[ing] industry meetings . . . is [in]sufficient evidence of agreement without evidence of communication." *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d at 673.[7] The Court acknowledges that "the evidence wasn't overwhelming" regarding Wabash Valley, and that "knowing involvement of each co-conspirator in the alleged conspiracy [must be proven]." Order at 37 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 430 (1978)). Plaintiffs failed to meet their burden of proof to get to the jury on Wabash Valley.

### F. Plaintiffs Do Not—and Cannot—Meet Their Burden of Proof on Damages Based on the Limited Conspiracy Found by the Jury.

Dr. Baye's damages model did not identify and could not isolate which producers' conduct purportedly reduced supply due to the conspiracy. His model, rather than measuring the impact of any producer who joined due to a conspiracy, instead measured the sweeping effects of the ***entire*** UEP Certified Program on the ***entire*** U.S. egg-laying flock through 2012. Because the jury concluded that not all UEP Certified Program members were part of a conspiracy and Plaintiffs failed to establish whether any producers outside of the handful the jury found were involved in a conspiracy, Plaintiffs failed to bridge the gap between the conspiracy that they presented (or the

---

[7] MFI applied to join the Certified Program for the first time in mid-2006. Pl. Tr. Ex. 600 (MFI's June 2006 UEP Certification application). The only evidence regarding the "why" of MFI's decision relates to customer demand. The jury heard from Gary Pickett that Walmart wouldn't purchase egg products from MFI unless it was certified. *See* 11/7/2023 Trial Tr. 4226:19–4227:3; *see also* Def. Tr. Ex. 832. That same year—2006—Plaintiff Nestlé began to include UEP Certification as a requirement for the sugared yolks that Dreyer's purchased from MFI. *See* Def. Tr. Ex. 175. The only evidence put into the record concerning Wabash Valley pertained to an affiliate's exports and attendance at certain meetings. 10/23/2023 Trial Tr. 1138, 1175, 1218; Pl. Tr. Ex. 137.

narrower one the jury found) and Dr. Baye's quantification of the anticompetitive effects arising out of his version of the conspiracy, which included all UEP Certified Producers from 2002–2012. For all the reasons set forth above, *see* Section B, and in Cal-Maine's Motion to Amend the Judgment Pursuant to Rule 59(e), filed concurrently and fully incorporated by reference, Plaintiffs damages' theory is manifestly erroneous, unreliable, irrelevant, and prejudicial. As such, it cannot serve as the basis of a damages award against Defendants and should have been excluded during trial. It is an utter mismatch between the damages model and the theory of liability in violation controlling law. *Comcast v. Behrend*, 569 U.S. 27, 36 (2013) (holding that regression model that "failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised" could not serve as evidence of damages).

The irreconcilability of Dr. Baye's conclusions with the jury's liability findings goes to the admissibility rather than the weight of Dr. Baye's testimony. When deciding whether to allow an expert witness' damages model and testimony, a Court must first decide whether the necessary elements for admission have been shown by a preponderance of the evidence under Federal Rule of Evidence 702. Fed. R. Evid. 702 (the proponent must demonstrate "to the court that it is more likely than not" that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.").[8]

The Court here suggested it agreed with Plaintiffs that whether Dr. Baye's damages model accurately reflected damages proximately caused by the conspirator's conduct was "a question of fact for the jury." *See* Trial Tr. 6962:6-11; *see also* Order 53–57. But respectfully, that is wrong.

---

[8] This standard has led to confusion, and that confusion led to an amendment to Rule 702 in 2023. In discussing the amendment, the Advisory Committee observed that "many courts have held that the critical questions of the sufficiency of an expert's basis" are questions of "weight and not admissibility," but noted that is an "***incorrect application of Rules 702 and 104(a)***." Fed. R. Evid. 702 Advisory Committee Note to 2023 amendment (emphasis added).

Rule 702 "requires a connection between the data employed and the opinion offered" to be admissible. *See Mendez v. City of Chi.*, No. 18-CV-5560, 2024 WL 4661139, at *4 (N.D. Ill. Sept. 20, 2024) (slip op.) (granting in part motion to exclude expert testimony based on flawed report under Rule 702, and emphasizing that following 2023 amendment, "it is the opinion connected to existing data 'only by the *ipse dixit* of the expert,' that is properly excluded under Rule 702.") (citing *Manpower, Inc., v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)).

When an expert analyzes data, even where the expert is using a reliable method, that does not automatically mean testimony based on that analysis is *per se* relevant and admissible under *Daubert*. If the underlying data and analysis do not show the required "connection between the data employed and the opinion offered," the opinion will not pass muster under Rule 702 and should be excluded. *See Mendez*, 2024 WL 4661139, at *4; *see also Comcast*, 569 U.S. at 36 n.5 ("[W]hile the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold.").

The Indirect Purchaser Plaintiffs' class certification expert, Dr. Kyle Stiegert, created a similarly rigid model that aimed to determine the size of the nation's flock "but-for" the alleged conspiracy. But (like Dr. Baye here), Dr. Stiegert did not examine whether the alleged conspiracy reduced the number of hens laying commodity shell eggs in the alleged co-conspirators' flocks. Instead, Dr. Stiegert used USDA data on nationwide flock size to examine whether the *entire* American egg-laying flock was lower in the "conspiracy" period than his model indicated it should have been. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa. 2015). Applying *Comcast*, Judge Pratter found that "the failure to account for non-conspiring producers . . . undermin[ed] the reliability of Dr. Stiegert's model." *Id.* In particular, Judge Pratter found that Dr. Stiegert's model failed to "isolate the effects of Defendants' conduct on the total egg supply"

by not controlling for "any supply reduction by non-conspiring producers . . . ." *See id.* at 153–54. Consequently, she held that Dr. Stiegert's model failed to show that "any drop in egg supply [was] sufficiently tied to Defendants' conduct to make the model reliable for showing antitrust impact." *Id.* at 153; *see also, e.g.*, *Flodin v. Cent. Garden & Pet Co.*, No. 21-CV-01631-JST, 2024 WL 4565340, at **8-10 (N.D. Cal. Oct. 23, 2024) (slip op.) (denying class certification premised on expert's damage model that did not "align with Plaintiffs' theory of liability").

So too here. Given the jury's findings during the liability phase, Dr. Baye's rigid damages model assumed and produced data untethered to the conspiracy the jury found, which was limited both temporally and as to membership. To allow Plaintiffs to proffer Dr. Baye's regression model, which used inputs based on a conspiracy that the jury expressly rejected, is to permit Plaintiffs to proffer an opinion that is connected to "existing data 'only by the *ipse dixit* of the expert.'" *See Mendez*, 2024 WL 4661139, at *4. No amount of cross-examination could remediate the prejudice of allowing the jury to hear and consider Dr. Baye's unreliably and irrelevant testimony.

Like Dr. Stiegart's model, and like the model in *Comcast*, Dr. Baye's rigid model did not isolate the impact "from the particular antitrust injury on which [Plaintiffs'] liability in this action is premised." *See Comcast*, 569 U.S. at 36. Though *Comcast* and Judge Pratter's decisions were at earlier procedural points in those litigations, these principles apply with equal force at the trial phase. *Id.* at 35 ("[A]t the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'") (citing ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)).

The jury's conclusions in their liability verdict meant that Dr. Baye's econometric model was fundamentally irreconcilable with the jury's findings. As such, Dr. Baye's testimony was

unreliable and irrelevant during the damages phase and should have been excluded under Rule 702. Because the jury's damages verdict was based on this unreliable and irrelevant damages model and testimony, the verdict must be set aside.

### G. There is No "Antitrust Injury" as a Matter of Law for Cal-Maine's Conduct *At Least* until August 2005.

As a matter of law, Plaintiffs failed to prove injury attributable to any purported conduct by Cal-Maine until *at least* August 2005. 10/31 2023 Trial Tr. 2712:20–2713:12, 2724:7–25 (Dr. Baye testifying there was no "statistically significant effect" between the time Certified Guidelines went into effect and July 2005). To get to the jury, Plaintiffs had to meet a threshold burden to demonstrate antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Greater Rockford Energy & Tech. Corp.*, 998 F.2d at 401. Moreover, to satisfy their burden, Plaintiffs could not solely rely on alleged increased prices. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007). "[P]rices can be increased in the course of promoting procompetitive effects." *Id*. at 895–96. Plaintiffs' proffered economics expert, Dr. Baye, found "no statistically significant" effect (*i.e.*, no effect at all) from *any* measure prior to August 2005. 10/31/2023 Trial Tr. 2712:20–2713:12, 2724:7–25; *see also infra* Section B. Plaintiffs' failure to establish injury before August 2005 precludes any claim against Cal-Maine for conduct occurring before August 2005.

### Conclusion

For the foregoing reasons, Defendant Cal-Maine respectfully asks that the Court vacate the jury's verdict on liability, direct a verdict for Cal-Maine on damages, and enter judgment in favor of Cal-Maine. Alternatively, Cal-Maine respectfully requests a new trial.

Dated: December 4, 2024                  Respectfully submitted,

*/s/ Livia M. Kiser*
Patrick M. Collins (pcollins@kslaw.com)
Livia M. Kiser (lkiser@kslaw.com)
Patrick M. Otlewski (potlewski@kslaw.com)
Abigail Hoverman Terry (aterry@kslaw.com)
KING & SPALDING LLP
110 North Wacker Drive, 38th Floor
Chicago, IL 60606
Tel: (312) 995-6333

Brian E. Robison (brian@brownfoxlaw.com)
(pro hac vice)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
Tel: (972) 707-2809

**Counsel for Defendant Cal-Maine Foods, Inc.**